**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

               Plaintiff,

       vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

             Defendants.

_____/

**<u>COMPLAINT</u>**

Plaintiff, Dr. ANTHONY STANLEY, by and through his undersigned attorneys, ChaseLawyers, sues (1) Defendant THE BRAVEHEART GROUP, LLC; (2) Defendant EXPERITY INC.; (3) Defendant URGENT CARE ASSOCIATION, INC.; and (4) Defendant URGENT CARE COLLEGE OF PHYSICIANS, INC. (collectively, "Defendants") and alleges as follows:

## JURISDICTION, PARTIES, AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this is an action for Copyright Infringement under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*

2.     In addition, this court has jurisdiction over supplemental State law claims under 28 U.S.C. § 1367.

3.     Venue is proper in this district for THE BRAVEHEART GROUP, LLC ("Braveheart") under 28 U.S.C. § 1400(a) and § 1391(b) because Braveheart and/or its agent(s) solicit and transact business within this district; a substantial part of the events or omissions giving rise to Plaintiff's claims against Braveheart occurred in this district, including but not limited to Braveheart's violation of Section 501 of the Copyright Act (17 U.S.C. § 501); and/or a substantial part of the property that is the subject of this action is situated in this district.

4.     Venue is proper in this district for EXPERITY INC. ("Experity") under 28 U.S.C. § 1400(a) and § 1391(b) because Experity and/or its agent(s) solicit and transact business within this district; a substantial part of the events or omissions giving rise to Plaintiff's claims against Experity occurred in this district, including but not limited to Experity's violation of Section 501 of the Copyright Act (17 U.S.C. § 501); and/or a substantial part of the property that is the subject of this action is situated in this district.

5.     Venue is proper in this district for URGENT CARE ASSOCIATION, INC. ("UCA") under 28 U.S.C. § 1400(a) and § 1391(b) because UCA and/or its agent(s) solicit and transact business within this district; a substantial part of the events or omissions giving rise to Plaintiff's claims against UCA occurred in this district, including but not limited to UCA's violation

of Section 501 of the Copyright Act (17 U.S.C. § 501); and/or a substantial part of the property that is the subject of this action is situated in this district.

6.      Venue is proper in this district for URGENT CARE COLLEGE OF PHYSICIANS, INC. d/b/a "CUCM" ("CUCM"), under 28 U.S.C. § 1400(a) and § 1391(b) because "CUCM" and/or its agent(s) solicit and transact business within this district; a substantial part of the events or omissions giving rise to Plaintiff's claims against CUCM occurred in this district, including, but not limited to, CUCM's violation of Section 501 of the Copyright Act (17 U.S.C. § 501); and/or a substantial part of the property that is the subject of this action is situated in this district.

7.      Plaintiff, Dr. ANTHONY STANLEY ("Dr. Stanley" or "Plaintiff"), is an individual medical doctor, is *sui juris*, and is a resident of Miami-Dade County, Florida.

8.      Upon information and belief, Defendant Braveheart is a limited liability company formed under the laws of the State of New Jersey and doing business as the publication known as THE JOURNAL OF URGENT CARE MEDICINE ("JUCM"), which publication is distributed in Miami, Florida. This Court has jurisdiction over Braveheart pursuant to Section 48.193, Fla. Stat. (2018) and Rule 4(k)(1), Fed. R. Civ. P., as Braveheart has engaged in substantial activity in the State of Florida and committed one or more tortious acts within the State of Florida, which acts have caused injury to Plaintiff. Moreover, Braveheart has purposefully availed itself of the jurisdiction of this Court by transacting business in this district and in the State of Florida, including but not limited to by its actions infringing on Plaintiff's copyright in violation of Section 501 of the Copyright Act (17 U.S.C. § 501).

9.      Upon information and belief, Braveheart is a boutique publisher and publishers' representative firm with seventeen (17) years of experience in publishing and marketing scholarly

3

print medical journals, practical review journals, and online medical highlight products that span a multitude of medical specialties relating to urgent care medicine.

10.     Upon information and belief, Defendant Experity is a corporation formed under the laws of the State of Illinois and is doing business as EXPERITY HEALTH in Miami, Florida. Upon information and belief, Experity wholly owns Braveheart. This Court has jurisdiction over Experity pursuant to Section 48.193, Fla. Stat. (2018) and Rule 4(k)(1), Fed. R. Civ. P., as its subsidiary Braveheart has engaged in substantial activity in the State of Florida and committed one or more tortious acts within the State of Florida, which acts have caused injury to Plaintiff. Moreover, Experity has purposefully availed itself of the jurisdiction of this Court by transacting business in this district, including but not limited to by its actions infringing on Plaintiff's copyright in violation of Section 501 of the Copyright Act (17 U.S.C. § 501).

11.     Upon information and belief, Defendant Experity is a leading software services company for on-demand urgent care medicine and provides an integrated operating system complete with electronic medical records, practice management, patient engagement, billing, teleradiology, business intelligence, and consulting solutions.

12.     Upon information and belief, Defendant UCA is a corporation formed under the laws of the State of Illinois and doing business as URGENT CARE ASSOCIATION in Miami, Florida. JUCM is the official publication of UCA and is UCA's affiliate. This Court has jurisdiction over UCA pursuant to Section 48.193, Fla. Stat. (2018) and Rule 4(k)(1), Fed. R. Civ. P., as UCA and its affiliate Braveheart have engaged in substantial activity in the State of Florida and committed one or more tortious acts within the State of Florida, which acts have caused injury to Plaintiff. Moreover, UCA has purposefully availed itself of the jurisdiction of this Court by

transacting business in this district, including but not limited to its actions infringing on Plaintiff's copyright in violation of Section 501 of the Copyright Act (17 U.S.C. § 501).

13.     Upon information and belief, Defendant UCA is an organization consisting of leaders, providers, and suppliers in the field of on-demand, consumer-focused healthcare and is recognized as the largest, most notable trade and professional association in the urgent care field.

14.     Upon information and belief, Defendant CUCM is a corporation formed under the laws of the State of Illinois and is doing business as COLLEGE OF URGENT CARE MEDICINE in Miami, Florida. JUCM is the official publication of CUCM and is CUCM's affiliate.  This Court has jurisdiction over CUCM pursuant to Section 48.193, Fla. Stat. (2018) and Rule 4(k)(1), Fed. R. Civ. P., as CUCM and its affiliate Braveheart have engaged in substantial activity in the State of Florida and committed one or more tortious acts within the State of Florida, which acts have caused injury to Plaintiff. Moreover, CUCM has purposefully availed itself of the jurisdiction of this Court by transacting business in this district, including but not limited to its actions infringing on Plaintiff's copyright in violation of Section 501 of the Copyright Act (17 U.S.C. § 501).

15.     Upon information and belief, Defendant CUCM is an organization consisting of urgent care clinicians with the mission of advancing the urgent care specialty through education, advocacy, and research.

## ACTIONS GIVING RISE TO THIS COMPLAINT

16.     Dr. Stanley brings this action seeking equitable and monetary relief for Defendants' infringement of the copyright in his original article entitled *Clinical Approach to Fishhook Removal* (the "Copyrighted Work") by (1) making a derivative work thereof without seeking or obtaining a license to do so from Dr. Stanley (See, especially, paragraphs 42 *et seq.* below); (2) materially distorting the content and meaning of the Copyrighted Work in creating its derivative

work; and (3) failing to abide by well-settled requirements of Florida law when requested to retract its distorted derivative work. A true and correct copy of the Copyrighted Work as authored by Dr. Stanley is attached hereto as Exhibit "A" (at Exhibit page 2 *et seq*.) and is incorporated herein by this reference. A copy of Defendants' unlawfully revised version of Dr. Stanley's Copyrighted Work (the "Distorted Derivative Work" or "Distorted Work") is attached hereto as Exhibit "B" (at Exhibit page 16 *et seq*.) and incorporated herein by this reference.

17.     At all times relevant hereto, Plaintiff has been and is the holder of the exclusive rights under the Copyright Act of 1976 (17 U.S.C. §§ 101 *et. seq.,* and all amendments thereto (the "Copyright Act")) to reproduce, distribute, display, and/or license the reproduction, distribution, and/or display of the Copyrighted Work throughout the United States. True and correct copies of the copyright registrations for Dr. Stanley's Copyrighted Work from the Registrar of Copyrights, effective October 25, 2021 (Registration No. TXu002286333)[1] and copyright registration for Dr. Stanley's Copyrighted Work from the Registrar of Copyrights, effective October 3, 2022 (Registration No. TXu2339980) are attached hereto as Exhibit "C" (at Exhibit page 37) and are incorporated herein by this reference.

18.     Dr. Stanley is a well-respected physician with nearly thirty (30) years of experience. Specializing in urgent care medicine, Dr. Stanley leveraged his experience, his extensive medical training, and his knowledge, to author the Copyrighted Work so as to share his expertise with the medical community and enhance his own professional standing. The Copyrighted Work reflects Dr. Stanley's approach and guidance in (i) understanding the mechanism of a fishhook injury, (ii) the variety of fishhooks involved, and (iii) the proper techniques for fishhook removal.  In addition

---

[1] The subsequent filing of Dr. Stanley's Copyrighted Work is currently registered with the United States Copyright Office as of October 3, 2022, including the section entitled "Post-Removal Wound Care", as ownership of certain material was transferred to Dr. Stanley by written agreement under Registration No. TXu2339980.

to authoring the Copyrighted Work, through his many years of research and clinical experience in the treatment of fishhook injuries, Dr. Stanley has also successfully obtained patents for two (2) of the first medically approved fishhook removal devices the "Moby Cutter" and the "Moby Clamp". True and correct copies of United States Patent No. 9,943,971 B2, effective April 17, 2018, and United States Patent No. 9,943,971 B2, effective April 18, 2016 are attached hereto as Exhibit "D" (at Exhibit pages 41-42) and are incorporated herein by this reference. The "Moby Cutter", Dr. Stanley's first patented device, is currently registered for commercial use with the Food and Drug Administration ("FDA") as a Class 1 Medical device. A true and correct copy of the email correspondence from FDA.gov confirming Dr. Stanley's medical device registration for the year 2022 is attached hereto as Exhibit "E" (at Exhibit page 44) and is incorporated herein by this reference.

19.     Unfortunately, despite Dr. Stanley's successes in bringing new and vital advancements to the field of urgent care medicine, the Defendants in this action have negligently (or recklessly) undone much of his years of hard work, causing great detriment to Dr. Stanley's livelihood and medical career by way of their negligent and/or malicious publishing practices, as further detailed below.

20.     In or about February 2021, in order to share his work with the medical community, Dr. Stanley sought a publisher to feature his Copyrighted Work. Having been an avid reader of medical scholarship throughout his career, particularly in his specialty of urgent care medicine, and being familiar with the reputations of UCA and CUCM, Dr. Stanley was also familiar with JUCM (The "Journal of Urgent Care Medicine"), a UCA/CUCM publication, and in good faith believed that JUCM could be relied upon as a medical publisher with scrupulous ethics. Discovering (on JUCM's website) that JUCM was in search of an article on the topic of fishhook

injury, and entrusting JUCM to publish his life's work with strict adherence to professional medical publishing standards, Dr. Stanley enthusiastically submitted his Copyrighted Work to JUCM, unaware of the predatory publishing practices and egregious acts that were to follow and the grave and irretrievable cost of those practices and acts to his own professional reputation and livelihood.

21.     On or about February 16, 2021, Dr. Stanley submitted his Copyrighted Work to JUCM through the "Scholastica" web-portal (a hosting software for publishers) ("Scholastica"). A true and correct copy of documents produced during Dr. Stanley's submission process, including correspondence with JUCM within Scholastica and via direct email from Dr. Stanley to JUCM, is attached hereto as Composite Exhibit "F" (at Exhibit page 45 *et seq*., retaining Dr. Stanley's yellow highlights) and is incorporated herein by this reference.[2] After Dr. Stanley submitted his work, he was advised by JUCM's Executive Editor Harris Fleming that his article would be featured on the cover of the journal's June 2021 hard-copy issue and would also be available online beginning June 1, 2021. *See,* Composite Exhibit "F" (with yellow highlights included).

22.     Between February 16, 2021 and May 5, 2021, the Parties maintained a communicative professional relationship; and, in anticipation of the June 1 publishing date, on or about May 5, 2021, Dr. Stanley approved the content, layout, and instructional text to his Copyrighted Work in the final form he authorized for publication by JUCM. *See,* Composite Exhibit "F" (at Exhibit page 45 *et seq*., with yellow highlights included).

23.     Immediately subsequent to Dr. Stanley's May 5th approval, however, JUCM inexplicably began engaging in strange and unprofessional behavior, mimicking the notorious

---

[2] Of note, prior to his submission, Dr. Stanley contacted JUCM on or about February 2020 and was advised that he needed to obtain copyright releases for certain photographs to be used prior to his submission of the Copyrighted Work. Despite Dr. Stanley's resulting effort to seek and gather the requested releases over approximately a year's time, JUCM unaccountably failed to use most of these photographs in its eventual publication of the Distorted Derivative Work.

"bait and switch" practices more associated with car dealers than with reputable professional publications. Specifically, JUCM began to ignore communications from Dr. Stanley, denying him the right to review, approve, or make final decisions regarding **his** Copyrighted Work. After sending multiple communications through Scholastica and placing telephone calls to JUCM's editor, Mr. Harris Fleming ("Fleming"), in early May, on or about May 17 Dr. Stanley finally received a response from Fleming with the news that JUCM was "unable to share the layout in advance of publication" -- even to its author. (*See, specifically*, Exhibit page 50) Thus, Dr. Stanley was deprived of any access to preview the version of his Copyrighted Work that JUCM would actually publish on June 1. *See,* Composite Exhibit "F" (at Exhibit page 45 *et seq*., with yellow highlights included).

24.     On or about June 1, JUCM published its Distorted Derivative Work as an unapproved version of the article, without Dr. Stanley's final approval and materially ignoring the "approved" version of the Copyrighted Work he submitted to JUCM on May 5, 2021.

25.     The Distorted Derivative Work contained inaccurately worded quotes, misrepresentations, improper attributions of ownership, numerous spelling errors, and negligent oversights (such as the unexplained "duplicate printing" of the *Advance and Cut* technique in the online article) not contained in the Copyrighted Work. Dr. Stanley also observed that important parts of his Copyrighted Work were missing, and that new parts were added without his knowledge or approval (as further explained in paragraph 26 below) to constitute the Distorted Derivative Work. A true and correct copy of the side-by-side comparison exhibiting the differences between Dr. Stanley's "approved version" of his Copyrighted Work submitted to JUCM on May 5, 2021 and JUCM's Distorted Derivative Work is attached hereto as Exhibit "G" (at Exhibit page 70 *et seq*.) and is incorporated herein by this reference.

26.     Most disturbingly, the Distorted Derivative Work (as indicated in Table 1 below) *conveyed misleading medical advice* — which not only caused irretrievable damage to Dr. Stanley's medical reputation, but also, and most importantly, placed in harm's way patients seeking treatment in reliance on JUCM's Distorted Work, as explained in paragraph 27 below.

27.     Without prior approval from Dr. Stanley, JUCM made, *inter alia*, the following notable additions to the Copyrighted Work:

| Added information in the **Advance and Cut Technique** section |
|---|
| <u>Distorted Derivative Work</u>: "[o]n first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety [sic] the patient, and saves time of procedure." |

Tbl. 1

The above advice (which did not appear at all in the Copyrighted Work) was unilaterally crafted by JUCM, apparently as the result of the pre-May 5 "approval process", when JUCM sent Dr. Stanley a draft of the article and asked him the following question: "would removal of the shank barbs obviate the need to drag them through the wound?" Without notice to Dr. Stanley or his prior approval, however, JUCM then altered Dr. Stanley's work by unilaterally adding Dr. Stanley's response as if it were part of the original article, as follows:

| Dr. Stanley's comment response: *"Harris, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). By cutting the tail end off, then pull thru, you are just dragging the shank barbs intact thru the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient and saves time of procedure. As seen on X ray some hooks have small barbs and some larger."* | Derivative Work: "[o]n first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the |

| | provider, less anxiety [sic] the patient, and saves time of procedure." |

Tbl. 2

JUCM also published a new section and added information to the section entitled *Advance and Cut Technique* in both the printed and online versions of the Distorted Derivative Work. Upon information and belief, the section was authored by non-medical JUCM staff offering misleading medical advice and instruction by alluding to parts of the fishhook that are not necessary, *i.e.*, the "barbs". The inclusion of these "barbs" can lead to confusion for a medical practitioner whose attention is now drawn to focus on pieces that are insignificant to foreign body removal rather than to follow the well-established medical techniques which Dr. Stanley conveys in his Copyrighted Work, *i.e.*, that it is medically unnecessary to cut tiny barbs that are not obstructing the removal process.[3] JUCM's unilateral insertion of this additional section is likely to lead to negligent treatment of a patient, as the tissue injury channel created by the fishhook injury in the patient's skin is larger than the diameter of the fishhook, and focus on the barbs in patient treatment is

---

[3] When the fishhook punctures the skin, it triggers a series of tissue trauma events. There is forceful cutting and separation of tissue planes, which creates a "Tissue Injury Channel". The depth of the wound depends on the angle of entry and the Gap Boundary. The cutting diameter created by the combined cutting surface between the Point and Barb is inherently greater than the diameter of the shank of the fishhook trailing. The cutting surface between the point and the barb varies. Some are razor-like and subject to variable pulling forces when being hooked. The shank of the fishhook will pull through easily in either direction unless there are tiny shank barbs (which define a one-way directional removal). The walls of the Tissue Injury Channel are amorphous tissue borders, and as elastic as its associated surrounding structures. If by chance the tiny shaft barbs have entered the Tissue Injury Channel, the procedure directs the provider to cut off the Eye of the fishhook and pull the remaining body through the channel. There is minimal additional tissue damage when pulling the multi-barb through the channel (see medical illustrations in footnote 3). This modification of the Advance and Cut Technique is well established in the medical literature and explained in Dr. Stanley's Copyrighted Work. With a proper understanding of the anatomy of the fishhook, there is no need to suggest or discuss any alteration in the procedure, since this could add confusion. However, the JUCM staff member who wrote the section in question seems not to have been a medical doctor, lacked this type of clinical experience and therefore wrote an erroneous layman's opinion about an established medical procedure.

unnecessary. As demonstrated in the medical illustrations below, the barbs are insignificant in patient treatment.[4]

28.     Prior to JUCM's seemingly deliberate distortion of Dr. Stanley's Copyrighted Work, the parties mutually came to numerous decisions regarding the proposed publication, such as: (i) the expected use of photographs submitted by Dr. Stanley on March 23; and (ii) the content layout and instructional text approved by Dr. Stanley on May 5th (which mutual decisions were wholly ignored by JUCM, in favor of making its own unilateral alterations). *See,* Composite Exhibit "F" (At Exhibit page 45 *et seq.*, with yellow highlights included).  Unfortunately, JUCM's blatant disregard of the joint decisions previously made, and its unilateral unauthorized changes,



---

[4]

12

transformed the entire essence of the Copyrighted Work from a scholarly medical treatise to a disorganized technical guide. *See,* Exhibit "B" (at Exhibit page 16 *et seq*.).

29.     Due to 2021's new wave of COVID-19 infections and overtime shifts for Dr. Stanley to treat patients with emergencies, Dr. Stanley was unable to focus on JUCM's distortions in the immediate post-publication period. On June 23, 2021, however, Dr. Stanley submitted a retraction request by email. Among other things, he outlined in that email the unauthorized distortions made to his Copyrighted Work by non-MD staff (seemingly engaging in the unauthorized practice of medicine) and advised JUCM that its Distorted Derivative Work was unauthorized and **not** his authorship. Dr. Stanley requested that a retraction be made, and that the article be re-published by JUCM in the original form of his Copyrighted Work.  A true and correct copy of Dr. Stanley's email dated June 23, 2021 is attached hereto at Composite "H" (at Exhibit page 105) and is incorporated herein by this reference.

30.     Unfortunately, despite JUCM's knowledge of Dr. Stanley's June 23, 2021 email – and therefore its knowledge of the (i) misinformation which JUCM had printed, (ii) potential damages associated with providing wrongful medical advice in performance of patient care, and (iii) likely and wholly foreseeable damage to Dr. Stanley's medical reputation and livelihood – JUCM unaccountably refused to issue a retraction. Rather than attempt to right its wrong, issue an apology, and (in response to Dr. Stanley's request) retract the Distorted Derivative Work and the misinformation it published, JUCM falsely asserted in an email dated June 23, 2021 that the published article was "approved" by Dr. Stanley on May 4th (at which time JUCM submitted an edited version of the article to Dr. Stanley for his review). The argument that the published article was approved by Dr. Stanley on May 4th is specious, considering that JUCM received an approved version of the article from Dr. Stanley as an attachment to his May 5th email, stating:

> Hello Harris: I reviewed the article. I made a few rearrangements of photos to make everything flow a little better. I was able to cut the page count from 13 to 12. Content not changed but truncated to conserve space. I included my x ray of the fish hooked finger which has been a inspiration point for me writing this article (PATIENT EVALUATION), hope its [sic] no problem. I like your edits of the article and satisfied with the results.

*See,* Composite Exhibit "F" (*see, specifically*, Exhibit F at page 50, with yellow highlights included).  Rather than accept Dr. Stanley's changes and his approved version of the article, JUCM openly ignored this communication and inadvertently admitted in its June 23, 2021 email (*see, specifically,* Exhibit page 105-06) to publishing an *unapproved* version, rather than the approved version submitted by Dr. Stanley on May 5th by stating that Dr. Stanley 'approved' the May 4th version in his email on May 5th – revealing that JUCM did not acknowledge Dr. Stanley's approved version of the article on May 5th. Despite JUCM's being fully apprised of its negligent actions, however, Dr. Stanley's pleas for a retraction and amicable resolution were to no avail. *See,* Composite Exhibit "H" (Exhibit page 106).

31.     Stunned by the medical misinformation, disorganization and inaccuracies published online by JUCM, on or about September 22, 2021 at least ten (10) disinterested members of the South Florida medical community submitted a Petition to JUCM, demanding that the Distorted Derivative Work be retracted. The Petition (at Exhibit I, incorporated herein by the reference, at page 108 *et seq.*), signed by Virginia Sardinas, ARPN, Markira Stewart, PA-C, William Kranichfeld, MD, Ernesto Sanz, MD, Betty Ruiz, ARNP, Dia Nguyen, MD, Yenny Ceballos, ARNP, Anisleydi Pardon, ARNP, Michael Sasoni, DO, and Bonnie J, Sullivan, MD[5], stated as follows:

> We've had the opportunity of reading Dr. Stanley's original article entitled "Clinical Approach to Fishhook Removal" and the JUCM's printed version entitled "An

---

[5] Notably, multiple signatories to the Petition are critical care providers, experienced in fishhook injury and removal, who are offered course training annually about treatment of fishhook injury, with certification in emergency care by Baptist Hospital of South Florida.

Urgent Care Approach of Fishhook Removal" for comparative purposes and have reached the following conclusions.

The current JUMC article gives the reader, a viewpoint that fishhook injured people go to the Urgent Care centers, located in recreation areas, and that they go to the Urgent Cares, during the vacation season. These three unverified clinical assumptions are not factual medical information. There is no National data on the incidence of fishhook injury, no information on seasonal incidence, no information on geographical or regional location centers of concentrated injury. If you read the printed article's citation # 2, you will find no information to support the claims stated in the article regarding the incidence and occurrence of Fishhook injury.

The original article as written by Dr. Stanley was geared to alert the reader of the mindfulness of needing to track valuable incidence data and bring about a renewed approach to fishhook injury and treatment strategies. In reading the printed JUCM version in comparison to the original version it is evident that Dr. Stanley's information was cut and pasted out of the article, producing multiple typographical errors, and leaving poorly explained, disjointed medical concepts (e.g., "Fish hook Removal System") and, leaving the reader with only technical information of fishhook removal.

The original article furthermore has several pictures of actual patients who have provided their consent to use the images in question to bring home several points of injury awareness and diversity in skill needed to consider removal of this type of foreign body. All photos in the original article and related information were unexplainably deleted in the final version. It is, however, noticeable that JUCM has placed their own photos in the published article.

We have analyzed both versions of the article in question and believe that the readers were denied the full scope of Dr. Stanley's insight into this field of medicine, and ultimately denied valuable clinical information intended for the provider who will be faced with the difficult challenge of removing fishhooks from patients. Further, the article has excessive brightly colorized diagrams that are of unacceptable poor visibility, all instructional diagrams listed in the article are located at the top of the pages and do not flow with the written text easily as originally intended. This arrangement requires the readers to constantly look up and look down and could potentially lead to them becoming confused. Providers, who may need to reference this article quickly in current format, (which is full of grammatical errors, disjointed through concepts and difficult to follow text) could become confused.

In conclusion, this current article "An Urgent Care Approach to Fishhook Removal'" is drastically different from its original easy-to-follow format/layout. As a result of these numerous errors and clinical omissions listed above, the use of the article as currently published could adversely affect the care of patients and may result in injuries if not retracted and amended.

However, as with Dr. Stanley's own request, this Petition was met with stonewall silence. Additionally, JUCM was contacted directly by Sheron Clark, a Registered Nurse, on June 5, 2021, advising them as follows: "there are multiple errors in the publication…[t]hese errors can adversely affect the care of patients, which may result in more harm than good". A partial copy of the email dated June 5, 2021 from Sheron Clark is attached hereto as Composite "I" (at Exhibit page 112) and incorporated herein by this reference[6]. Thus, as early as June 5, 2021, despite being on notice of the errors and harm that might result from its publication of the Distorted Derivative Work, JUCM recklessly proceeded to print the hard-copy June issue on or about June 21, 2021.

32.     Defendants knew or should have known that their negligent editing, printing, and subsequent refusal to correct their mistakes would cause substantial damage to Dr. Stanley, financially, professionally, and emotionally.  While it is impossible to know, JUCM's behavior has been so out of bounds and defiant that Dr. Stanley has speculated that JUCM may have singled him out, an African-American physician-author, and engaged in what can only be described as either gross negligence, recklessness, or ruthless and predatory behavior — perhaps anticipating that it would not be met with this legal challenge due to significant litigation costs. Furthermore, upon information and belief, JUCM's motivation for its egregious behavior and for compressing the 'review process' into four (4) months (which Dr. Stanley was advised in February 2021 could take up to six (6) months) was due to its business preference to exploit Dr. Stanley's Copyrighted Work during the summer season – a time when fishhook injuries are likely to be most prevalent – while promoting and advertising commercial urgent care centers for the treatment of fishhook

---

[6] Upon information and belief, JUCM has received a number of other negative reviews/comments to which access by Dr. Stanley is currently unavailable. We believe that discovery will confirm that Sheron Clark is not the only person to have submitted an individual objection to JUCM about the Distorted Work. Dr. Stanley has never received any notice from JUCM of the individually submitted complaints.

injuries. Openly, JUCM placed an unusual emphasis on the phrase 'urgent care' (understood in the medical community to refer to *commercial* urgent care treatment centers) during its editing process of the Copyrighted Work. In the most apparent example, JUCM changed the title of the Copyrighted Work from *Clinical Approach to Fishhook Removal* to *An Urgent Care Approach to Fishhook Removal* in a seeming effort to lure readers into associating commercial urgent care facilities (a discreet segment of the medical community) with optimum treatment of a fishhook injury. Similarly, the article was featured on the publication's June 2021 cover page with the slogan, *'Gone fishin', Then Going to Urgent Care.….."*. When questioned about the purpose of the title change, Fleming advised Dr. Stanley that 96% of doctors who subscribe to his publication do not "like" the word "clinical".[7]  Additionally, JUCM added the following sentence to the **Urgent Message** section "while fishhook injuries are common in Urgent Care centers located in recreation areas…" and the following statement on page 3, "[p]atients who contact the Urgent Care center before arrival can be advised to wash the wound with soap and water." Dr. Stanley never intended for his Copyrighted Work to be transformed from a scholarly article into an advertisement for commercial urgent care clinics. Unfortunately, as evidenced by the foregoing changes – it seems that Dr. Stanley's Copyrighted Work was used as a resource and platform for JUCM to advertise and promote its own commercial interests[8] (paid advertising by commercial urgent care facilities) rather than to provide critical information to the medical community.

---

[7] Contrary to this claim—JUCM uses the term 'clinical' repeatedly on its website at https://www.jucm.com. A true and correct copy of screenshots (as of November 26, 2022) evidencing multiple examples on JUCM's use of the term 'clinical' is attached hereto as Exhibit "J" (at Exhibit page 114 *et seq.*) and incorporated herein by this reference.

[8] By way of further example, JUCM used Dr. Stanley's Copyrighted Work as a resource for its clinical 'Continuing Medical Education' ("CME") quiz, to which JUCM subscribers could submit responses for up to 3 American Medical Association CME credits by answering the following three multiple choice questions correctly after reading the Distorted Derivative Work:

(1) Most fishhook injuries are:
a. Penetrating soft-tissue injuries of the hand, face, head, or upper extremity

33.     Up to and including the date of this Complaint, JUCM refuses to take action sufficient to correct or even mitigate the damage it has caused to Dr. Stanley and the disservice it has done to practitioners and patients. All post-publication communications and retraction requests have been met with a disturbing, persistent stubbornness against correcting JUCM's misinformation even though it may harmfully affect patient care.

34.     Due to the distorting changes made to Dr. Stanley's Copyrighted Work, medical practitioners are presented with a confusing presentation of material that is difficult to follow when rendering patient care. For example (i) the sequencing of photographs/medical artwork in the Distorted Derivative Work, with instructions incorrectly presented and misplaced, can lead to a muddled thought process during a high-tension emergency procedure; (ii) the medical artwork presented in fluorescent coloring can cause difficulty in focusing and following instructions while rendering emergency patient care; and (iii) collages created by JUCM and random highlighting exhibited throughout the Distorted Derivative Work can cause confusion in correctly following Dr. Stanley's substantive guidance.

35.     Unsurprisingly, JUCM's continuing refusal to correct its errors has caused Dr. Stanley (i) substantial known and potential loss of income; (ii) distrust and humiliation amongst

---

b. Penetrating injuries to deep tissue structures
c. Lacerations of the face and scalp
d. Puncture wounds to the sole of the foot

(2) When one point of a multipoint hook causes an injury, the "free points" should be:
a. Bent so the sharp end is not exposed to the provider or the patient
b. Removed from the hook using bolt cutters
c. Taped or removed with a wire cutter to avoid additional wounds
d. Simply avoided

(3) Which of the following fishhook removal techniques is likely to be most widely accepted in urgent care?
a. Advance-and-cut
b. Barb crush
c. Cut-it-out
d. String-yank

his colleagues, employer, and affiliates; (iii) undue hardship to his family; and (iv) emotional distress. Numerous colleagues of Dr. Stanley have contacted him expressing great concern regarding the Distorted Derivative Work.

36.     For example, in correspondence received by Dr. Stanley on December 2, 2021, a colleague Medical Doctor, Bonnie Jean O'Sullivan, stated:

> I came across your June 1, 2021 article…upon reading the article I noticed multiple typographical errors. I was very disappointed, and had difficulty trying to comprehend the written subject matter, and follow along with the **photos which were not synchronized with the reading.** (Emphasis added.)

Separately, on November 21, 2021, colleague and Family Nurse Practitioner Raisa K. Barros, wrote:

> I would like to share feedback regarding your article…I found it in the breakroom at our Urgent Care…I was very surprised and disappointed as in my opinion the article was poorly written…has multiple errors and sentences that do not make sense…**pictures are printed in such poor quality, and out of order…made it difficult to follow the recommended procedures.** (Emphasis added.)

Yet another colleague, Jennifer Aquino, an Advanced Registered Nurse Practitioner at Mount Sinai Medical Center, stated in correspondence dated November 23, 2021:

> I came across your June 1, 2021 article…on October 2nd, 2021, I was at work and a patient came in with a fishhook injury to the palm of his hand…I took 5 minutes to review the article and I was shocked of [sic] the typographical errors and disjointed statements…**the pictures were so small and outlined with such bright colors that distracted me from focusing and comprehending what to do…the instructions and the related photos were out of place and made everything difficult to comprehend…** *I was disappointed with your writing and you.* (Emphases added.)

True and correct copies of the correspondence from Bonnie Jean O'Sullivan dated December 2, 2021, from Raisa K. Barros on November 21, 2021, and from Jennifer Aquino on November 23, 2021 are attached hereto as Exhibits "K" (at Exhibit page 124), "L" (at Exhibit page 126), and "M" (at Exhibit page 128), respectively, and are incorporated herein by this reference.

37.     Dr. Stanley relied heavily on JUCM's publication of his Copyrighted Work to finalize ongoing negotiations with Dr. William Kranichfeld, a staff emergency room physician with nearly thirty (30) years of professional experience, to establish an ongoing procedures course about outpatient procedures, with the Copyrighted Work serving as the basis for planned teaching materials. But after the appearance of the Distorted Derivative Work, Dr. Kranichfeld wrote the following to Dr. Stanley on October 10, 2021:

> I offered you an ongoing faculty position and salary of $2,500 per month to lecture on the contents of the article…entitled An Urgent Care Approach to Fish Hook Removed [sic] published in the June issue of the Journal of Urgent Care Medicine…I am sending you this letter to inform you that I can no longer support the use of this article due to its printing of medical misinformation, multiple grammatical errors, poor editing and poorly displayed medical illustrations…[t]he committee found the format used was not professionally suitable for the use of our attendees, and subsequently cannot be referenced in our take home materials nor placed on our website as a creditable source of medical information…[t]he arrangement counted on your listing in the Journal of Urgent Care Medicine, establishing your creditable authorship.

A true and correct copy of the communication from Dr. William Kranichfeld is attached hereto as Exhibit "N" (at Exhibit page 131) and is incorporated herein by this reference.

38.     Dr. Stanley also relied on the responsible publication of his Copyrighted Work to finalize ongoing negotiations with Baptist Health of South Florida ("BHSF") as a potential customer for Dr. Stanley's aforementioned patented medical devices. (*See* Paragraph 18 and Exhibit "E", at Exhibit page 44). BHSF regularly explores opportunities to introduce new and improved medical devices and techniques to improve its patient care, and it had shown interest in purchasing Dr. Stanley's fishhook removal devices as the safest method of fishhook removal. However, negotiations came to a halt as Dr. Stanley needed a credible publication in order to receive an interview for his new project. The mess that JUCM made of his original Copyrighted Work appears to have put a stop to that process. A true and correct copy of Dr. Stanley's

communications with Baptist Health of South Florida is attached hereto as Composite Exhibit "O" (at Exhibit page 133 *et seq*.) and is incorporated herein by this reference.

39.    Dr. Stanley also relied on JUCM's faithful publication of his Copyrighted Work for plans to inform potential customers desiring to obtain creditable information on his business website, (www.StanleyMedicalDesigns.com) regarding fishhook injury and removal procedures. Without the responsible distribution of his original Copyrighted Work, Dr. Stanley's website no longer operates as an e-commerce website for the purchase of his patented wire cutter device, nor does it distribute important information to the public regarding safer methods for the fishhook removal procedure.

40.    Due to JUCM's publication of the Distorted Derivative Work, Dr. Stanley's ability to gain employment as an "Expert Witness" for the State of Florida — a position for which Dr. Stanley worked for seven (7) years — has been met with great difficulty, as Dr. Stanley's credentials as a published medical author would amply support his candidacy as a fishhook injury and foreign body removal expert. Furthermore, a publication would aid Dr. Stanley in being selected for positions as an expert witness on the Seak, Inc. webpage (www.seak.com, an online expert witness directory). Florida Rule of Civil Procedure 1.390 defines an expert witness as "a person duly and regularly engaged in the practice of a profession who holds a professional degree from a university or college and has had special professional training and experience, or *one possessed of special knowledge or skill about the subject* upon which called to testify". (Emphasis added). As such, publication of the Copyrighted Work was integral to meeting Dr. Stanley's application requirements as an Expert Witness.[9]

---

[9] Of note, despite JUCM's actions causing a setback in attaining a position as an expert witness in the State of Florida, Dr. Stanley has since been able successfully to overcome this hurdle. He finally received a Medical Doctor Expert Witness Certificate from the Florida Department of Health in January of 2023.

41.     Finally, JUCM's conduct left Dr. Stanley without any recourse other than to retain the undersigned and to seek judicial intervention. Cognizant of the significant legal fees associated with litigation, in or about July 2021 Dr. Stanley sought and accepted extra shifts at his workplace to afford the legal costs of defending himself against JUCM's wrongdoing. Unfortunately, despite being fully vaccinated against the COVID-19 virus, and having worked with COVID patients on a daily basis for eighteen (18) months without ever contracting the virus, once Dr. Stanley picked up the additional shifts – he did indeed contract the deadly virus himself. True and correct copies of Dr. Stanley's schedule from May 2021 through September 2021, and his COVID-19 test results, are attached hereto as Exhibits "P" (at Exhibit page 144 *et seq*.) and "Q" (at Exhibit page 150 *et seq*.), respectively, and are incorporated herein by this reference. His COVID case resulted in Dr. Stanley's becoming seriously ill and not working for a period of twenty (20) days. Sadly, during the time of his illness, he was also not able to care for his elderly mother, who relies on his assistance. He was also unable to work and lost significant revenue that he desperately needed at the time. These events have caused Dr. Stanley severe emotional distress, physical injury, pain and suffering.

42.     Thus, as a result of JUCM's conduct, Dr. Stanley has suffered and continues to suffer financial and other damages in an amount to be determined at trial.

43.     At no time did Dr. Stanley expressly or impliedly authorize JUCM to replace his original Copyrighted Work and publish the Distorted Derivative Work.  Instead, JUCM committed all of the aforesaid acts either grossly negligently, recklessly, or deliberately, without regard to Dr. Stanley's proprietary or other rights.

44.     Dr. Stanley never authorized JUCM to prepare a derivative work (the Distorted Derivative Work) based on his Copyrighted Work, nor to copy, publish, reproduce, distribute, or display the same.

45.     Without Dr. Stanley's permission, JUCM produced, published, and distributed the Distorted Work, a derivative of Dr. Stanley's Copyrighted Work, to the public. The Copyright Act grants Plaintiff the exclusive right to reproduce, publish, and distribute the Copyrighted Work and any derivatives thereof. Copyright Act, 17 U.S.C. § 106(2).

46.      JUCM's distortion of Dr. Stanley's Copyrighted Work was willful, in disregard of, and with indifference to, the rights of Dr. Stanley as the copyright owner.

47.     On September 23, 2021, Dr. Stanley's counsel sent a cease and desist letter ("C and D") objecting to Defendant Braveheart's unauthorized reproduction, publication, distribution, public display, and sale of the derivative work containing portions of Plaintiff's Copyrighted Work and requesting that a retraction be made pursuant to Fla. Stat. § 770.02. A true and correct copy of the C and D is attached hereto as Exhibit "R" (at Exhibit page 154 *et seq*.) and incorporated herein by this reference.

48.     To date, Defendant has not retracted the article nor issued an apology pursuant to Fla. Stat. § 770.02. Instead, JUCM deleted the online digital article, while issuing the following statement on their website (https://www.jucm.com/an-urgent-care-approach-to-fishhook-removal/):

> [i]t has been brought to our attention that the publication titled "An Urgent Care Approach to Fishhook Removal" originally published in [sic] June 2021 digital edition of The Journal of Urgent Care Medicine on June 1, 2021 ("Publication"), contains several changes made during the editing process performed by JUCM which the authors took issue with and subsequently demanded the Publication be retracted. Accordingly, at the request of the authors, Anthony G. Stanley, MD and Jorge Murillo, MD, we have fully retracted the Publication.

A true and correct copy of JUCM's webpage exhibiting the statement is attached hereto as Exhibit "S" (at Exhibit page 227 *et seq*.) and incorporated herein by this reference. But since JUCM is a monthly publication, the retraction should have occurred on or before November 27, 2021 pursuant to Florida law, within the forty-five (45) day notice period. Although a retraction statement was made for the digital version, no retraction was ever made by JUCM in its printed November 2021 edition.

49.     Next, on or about October 13, 2021, Plaintiff's counsel received the following statement in response to its C and D: "Per our general counsel, we will not be re-publishing the article out of an abundance of caution to avoid the potential confusion to the public. With publication of the full retraction we consider this matter finalized". A true and correct copy of correspondence dated October 13, 2021 is attached hereto as Exhibit "T" (at Exhibit page 231) and is incorporated herein by this reference. JUCM's (i) refusal to republish the original Copyrighted Work; and (ii) vague and accusatory language in its statement (i.e. "the authors took issue with and subsequently demanded the Publication be retracted") caused significant injury to Dr. Stanley by creating the implication that there was an issue with "the authors". This statement by JUCM led to the deterioration of Dr. Stanley's negotiations with BHSF after it showed interest in purchasing Dr. Stanley's fishhook removal devices.

50.     The Defendants' acts and inaction are causing, and unless a proper retraction is issued – including an apology, correction, re-publication or full retraction under Florida law – will continue to cause damage and irreparable harm to Dr. Stanley, for which Dr. Stanley has no adequate remedy at law.

51.     All conditions precedent to the bringing of this action have been performed, waived or excused, or otherwise satisfied.

52.     Dr. Stanley has retained the undersigned attorneys to bring this action and is obligated to pay a reasonable fee for their services.

53.     Because the Defendants' actions as described herein were seemingly performed with actual malice, ill will, gross indifference to, or with reckless disregard of, Dr. Stanley's federal and state law rights, and may amount to willful and wanton acts which were deliberate and without reasonable cause or basis, Dr. Stanley reserves the right to amend this Complaint to seek punitive damages under Fla. Stat. § 768.72.

## FIRST CAUSE OF ACTION
### Federal Copyright Infringement Against All Defendants
### (17 U.S.C. § 501)

54.     Plaintiff repeats and realleges paragraphs 1 through 53 above, as if fully set forth herein; and further alleges as follows.

55.     As set forth above, Plaintiff is the author and holds copyright to the Copyrighted Work.

56.     The Copyrighted Work is an original scholarly article containing copyrightable subject matter for which protection exists under the Copyright Act, 17 U.S.C. § 101, *et. seq*. Plaintiff is the exclusive owner of rights under copyright in and to the Copyrighted Work. Plaintiff owns a valid copyright registration, with Certificate of Copyright Registration No. TXu002286333 issued by the Registrar of Copyrights on October 25, 2021 and copyright registration for Dr. Stanley's Copyrighted Work from the Registrar of Copyrights, effective October 3, 2022 (Registration No. TXu2339980). *See,* Exhibit "C", which is incorporated herein by this reference, at Exhibit page 37 *et seq.*

57.    The Copyright Act grants Plaintiff the exclusive rights to reproduce, copy, publish and distribute the Copyrighted Work and any "derivative works based upon the copyrighted work." 17 U.S.C. § 106(2).

58.    Through Defendants' conduct alleged herein, including but not limited to Defendants' reproduction, distribution, public display, and sale of the Distorted Derivative Work containing portions of the Copyrighted Work without Plaintiff's permission, Defendants have directly infringed on Dr. Stanley's exclusive rights in the Copyrighted Work in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501.

59.    Defendants' infringing conduct was and continues to be willful and with actual knowledge of Plaintiff's rights in the Copyrighted Work.

60.    As a direct and proximate result of Defendants' infringing conduct, Plaintiff has been harmed and is entitled to damages in an amount to be proven at trial.

61.    Pursuant to 17 U.S.C. § 504(b), Plaintiff is also entitled to recovery of Defendants' profits attributable to Defendants' infringing conduct alleged herein.

62.    Alternatively, Plaintiff is entitled to recover from Defendants statutory damages pursuant to 17 U.S.C. § 504(c), up to $150,000 for Defendants' willful infringing conduct per copyright infringed, and for such other amount as may be proper pursuant to 17 U.S.C. § 504(c).

63.    Plaintiff is further entitled to its attorney fees and costs pursuant to 17 U.S.C. § 505.

64.    As a direct and proximate result of the Defendants' infringing conduct alleged herein, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

WHEREFORE, Dr. Stanley respectfully requests that judgment be entered in his favor and against Defendants jointly and severally, containing the following relief:

A.    That Defendants be required to account for and pay over to Dr. Stanley the actual damages suffered by him as a result of the infringement and any profits of the Defendants attributable to the infringement of Plaintiff's copyright or exclusive rights under copyright; and to pay such damages to Dr. Stanley as shall appear just and proper to this Court within the provisions of the Copyright Act, or, in the alternative, at Plaintiff's election, statutory damages for infringement of each separate copyright as set forth in 17 U.S.C. § 504;

B.    For an award of costs under 17 U.S.C. § 505 or as otherwise provided by law;

C.    For an award of attorneys' fees pursuant to 17 U.S.C. § 505;

D.    For an award of pre-judgment interest and post-judgment interest in the maximum amount permitted by law;

E.    For such other and further relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**Defamation Per Se Against All Defendants**

65.    Plaintiff repeats and realleges paragraphs 1 through 53 above, as if fully set forth herein; and further alleges as follows.

66.    On or about June 1, 2021, Defendants published the Distorted Work that contained multiple inconsistencies, medical inaccuracies, potentially harmful recommendations to readers providing medical services and their patients, and false statements about Plaintiff's authorship.

67.    Defendant JUCM falsely identified Dr. Stanley as the author of statements within the Distorted Work that Dr. Stanley never authored or approved.

68.    These false statements were published in print and online to third parties via URL: https://www.jucm.com/documents/jucm-June-2021.pdf/.

69.    These false statements were published recklessly and with actual malice.

70. A reasonable reader of the Distorted Work containing the unapproved statements could reasonably come to distrust Dr. Stanley and hold him in ill repute, as the Distorted Work contains multiple inconsistencies, medical inaccuracies, misleadingly positioned images and potentially harmful recommendations to readers and their patients.

71. Defendants' publication of the Distorted Work imputed to Dr. Stanley characteristics incompatible with the level of performance consistent with Dr. Stanley's occupation.

72. Dr. Stanley has been damaged by these false statements because the statements, when connected to the Distorted Work published by JUCM, have injured him in his profession and business.

73. Defendants' actions were so obviously defamatory and damaging to Dr. Stanley's reputation that they give rise to an absolute presumption of both malice and damages. As a direct and proximate result of Defendants' actions, Dr. Stanley has suffered and continues to suffer reputational harm for which he is entitled to an award of damages to the greatest extent permitted under law, including but not limited to punitive damages.

WHEREFORE, Dr. Stanley respectfully requests that judgment be entered in his favor against Defendants jointly and severally, containing the following relief:

A. An award for monetary damages for reputational harm;

B. An award of punitive damages;

C. Pre- and post-judgment interest on all amounts due;

D. Attorney's fees and costs; and

E. Such other and further relief as the Court may deem just and proper.

### THIRD CAUSE OF ACTION
**Fraudulent Misrepresentation Against Defendant The Braveheart Group, LLC d/b/a
Journal of Urgent Care Medicine**

74.     Plaintiff repeats and realleges paragraphs 1 through 53 above, as if fully set forth

herein; and further alleges as follows.

75.     Defendant JUCM and Dr. Stanley came to numerous decisions regarding

publication of what Dr. Stanley expected to be his Copyrighted Work, *i.e.*, the content, layout and

instructional text approved by Dr. Stanley on May 5th, 2021. *See,* Exhibit F (Communications from

March 2021-May 5, 2021, at Exhibit pages 46-68).

76.     JUCM's statement made to Dr. Stanley via telephone call by Mr. Fleming prior to

his submission that it would publish the Copyrighted Work based upon the decisions jointly made

by the parties was false.

77.     JUCM's instructions to authors submitting manuscripts listed on its website

https://jucm.scholasticahq.com/for-authors states as follows:

> The Editing and Review Process.
> When your manuscript arrives, we'll send you an acknowledgment and give your
> article to our Board of Editors. We'll let you know within a few weeks whether has
> been accepted. If your submission is accepted for publication, it will be scheduled
> for an upcoming issue of JUCM and assigned to an editor. After the first round of
> editing, the article is sent to several physician reviewers and board members for
> comment. **Any queries or requested changes will be forwarded to you for
> consideration.** Finally, the article goes to our production department to be prepared
> for publication. (Emphasis added.)

JUCM, in its own instructions, clearly misrepresents to its authors that its editing is subject to the

author's "consideration", a promise which trustful authors, such as Dr. Stanley, rely on prior to

submission to assure that their works would be published in a form consistent with the author's

"consideration" of any suggested edits. A true and correct copy of the webpage detailing JUCM's

instructions for authors is attached hereto as Exhibit "U" (Exhibit page 233 *et seq*.) and incorporated herein by this reference.

78.    JUCM's representation that it would publish the Copyrighted Work pursuant to the parties' joint agreement, as evidenced in Exhibit F (at Exhibit pages 46-68), was material because Dr. Stanley would not have submitted his Copyrighted Work to be published by JUCM without having decision-making and final approval rights. Neither Dr. Stanley nor any other responsible medical doctor would have agreed to lose control of his/her Copyrighted Work in the medical field unless he or she could be assured that, when published, it would not cause harm to patients.

79.    When JUCM made the assuring statements to Dr. Stanley, JUMC knew or should have known that the statements were false, because JUCM thenceforth started ignoring communications from Dr. Stanley, denying him his right to review, approve, "consider" or make decisions regarding the publishing of his Copyrighted Work in final form and only later stating that JUCM was "unable" to provide author-previewing. *See,* Exhibit F at Exhibit page 50.

80.    When JUCM made the false statements, its intent was to induce the Plaintiff's reliance on said false statements.

81.    Dr. Stanley did not otherwise know, nor could he reasonably suspect, that JUCM's representations were false.

82.    Dr. Stanley relied on JUCM's misrepresentations by proceeding with the publishing process and trusting JUCM to publish the Copyrighted Work pursuant to the parties' joint agreement.

83.    As a result of Dr. Stanley's reliance on JUCM's misrepresentations, Dr. Stanley has been damaged because the statements and his reasonable reliance thereon injured him in his profession and business, as aforesaid.

84.     JUCM's misrepresentations, inducing Dr. Stanley's reliance, were the direct and proximate cause of Dr. Stanley's loss.

WHEREFORE, Dr. Stanley respectfully requests that judgment be entered in his favor and against Defendant Braveheart, containing the following relief:

A.     Judgment for damages entered in his favor and against Defendant Braveheart;

B.     Pre and post-judgment interests on all amounts due;

C.     Attorneys' fees and costs;

D.     Such other and further relief as the Court may deem just and proper.

**FOURTH CAUSE OF ACTION**
**Unfair and Deceptive Trade Practices Against All Defendants**

85.     Plaintiff repeats and realleges paragraphs 1 through 53 above, as if fully set forth herein; and further alleges as follows.

86.     This is an action for damages under the Florida Deceptive and Unfair Trade Practices Act, § 501.201 *et seq.,* Florida Statutes.

87.     The acts and practices of Defendants as described above constitute unfair methods of competition and unfair or deceptive acts and practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201 *et seq.,* Florida Statutes.

88.     The unfair methods of competition, unconscionable acts and practices, and unfair or deceptive acts in which Defendants engaged include but are not limited to (a) JUCM's statement that it would publish the Copyrighted Work based upon the joint decisions made between the parties; and (b) JUCM's falsely identifying Dr. Stanley as the author of the unapproved statements and layout within the Distorted Derivative Work, which statements contained multiple

31

inconsistencies, medical inaccuracies, potentially harmful recommendations to readers and their patients, all tending to mislead the public.

89.     Plaintiff has suffered damages as a direct and proximate result of Defendants' violation of the Florida Deceptive and Unfair Trade Practices Act, § 501.201 *et seq*., Florida Statutes.

WHEREFORE, Dr. Stanley respectfully requests that judgment be entered in his favor and against Defendants jointly and severally, containing the following relief:

A.      Judgment for damages entered in his favor and against Defendants;

B.      Pre and post-judgment interest on all amounts due;

C.      Attorneys' fees and costs;

D.      Declaratory judgment declaring that JUCM's acts and practices are unfair and deceptive in violation of FDUTPA;

E.      An order enjoining Defendants from continuing to engage in such unfair and deceptive acts and practices; and

F.      Such other and further relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**
**Tortious Interference Against All Defendants**

90.     Plaintiff repeats and realleges paragraphs 1 through 53 above, as if fully set forth herein; and further alleges as follows.

91.     Prior to publication of the Distorted Work, Dr. Stanley enjoyed advantageous business relationships in the medical community with patients, medical supply vendors, hospitals, colleagues, medical clinics, etc. (collectively, "Business Relationships"), which were cultivated over a long period of time and with much effort, patience and expense on the part of Dr. Stanley.

92.     Over the years, Dr. Stanley gained the trust and confidence of his Business Relationships by exhibiting a great level of honesty, professionalism, service, and expert knowledge in his field. Plaintiff's entire livelihood has been built in large part on the foundation of his substantial Business Relationships.

93.     Defendants tortiously interfered with Dr. Stanley's Business Relationships by publishing the Distorted Work containing unapproved statements and layout, statements not actually authored by Dr. Stanley, multiple inconsistencies, medical inaccuracies, potentially harmful recommendations to readers and their patients, and misleading information.

94.     Due to Defendants' willful, wanton, intentional, and malicious conduct, Dr. Stanley has suffered and will continue to suffer significant financial loss and loss of goodwill in his Business Relationships, causing substantial harm to Dr. Stanley.

95.     Plaintiff is therefore entitled to damages, including exemplary damages, as a result of JUCM's conduct, as well as attorneys' fees, costs, and other appropriate and equitable relief.

WHEREFORE, Dr. Stanley respectfully requests that judgment be entered in his favor and against Defendants jointly and severally, containing the following relief:

A.      Judgment for damages entered in his favor and against Defendants;

B.      Pre and post-judgment interest on all amounts due;

C.      Attorneys' fees and costs;

D.      Such other and further relief as the Court may deem just and proper.

## SIXTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

96.     Plaintiff repeats and realleges paragraphs 1 through 53 above, as if fully set forth herein; and further alleges as follows.

97.     At all relevant times, Defendants had the power, ability, authority and duty to stop engaging in the conduct described herein.

98.     At all relevant times, Defendants knew, or reasonably should have known, that the conduct described herein would and did proximately result in Plaintiff's physical and emotional distress.

99.     Despite said knowledge, power, and duty, Defendants negligently failed to stop engaging in the conduct described herein.

100.     As a direct and legally cognizable result of Defendants' willful, wanton, intentional, and malicious conduct, Dr. Stanley was forced to seek judicial intervention and to pick up extra, physically exhausting, shifts at work in order to pay for his legal fees, which led to his abruptly contracting the COVID-19 virus, despite previously working Covid-free with patients on a daily basis for over eighteen (18) months.

101.     Dr. Stanley felt horrifically ill after contracting the COVID-19 virus and was unable to work or care for his elderly mother for a period of twenty (20) days, causing him severe physical and mental anguish, anxiety and worry.

102.     As a direct and legal result of Defendants' wrongful acts, Plaintiff has suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

103.  Defendants' conduct constitutes negligent infliction of emotional distress and is actionable under the laws of the State of Florida. Plaintiff therefore is entitled to compensatory and punitive damages in amounts to be ascertained at trial.

WHEREFORE, Dr. Stanley respectfully requests that judgment be entered in his favor and against Defendants jointly and severally, containing the following relief:

A.      Judgment for damages entered in his favor and against Defendants;

B.      Pre and post-judgment interest on all amounts due;

C.      Compensatory damages;

D.      Punitive and exemplary damages;

E.      Attorneys' fees and costs;

F.      Such other and further relief as the Court may deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Dr. Stanley respectfully requests that this Court enter judgment in his favor and jointly and severally against the Defendants, and further prays as follows:

1.      That Defendants be adjudged to have violated Section 501 of the Copyright Act (17 U.S.C. § 501).

2.      That Defendants be ordered to provide an accounting of Defendants' profits attributable to Defendants' infringing conduct, including Defendants' profits from sales and any other exploitation of the Distorted Derivative Work, and any products, works, or other materials that include, copy, are derived from, or otherwise embody the Distorted Derivative Work.

3.      That Defendants be ordered to destroy or deliver up for destruction all materials in Defendant's possession, custody, or control used by Defendants in connection with Defendants' infringing conduct, including but not limited to all remaining copies of the Distorted Derivative Work and any products and works that embody any reproduction or other copy or colorable imitation of the Copyrighted Work or the Distorted Derivative Work, as well as all means for manufacturing them.

4.      That Defendants, at their own expense, be ordered to recall the Distorted Derivative Work from distributors, retailers, vendors, or others that have distributed the Distorted

Derivative Work on Defendants' behalf, and any products, works, or other materials that include, copy, are derived from, or otherwise embody the Distorted Derivative Work, and that Defendants be ordered to destroy or deliver up for destruction all materials returned to it.

5.     That Defendants, jointly and severally, be adjudged to have violated Fla. Stat. §540.08, Fla. Stat. § 501.201 *et seq*., and Fla. Stat. §770.02 and made fraudulent misrepresentations in violation of Florida Law.

6.     That Dr. Stanley be awarded:

    A.     Defendants' profits obtained as a result of Defendants' infringing conduct, including but not limited to all profits from sales and other exploitation of the Distorted Derivative Work and any products, works, or other materials that include, copy, are derived from, or otherwise embody the  Copyrighted Work or the Distorted Derivative Work, or in the Court's discretion, such amount as the Court and/or jury finds to be just and proper;

    B.     Damages sustained by Dr. Stanley as a result of Defendants' infringing conduct, in an amount to be proven at trial;

    C.     Should Dr. Stanley so elect, statutory damages pursuant to 17 U.S.C. § 504(c) instead of actual damages or profits; and

    D.     Dr. Stanley's reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505.

7.     That Dr. Stanley be awarded interest, including pre-judgment and post-judgment interest, on the foregoing sums against all Defendants.

8.      That Defendant JUCM be ordered to print and publish the latest Plaintiff-approved version of Dr. Stanley's Copyrighted Work in its publication.

9.      That Defendant JUCM be ordered to provide Dr. Stanley a full-page advertising section for his medical products the *Moby Cutter* and the *Moby Clamp* for a period of twenty-four (24) months.

10.     That the Court award such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 28, 2023

Respectfully submitted,

CHASELAWYERS

_____
Barry Chase, Esq.
ChaseLawyers
21 SE 1st Avenue, Suite 700
Miami, Florida 33131
Telephone: (305) 373-7665
Facsimile: (305) 373-7668
Email: barry@chaselawyers.com

*Attorneys for Plaintiff*