**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

                    Plaintiff,

            vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

                Defendants.

_____/

EXHIBIT J
TO COMPLAINT
FILEDFEBRUARY 28, 2023



Search

**Subscribe/Get Access** | Log In |  

NEWS     RESEARCH     CLINICAL     PRACTICE MGMT     GET CME     BUYER'S GUIDE     JOBS

AUTHORS     ABOUT US     ARCHIVES

**CLINICAL ARTICLES**

When A Fever Is Not A URI: If It's Not In The Differential, It Won't Be In The Diagnosis



## When a Fever is Not a URI: If It's Not in the Differential, It Won't Be in the Diagnosis

**WEB EXCLUSIVE**
What Qualifies Someone To Take X-Rays In The Urgent Care Center? It All Depends On Where You're Located

**CASE REPORTS**
An Unusual Case Of Third And Fourth Metacarpophalangeal Joint Dislocations Following A Fall

**HEALTH LAW**
Who Can Take X-Rays In An Urgent

**IMAGES CHALLENGE**
A 10-Year-Old Boy

## Login

Username

LOGIN

Password

PASSWORD

Privacy • Terms



☑ Remember Me

LOG IN

Lost Password

# URGENT CARE NEWS

### Update: Amoxicillin and Clavulanate Products Will Continue to Be in Short Supply

JUCM News reported nearly a month ago on a scarcity of oral presentations of amoxicillin ...

### The Early Winter Forecast: Chilly with a Chance of COVID

As temperatures fall in much of the United States new hospitalizations for COVID-19 are expected ...

### Free *JUCM* Webinar: STI's Are Heating Up. Find Out What Role Urgent Care (and You) Can Play

As cases of COVID-19 (and restrictions like social distancing) took hold in the United States, ...

### Showing That You 'Understand' Individual Patients Could Go a Long Way Toward Ensuring Their Satisfaction

Everybody wants to be recognized and understood—whatever that means in a given scenario. When that ...

### Nurse Practitioners Are Inching Closer to Independence from Physician Oversight

The contributions of nurse practitioners and physician assistants (known collectively as advanced practice providers, or ...

# WEB EXCLUSIVE ARTICLES

### Code Case Files: An Established Adult Male Patient with 2 Days of COVID-Like Symptoms

Bradley L. Laymon, PA-C, CPC, CEMC PRESENTATION A 47-year-old established male patient presented after 2 ...

### What Qualifies Someone to Take X-Rays in the Urgent Care Center? It All Depends on Where You're Located

### Repairing Parallel Lacerations in the Urgent Care Center

### Mysterious Skin Lesions in a Horse Trainer

### Getting the Most Out of Your Urgent Care Google Ads Budget in 2022

## Sign Up For The JUCM Newsletter

Urgent care clinical, practice management, and curated news stories - delivered to your inbox - every Tuesday.

Enter Your Name

Enter Your Email Address

SIGN UP

# CLINICAL ARTICLES

### When a Fever is Not a URI: If It's Not in the Differential, It

# PRACTICE MANAGEMENT ARTICLES



Privacy • Terms

**Won't Be in the Diagnosis**

Urgent message: Fever in patients presenting to UC is often attributable to viral infections, urinary tract infections, otitis media, cellulitis, …

**Is It Appendicitis? The Role of <mark>Clinical</mark> Scoring Systems, Labs, and Diagnostic Imaging**

Urgent message: Ultrasound can provide essential data in the urgent care evaluation of suspicion of acute appendicitis. Facilitating a rapid …

**A Legal Quandary: A Diagnosis of Cellulitis…That Isn't**

Michael Weinstock, MD; Gabby Gostigian, MD; and Matthew Delaney, MD Urgent message: Failure to consider subtleties and the context in …

**Where Should I Refer My Spinal Patient? Outcomes with Orthopedic and Neurosurgeons for Common Neck and Back Procedures**

Urgent message: Neck and back pain are common issues preceding surgical intervention. Given differences in care plans, outcomes, cost, and …

**DOT Physicals and Urine Drug Testing Represent a Growth Opportunity for Urgent Care Centers**

Urgent message: Demand for DOT-related services for truck drivers is soaring. Urgent care centers can augment traditional insurance-paid visits with …

**Find Prime Locations for Rapid Urgent Care Growth**

Urgent message: Using a data-driven approach to predict performance, taking advantage of openings in traditional retail spaces, or utilizing resources …

**As COVID Turns Endemic, Investors Remain Bullish on Urgent Care Growth**

Urgent message: De novo growth of urgent care continued through the pandemic. As COVID turns endemic, investors remain bullish on …

**Why Private Equity and Other 'Smart Money' Is Bullish on Brick-and-Mortar Urgent Care**

Urgent message: Despite the current seasonal, postpandemic lull in volume, sophisticated investors are focused on the long-term growth prospects of …

# INSIGHTS IN IMAGES CHALLENGES

Privacy • Terms

Journal Of Urgent Care Medicine - Journal of Urgent Care Medicine

Privacy • Terms

## JUCM CAREER CENTER

**Physician House Calls Program New York City, Long Island, Northern Westchester, Staten Island, Bronx, and Brooklyn**
Brooklyn, NY - Northwell Health

**Internal Medicine: Pediatrics - Elizabethtown, KY - Paducah, KY - Recruiting Incentives up to $200,000**
Elizabethtown, KY - Baptist Health Medical Group

**Excellent PT or FT opportunity for Family Practice Physicians**
Hampstead, MD - LifeBridge Health

**STAFF PHYSICIAN - GENERAL PEDIATRICS**
Hershey, PA - Penn State Health Children's Hospital

**Family Medicine or Internal Medicine Recruiting Incentives up to $200,000**
Paducah, KY - Baptist Health Medical Group

**Family Medicine - Kentucky and Southern Indiana - Find optimal work-life balance and a lucrative recruitment package in the Beautiful Bluegrass Region - Recruiting Incentives up to $200,000**
KY - Baptist Health Medical Group

**Urgent Care Veterinarian**
Northampton, MA - Integrity Veterinary Center

**Urgent Care - Nurse Practitioner**
TEMPLE, TX - Baylor Scott & White Health

**Employed Family Medicine Employment Opportunities in Virginia + STUDENT LOAN INCENTIVES**
Roanoke, VA - Carilion Clinic

**Family Medicine Physicians**
St. Johnsbury, VT - Northeastern Vermont Regional Hospital

Privacy - Terms

# DOWNLOAD PAST ISSUES

*November 2022* : *Broadening the Differential for Fever – Etiologies Beyond Infection*

 October 2022

 September 2022

 July-August 2022

June 2022

VIEW ISSUES ARCHIVE

## CASE REPORTS

**An Unusual Case of Third and Fourth Metacarpophalangeal Joint Dislocations Following a Fall**
Urgent message: Metacarpophalangeal dislocations involving digits other than the thumb or index finger may be somewhat ...

**Bullous Pemphigoid Reaction After Second Dose of COVID-19 Vaccine**

**A Rare Case of Sequential Simultaneous Bilateral Mandibular Fractures**

**Brain Abscess in an Immunocompetent Patient:**

## HEALTH LAW

**Who Can Take X-Rays in an Urgent Care Center?**
Urgent message: Given that x-ray is a differentiating feature of "urgent care" and the current challenges ...

**What Qualifies Someone to Take X-Rays in the Urgent Care Center? It All Depends on Where You're Located**

**Avoiding Defamation Lawsuits in Urgent Care**

**Can PAs and NPs Unionize in Urgent Care Settings?**

Privacy • Terms

Complex Pathology and Communication

How Useful Is Ultrasound in Diagnosing Ovarian Torsion?

What's the Best Policy for Unlocking an Urgent Care's Doors when a Provider isn't Present?

## CLINICAL CHALLENGES

### An 83-Year-Old Female with CHF, A-Fib, and New-Onset Confusion and Syncope

An 83-year-old female with past medical history of congestive heart failure and atrial fibrillation presents to urgent care with confusion ...

### A 9-Year-Old Girl with a New Rash on Her Face

### A 40-Year-Old with Back Pain After a Fall

### A 45-Year-Old Male with Palpitations

### A 43-Year-Old with a New Rash on the Trunk

## OCCUPATIONAL MEDICINE

### Update: The COVID-19 Vaccine Mandate for Many Businesses Is Off —Again

Just when you thought you had clarity on the Occupational Safety and Health Administration's mandate to vaccinate workers at businesses ...

### That Vaccine Mandate for Private Businesses That Was Called Off? It's on Again—and the Clock Is Ticking

### Your Occ Med Clients Need Your Support with the New COVID-19 ETS—Immediately

### More People Are Trudging Off to Work on Site. Do You Know Who's at Greatest Risk for COVID-19?

### As Travel Opens Up, Opportunities to Offer COVID-19 Tests Could Be Lucrative

## REVENUE CYCLE MANAGEMENT

### Where Do You Start When Starting Your Urgent Care?

Heather Real There are many reasons to start your own urgent care, whether it be feeding your entrepreneurial spirit, investing ...

### New ICD-10-CM Codes in Effect as of October 1

### Primed for Growth: Why It's Time to

## DEVELOPING DATA

### Urgent Care Is Correcting Course on Antibiotic Prescribing

Just 4 years ago, a Research Letter published by JAMA Internal Medicine painted an unflattering picture of the antibiotic prescribing ...

### The Data Are Clear: Urgent Care Visits Almost Always Suffice for Low-Acuity Cervical Trauma

Privacy • Terms

**Consider Adding Primary Care Services to Your Urgent Care Center**

**A Half Century of Urgent Care: What Today's Startups Need to Know**

**Decreasing Denials and Rejections Through Your Urgent Care Operating Model**

**A Tale of Two Viruses: Rapid Flu and COVID-19 Tests in the Urgent Care Setting**

**Urgent Care—It's a Millennial's Market**

**Spoiler Alert: 2020 Saw a New Trent in Urgent Care Data Claims**

## ABSTRACTS IN URGENT CARE

**Abstracts in Urgent Care November 2022**
Fever: To Treat or Not to Treat? Distinguishing Viral from Bacterial ConjunctivitisScapular Fractures and Blunt Chest Trauma in ChildrenSterile vs Nonsterile …

**Abstracts in Urgent Care – October 2022**

**Abstracts in Urgent Care – September 2022**

**Abstracts in Urgent Care – July/August 2022**

**Abstracts in Urgent Care – June 2022**

## LETTER FROM THE EDITOR-IN-CHIEF

**The Value of Repeat Vital Signs**
Joshua Russell, MD, MSc, FCUCM, FACEP
I'm just going say it: we should repeat vital signs more often in urgent …

**The Value of Vitals – Part I**

**Antibiotic Prescribing in "Gotham City"**

**Playing in the Band**

**Addressing Without Managing: Defusing the Ticking Time Bombs in Urgent Care**

## ABOUT US

The Journal of Urgent Care Medicine® (JUCM) is the official journal of the Urgent Care Association (UCA). Each issue contains a mix of peer-reviewed clinical and practice management articles that

## QUICK LINKS

About Us

Advertise

Subscribe

Submit An Article

Careers

C

Privacy · Terms

address the distinct clinical and

practice management needs of those who are working in today's busy urgent care centers. JUCM's reach of over 42,000 includes qualified clinicians, business and administrative professionals working in urgent care facilities nationwide

**JUCM IS THE OFFICIAL JOURNAL OF**

©2022 - The Journal of Urgent Care Medicine - All Rights Reserved

Privacy • Terms

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

      Plaintiff,


    vs.


THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

      Defendants.

_____/


      EXHIBIT K
      TO COMPLAINT
    FILEDFEBRUARY 28, 2023

December 2, 2021

Hello Dr. Stanley:

I came across your June 1, 2021 article (**An Urgent Care Approach to Fishhook Removal**) online, early October, on the Journal of Urgent Care Medicine website. It seemed like a timely article that would summarize all the current ways to remove a fishhook. I wanted to use it for our Urgent Care Journal Club meeting, upon reading the article I noticed multiple typographical errors. I was very disappointed, and had difficulty trying to comprehend the written subject matter, and follow along with the photos which are not synchronized with the reading. You also alluded to the fact that there needs to be more research in fishhook injury and related demographics. However, the discussion seemed disconnected somehow.  Lastly, you talked about a new concept, a fishhook removal system but the discussion was limited. Over all, it was poorly written by you as a physician and author. The JUCM should share the blame for not proof reading. It's a great topic but needs to be presented to the medical community properly. I am a monthly reader of the JUMC and surprised of this body of work they released to the medical community! I have read several medical journals with mistakes in the past and like them, in this case, it should be corrected and reprinted. I would love to have presented this article "**An Urgent Care Approach to Fishhook Removal**" to Journal Club at our urgent care.

I was hesitant to contact you, but just felt you should know.

Sincerely,

Bonnie Jean O'Sullivan, MD

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

                Plaintiff,

        vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

                Defendants.

_____/

EXHIBIT L
TO COMPLAINT FILED
FEBRUARY 28, 2023

**From:** Raisa K. Barros <RaisaB@baptisthealth.net>
**Sent:** Wednesday, November 24, 2021 10:28
**To:** tuff57@msn.com
**Subject:** Journal Complaint

Dr. Stanley,

I would like to share some feedback regarding your article "An Urgent Care Approach to Fish Hook Removal" in the Journal of Urgent Care Medicine printed June 1, 2021.  I found it in the break room at our Urgent Care and I was very interested in the subject as this is a very common patient visit in my patient demographic area. I have to mentioned that I was very surprised and disappointed as in my opinion the article was poorly written. The article, has multiple errors and the sentences do not make sense in a lot of the sections. The pictures are printed in such poor quality, and out of order. I made it dif icult to follow the recommended procedures. You are supposed to be an expert in the subject, I am surprised you did not proof read your work before submitting it to a Premier Medical Journal like the Journal of Urgent Care Medicine.  I am also sending a copy of this letter to the Journal for not checking what they printed. I hope you consider my feedback for any future work you publish.

Respectfully,

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

                      Plaintiff,


               vs.


THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

                     Defendants.

_____/


EXHIBIT M
TO COMPLAINT FILED
FEBRUARY 28, 2023

**From:** Aquino, Jennifer <Jennifer.Aquino@mountsinai.org>
**Sent:** Tuesday, November 23, 2021 11:05 AM
**To:** Anthony G. Stanley <AnthonyS@baptisthealth.net>
**Subject:** [External] FW: Complaint letter

Dear Dr. Anthony Stanley:

My name is Jennifer Aquino, ARNP.  I am writing to inform you, I came across your June 1, 2021 article on fish hook removal in the Journal of Urgent Care Medicine (JUCM) entitled "An Urgent Care Approach to Fish Hook Removal". I saved the article for that possible situation of getting a patient in the urgent care with a fish hook injury. I have rarely seen the injury but felt assured that the JUCM would have the best information. On October 2nd, 2021, I was at work and a patient came in with a fish hook injury to the palm of his hand. Before going into the room I took 5 minutes to review the article and its suggested approaches. Upon finally reading the article I was shocked of the typographical errors and disjointed statements located in the article.

The pictures were so small and outlined with such bright colors that distracted me from focusing and comprehending what to do. Also, the instructions and the related photos were out of place and made everything difficult to comprehend. I am sorry to say I was disappointed with your writing and you

should take a course in journalism. I am surprised the JUCM published this article. I had to send the patient to the emergency room for fish hook removal and I looked very bad for not being able to perform the procedure. The patient also wrote a discouraging letter to my supervisor about me as a practitioner. It took some time to locate you, but.

Thought you should share in my sorrow!

Cordially

Jennifer Aquino, ARNP

This message originates from Baptist Health South Florida (BHSF). It contains information that may be confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for anyone else to disclose, copy, distribute or use the contents of this message. This message may not be copied or distributed without this disclaimer. All personal messages express views solely of the sender, which are not to be attributed to BHSF. If you received this message in error, please notify us immediately at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

                              Plaintiff,


              vs.


THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

                      Defendants.

_____/


                      EXHIBIT N
                  TO COMPLAINT FILED
                  FEBRUARY 28, 2023



**CritiCare Clinics, Inc.**

October 10, 2021

Dear Dr. Stanley:

As you know each year in October, my company is the host of an annual Out-Patient Procedures Course to in-service our medical staff of over 150 Physicians, ARNP's, PA's, in addition we reach out to community physicians in need of medical procedure education.  On May 3rd, 2021, you and I discussed your participation in a paid faculty position as an authority in the field based on your upcoming article in the JUCM. As you know we are considering, making this program a monthly course. In a private meeting I offered you an ongoing faculty position and salary of $2,500 per month to lecture on the contents of the article at our various venues, and a monthly royalty fee of $500.00 monthly for the term of one year, to use the contents of your copyrighted article and medical illustrations as we saw fit, and for future ads.  The educational committee this year learned of your article entitled **An Urgent Care Approach to Fish Hook Removal** published in the June issue of the **Journal of Urgent Care Medicine** and submitted it for review to be implemented in our educational platform. I am sending you this letter to inform you that I can no longer support the use of this article due to its printing of medical misinformation, multiple grammatical errors, poor editing and poorly displayed medical illustrations.

The committee found the format used was not professionally suitable for the use of our attendees, and subsequently cannot be referenced in our take home materials nor placed on our purposed website as a creditable source of medical information. I sorry to inform you of this decision by the committee. I will not be able to honor any financial considerations previously discussed, nor afford you a place on the lecture podium this year. Time is of the essence for preparing our course curriculum and this position will be offered to another candidate. The arrangement counted on your listing in the Journal of Urgent Care Medicine, establishing your creditable authorship. As you know all lectures on our program must have published creditable articles on their topic. Your current JUCM article on-line and in print does not meet our requirements to be a part of the lecture staff. The participants of our program appreciate the authenticity of the material being presented to them to use safely and reliably in their patient care practice.  If you are able to present the committee with a creditable article printed in an acceptable medical journal I will reconsider this offer at a later date.

Cordially,

Dr. William Kranichfeld

5975 Sunset Dr. Suite 402, Miami, FL      (305) 669-2833

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

                Plaintiff,

       vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

                Defendants.

_____/

EXHIBIT O
TO COMPLAINT FILED
FEBRUARY 28, 2023

From: **Barry Katzen** <BARRYK@baptisthealth.net>
Date: Wed, Apr 6, 2022 at 12:04 PM
Subject: RE: FW: [External]
To: Anthony Stanley MD <stanmeddesigns@gmail.com>
Cc: Nila D. Bhakuni <NilaB@baptisthealth.net>

Dr. Stanley,


We have reviewed this opportunity in detail and tried to share with you the information
collected during the process.  Unfortunately, Innovations will not be able to move forward
on this device, but wish you success moving forward and hope the analytics done by us
might be helpful to you moving forward.  Keep working on new ideas!


Barry


Barry T. Katzen, MD, FACC, FACR, FSIR

Founder and Chief Medical Executive | Miami Cardiac & Vascular Institute

Chief Medical Innovation Officer | Baptist Health South Florida

**Assistant: Lisa Gordon 786-662-7754**

1500 San Remo Avenue, Suite 125| Coral Gables, Florida 33146

Direct: 786-662-7787 | Mobile: 305-773-4060

BarryK@baptisthealth.net | BaptistHealth.net




Professor and Chairman

Department of Interventional Radiology

Herbert Wertheim College of Medicine

Florida International University






**From:** Nila D. Bhakuni <NilaB@baptisthealth.net>
**Sent:** Wednesday, April 6, 2022 11:02 AM
**To:** Anthony Stanley MD <stanmeddesigns@gmail.com>
**Cc:** Barry Katzen <BARRYK@baptisthealth.net>
**Subject:** RE: FW: [External]

Hello Dr. Stanley,

Thanks for your note.  Let me touch base with Dr. Katzen and we will get back with you.

Best,

Nila

**From:** Anthony Stanley MD <stanmeddesigns@gmail.com>
**Sent:** Thursday, March 31, 2022 10:08 AM
**To:** Nila D. Bhakuni <NilaB@baptisthealth.net>
**Subject:** Re: FW: [External]

Hello Nila: Thank you for the information. Would Innovations be interested in partnering in hemostat development?

Thanks

Dr. Stanley

On Wed, Mar 30, 2022 at 11:06 AM Nila D. Bhakuni <NilaB@baptisthealth.net> wrote:

> Dr. Stanley,
>
> As promised, please find the market landscape for your Hybrid Hemostat Invention.  In addition, I asked the group to see if they could quantify the issue of fishhook injuries, and I think they did a pretty decent job.
>
> Take a look and let me know if you have any questions.

Best,

Nila

---

**From:** Maureen Wilson <mwilson@firstlinkanalytics.com>
**Sent:** Wednesday, March 30, 2022 10:52 AM
**To:** Nila D. Bhakuni <NilaB@baptisthealth.net>
**Cc:** Brittany Shaffer <bshaffer@firstlinkanalytics.com>
**Subject:** Re: [External]

Hi Nila,

Attached is the Hybrid Hemostat Market Landscape, a supplemental 2-pager, and information we found regarding fishhook injuries. The key findings for the Hybrid Hemostat Market Landscape include:

- There appear to be a total of **10 solutions** that offer similar features to the proposed invention.
- **Integra LifeSciences Corporation's (MicroFrance) solution appears to be the only one that has the unique feature of a medical tool combined with a measuring device. However, it is designed to be used only in the field of otology, which limits its application.**
- Since proper and timely insurance reimbursement may be contingent upon accurate reporting of medical procedure details, such as the dimensions of embedded objects, wounds, and the like, the proposed invention can assist in this regard due to its unique measuring feature.
- There are two relevant markets for the proposed invention, the global market for handheld surgical instruments and the global hemostats market.

Additionally, in regards to fishhook injuries, we found that:

- There is little data on the prevalence of fishhook injuries in the United States. The best estimate is **500,000 to 1 million injuries related to fishhooks each year.**
    - Uncounted are the numerous hooks removed by the injured anglers themselves or by their fishing buddies. Removal advice isn't hard to find.
- Some hospitals state that they treat **90 to 100 patients with embedded fishhooks each year.**
- There are approximately **60 million anglers in the U.S.** of which 46 million are estimated to fish in a given year.
- **Florida is the number one ranked state for fishing** and the number one ranked state for non-resident fishing destinations.

Please let us know if you have any questions on any of this information!

Thank you,

Maureen

On Feb 23, 2022, at 8:37 AM, Nila D. Bhakuni <NilaB@baptisthealth.net> wrote:

Hi,

Can you do a market assessment for this product?

And is there any way you can determine how many people get hooked with fishhooks in the US, rest of the world?

Thanks,

Nila

---

**From:** Nila D. Bhakuni
**Sent:** Tuesday, January 25, 2022 9:55 AM
**To:** Carla Garic <Carla.Garic@baptisthealth.net>
**Cc:** Stephanie Parra <Stephanie.Parra@baptisthealth.net>; Daeanne Alvarez Cruz <Daeanne.AlvarezCruz@baptisthealth.net>
**Subject:** FW: [External]

A new project – new hybrid hemostat

Anthony Stanley has submitted other project ideas to us so there are related projects.

Project Manager is Stephanie Parra

Person internally right now is Barry Katzen.

Stephanie, please ask Barry if he can give you a subject matter expert for this case to review this material.

Nila

**From:** Anthony Stanley MD <stanmeddesigns@gmail.com>
**Sent:** Monday, January 24, 2022 3:18 PM
**To:** Nila D. Bhakuni <NilaB@baptisthealth.net>
**Cc:** Bill M. Duquette <BillD@baptisthealth.net>; Barry Katzen <BARRYK@baptisthealth.net>; Stephanie Parra <Stephanie.Parra@baptisthealth.net>; Lisa Gordon <lisag@baptisthealth.net>; Caroline Mauriello <CarolineM@baptisthealth.net>; Daeanne Alvarez Cruz <Daeanne.AlvarezCruz@baptisthealth.net>; Carla Garic

<carla.garic@wellspring.com>
**Subject:** Re: [External]

1/24/2022
Dear Innovations:

 This is Dr. Stanley with another medical device that I am desiring to bring to fulfillment.  My **second invention** is a **new hybrid hemostat** approved by the US Patent office for measuring while in surgical procedures.  During surgical procedures, the need often arises to measure distances of a relatively small size such as puncture depths, foreign object sizes, wound sizes, abscess sizes, and the like. Such dimensions are often necessary to gauge the level and type of care required for a patient. Moreover, this need is also becoming necessary for administrative purposes. For instance, proper and timely insurance remuneration can depend upon the accurate reporting of the details of a medical procedure including the dimensions of embedded objects, wounds, etc. This device can perform multiple surgical functions and uniquely give the provider the option to measure simultaneously.

 I am in the development phase of the project and this may be an opportunity for **Baptist Health South Florida** to partner with me in bringing this new medical device to its full potential. As you are aware I recently presented my first medical invention to the**Innovations division, a special wire cutter which was able to catch cut fragments and prevent them, from flying across the surgical table**, called a" **Moby Cutter"** of which I was informed was too close to the"purchasing phase", **and not a potential co-development opportunity**.

I am enclosing a copy of the **second invention Patent** for your review. I would like an opportunity to come in and meet with the Innovations staff to present my second medical device plans**. I have been associated with Baptist Health South Florida since 1997. My**

**specialty outside of Emergency Medicine Services for Baptist Health South Florida, is developing ways to make medical procedures safer with improved efficiency. I have now been awarded 3 approved US medical device patents and 4 pending**. I think it is a great opportunity for all of us to get together to advance the field of medical device development, work on mutual interest to **improve patient care**, **and satisfaction** with improved medical device usage. I have attached a copy of the **approved US patent** for the device.

Thank you for your consideration and look forward to your review and response.

Anthony G. Stanley, MD

On Tue, Jan 18, 2022 at 5:51 PM Nila D. Bhakuni <NilaB@baptisthealth.net> wrote:

Dr. Stanley,

Please note that since this is a purchasing issue, and not a potential co-development opportunity, it is no longer in the hands of Innovations, and will be passed to those who will be able to adequately evaluate your new designs.

Best,

Nila

**From:** Stephanie Parra <Stephanie.Parra@baptisthealth.net>
**Sent:** Tuesday, January 18, 2022 5:36 PM
**To:** stanmeddesigns@gmail.com
**Cc:** Nila D. Bhakuni <NilaB@baptisthealth.net>; Lisa Gordon <lisag@baptisthealth.net>
**Subject:** RE: [External]

Good afternoon Dr. Stanley,

I hope this email finds you well.

We received your voicemail earlier today and have elevated your request to our Miami Cardiac & Vascular Institute team. Lisa Gordon will be reaching out to you soon to discuss the next steps and getting a meeting scheduled.

Thank you.

Best regards,

**Stephanie Parra**

Innovation Project Manager

Baptist Health Innovations

**Baptist Health South Florida**

6855 S. Red Rd. l Coral Gables, FL 33143

Direct: (786) 662-7859

Stephanie.Parra@baptisthealth.net|Baptist Health Innovations



**From:** Anthony Stanley MD <stanmeddesigns@gmail.com>

**Sent:** Monday, December 27, 2021 7:37 AM
**To:** Nila D. Bhakuni <NilaB@baptisthealth.net>
**Cc:** Bill M. Duquette <BillD@baptisthealth.net>; Stephanie Parra
<Stephanie.Parra@baptisthealth.net>; Carla Garic
<carla.garic@wellspring.com>; Barry Katzen
<BARRYK@baptisthealth.net>
**Subject:** Re: [External]

12/26/2021

Dear Baptist Health of South Florida Innovations:

I am contacting your department to introduce a new cutting device that I have invented. The device was actually presented in its prototype stage at the Baptist Doral Plaza to a group of BOS representatives, it was tested for functionality and well received. That meeting was held on June 5th, 2018. The device is now fully developed and has a **United States Patent** (see attached). The first shipment is now in Ohio being packaged and will be **FDA Registered and Device Listed as** required as a **Class 1 Medical Device** in late January, 2022, before shipping to Miami, Florida.  It is my desire and intent to have **Baptist Health of South Florida**, to have the first opportunity to purchase and partner with my group.  I think this is a unique opportunity to have **your own in-house staff member** that is an **inventor**, **first responder in your urgent care system** and **born and raised** in the **South Florida Community**. I think that concept will go over well with the local community. The device is designed to replace many of the surgical wire cutters currently used due to its improved safety designs and features. The cutter can be used in **Orthopedic Surgery, Cardiac Surgery, Podiatry Surgery, Emergency Room and in the Urgent Care Centers**. It is one of the best surgical wire cutters on the market. The device last week was approved for patenting in Europe, so you know it must work well. The device is called a "Moby Cutter" and is 7 years now in the making.

Over the past 7 years with my background in healthcare and mechanical engineering science, I conducted research on the functionality of multiple commercial and surgical wire cutters while designing the current one whose pictures were previously sent to the Innovations Department. In conjunction with the design, I wrote an article **(An Urgent Care Approach to Fishhook Removal)** on June 1, 2021 in the **Journal of Urgent Care Medicine**. The article was written by myself and co-authored by one of the Baptist Health of South Florida's Premier Infectious Disease physicians', Dr. **Jorge Murillo**, however the **timely article** was **misprinted** (see below acknowledgement by the JUCM) and a reprint is not available at this time to assist your committee to understand the need for the wire cutter and its purchase.



It has been brought to our attention that the publication titled "An Urgent Care Approach to Fishhook Removal" originally published in June 2021 digital edition of The Journal of Urgent Care Medicine on June 1, 2021 ("Publication"), contains several changes made during the editing process performed by JUCM which the authors took issue with and subsequently demanded the Publication be retracted. Accordingly, at the request of the authors, Anthony G. Stanley, MD and Jorge Murillo, MD, we have fully retracted the Publication.

An Urgent Care Approach to Fishhook Removal - Journal of Urgent Care Medicine (jucm.com)

However, I have developed a **powerpoint presentation** to help compensate for the loss of the article and ask your committee to allow me to come in for a formal presentation and hands on demonstration with your purchasing department and appropriate clinical representatives. As your surgeon reviewer said in your last email to me, it was hard for him to understand the application by looking at pictures, … *"and if it works properly, it may add safety in the OR".*  I believe a formal presentation to the key committee members will quickly show the potential of the device and the timely ness of its arrival to Baptist Health OF South Florida. Some of you may know or have heard of me, I have been working with Baptist Health of South Florida since completing Internal Medicine Residency at Jackson Memorial Hospital in 1997. I have worked at Homestead Hospital for many years and currently registered Baptist Medical Staff working in the BOS Urgent Care

Hospital for many years and currently registered Baptist Medical Staff working in the DCC Urgent Care facilities.

I appreciate your review of my introduction and look forward to setting up a formal meeting to have a chance to properly introduce my surgical device with multiple applications.

Sincerely,


Anthony G. Stanley, MD


On Fri, Dec 17, 2021 at 8:23 AM Nila D. Bhakuni <NilaB@baptisthealth.net> wrote:

> ## Dr. Stanley,
>
> ## Your information was shown to a surgeon in our system, and this was the reply.
>
> *"I think the concept is a good one, I'm not sure I understand how it actually works by looking at the design or pictures of the device.  Certainly we have all seen flying pieces of wire after clipping them, and if it works properly it may aid safety in the OR."*
>
> ## Best,
>
> ## Nila
>
> ---
>
> **From:** Anthony Stanley MD <stanmeddesigns@gmail.com>
> **Sent:** Thursday, December 16, 2021 1:48 PM
> **To:** Nila D. Bhakuni <NilaB@baptisthealth.net>
> **Cc:** Bill M. Duquette <BillD@baptisthealth.net>
> **Subject:** [External]
>
> **\*External Email: Exercise Caution!**
>
> Hello Nila:
>
>  I have not heard from anyone regarding my medical device review since your communication on October 13, 2021.
>
>  I am just contacting you to follow up on the next steps.
>
>
> Thanks
>
> Anthony G. Stannley, MD
>
> This message originates from Baptist Health South Florida (BHSF). It contains information that may be confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for anyone else to disclose, copy, distribute or use the contents of this message. This message may not be copied or distributed without this disclaimer. All personal messages express views solely of the sender, which are not to be attributed to BHSF. If you received this message in error, please notify us immediately at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

This message originates from Baptist Health South Florida (BHSF). It contains information that may be confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for anyone else to disclose, copy, distribute or use the contents of this message. This message may not be copied or distributed without this disclaimer. All personal messages express views solely of the sender, which

are not to be attributed to BHSF. If you received this message in error, please notify us immediately at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

This message originates from Baptist Health South Florida (BHSF). It contains information that may be confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for anyone else to disclose, copy, distribute or use the contents of this message. This message may not be copied or distributed without this disclaimer. All personal messages express views solely of the sender, which are not to be attributed to BHSF. If you received this message in error, please notify us immediately at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

This message originates from Baptist Health South Florida (BHSF). It contains information that may be confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for anyone else to disclose, copy, distribute or use the contents of this message. This message may not be copied or distributed without this disclaimer. All personal messages express views solely of the sender, which are not to be attributed to BHSF. If you received this message in error, please notify us immediately at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

This message originates from Baptist Health South Florida (BHSF). It contains information that may be confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for anyone else to disclose, copy, distribute or use the contents of this message. This message may not be copied or distributed without this disclaimer. All personal messages express views solely of the sender, which are not to be attributed to BHSF. If you received this message in error, please notify us immediately at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

                Plaintiff,

           vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

                Defendants.

_____/

EXHIBIT P
TO COMPLAINT FILED
FEBRUARY 28, 2023



Stanley, Anthony

*Scheduled 43 12 Hr Shifts for*

**Shift Search**

Click on drop down to Search->   [Go]   [Reset]

### May - 2021

| | SUN | MON | TUE | WED | THU | FRI | SAT | Hrs | 42/1Wks |
|---|---|---|---|---|---|---|---|---|---|
| TARGETS | Apr 25  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Davie 12.00 hrs** | Apr 26  NA: FS | Apr 27  NA: FS | Apr 28  NA: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Weston 12.00 hrs** | Apr 29  NA: FS | Apr 30  NA: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Brickell 12.00 hrs** | 01  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Miami Beach Urgent Care 12.00 hrs** | 48 Hrs | 04/25-05/01<br>48 Hrs |
| TARGETS | 02  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Davie 12.00 hrs** | 03  NA: FS | 04  NA: FS | 05  NA: FS | 06  NA: FS | 07  NA: FS | 08  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Davie 12.00 hrs** | 24 Hrs | 05/02-05/08<br>24 Hrs |
| TARGETS | 09  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Davie 12.00 hrs** | 10  NA: FS | 11  NA: FS | 12  NA: FS | 13  NA: FS | 14  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Davie 12.00 hrs** | 15  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**University 12.00 hrs** | 36 Hrs | 05/09-05/15<br>36 Hrs |
| TARGETS | 16  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Davie 12.00 hrs** | 17  NA: FS | 18  NA: FS | 19  NA: FS | 20  NA: FS | 21  NA: FS<br>Confirmed: MD/DO<br>11A - 5P<br>**Weston 6.00 hrs** | 22  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Coral Gables 12.00 hrs** | 30 Hrs | 05/16-05/22<br>30 Hrs |
| TARGETS | 23  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Davie 12.00 hrs** | 24  NA: FS | 25  NA: FS | 26  NA: FS | 27  NA: FS | 28  NA: FS | 29  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Davie 12.00 hrs** | 24 Hrs | 05/23-05/29<br>24 Hrs |
| TARGETS | 30  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Davie 12.00 hrs** | 31  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Brickell 12.00 hrs** | Jun 01  NA: FS | Jun 02  NA: FS<br>Confirmed: MD/DO<br>11a - 11p | Jun 03  NA: FS | Jun 04  NA: FS | Jun 05  A: FS<br>Confirmed: MD/DO<br>11a - 11p<br>**Miami Beach Urgent Care 12.00 hrs** | 36 Hrs | 05/30-06/05<br>36 Hrs |
| | SUN | MON | TUE | WED | THU | FRI | SAT | Hrs | 42/1Wks |

Total = 0
OC =198 Hrs









**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

                  Plaintiff,

             vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

                  Defendants.

_____/

EXHIBIT Q
TO COMPLAINT FILED
FEBRUARY 28, 2023

*"Covid Positive for 20 Days"*

# Baptist Health South Florida
# COVID Center

**STANLEY, ANTHONY G**

Birth Date: Mar 24, 1957

## COVID-19 Immunizations

No information recorded

## COVID-19 Laboratory Results

**SARS-CoV-2 (COVID-19)**

## Negative

Collection Date:  Aug 05, 2021 10:18 a.m. EDT        Reference Range:  Negative

**Ordered By:**  Carriazo Isasi, Jorge MD

**Note:** Aug 05, 2021 10:37 a.m. EDT
 Coronavirus Interpretation
Negative:  Negative results should be treated as presumptive and, if inconsistent with clinical
signs and symptoms or necessary for patient management, should be tested with an alternative
molecular assay.
This result does not rule out co-infection with other pathogens.
Positive: COVID-19 viral RNA detected.
Invalid: The presence or absence of COVID-19 Viral RNA cannot be determined.  Please consider
re-collection of a new specimen, if clinically indicated.

NOTE: This is a molecular test utilizing isothermal nucleic acid amplification for the qualitative
detection of nucleic acid from the SARS-CoV-2 viral RNA in patient samples.  The test has not
been FDA approved or cleared.  This test is authorized for use under the Food and Drug
Administration's Emergency Use Authorization (EUA).

**SARS-CoV-2 (COVID-19)**

## NOT DETECTED

Collection Date:  Aug 05, 2021 10:18 a.m. EDT        Reference Range:  NOT DETECTED

**Ordered By:**  Carriazo Isasi, Jorge MD

**Note:** Aug 06, 2021 03:40 p.m. EDT

A Not Detected (negative) test result for this test means that SARS- CoV-2 RNA was not present in the specimen above the limit of detection. A negative result does not rule out the possibility of COVID-19 and should not be used as the sole basis for treatment or patient management decisions. If COVID-19 is still suspected, based on exposure history together with other clinical findings, re-testing should be considered in consultation with public health authorities. Laboratory test results should always be considered in the context of clinical observations and epidemiological data in making a final diagnosis and patient management decisions. Please review the "Fact Sheets" and FDA authorized labeling available for health care providers and patients using the following websites: https://www.questdiagnostics.com/home/Covid-19/HCP/QuestIVD/fact- sheet.html https://www.questdiagnostics.com/home/Covid-19/Patients/QuestIVD/fact-sheet.html This test has been authorized by the FDA under an Emergency Use Authorization (EUA) for use by authorized laboratories. Due to the current public health emergency, Quest Diagnostics is receiving a high volume of samples from a wide variety of swabs and media for COVID-19 testing. In order to serve patients during this public health crisis, samples from appropriate clinical sources are being tested. Negative test results derived from specimens received in non-commercially manufactured viral collection and transport media, or in media and sample collection kits not yet authorized by FDA for COVID-19 testing should be cautiously evaluated and the patient potentially subjected to extra precautions such as additional clinical monitoring, including collection of an additional specimen. Methodology: Nucleic Acid Amplification Test (NAAT) includes RT-PCR or TMA Additional information about COVID-19 can be found at the Quest Diagnostics website: www.QuestDiagnostics.com/Covid19. Lab test performed by: Lab Mnemonic: MI Quest Diagnostics-Miami 10200 Commerce Pkwy Miramar, FL 33025-3938 DR. Julie L Friedman

**SARS-CoV-2 (COVID-19)**

**Positive (Critical)**

Collection Date:  Jul 27, 2021 10:42 a.m. EDT        Reference Range:  Negative

**Ordered By:**  Carriazo Isasi, Jorge MD

**Note:** Jul 27, 2021 10:53 a.m. EDT
Critical results called to DR.Carriazo at 07/27/2021 10:53:42 EDT by AP. Read back and verified? YES

**Note:** Jul 27, 2021 10:53 a.m. EDT
 Coronavirus Interpretation
Negative:  Negative results should be treated as presumptive and, if inconsistent with clinical signs and symptoms or necessary for patient management, should be tested with an alternative molecular assay.
This result does not rule out co-infection with other pathogens.
Positive: COVID-19 viral RNA detected.
Invalid: The presence or absence of COVID-19 Viral RNA cannot be determined.  Please consider re-collection of a new specimen, if clinically indicated.

NOTE:  This is a molecular test utilizing isothermal nucleic acid amplification for the qualitative detection of nucleic acid from the SARS-CoV-2 viral RNA in patient samples.  The test has not

been FDA approved or cleared.  This test is authorized for use under the Food and Drug Administration's Emergency Use Authorization (EUA).

## SARS-CoV-2 (COVID-19)

## NOT DETECTED

Collection Date:  Jul 27, 2021 10:42 a.m. EDT          Reference Range:  NOT DETECTED

**Ordered By:**  Carriazo Isasi, Jorge MD

**Note:** Jul 28, 2021 09:00 p.m. EDT
A Not Detected (negative) test result for this test means that SARS- CoV-2 RNA was not present in the specimen above the limit of detection. A negative result does not rule out the possibility of COVID-19 and should not be used as the sole basis for treatment or patient management decisions. If COVID-19 is still suspected, based on exposure history together with other clinical findings, re-testing should be considered in consultation with public health authorities. Laboratory test results should always be considered in the context of clinical observations and epidemiological data in making a final diagnosis and patient management decisions. Please review the "Fact Sheets" and FDA authorized labeling available for health care providers and patients using the following websites: https://www.questdiagnostics.com/home/Covid-19/HCP/QuestIVD/fact- sheet.html https://www.questdiagnostics.com/home/Covid-19/Patients/QuestIVD/fact-sheet.html This test has been authorized by the FDA under an Emergency Use Authorization (EUA) for use by authorized laboratories. Due to the current public health emergency, Quest Diagnostics is receiving a high volume of samples from a wide variety of swabs and media for COVID-19 testing. In order to serve patients during this public health crisis, samples from appropriate clinical sources are being tested. Negative test results derived from specimens received in non-commercially manufactured viral collection and transport media, or in media and sample collection kits not yet authorized by FDA for COVID-19 testing should be cautiously evaluated and the patient potentially subjected to extra precautions such as additional clinical monitoring, including collection of an additional specimen. Methodology: Nucleic Acid Amplification Test (NAAT) includes RT-PCR or TMA Additional information about COVID-19 can be found at the Quest Diagnostics website: www.QuestDiagnostics.com/Covid19. Lab test performed by: Lab Mnemonic: MI Quest Diagnostics-Miami 10200 Commerce Pkwy Miramar, FL 33025-3938 DR. Julie L Friedman

## SARS-CoV-2 (COVID-19)

Positive (Critical)

Collection Date:  Jul 17, 2021 09:44 a.m. EDT          Reference Range:  Negative

**Ordered By:**  Perugorria, Yamirka MD

**Note:** Jul 17, 2021 09:54 a.m. EDT
Critical results called to Dr.Perugorria at 07/17/2021 09:54:36 EDT by AP. Read back and verified? yes

**Note:** Jul 17, 2021 09:54 a.m. EDT
 Coronavirus Interpretation
Negative:  Negative results should be treated as presumptive and, if inconsistent with clinical signs and symptoms or necessary for patient management, should be tested with an alternative

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

                Plaintiff,

           vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

                Defendants.

_____/

EXHIBIT R
TO COMPLAINT FILED
FEBRUARY 28, 2023



**Barry Oliver Chase**
**Senior Partner**
**Barry@ChaseLawyers.com**
**Florida, New York, District of**
**Columbia, US Supreme Court**

**Gregory Bloom**
**Partner**
**Greg@ChaseLawyers.com**
**Florida**

**Alexander Loveyko**
**Associate Attorney**
**Alex@ChaseLawyers.com**
**New York**

**Anastasia Latman**
**Associate Attorney**
**Anastasia@ChaseLawyers.com**
**New York**

**Website: www.ChaseLawyers.com**

**IP, Entertainment, Arts, Sports and Media Law**

| **21 SE 1ˢᵗ Ave. Suite 700** | **1345 6th Avenue, 2nd floor,** |
| **Miami, FL 33131 USA** | **New York, NY 10105** |
| **Office (305) 373-7665** | **Office (212)-601-2762** |
| **Fax (305) 373-7668** | **Fax (305) 373-7668** |

September 23, 2021

**To: Braveheart Group LLC d/b/a "The Journal of Urgent Care Medicine"**

**185 State Route 17, Suite 4**

**Mahwah, NJ 07430**

**Via email to swilliams@jucm.com, editor@jucm.com**

Dear Mr. Williams,

Reaching out on behalf of our client, Dr. Anthony Stanley ("Client" or "Copyright Owner"), in regard to the article published by your company, The Journal of Urgent Care Medicine ("Publisher") on June 1, 2021, titled "An Urgent Care Approach to Fishhook Removal" with a URL located at https://www.jucm.com/documents/jucm-June-2021.pdf/ ("Publication"), as well as printed in the June 2021 print edition of the Publisher.

We have been informed by our Client, and have concluded from independently researching the matter at hand, that there were several substantial infringements of our client's rights, both as it regards federal copyright legislation, as well as local legislation on defamation by Publisher as follows:

I.       <u>Violation of our Client's rights under the Copyright Act.</u>

In your email dated June 23, 2021, addressed to our Client you are referring to an approval allegedly received from our Client on May 5ᵗʰ, 2021 in regard to the version of the Original Article that was to be published in the Publication ("Approval Correspondence"). See Exhibit A for the copy of that correspondence and a copy of the June 23 correspondence.

Please also see Exhibit B, comparing the version approved by our Client in Approval Correspondence and the version of the Original Article actually published in the Publication (online version), and identifying the parts of Publication inserted or removed without Dr. Stanley's approval, as well as the legend of existing typos, misrepresentations, improper attributions of rights ownership and basic spelling mistakes currently present in the Publication.

Description of differences:

1.  Section "Urgent Message" added w/o our Client's approval.

2. Photo by "Thundermist Lure Company" removed w/o our Client's approval.

3. The following sentences added w/o our Client's approval:

"U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are treated in the field without attention from a healthcare provider. However, the presumption is that patients who seek medical care do so in the emergency room, an urgent care center, or in an ambulatory care center."

"From this author's experience, pandemonium commences as soon as front desk personnel in the urgent care center announce there's a fishhook injury in the waiting room."

4. Photo by Dr. Stanley was removed w/o our Client's approval, and, moreover, in contradiction with a direct request by Dr. Stanley in an email dated 06/05/2021.

5. Five (5) Photos removed from the "Trauma Gallery" section of the Original Article w/o our Client's approval.

6. Photo by "Ty Southerland" removed w/o our Client's approval.

7. An answer to the question posed by Publisher to Dr. Stanley under a premise of peer review during the approval process was reworded, supplemented with Publisher's own comments and published w/o our Client's approval.

Additionally, the following violations were performed by Publisher in its printed version of the Publication (please see Exhibit C detailing the placement of the violations attached to herein):

1. Unauthorized use of a photo belonging to by Dr. Stanley in violation of his rights.

2. Misplaced photos (Figure 5, Figure 6, Figure 7, Figure 9, Figure 10) confusing the reader and leading to potential injuries to the reading public.

As is evident from both Exhibit B, Exhibit C, the legend of existing mistakes and misrepresentations (in Exhibit B) and the breakdown provided above, the version originally approved for publication by Dr. Stanley on May 5th, as referred to above, and in your correspondence dated June 23, 2021, is substantially different from the version actually published in the Publication (including the print version) violating a number of rights of our Client under the Copyright Act (please see below).

Please be aware, that our Client has performed a filing for Copyright Registration in regard to the original version of the Publication ("Original Article"), Copyright Claim # 1-10640834731 on 07/08/2021 – within three (3) months of the work's publication as per 17 U.S.C. 412 - providing himself with access to both actual and statutory damages associated with the infringement of the scope of his rights under the Copyright Act.

Publisher's failure to obtain our Client's authorization to publish the Publication violated Dr. Stanley's rights to distribute the Original Article, to publicly display the Original Article, and to prepare derivative works on the basis of the Original Article, with the Publisher going beyond the scope of any implied license by implementing edits and amendments that were both contrary to the spirit of the Original Article, as well as potentially harmful to both our Client's reputation and health of the public.

2

Namely, in present instance, registration of Dr. Stanley's rights to the Original Article and subsequent violation of his rights under the Copyright Act by the Publisher, results in potential liability for copyright infringement for the Publisher, the scope of statutory damages for which can be as high as **$150,000 (One Hundred and Fifty Thousand US Dollars)** per work infringed, as per 17 U.S.C. 504, as well as attorney's fees.

Copyright Owner treats copyright infringement as a very serious matter and fully enforces its rights against infringers. Under the circumstances, Copyright Owner is prepared to try to resolve this matter amicably provided that you cooperate fully with Copyright Owner and establish to its satisfaction that this was a one-time error of judgment and not a systematic effort to profit from Copyright Owner's intellectual property.

## II.    <u>Claim of Defamation under Florida Law</u>

Under Florida law, the elements of a defamation claim are:

- the defendant published a false statement;
- about the plaintiff;
- to a third party; and
- the falsity of the statement caused injury to the plaintiff.

Border Collie Rescue v. Ryan, 418 F.Supp.2d 1330, 1348 (M.D.Fla. 2006). A plaintiff must also prove that the defendant's fault in publishing the statement amounted to at least negligence.

In present instance, all elements are clearly evident from the facts of the case:

1) Publisher published the Publication that contains multiple inconsistencies, medical inaccuracies and potentially harmful recommendations to the readers of the Publication;
2) Publisher identified Dr. Stanley as the author of the Publication, leading to reputational damages to Dr. Stanley, as well as potentially negligent infliction of harm to the public at large;
3) Publisher distributed the Publication to third parties via providing access to the Publication at the https://www.jucm.com/documents/jucm-June-2021.pdf/ URL as well as in the printed version of the Publication;
4) Publisher have caused and continues to cause substantial reputational damages to our Client by refusing to retract or edit the Publication, in violation of our Client's rights.

Please see Exhibit D for a Petition for Article Retraction ("Retraction Statement") authored by William Kranichfeld, MD, Ernesto Sanz, MD, Betty Ruiz, ARNP, Dia Nguyen, MD, Yenny Ceballos, ARNP, Anisleydi Pardon, ARNP, Michael Sasoni, MD and Bonnie J. O'Sullivan, MD that identifies the following issues existing with the publication:

1) Factual and grammatical errors
2) Factual misrepresentations and omissions
3) Unauthorized and incorrect medical advice provided by Publisher under Dr. Stanley's name

Our Client fully intends to proceed with asserting his claims of defamation, if the Publisher fails to comply with our

respectful demands contained below, due to the contents of Publication being harmful not only as it pertains his personal reputation, but also potentially, subject to a tort of negligence, due to the Publication reflecting a breach on behalf of the Publisher, as a medical issue, of its duty to provide correct and truthful information to the medical professionals that can use this information to serve the public, as confirmed by a number of medical professionals that have authored the Petition Statement.

Failure of Publisher to comply with our respectful demands contained in the later section will result in our Client asserting the claim of defamation under Florida law, subject to compensatory, punitive and other available damages under the appropriate legislation.

**III.**      **Provisions of Florida's Retraction Statute**

Under the Florida retraction statute, Fla. Stat. § 770.02, once the publisher receives the retraction request, the publisher must **publish the correction, apology, or retraction within**:

- ten days of notice, for a daily or weekly publication;
- twenty days of notice, for a semimonthly publication;
- forty-five days of notice, for a monthly publication; or
- the next issue, for a work published "less frequently than monthly," as long as the plaintiff serves the notice no later than 45 days prior to such publication.

The publisher must make a **full and fair correction, apology, or retraction** by placing it in the same editions or corresponding issues of the newspaper or periodical in which said article appeared and in as conspicuous place and type as said original article.

Failure of the Publisher to retract an offensive publication may result in the plaintiff potentially claiming not only actual damages resulting from the defamation inflicted by the improper publication, but also reputational or punitive damages.

**IV.**      **Our Respectful Demands**

Our Client fully intends to assert his rights under both federal Copyright legislation, as well as local civil regulations pertaining to defamation, and negligence on behalf of the Publisher in publishing an unauthorized version of the Original Article at the https://www.jucm.com/documents/jucm-June-2021.pdf/ URL, unless:

1. Publisher immediately ceases and desists from all further attempts to reproduce, publish, provide, distribute, transmit, display, publicly perform, or otherwise make any use of the Publication as it is currently published at the https://www.jucm.com/documents/jucm-June-2021.pdf/ URL.

2. Publisher immediately ceases and desists from all further attempts to reproduce, publish, provide, distribute, transmit, display, publicly perform, or otherwise make any use of the Publication as it is currently published in its printed June 2021 version.

3.  Publisher interprets this Demand Letter as the "retraction request" within the meaning of Fla. Stat. § 770.02.

4.  In accordance with Fla. Stat. § 770.02, as well as the Publisher's own Retraction Rules which can be found at https://www.jucm.com/author-instructions/, under "Retractions", Publisher makes a **full and fair apology, or retraction** by placing it in the same edition or issue of the newspaper or periodical in which said article appeared and in as conspicuous place and type as said original article (both online and printed versions).

5.  Publisher makes a correction, by publishing an updated version of the Original Article attached to herein as Exhibit E, by placing it in the same edition or issue of the newspaper or periodical in which said article appeared and in as conspicuous place and type as said original article (both online and printed versions), as the current Publication contains flawed or erroneous data such that its findings and conclusions cannot be relied upon.

**The above does not constitute a full recitation of our Client's rights or claims and nothing set forth herein constitutes a waiver of any of our Client's rights, remedies and positions, all of which are expressly reserved.**

Please contact the undersigned no later than **five (5) days** from the date of this letter to confirm that the parties are in mutual understanding that the absence of action on behalf of the Publisher will result in us advising our Client to consider legal action to enforce his rights and to collect the damages for defamation as well as an action for copyright infringement under the Copyright Act, subject to the claims for actual, statutory damages and attorney's fees.

| | |
|---|---|
| **Name:** Alexander Loveyko, Esq. | Very truly yours, |
| **Address:** 21 SE 1st Ave, Suite 700, | |
| Miami, FL, USA 33131 | *Loveyko Alexander* |
| **Telephone:** 305-373-7665 | |
| **Email:** alex@chaselawyers.com | Attorney of Record for Client |

**Exhibit A – "Correspondence Printouts"**

Emails from *Scholastica* Web Portal

Total ④

# Clinical Approach to Fishhook Removal

Submitted on Feb 16, 2021 - Manuscript ID: 1320812

Start a discussion

- Anthony G. Stanley
  Jun 4, 2021 - 11:11 am EDT
  Article Credits
  4
  Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on some of the online d...
- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT
  Receipt of your submission to JUCM
  8
  Ok great Harris. Looking forward to reading it along with family and friends. Yes please send a f...
- Anthony G. Stanley
  Apr 29, 2021 - 11:41 am EDT
  Article discussion and photos
  4
  Hello Harris: Just checking to see how the project is coming along. Let if you need my assistance...

Discussion with *Journal of Urgent Care Medicine*

## Article discussion and photos

- Anthony G. Stanley
  Apr 16, 2021 - 7:32 pm EDT
  Hello Harris: I would like to contact you on Monday to discuss some aspects of the article and set up. I will try to contact you Monday 4/19/21 after 10:30am, if it is good timing for you.
  Dr. Stanley

- Anthony G. Stanley
  Apr 19, 2021 - 10:44 am EDT
  hello
  Attachments
    - work copy an urgent care approach to fishhook remova

- Anthony G. Stanley

Help

Apr 20, 2021 - 7:26 am EDT
Hello Harris:
I contacted all the photo copyright owners and cc you last evening. Attached is a composite contact list.

keep me posted.
Dr. Stanley
Attachments
  ○ 2021_copy_right_granted_list_a_autorecovered_.docx
- Anthony G. Stanley
  Apr 29, 2021 - 11:41 am EDT
  Hello Harris:
  Just checking to see how the project is coming along. Let if you need my assistance.
  Take
  Dr. Stanley

## Post a response

bolditalicbulletsnumberslink

Add an attachment

| Choose File | No file chosen      Add file

## Allowed file types

**You may upload the following types of files:**

*.aac, *.avi, *.csv, *.doc, *.docx, *.flac, *.gif, *.html , *.jpeg, *.jpg, *.key, *.m4a, *.md, *.mov, *.mp3, *.mp4, *.mpeg, *.mpg, *.odt, *.pdf, *.png, *.pps, *.ppt, *.tex, *.tif, *.tiff, *.txt, *.xls, *.xml, *.zip

If you have a file that is unsupported please archive it within a **.ZIP** file before uploading.

Post Message

X

*Email From Scholastic Web Portal    Total (8)* (handwritten)

# Clinical Approach to Fishhook Removal

Submitted on Feb 16, 2021 - Manuscript ID: 1320812

Start a discussion

- Anthony G. Stanley
  Jun 4, 2021 - 11:11 am EDT
  Article Credits
  4
  Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on some of the online d...
- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT
  Receipt of your submission to JUCM
  8
  Ok great Harris. Looking forward to reading it along with family and friends. Yes please send a f...
- Anthony G. Stanley
  Apr 29, 2021 - 11:41 am EDT
  Article discussion and photos
  4
  Hello Harris: Just checking to see how the project is coming along. Let if you need my assistance...

Discussion with *Journal of Urgent Care Medicine*

# Receipt of your submission to JUCM

- Harris Fleming
  Feb 17, 2021 - 8:02 am EST
  Dear Dr. Stanley,

  Thank you for submitting your manuscript to *JUCM, The Journal of Urgent Care Medicine*. We appreciate your taking the time and the initiative to contribute to the growing body of urgent care literature.

  Your article will be shared with a member of our clinical editorial team, after which I will update you on its status. You can expect to hear from me in 2 to 4 weeks. Typically, manuscripts that are accepted by our journal wil[...] [...]3 to 6 months after submission, depending on seasonality, the peer [...], and other factors.

Help

If you have any questions at any time, please email me at hfleming@jucm.com.

Thanks again.

Harris

**Harris Fleming**
**Executive Editor**
*JUCM, The Journal of Urgent Care Medicine*


- Anthony G. Stanley
  Mar 2, 2021 - 8:54 am EST
  Hello Harris: Just checking in. This is my first journal article. Let me know if you need any information from me, medical illustrations, photos etc...

  Have a great day!
  Dr. Stanley

- Harris Fleming
  Apr 30, 2021 - 12:01 pm EDT
  Dr. Stanley,
  Right now your manuscript is being read by a couple members of our peer review panel. It's the final step before preparing the article for publication. I will let you know whether or not they have any queries. I've asked them to get back to me no later than today.

  Thank you for checking in.

  Harris

- Anthony G. Stanley
  May 5, 2021 - 6:31 pm EDT
  Hello Harris: I reviewed the article . I made a few rearrangements of photos to make everything flow a little better. I was able to cut the page count from 13 to 12. Content not changed but truncated to conserve space. I included my x ray of the fish hooked finger which has been a inspiration point for me writing this article (PATIENT EVALUATION), hope its no problem. I like your edits of the article and satisfied with the results.

Dr. Stanley

Attachments
- o jucm_0621_clinical_fishhook_post_peer_review_2.docx
- o jucm_article_disclosure_form_ags.pdf

- Anthony G. Stanley
  May 10, 2021 - 7:57 am EDT
  Good Morning Harris;
  Here are two photos of me to choose from  and Disclosure from Dr. Murrillo.
  Have a great week.
  Dr. Stanley

  Attachments
  - o dr.stanley.jpg
  - o dr._stanley.jpg
  - o jucm_disclosure_form3_28_21jm.pdf

- Anthony G. Stanley
  May 17, 2021 - 1:31 pm EDT
  Hello Harris:

  Just checking if you know if the article is slated for June or July issue?
  Also please send a copy of the final layout plans ( copy and photos) of the article.

  Thanks
  Dr. Stanley

- Harris Fleming
  May 17, 2021 - 2:39 pm EDT
  Hi, Dr. Stanley.

  Your article will be featured on the cover of the June issue, which goes to press
  this week. I will be happy to send you a few copies after we've received the excess
  back from the printer, which will probably be in the second week of June.
  Unfortunately, we're unable to share the layout in advance of publication. It will
  be available online starting on June 1.

  Harris

- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT

  Ok great Harris. Looking forward to reading it along with family and
  friends. Yes please send a few copies when you can!

  Have a great week

## Post a response

bolditalicbulletsnumberslink

Add an attachment

[ Choose File ] No file chosen          Add file

## Allowed file types

**You may upload the following types of files:**

*.aac, *.avi, *.csv, *.doc, *.docx, *.flac, *.gif, *.html , *.jpeg, *.jpg, *.key, *.m4a, *.md, *.mov, *.mp3, *.mp4, *.mpeg, *.mpg, *.odt, *.pdf, *.png, *.pps, *.ppt, *.tex, *.tif, *.tiff, *.txt, *.xls, *.xml, *.zip

If you have a file that is unsupported please archive it within a **.ZIP** file before uploading.

[ Post Message ]
X

*E-mail From Scholastica Web Portal*

*Total (4)* 

# Clinical Approach to Fishhook Removal

Submitted on Feb 16, 2021 - Manuscript ID: 1320812

Start a discussion

- Anthony G. Stanley
  Jun 4, 2021 - 11:11 am EDT
  Article Credits
  4
  Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on some of the online d...
- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT
  Receipt of your submission to JUCM
  8
  Ok great Harris. Looking forward to reading it along with family and friends. Yes please send a f...
- Anthony G. Stanley
  Apr 29, 2021 - 11:41 am EDT
  Article discussion and photos
  4
  Hello Harris: Just checking to see how the project is coming along. Let if you need my assistance...

Discussion with *Journal of Urgent Care Medicine*

## Article Credits

- Anthony G. Stanley
  Jun 1, 2021 - 12:46 pm EDT
  Hello Fleming:

  I wanted see if my photo can be added to the On-line version and add me to the Authors Bios  Section.

  Thanks
  Dr. Stanley
  Attachments
    - dr._stanley.jpg
    - post_review.docx
- Harris Fleming

Help

Jun 1, 2021 - 11:40 pm EDT

Dr. Stanley,

Yes, your photo and your information will be added when the standalone PDF version of your article is uploaded to the website. There is a lag between publication of the issue and its articles and their addition to the archives, which coincides with updating the author bios.

Thank you for asking (and, again, for your excellent contribution).

Harris

- Anthony G. Stanley

Jun 2, 2021 - 10:53 am EDT

Hi Harris:

Thanks for the info. Oh by the way , I wanted to know if in the future , can you send me any statistical data in regards to the article readership . How many clicks and that sort of info if it is available? Just want to gauge where it is on the popularity list over time!

Thanks again.

- Anthony G. Stanley

Jun 4, 2021 - 11:11 am EDT

Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on some of the online documents?

If possible;

Jorge Murillo

Dr. Stanley

## Post a response

bolditalicbulletsnumberslink

Add an attachment

Choose File  No file chosen        Add file

## Allowed file types

**You may upload the following types of files:**

*.aac, *.avi, *.csv, *.doc, *.docx, *.flac, *.gif, *.html , *.jpeg, *.jpg, *.key, *.m4a, *.md, *.mov, *.mp3, *.mp4, *.mpeg, *.mpg, *.odt, *.pdf, *.png, *.pps, *.ppt, *.tex, *.tif, *.tiff, *.txt, *.xls, *.xml, *.zip

If you have a file that is unsupported please archive it within a **\*.ZIP** file before uploading.

Post Message
X

 **Gmail**

**Anthony Stanley MD <stanmeddesigns@gmail.com>**

---

## Article Retraction Request
3 messages

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                    Wed, Jun 23, 2021 at 9:07 AM
To: editor@jucm.com
Cc: swilliams@jucm.com, Harris Fleming <hfleming@jucm.com>

6/23/2021

Dear **Journal of Urgent Care Medicine / Braveheart Group, LLC/ Experity Health**:

You recently printed an unauthorized article on June 1, 2021 in the JUCM, entitled **An Urgent Care Approach to Fishhook Removal** under my name which is not my writings. It is superimposed with editorial comments placed by the JUCM and medical advice injected, not authorized by me. I came to your company with integrity, honesty and fairness. However, I was not treated with the same. I want to know why did you do such a thing? The peer reviews your website advertise, worked as a peer take over and operated under inadequate supervision of the editing and rewriting process. The paper is filled with grammatical errors and omitted steps in medical procedural concepts due to unskillful cutting and pasting. I worked and researched the article contents for **7 years** and it's now in ruins as well as my medical reputation. An opportunity to proof the final article was intentionally taken away from me. Why did you do such a thing? Do you take over from **every author**, **every month** and **deny all authors final proofing** or did you just, **decided to choose** me? Were your actions, **Racially Motivated** or what was your reason? Was your hastiness due to the old acronym Publish or Perish (ideological thinking). **How can you sleep at night knowing what you have done?**

Key sections of my work were wrongfully discarded.  There are sections in the paper that your non doctoral staff contributed, giving **medical advice and misinformation** which may have damaging effects if readers act on **wrongful medical advice in performance of patient care.** Read what your agents wrote into the article and compare it to the original submission in the **Scholastica portal**. I am asking that the article be retracted and my original writings be printed unchanged. I was asked to write your organization and **"simply ask, the Journal of urgent Care Medicine to retract the article and remove it from any form of technological circulation".**   I hold all parties mentioned (and copied in this email) accountable and ask for an internal audit of your activity and participation in this event. I look forward to your response. I am very, very disappointed in the JUCM and what has taken place.  I hope we can work together to rectify the issues, prevent harm to the readers acting on misinformation and come to a reasonable solution. Your website talks about integrity, honesty and fairness but as you can see by the treatment shown to me, those claims are not true. All of the **doctors on your JUCM staff have a medical license, and** all took a "**Hippocratic Oath", I am sure they realized the importance of retracting the article in all forms and setting the record straight, to protect the public. At the advice of an attorney, I am sending you this letter to "simply ask".**

**Sincerely**

---

**swilliams@jucm.com** <swilliams@jucm.com>                    Wed, Jun 23, 2021 at 11:27 AM
To: Anthony Stanley MD <stanmeddesigns@gmail.com>

Dr. Stanley,

I'm sorry to hear that you weren't happy with our publishing your article.

On May 4th, you were sent a version of the manuscript of your article that included edits necessitated after our internal medical review comments, and external peer reviewer comments. You may have forgotten that on May 5th, you sent an email to Executive Editor Harris Fleming acknowledging the receipt of the revised manuscript, and replied "I like your edits and am satisfied with your results".  Upon receipt of  your approval, this exact version of the manuscript was sent to our designer for layout.

I don't understand what the problem is, now that the article has been published.  You approved the content, in writing.  As our medical staff and peer reviewers have agreed, it is a valuable contribution to the medical literature on an important topic in urgent care medicine.

I see no reason to retract this article.

Best wishes,

Stuart



**Stuart Williams**

Publisher

p: 201-529-4004

[Quoted text hidden]

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>
Draft To: swilliams@jucm.com

Wed, Jun 23, 2021 at 12:38 PM

Hello Mr. Williams: This is the first time you have formally entered the picture. Welcome! Please try to keep the facts correct. The version (work copy #2 that was corrected by me and ) I sent to Mr. Harris on May 5th is not the version you printed June 1, 2021 online. There is an old Jamacian saying
" out of evil, cometh good". I am sure we both will have a clearer understanding with time. The problem still stands as stated in the previous emails. **By your statements today**, It appears you printed an unauthorized version. Recheck your emails time and date. It seems that all emails go to you or Mr. Harris, do you guys own the JUCM?

Dr. Stanley

[Quoted text hidden]

**Exhibit B – "Online Publication Violations and Legend"**

**Journal of Urgent Care Medicine (JUCM) Error Sheet Legend (Comparison of Approved Article and Published Article)**

1. Mr. Harris Fleming (editor), stated to me, the JUCM readers did not want to see the word **Clinical**, it does not sit well with them, they like something with Urgent Care in it so he removed and changed, my title "Clinical Approach to Fishhook Removal" to **An Urgent Care Approach to Fishhook Removal.** Contrary to his statements he uses the word **Clinical Feature Articles** on their JUCM website.

2. Un authorized photo attached to my article. All of my comparable photos, were omitted. Please refer to original article to appreciate all the changes.

3. My article used for advertisement solicitation and attraction or readers.

4. JUCM propaganda injected into my article without permission to steer (brain wash) readers to their Urgent Care mindset- not authorized

5. There is no national data (CDC tracking) on incidence of injuries going to Urgent Care Centers in the US with fishhook injury. This is **medical misinformation**

6. Grammatical error

7. There is no **U.S. data** on incidence on fishhook injury, the **CDC** does not track that information at this time. This is one of the points, pointed out in the original paper but unknowingly taken out during the rapid takeover of the paper (cut and paste process) by the JUCM. They over looked that point completely.

8. Word tense error

9. Poor wording (bad writing habits)

10. The subject **Fishhook Removal System**, which is a totally new concept to medicine, has no lead-in introduction. The lead in statements were cut out during the rapid cut and past proceeding by the JUMC. Since the JUCM, did not write the paper, the cut and paste confederates did not appreciate the concept.

11. Grammatical error

12. Interjection by the JUCM- not authorized

13. Misspelled word

14. Typo

15. Interjection by the JUMC after cut and pasting

16. Placing unauthorized framing and coloring on © copyrighted art without permission

17. Changing colors on the **fish hook diagram** from black to red on © copyrighted art without permission

18. Reproducing art with poor quality coloring

19. Improper © copyright art work salutation

20. Personal Phrase interjection not authorized

21. Wasted space- The JUMC lied and informed me, they had spacing limitations but avoided formatting in space saving set ups.

22. JUCM propaganda injected into my article without permission to steer (brain wash) readers to their Urgent Care mindset- not authorized

23. Typo

24. Improper © copyright art work salutation

25. Typo

26. Improper © copyright art work salutation

27. Improper © copyright art work salutation
28. Found only on the on-line version. The entire chapter on **Needle Cover Technique** is missing
29. Improper © copyright art work salutation
30. Improper © copyright art work salutation
31. Typo
32. Improper © copyright art work salutation
33. Personal Phrase interjection not authorized
34. This entire paragraph starting with "**On first glance**……etc.", was written by Mr. Harris Fleming whom in **not a medical doctor** and clearly **giving medical advice** in my article. No permission given.
35. Major error due to not proof reading the on-line version has the **Advance and Cut** section printed twice.
36. POSTREOVAL WOUND CARE, post-removal is spelled wrong

*This is my last response to Jucm.*
*Response sent to Jucm 6/5/21 approx 6:31 pm*
*there is also an email sent.*

**JUCM 0621 Clinical – Fishhook Removal CME**

**An Urgent Care Approach to Fishhook Removal**

*Jucm Comments*

**Urgent message:** While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal.

**Anthony G. Stanley, MD** and **Jorge Murrilo, MD**

**INTRODUCTION**
Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line known (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as *collateral damage*..



*Removed by JUCM*

Photo courtesy of Thundermist Lure Company.

*Jucm Comments*

U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are treated in the field without attention from a healthcare provider. However, the presumption is that patients who seek medical care do so in the emergency room, an urgent care center, or in an ambulatory care center. (The emergency department is the site for 28% of all acute care visits in the United States.[2]) From this author's experience, pandemonium commences as soon as front desk personnel in the urgent care center announce there's a fishhook injury in the waiting room.

Fishhook removal is a procedure comparable in difficulty to laceration repair of the skin with proper equipment. The fishhook removal system can be either disposable or a reusable sterile device similar to the standard suture tray. Here, we review the clinical approach to evaluation and removal of fishhooks, focusing on the six most common techniques of fishhook removal and injury management. To do so, it is essential to understand the anatomy of the fishhook, the injured area, and common techniques used to remove fishhooks in a timely and safe manner with minimal trauma.

**ANATOMY OF THE FISHHOOK—AND WHY IT MATTERS**

*Jucm*

The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the hook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the discretion of the provider. Tetanus status should be accessed and Td or Tdap administered if needed with age appropriateness as per established guidelines.

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (**Figure 1**). There are common features among them, however (**Figure 2**). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point. When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.



**Figure 1. Classic types of fishhooks: A, single barbed fishhook; B, multiple barbed fishhook; C, treble fishhook.** (Illustration copyright Devon Medical Art, LLC. Used with permission.)



**Figure 2. Anatomy of the fishhook.** (Illustration copyright Devon Medical Art, LLC. Used with permission.)

**PATIENT EVALUATION**

After obtaining a history of the injury, vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration. Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED. Bear in mind that the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required).

Photo courtesy of A G Stanley, MD.

*Removed*

*I specifically wrote a note on the 6/5/21 email to leave in my XRay, it was also Removed*

**PRINCIPLES OF REMOVAL**

The six most common techniques for the removal of fishhooks are:

1. Retrograde
2. String-yank
3. Needle cover
4. Barb crush
5. Cut-it-Out
6. Advance-and-cut

The method selected is based on the judgment of the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimal, this will require:

1. Wire cutter
2. Hemostat or needle driver
3. Gloves

4. Wound cleanser
5. Protective eyewear (goggles or face shield)
6. Local anesthetic

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times multiple techniques must be attempted before the fishhook is successfully removed.

In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia typically lidocaine 1% (Xylocaine) without epinephrine. A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook should have the free barbs taped or cut to avoid additional embedded puncture wounds during the removal procedure. All items attached to the hook (eg, fish line, bait, and the body of the lure itself) should be removed. The provider and bystanders should take care not to be struck by the hook during removal. Anyone assisting before the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.

**Trauma Gallery**





Photo courtesy of Steve Wecks.

Photo courtesy of Chris Barry.





Photo courtesy of *Fishing World Magazine*.
R

Photo(s) courtesy of Karen Rudkin-Moody and Ryan Moody.

Section
← Removed after 6/5/21

## Retrograde Technique

Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb, from the resting tissue site. The hook can then be backed out of the skin along the path of entry (**Figure 3**). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.



**Figure 3.** Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



Photo courtesy of Ty Southerland.

*Removed by JVCM*

## String-Yank Technique

The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. This technique works best when removing small and *medium-size hooks*. It *should not* be attempted on deeply embedded fishhooks, for fear of

damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting *1,2,3, go* (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position, use a simple knot such as a lark's head knot (**Figure 4**). Wrap the free ends around the index finger of the free hand.

A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (**Figure 5A**). Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and be embedded into a new location (**Figure 5B**).

**Figure 4**. Applying a lark's head knot to a fishhook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



E.  This can be done in reverse

A.  Match the ends of your suture or cord in half.

B.  Lay the shank of the fishhook across the suture or cord.

C.  Grab the two suture or cord ends and tuck them under the loop.

D.  Pull them tightly until tight and snug on the bend of the fishhook.

**Figure 5.** String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



A. Good firm pulling force
B. Laxity in pulling force

### Needle Cover Technique

The *needle cover technique* requires great dexterity on the part of the provider (and a little luck). It works well for the removal of large hooks with a single barb, and when the point of the fishhook is superficially embedded in the skin (surface).

After standard wound prep and local anesthesia, a 16-18-gauge needle is advanced along the wound entrance of the fishhook (**Figure 6**). The direction of insertion should be parallel to the shank. The bevel should point toward the inside of the curve of the fishhook, enabling the needle opening to cover over (capping off) the barb. It is important to have the bevel pointed in the correct direction as shown so that the leading edge of the needle matches the angle of the fishhook barb. Advance the fishhook to disengage the barb, then pull and wiggle it so that the point enters the lumen of the needle. Once covered, back out the fishhook (similar to the retrograde technique), taking care to move the needle along the entry point of the fishhook.

**Figure 6.** Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps, the barb. The fishhook and needle are then pulled back and removed as a single unit. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



A modification of this technique involves sliding a #11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out thru the track of the incision line.

**Barb Crush Technique**

The barb crush technique is considered another modification of the Retrograde Technique, but with a higher success rate.

Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (**Figure 7**).

**Figure 7.** Barb crush method. Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



### Cut-It-Out Technique

The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.[5] However, this should be a procedure of last resort in the ambulatory care setting, when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present.

To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See **Figure 8**)This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.

**Figure 8**. Cut-it-out technique. Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



### Advance-and-Cut Technique

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cut technique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective

eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

*"On first glance ..."*

**Figure 9.** Advance-and-cut technique with a single barb fishhook. Advance the fishhook through the skin, creating an exit wound. Cut off the barb of the fishhook and back the remaining fishhook out the entry point. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



**Figure 10.** Advance-and-cut technique with a multiple barb fishhook. Advance the fishhook through the skin creating an exit wound. Cut the eye of the fishhook off and pull the remaining fishhook forward through the exit wound created by advancing the point through the skin. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



Cut here

*(handwritten margin notes:)*
*Here on the Printed version 7/1/2021*

*Alex! JUGM Ased me a question then re-wrote & Addded Their comments*

**Commented [HF1]:** Peer review question: "Would removal of the shank barbs obviate the need to drag them through the wound?"

**Commented [AS2R1]:** Harris, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). By cutting the tail end off, then pull thru, you are just dragging the shank barbs intact thru the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient and saves time of procedure.  As seen on the X ray some hooks have small barbs and some larger.

**Commented [AS3R1]:**

**Commented [AS4R1]:**

**POSTREMOVAL WOUND CARE**

After removal of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a sterile dressing. Wound care should include routine irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed.

Infections after fishhook removal are uncommon.[1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason for suspicion of infection and antibiotics are prescribed, consideration of coverage water-borne organisms is reasonable.

Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus-diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required.

**CONCLUSION**

Fishhook injuries can occur at any time—during angling, commercial fishing, or simply cleaning out the garage. There is a need to establish a basic minimal procedural understanding by all healthcare providers involved in ambulatory care, urgent care, and emergency rooms for quick assessment and swift removal of fishhooks. This is an area where risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider starting with the simpler removal techniques (ie, retrograde, needle cover) prior to the more robust methods mentioned in this article. Further, there is a need to establish a standard fishhook removal system that is as universal as the suture tray, containing a medically approved cutting device, along with hemostat, protective eye wear, and other supportive care supplies. Ensuring there is an established protocol, provider training, and a ready-to-use fishhook removal system on hand (ideally in close proximity to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction.

**REFERENCES**

1.  Doser C, Cooper WL, Edinger WM, et al. Fishhook injuries: a prospective evaluation. *Am J Emerg Med*. 1991;9(5):413-415.
2.  Weinick, Robin M., Kirsten Becker, Layla Parast, Brian Dale Stucky, Marc N. Elliott, Megan Mathews, Chris Chan and Virginia Kotzias. Emergency Department Patient Experience of Care Survey: Development and Field Test. Santa Monica, CA: RAND Corporation, 2014. https://www.rand.org/pubs/research_reports/RR761.html.
3.  Gammons MG, Jackson E. Fishhook removal. Am Fam Physician. 2001;63(11):2231–6.
4.  Newton's Third Law of Motion: Textbook of Physics, AM J Phys. 12,109 (1944)

5. Ahmad SS, Seng CW, Ghani SA, Lee JF.  Cut-it-out technique for ocular fish-hook injury Journal of Emergencies Trauma and Shock, 6(4):293-295, 30 Sep 2013
6. Diekema DS, Quan L. Fishhook removal. In: Henretig FM, King C, eds. Textbook of Pediatric Emergency Procedures. Baltimore: Williams & Wilkins, 1997:1223–7.
7. GOHAR A. SALAM, M.D., D.O., Regional Anesthesia for Office Procedures: North Shore University Hospital at Manhasset, Manhasset, New York: *Am Fam Physician*. 2004 Feb 15;69(4):896-900.

Anthony G. Stanley, MD, Bio: Staff physician Criticare Clinics & Urgent Care Miami, Fl. Staff Emergency Room Physician, Baptist Healthcare of South Florida. Medical Device Inventor (holder of 3 medical device patents).  Dr. Stanley received his medical degree from Rutgers-New Jersey Medical School, Newark New Jersey. He completed Residency in Internal Medicine at University of Miami-Jackson Memorial Medical Center/ Miami VA Medical Center Miami, Florida.

Jorge Murrilo, MD, FIDSA, FACP Bio: Associate Professor of Medicine – Herbert Wertheim College of Medicine, Florida International University, Miami, Florida, Consultant in Infectious Diseases and Tropical Medicine, Baptist Health System of South Florida. Dr. Murillo received his medical degree from the Central University of Venezuela. He completed his fellowship in Infectious Diseases at the University of Maryland Hospital, Baltimore, Maryland.

*Exhibit Edition*

*Attorney General statement explained to me 96-98% Residential*

*Urgent Care Doctor*

# JUCM

#### THE JOURNAL OF URGENT CARE MEDICINE®

NEWS | RESEARCH | CLINICAL | PRACTICE MGMT | GET CME | BUYER'S GUIDE | JOBS | AUTHORS | ABOUT US | ARCHIVES

Search 🔍 | Subscribe/Get Access | Log Out | f 🐦 📧



## CLINICAL FEATURE ARTICLES

### An Urgent Care Approach To Fishhook Removal

Urgent message: While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal.

*Anthony G. Stanley, MD and Jorge Murrilo, MD* Citation: Stanley AG, Murrilo J. An urgent care approach to fishhook removal. J Urgent Care Med. 2021;15(9):13-18. INTRODUCTION Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and ...

*Unauthorized Photo attached to my article #2*

🔵 cme | Read More

### Outpatient Management Of COVID-19 In The Urgent Care Clinic: Administering Monoclonal Antibodies

Urgent message: The approved use of monoclonal antibodies to treat patients who have COVID-19 may signal a shift from inpatient to outpatient care of infected individuals who do not require hospitalization. Urgent care facilities may be ideally suited to serve as treatment centers and to become destinations of choice for such patients. Lindsey Fish, MD Now that COVID-19 has been with us for over a year, we are in a much different position regarding the treatment of this illness. While many of the initial therapeutics were focused on inpatient, specifically ...

🔵 cme | Read More

### Pretravel Consultations In The Urgent Care Setting

Urgent message: A pretravel consultation assesses the patient's fitness for travel in the context of anticipated risks associated with their journey. This individualized counseling takes into account not just age or destination, but also general health and other factors such as past travel experience. Given the proliferation of single-specialty travel medicine clinics, with appropriate training and preparation, these assessments can easily be

---

How will you meet patients' needs in the **New Era** of Urgent Care?

**EXPERITY**
Get the Guide ›

adapt

*Paid Advertisement #3*

Welcome Anthonys



**JUCM**
THE JOURNAL OF URGENT CARE MEDICINE®

Search | Subscribe/Get Access  Log Out  f  t  ⁂

NEWS    RESEARCH    CLINICAL    PRACTICE MGMT    GET CME    BUYER'S GUIDE    JOBS

AUTHORS    ABOUT US    ARCHIVES

# AN URGENT CARE APPROACH TO FISHHOOK REMOVAL

**Urgent message:** While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal.

**Anthony G. Stanley, MD** and **Jorge Murillo, MD**

Citation: Stanley AG, Murillo J. An urgent care approach to fishhook removal. *J Urgent Care Med.* 2021;15(9):13-18.

# INTRODUCTION

Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line known (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as *collateral damage.*

U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are treated in the field without attention from a healthcare provider. However, the presumption is that patients who seek medical care do so in the emergency room, an urgent care center, or in an ambulatory care center. (The emergency department is the site for 28% of all acute care visits in the United States.[2]) From this author's experience, pandemonium commences as soon as front desk personnel in the urgent care center announce there's a fishhook injury in the waiting room.

Fishhook removal is a procedure comparable in difficulty to laceration repair of the skin with proper equipment. The fishhook removal system can be either disposable or a reusable sterile device similar to the standard suture tray. Here, we review the clinical approach to evaluation and removal of fishhooks, focusing on the six most common techniques of fishhook removal and injury management. To do so, it is essential to understand the anatomy of the fishhook, the

**Welcome Anthonys**

View Archived | Privacy - Terms

injured area, and common techniques used to remove fishhooks in a timely and safe manner with minimal trauma.

# ANATOMY OF THE FISHHOOK—AND WHY IT MATTERS

The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the *discretion* of the provider. Tetanus status should be accessed and Td or Tdap administered if needed with age appropriateness as per established guidelines.

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (**Figure 1**). There are common features among them, however (**Figure 2**). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point. When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.

Figure 1. Classic types of fishhooks: A, single barbed fishhook; B, multiple barbed fishhook; C, treble fishhook.

(Illustration copyright Devon Medical Art, LLC. Used with permission.)



Figure 2. Anatomy of the fishhook.

Eye
Shank
Shank barbs (not present on all hooks)
Gap
Point
Barb
Bend

(Illustration copyright Devon Medical Art, LLC. Used with permission.)

# PATIENT EVALUATION

After obtaining a history of the injury, vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury

Dashboard
Subscriptions
Payments
Logout

Sign Up For The JUCM Newsletter
Urgent care clinical, practice management, and curated news stories - delivered to your inbox - every Tuesday.

Enter Your Name
Enter Your Email Address
SIGN UP

Privacy - Terms

involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration.

Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED. Bear in mind that the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required).

*#20 Jucm Personal Phrase Interjection*

## PRINCIPLES OF REMOVAL

*Wasted Space*

The six most common techniques for the removal of fishhooks are:

1. Retrograde
2. String-yank
3. Needle cover
4. Barb crush
5. Cut-it-out
6. Advance-and-cut

*This Lay out Saves Space*

*#21 Wasted Space*

The method selected is based on the judgment of the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimal, this will require:

*Wasted Space*

1. Wire cutter
2. Hemostat or needle driver
3. Gloves
4. Wound cleanser
5. Protective eyewear (goggles or face shield)
6. Local anesthetic

*This Lay out Saves Space*

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times multiple techniques must be attempted before the fishhook is successfully removed.

In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia typically lidocaine 1% (Xylocaine) without epinephrine. A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook should have the free barbs taped or cut to avoid additional embedded puncture wounds during the removal procedure. All items attached to the hook (eg, fish line, bait, and the body of the lure itself) should be removed. The provider and bystanders should take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.

*#22 Jucm Interjection of Personal Comments*

*#23 Jucm Typo*

## Retrograde Technique

Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of the hook. This maneuver pushes the hook deeper into the tissue bed and

*Page 4*

Privacy - Terms

dislodges the barb, from the resting tissue site. The shook can then be backed out of the skin along the path of entry (**Figure 3**). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.



**Figure 3**. Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

*#24    Jucm*
*improper copyright*
*Salutation*

# String-Yank Technique

The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting *1,2,3, go* (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

*#25*
*Jucm*
*Typo*

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position, use a simple knot such as a lark's head knot (**Figure 4**). Wrap the free ends around the index finger of the free hand. A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (**Figure 5A**). Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and be embedded into a new location (**Figure 5B**).

Privacy - Terms

*Page 5*



A. Match the ends of your suture or cord in half.

B. Lay the shank of the fishhook across the suture or cord.

C. Grab the two suture or cord ends and tuck them under the loop.

D. Pull them tightly until tight and snug on the bend of the fishhook.

E. This can be done in reverse

**Figure 4.** Applying a lark's head knot to a fishhook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

*[handwritten: #26 JUCM Improper © Salutation]*



A. Good firm pulling force
B. Laxity in pulling force

A.
B.

**Figure 5.** String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

*[handwritten: #27]*

*[handwritten: JUCM Skin Color Printed Darker Then original]*

*[handwritten: JUCM]*

*[handwritten: #28 Missing the entire Section on Needle Cover Technique. Procedure Instructions not Printed. Information Goes above fig 6.]*

**Figure 6.** Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps, the barb. The fishhook and needle are then pulled back and removed as a single unit. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

*[handwritten: #29 Improper Salutation Re copyright]*

*[handwritten: Page 6]*

Privacy - Terms

A modification of this technique involves sliding a #11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out thru the track of the incision line.

# Barb Crush Technique

The barb crush technique is considered another modification of the Retrograde Technique, but with a higher success rate. Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (**Figure 7**).



**Figure 7**. Barb crush method. Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

# Cut-It-Out Technique

#30
Inappropriate @ Salutation
Jucm

The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.[5] However, this should be a procedure of last resort in the ambulatory care setting, when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present. To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See **Figure 8**)This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.

#31
Jucm
Typo

Privacy - Terms



**Figure 8.** Cut-it-out technique. Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

#32
Improper Salutation

## Advance-and-Cut Technique

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cuttechnique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

#33
JUCM
Personal Re-Phrasing

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

#34
All Personal Comments Interjected into the article by Mr. Harris | JUCM un-necessary Jargon

On first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture

JUCM

Page 8

Misinformation to public

wound. This results in less risk of injury to the provider, less anxiety to the patient, and saves time of procedure.

## Advance-and-Cut Technique

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cuttechnique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

On first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient, and saves time of procedure.



Privacy • Terms

**Figure 9.** Advance-and-cut technique with a single barb fishhook. Advance the fishhook through the skin, creating an exit wound. Cut off the barb of the fishhook and back the remaining fishhook out the entry point. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



**Figure 10.** Advance-and-cut technique with a multiple barb fishhook. Advance the fishhook through the skin creating an exit wound. Cut the eye of the fishhook off and pull the remaining fishhook forward through the exit wound created by advancing the point through the skin. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

# POSTREMOVAL WOUND CARE

After removal of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a sterile dressing. Wound care should include routine irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed.

Infections after fishhook removal are uncommon.[1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason for suspicion of infection and antibiotics are prescribed, consideration of coverage water-borne organisms is reasonable.

Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus-diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required.

# CONCLUSION

Fishhook injuries can occur at any time—during angling, commercial fishing, or simply cleaning out the garage. There is a need to establish a basic minimal procedural understanding by all healthcare providers involved in ambulatory care, urgent care, and emergency rooms for quick assessment and swift removal of fishhooks. This is an area where risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider starting with the simpler removal techniques (ie, retrograde, needle cover) prior to the more robust methods mentioned in this article. Further, there is a need to establish a standard fishhook removal system that is as universal as the suture tray, containing a medically approved cutting device, along with hemostat, protective eye wear, and other supportive care supplies. Ensuring there is an established protocol, provider training, and a ready-to-use fishhook removal system on hand (ideally in close proximity



to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction.

## REFERENCES

1. Doser C, Cooper WL, Edinger WM, et al. Fishhook injuries: a prospective evaluation. *Am J Emerg Med*. 1991;9(5):413-415.
2. Weinick, RM, Becker K, Parast L, et al. Emergency department patient experience of care survey: development and field test. Santa Monica, CA: RAND Corporation, 2014. Available at: https://www.rand.org/pubs/research_reports/RR761.html. Accessed May 12, 2021.
3. Gammons MG, Jackson E. Fishhook removal. *Am Fam Physician*. 2001;63(11):2231–2236.
4. Newton's Third Law of Motion: Textbook of Physics.
5. Ahmad SS, Seng CW, Ghani SA, Lee JF. Cut-it-out technique for ocular fish-hook injury. *J Emerg Trauma Shock*. 2013;6(4):293-295.
6. Diekema DS, Quan L. Fishhook removal. In: Henretig FM, King C, eds. *Textbook of Pediatric Emergency Procedures*. Baltimore, MD: Williams & Wilkins; 1997:1223–1227.
7. Salam GA. Regional anesthesia for office procedures: North Shore University Hospital at Manhasset, Manhasset, New York: *Am Fam Physician*. 2004;;69(4):896-900.

**Author affiliations:** Anthony G. Stanley, MD, Criticare Clinics & Urgent Care, Miami, FL; Baptist Healthcare of South Florida; Stanley Medical Designs. Dr. Stanley holds patents for three medical devices, but has no relevant outside financial relationships with any commercial interests. Jorge Murillo, MD, FIDSA, FACP, Herbert Wertheim College of Medicine, Florida International University; Baptist Health System of South Florida. Dr. Murillo has no relevant financial relationships with any commercial interests.

*[handwritten note: Max·116]*

*[handwritten note: This section Cut Short by JUCM]*

Tagged on:   Clinical      Clinical Article      Fishhook      Foreign Body Removal

   Clinical, Clinical Articles

## ABOUT US

The Journal of Urgent Care Medicine® (JUCM) is the official journal of the Urgent Care Association (UCA). Each issue contains a mix of peer-reviewed clinical and practice management articles that address the distinct clinical and practice management needs of those who are working in today's busy urgent care centers. JUCM's reach of over 42,000 includes qualified

## QUICK LINKS

About Us

Advertise

Subscribe

Submit An Article

Careers

Contact Us

JUCM IS THE OFFICIAL JOURNAL OF

*[UCA Urgent Care Association logo]*

*[College of Urgent Care Medicine logo]*

Privacy - Terms

clinicians, business and
administrative
professionals working in
urgent care facilities
nationwide

©2021 - The Journal of Urgent Care Medicine - All Rights Reserved

6/5/21 Question from MR Harris Fleming



Advance the fishhook
off and pull the remaining
oint through the skin.

Commented [HF1]: Peer review question: "Would removal of the shank barbs obviate the need to drag them through the wound?"

Commented [AS2R1]: Harris, It is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). By cutting the tail end off, then pull thru, you are just dragging the shank barbs intact thru the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient and saves time of procedure. As seen on the X ray some hooks have small barbs and some larger.

Commented [AS3R1]:

Commented [AS4R1]:

**Exhibit C – "Violations in the Printed Version"**

# JUCM®

## THE JOURNAL OF URGENT CARE MEDICINE®

JUNE 2021
VOLUME 15, NUMBER 9

*Journalistic Confusion!*

www.jucm.com

The Official Publication of the UCA and CUCM

CLINICAL cme

*Article used to make money selling advertisement →*

# Gone Fishin,'
## Then Going to Urgent Care

*Unauthor'zed Photo →*

### ALSO IN THIS ISSUE

cme **21  Case Report**
Don't Let Anchoring Bias Sink Your Patient's Chance for Survival

**25  Original Research**
Keep Them Waiting, and You'll Keep Them Away—Why You Must Break Through Bottlenecks

**34  Clinical**
Follow the Evidence to Keep Concussion Patients Safe

**38  Pediatric Urgent Care**
'Usually Benign' Shouldn't Keep You from Digging for the Right Diagnosis

cme **Practice Management**
Could Keeping Your Team Apart Help Keep Your Business Together?

# JUCM®

The Official Publication of the UCA and CUCM

June 2021 | VOLUME 15, NUMBER 9



**CLINICAL**

## 13 An Urgent Care Approach to Fishhook Removal

*Gone fishin'* usually signals a blissful experience in nature—until fishhook meets human flesh, at least. When patients present with a sharp, barbed metal object embedded in one body part or another, you'll need a sound understanding of the type of hook you're dealing with, the corresponding proper technique for removal, and what the next steps should be.

*Anthony G. Stanley, MD and Jorge Murrilo, MD*

**CASE REPORT**

## 21 A 'Red Herring' Chief Complaint



The patient's account of what brought them to [the] urgent care center is the f[oun]dation of the history. However, falling [vic]tim to anchoring bias could have dev[as]tating consequences.

*Ryan Hagan, PA-C and Christina Gardner, DHSc, MBA, PA-C*

**ORIGINAL RESEARCH**

## 25 More Timely Care: Effect of Online Queuing vs Change in Hours of Operation on Hourly Arrival Volumes. A Practice Management Reflection



Bottlenecks can be the bane of the urgent care operator's existence. What's the best solution (or better yet, preventive measure), though?

*Aimy Patel, MD; Jennifer Johnson, MD; Brian R. Lee, PhD, MPH; Amanda Montalbano, MD, MPH*

**[PRACTICE MANAGEMENT]**



[...] Hybrid [...] Look Like for [...] Care

[...] a wrench into [...] collective understanding of [...] a "normal" workplace functions. What happens now that restrictions are easing?

*Alan A. Ayers, MBA, MAcc*

**CLINICAL**

## 34 Managing Concussion in Acute Care



Knowing the best approach to managing patients who may have sustained a concussion starts with recognizing the signs and grasping the relative merits of the rest vs return-to-activity approaches.

*Jordan Wackett, MD, MPH, Joshua Kornegay, MD, and Craig Rudy, MD*

**PEDIATRIC URGENT CARE**

## 38 Febrile Seizure: An Urgent Care Overview



Identifying the type of seizure and causes of fever are the essential first steps.

*Tiffany Addington, MD*

## NEXT MONTH IN *JUCM*

The sight of blood is always unsettling to the patient and their loved ones. While it's likely to be less disconcerting to healthcare professionals, bleeding without an obvious cause is concerning even when the presentation is something as common as epistaxis. Vital signs, location of the bleeding, and patient history are essential to understanding the etiology. Familiarity and comfort with certain procedures are necessary for a positive outcome. Reading the cover article in the July/August issue of *JUCM* will help you feel confident that you'll be prepared.

## DEPARTMENTS

1    Letter from the Editor-in-Chief
9    From the UCA CEO
10   Continuing Medical Education
43   Insights in Images
50   Abstracts in Urgent Care
53   Revenue Cycle Management Q&A
57   Developing Data

## CLASSIFIEDS

55   Career Opportunities

## TO SUBMIT AN ARTICLE:

*JUCM* utilizes the content management platform Scholastica for article submissions and peer review. Please visit our website for instructions at http://www.jucm.com/submit-an-article

*[handwritten note: ↑ unauthorized Photo]*

**Clinical**

**CME:** This peer-reviewed article is offered for AMA PRA Category 1 Credit.™
See **CME Quiz Questions** on page 11.



# An Urgent Care Approach to Fishhook Removal

**Urgent message:** While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal.

ANTHONY G. STANLEY, MD and JORGE MURRILO, MD

**Citation:** Stanley AG, Murrilo J. An urgent care approach to fishhook removal. *J Urgent Care Med.* 2021; 15(9):13-18.

## Introduction

Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as *collateral damage*.

U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are treated in the field without attention from a healthcare provider. However, the presumption is that patients who seek medical care do so in the emergency room, an urgent care center, or in an ambulatory care center. (The emergency department is the site for 28% of all acute care visits in the United States.[2]) From this author's experience, pandemonium commences as soon as front desk personnel in the urgent care center announce there's a fishhook injury in the waiting room.

Fishhook removal is a procedure comparable in



difficulty to laceration repair of the skin with proper equipment. The fishhook removal system can be either disposable or a reusable sterile device similar to the standard suture tray. Here, we review the clinical approach to evaluation and removal of fishhooks, focusing on the six most common techniques of fishhook removal and injury management. To do so, it is essential to understand the anatomy of the fishhook,

**Author affiliations: Anthony G. Stanley, MD,** Criticare Clinics & Urgent Care, Miami, FL; Baptist Healthcare of South Florida; Stanley Medical Designs. Dr. Stanley holds patents for three medical devices, but has no relevant outside financial relationships with any commercial interests. **Jorge Murrilo, MD, FIDSA, FACP,** Herbert Wertheim College of Medicine, Florida International University; Baptist Health System of South Florida. Dr. Murrilo has no relevant financial relationships with any commercial interests.

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



**Figure 1. Classic types of fishhooks: A, single barbed fishhook; B, multiple barbed fishhook; C, treble fishhook.**

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*



**Figure 2. Anatomy of the fishhook.**

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

*"Tetanus-diphtheria or tetanus-diphtheria-pertussis vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required."*

the injured area, and common techniques used to remove fishhooks in a timely and safe manner with minimal trauma.

### Anatomy of the Fishhook—and Why It Matters
The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the discretion of the provider. Tetanus status should be ascertained.

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (**Figure 1**). There are common features among them, however (**Figure 2**). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point.

When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-

barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.

### Patient Evaluation
After obtaining a history of the injury and vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration.

Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head, or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED.

Bear in mind that the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required).

### Principles of Removal
The six most common techniques for the removal of fishhooks are:
1. Retrograde
2. String-yank
3. Needle cover
4. Barb crush
5. Cut-it-out
6. Advance-and-cut

The method selected is based on the judgment of

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



**Figure 3.** Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry.

(Illustration copyright Devon Medical Art, LLC. Used with permission.)



**Figure 4.** Applying a lark's head knot to a fishhook.

A. Match the ends of your suture or cord and fold in half.   B. Lay the shank of the fishhook across the suture or cord.   C. Pull the two suture or cord ends under the loop.   D. Pull the suture or cord through, until a tight and snug knot is positioned on the bend of the fish hook.   E. This can be done in reverse

(Illustration copyright Devon Medical Art, LLC. Used with permission.)

*"Diagram Not Positioned"*

the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimum, this will require:

1. Wire cutter
2. Hemostat or needle driver
3. Gloves
4. Wound cleanser
5. Protective eyewear (goggles or face shield)
6. Local anesthetic

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times, multiple techniques must be attempted before the fishhook is successfully removed.

In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia is typically lidocaine 1% (Xylocaine) without ep_____ ___ _____ or regional block may also be ____ _____ ___ the injury site.

Hooks wi__ _____ ____ like the treble fish-hook should ___ __ _____ed or cut to avoid additional e_____ _____nds during the re-moval proce__ ____ __ __ to the hook (eg, fish line, bai_ _____ ___ _____e itself) should be removed. Th_ _____ ___ ____s should take care not to be str___ ____ __ _____ removal. Anyone assisting wit_ _____ _____ __ have clean hands and gloves. P_____ve eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.

**Retrograde Technique**

Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It

works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb from the resting tissue site. The hook can then be backed out of the skin along the path of entry (**Figure 3**). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.

**String-Yank Technique**

The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting 1,2,3, go (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position; use a simple knot such as a lark's head knot (**Figure 4**). Wrap the free ends around the index finger of the free hand.

A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft.

The involved skin area should be well stabilized

*Fixed*   *Added ↑ Unauthorized Comments*

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



Figure 5. String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook.

A. Good firm pulling force
B. Laxity in pulling force

(Illustration copyright Devon Medical Art, LLC. Used with permission.)



Figure 6. Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps, the barb. The fishhook and needle are then pulled back and removed as a single unit.

(Illustration copyright Devon Medical Art, LLC. Used with permission.)

against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (**Figure 5A**).

Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and become embedded into a new location (**Figure 5B**).

### Needle Cover Technique

The needle cover technique requires great dexterity on the part of the provider (and a little luck). It works well for the removal of large hooks with a single barb, and when the point of the fishhook is superficially embedded in the skin (surface).

After standard wound prep and local anesthesia, a 16- to 18-gauge needle is advanced along the wound entrance of the fishhook (**Figure 6**). The direction of insertion should be parallel to the shank. The bevel should point toward the inside of the curve of the fishhook, enabling the needle opening to cover over (capping off) the barb. It is important to have the bevel

pointed in the correct direction, so that the leading edge of the needle [...] the fishhook barb. Advance [...] barb, then pull and wiggle [...] the lumen of the needle. On [...] fishhook (similar to the retro[...] care to move the needle along [...] fishhook.

A modification of this technique [...] #11 scalpel blade along the wound [...] fishhook. The fishhook may the[...] through the track of the incision line.

### Barb Crush Technique

The barb crush technique is considered a[...] ification of the retrograde technique, but wit[...] success rate.

Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (**Figure 7**).

### Cut-It-Out Technique

The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.[5] However, this should be a procedure of last resort in the ambulatory care setting,

*[handwritten note: This Photo goes on page 116]*

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



**Figure 7. Barb crush method.** Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes.

(Illustration copyright Devon Medical Art, LLC. Used with permission.)



**Figure 8. Cut-it-out technique.** Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment.

(Illustration copyright Devon Medical Art, LLC. Used with permission.)

when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present.

To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See **Figure 8**). This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.

### Advance-and-Cut Technique

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cut technique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin; alternatively, a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the exit point of the hook to allow easier exit. Once the shaft of the fishhook completely clears the skin, either cut it with a medical wire cutter or another

tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

On first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient, and saves time of procedure.

### Wound Care

*[handwritten note: Medical Advice Not authorized]* of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a sterile dressing. Wound care should include rou-

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



**Figure 9. Advance-and-cut technique with a single barb fishhook.** Advance the fishhook through the skin, creating an exit wound. Cut off the barb of the fishhook and back the remaining fishhook out the entry point.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*



**Figure 10. Advance-and-cut technique with a multiple barb fishhook.** Advance the fishhook through the skin creating an exit wound. Cut the eye of the fishhook off and pull the remaining fishhook forward through the exit wound created by advancing the point through the skin.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

> *"Risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method."*

tine irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed. Infections after fishhook removal are uncommon.[1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason for suspicion of infection and antibiotics are prescribed, consideration of coverage for water-borne organisms is reasonable.

Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus-diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required.

### Conclusion

Fishhook injuries can occur at any time—during angling, commercial fishing, or simply cleaning out the garage. There [...] to establish a basic minimal procedure [...] by all healthcare providers in [...] care, urgent care, and emergency [...] and swift removal of f[...] risk recognition has to be [...] injuries to patients and provide[...] be knowledgeable of the anato[...] be prepared mentally to ma[...] procedural method. Always co[...] removal techniques (i[...] prior to the more robust me[...]cle.

Further, [...] standard fishhook removal [...] the suture tray, containing [...]g device, along with hem[...] and other supportive care su[...]

Ensuring there [...]shed protocol, provider training, and a read[...]use fishhook removal system on hand (ideally in close proximity to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction. ∎

### References

1. Doser C, Cooper WL, Edinger WM, et al. Fishhook injuries: a prospective evaluation. *Am J Emerg Med.* 1991;9(5):413-415.
2. Weinick, RM, Becker K, Parast L, et al. Emergency department patient experience of care survey: development and field test. Santa Monica, CA: RAND Corporation, 2014. Available at: https://www.rand.org/pubs/research_reports/RR761.html. Accessed May 12, 2021.
3. Gammons MG, Jackson E. Fishhook removal. *Am Fam Physician.* 2001;63(11):2231–2236.
4. Newton's Third Law of Motion: Textbook of Physics.
5. Ahmad SS, Seng CW, Ghani SA, Lee JF. Cut-it-out technique for ocular fish-hook injury. *J Emerg Trauma Shock.* 2013;6(4):293-295.
6. Diekema DS, Quan L. Fishhook removal. In: Henretig FM, King C, eds. *Textbook of Pediatric Emergency Procedures.* Baltimore, MD: Williams & Wilkins; 1997:1223–1227.
7. Salam GA. Regional anesthesia for office procedures: North Shore University Hospital at Manhasset, Manhasset, New York: *Am Fam Physician.* 2004;69(4):896-900.

**Exhibit D – "Retraction Petition"**

**Petition for Article Retraction**

To: Braveheart Group LLC d/b/a "The Journal of Urgent Care Medicine"

185 State Route 17, Suite 4

Mahwah, NJ 07430

Dear Journal of Urgent Care Medicine (JUCM):

We the undersigned are licensed medical providers (MD, DO, ARNP, PA-C, RN) working in the Urgent Care setting. We the undersigned are familiar with caring for fishhook injured patients, with Dr. Stanley and his work in fishhook removal education over the past several years.

Upon reading the article in your JUCM magazine on-line and printed dated June 1, 2021, entitled "An Urgent Care Approach to Fishhook Removal" we have been unfortunately surprised by the medical misinformation multiple grammatical errors that the JUCM publication presented to the medical community. We've had the opportunity of reading Dr. Stanley's original article entitled "Clinical Approach to Fishhook Removal" and the JUCM's printed version entitle "An Urgent Care Approach of Fishhook Removal" for comparative purposes and have reached the following conclusions.

The current JUMC article gives the reader, a viewpoint that fishhook injured people go to the Urgent Care centers, located in recreation areas, and that they go to the Urgent Cares, during the vacation season. These three unverified clinical assumptions are not factual medical information. There is no National data on the incidence of fishhook injury, no information on seasonal incidence, no information on geographical or regional location centers of concentrated injury. If you read the printed article's citation # 2, you will find no information to support the claims stated in the article regarding the incidence and occurrence of Fishhook injury.

The original article as written by Dr. Stanley was geared to alert the reader of the mindfulness of needing to track valuable incidence data and bring about a renewed approach to fishhook injury and treatment strategies. In reading the printed JUCM version in comparison to the original version it is evident that Dr. Stanley's information was cut and pasted out of the article, producing multiple typographical errors, and leaving poorly explained, disjointed medical concepts (e.g., "Fish hook Removal System") and, leaving the reader with only technical information of fishhook removal.

The original article furthermore has several pictures of actual patients who have provided their consent to use the images in question to bring home several points of injury awareness and diversity in skill needed to consider removal of this type of foreign body. All photos in the original article and related information were unexplainably deleted in the final version. It is, however, noticeable that JUCM has placed their own photos in the published article.

We have analyzed both versions of the article in question and believe that the readers were denied the full scope of Dr. Stanley's insight into this field of medicine, and ultimately denied valuable clinical information intended for the provider who will be faced with the difficult challenge of removing fishhooks from patients. Further, the article has

excessive brightly colorized diagrams that are of unacceptable poor visibility, all instructional diagrams listed in the article are located at the top of the pages and do not flow with the written text easily as originally intended. This arrangement requires the readers to constantly look up and look down and could potentially lead to them becoming confused. Providers, who may need to reference this article quickly in current format, (which is full of grammatical errors, disjointed through concepts and difficult to follow text) could become confused.

In conclusion, this current article "An Urgent Care Approach to Fishhook Removal'" is drastically different from its original easy-to-follow format/ layout. As a result of these numerous errors and clinical omissions listed above, the use of the article as currently published could adversely affect the care of patients and may result in injuries if not retracted and amended.

For the aforementioned reasons:

- We the undersigned medical practitioners, support a complete retraction of the article "An Urgent Care Approach to Fishhook Removal" (attached to herein in Exhibit A) in all media forms to mitigate or reduce risk to patients, ensure patient safety and satisfactory outcome.

- We the undersigned medical practitioners, support that an updated version of the article (attached to herein as Exhibit B) be published in the same edition or issue of the newspaper or periodical in which said article appeared and in as conspicuous place and type as said original article (both online and printed versions) in the Journal of Urgent Care Medicine.

By: _____

Virginia Sardinas, ARPN

Date: ___9/8/2021_____


By: _____

Markira Stewart, PA-C

Date: ___09-08-2021_____

By: _____

William Kranichfeld, MD

Medical Director Criticare Clinics Urgent Care

Date: _____9/17/21_____

By: _____

Ernesto Sanz, MD

Medical Director Criticare Clinics Urgent Care

Date: _____9/17/21_____

By: _____

Betty Ruiz, ARNP

Date: _____09/17/21_____

By: _____

Dia Nguyen, MD

Date: _____9/8/21_____

By: _____

Yenny Ceballos, ARNP

Date: _____9/8/21_____

By: _____

Anisleydi Pardon, ARNP

Date: _____9/18/2021_____

By: _____

Name/Title: _Michael Sason, DO_

Date: _09-08-21_

By: _____

Name/Title: _Bonnie J. O'Sullivan  MD_

Date: _9/13/21_

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

**Exhibit E – "Updated Article"**

©2021 Anthony G. Stanley, MD

## Clinical Approach to Fishhook Removal

**Anthony G. Stanley, MD** and **Jorge Murillo, MD**

## Key Concepts

**Fish hook removal system**

**Risk Recognition**

**Patient satisfaction & experience**

**Shorter registration to discharge times**

*Urgent Message* **Fishhook injuries occur year-round under various circumstances, as simple as cleaning out the trunk of your car or garage. Upon arrival at the health care facility, *"there is often, office pandemonium once the receptionist gives notification of a fish hook injury in the waiting room"***

## Navigate this Article

- Abstract / Introduction
-     Relevance in today's health care system
- Anatomy of the Fish Hook
- Patient Evaluation
- Principles of Removal
-     Fishhook Removal System
-   Techniques
-     1 Retrograde Technique
-     2 Needle Cover Technique
-     3 String-Yank Technique
-     4 Barb Crush Technique
-     5 Cut it out Technique
-     6 Advance and Cut Technique
-   Post-Removal Wound Care
- Conclusion
- References

**Lead internet photo(s)**



Photo courtesy of Thundermist Lure



Photo courtesy of Richard Gene

**INTRODUCTION**

Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line known as "angling". There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as "*collateral damage*" as noted in our *Trauma Gallery.*

National data reveal, the emergency department is the site for 28% of all acute care visits in the United States.[2] How common is a fish hook injury? This is a commonly asked question, and very little national data exist on this specific type of injuring. The incident of this type of injury is an area where more clinical research is needed. Fishhook injuries that are not treated in the field will present to the ER, ambulatory care or urgent care centers. When these injuries present to the health care facilities, "there is often, office pandemonium once the receptionist gives notification of a fishhook injury in the waiting room". Besides the high anxiety felt by the patient, the staff also goes through an equivalent experience. There is disruption in continuity in the care of patients already in the treatment area, due to staff frantically making phone calls searching for a fishhook removal device. Many of the commonly used wire cutters, are only sanctioned for home repairs and electrical work use. Currently there is no medical fishhook removal system established. In addition to locating a wire cutting tool for removal, the provider must be familiar with the anatomy of the fishhook, the anatomy of injured area and well versed in common techniques used to remove fishhooks in a timely and safe manor with minimal trauma. The confidence of the provider, availability of the removal system, gives the patient assurance they are in great hands and reduces anxiety.  Often because of unavailability of established medical fish hook removal system(s), clinician's lack of removal experience, many of these cases are simply screened by the nurse and provider then sent to the ER for removal. Fishhook removal is a procedure comparable in difficulty to laceration repair of the skin with proper equipment. The fishhook removal system can be either disposable or a reusable sterile medical device similar to, the standard suture tray.

This article will review the clinical approach to evaluation and removal of fishhooks, focusing on the six most common techniques of fishhook removal, injury management and the mindfulness of establishing a formal fishhook removal system. The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the discretion of the provider. Tetanus status should be assessed and Td or Tdap administered if needed with age appropriateness as per established guidelines.

**Trauma Gallery**



Photo courtesy of Steve Wecks



Photo courtesy of Chris Barry



Photo courtesy of *Fishing World Magazine*



Photo(s) courtesy of Karen Rudkin-Moody and Ryan Moody





Photo courtesy of Thundermist Lure Company

**ANATOMY OF THE FISHHOOK**

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble as seen in (**Figure 1**). Common features of fishhooks seen in (**Figure 2**). The "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin.  The gape or gap describes the

distance between the shank and the point. When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.



**Figure 1. Classic types of fishhooks: A. single barbed fishhook; B. multiple barbed fishhook; C. Treble fish hook.** ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")



**Figure 2. Anatomy of the fishhook.** ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")

## PATIENT EVALUATION

After obtaining a history of the injury, vital signs, examine the wound and surrounding structures. Inspect distal and proximal to the injury site. Assess for deep injury involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration. Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest emergency room. Keep in mind, all wire cutters have a limitation in cutting capacity. In cases involving larger fishhooks, the patient may have to be referred to the ER where larger surgical cutting devices are available (e.g., bolt cutter or an extensive surgical procedure may be required).

©2021 A G Stanley, MD

**PRINCIPLES OF REMOVAL**

The six most common techniques for the removal of fishhooks are:

| | |
|---|---|
| 1. Retrograde | 4. Barb crush |
| 2. Needle cover | 5. Cut-it-Out |
| 3. String-yank | 6. Advance-and-cut |

The method selected is based on the judgment of the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before getting started make sure you have a fish hook removal system, this will require:

| | |
|---|---|
| 1. Wire cutter | 4. Wound cleanser |
| 2. Hemostat or needle driver | 5. Protective eyewear (goggles or face shield) |
| 3. Gloves | 6. Local anesthetic |

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank method). Often times multiple techniques must be attempted before the fishhook is successfully removed. In the clinical setting local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, Hexachlorophene solution or if not available use soap and water before attempting removal of the fishhook. Local anesthesia typically Lidocaine 1% (Xylocaine) without epinephrine, A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook, should have the free barbs taped or cut to avoid receiving additional embedded puncture wounds during the removal procedure. All items attached to the hook (i.e., fish line, bait and the body of the lure itself) should be removed. The physician and bystanders should take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the String-Yank method and Advance and Cut method.

**Retrograde Technique**

Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb, from the resting tissue site. The hook can then be backed out of the skin along the path of entry (**Figure 3**). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.



**Figure 3.** Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry. ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")

### Needle Cover Technique

The needle cover technique requires great dexterity on the part of the provider (and a little luck). It works well for the removal of large hooks with a single barb, and when the point of the fishhook is superficially embedded in the skin (surface).

After standard wound prep and local anesthesia, a 16-18-gauge needle is advanced along the wound entrance of the fishhook (**Figure 6**). The direction of insertion should be parallel to the shank. The bevel should point toward the inside of the curve of the fishhook, enabling the needle opening to cover over (capping off) the barb. It is important to have the bevel pointed in the correct direction as shown so that the leading edge of the needle matches the angle of the fishhook barb. Advance the fishhook to disengage the barb, then pull and wiggle it so that the point enters the lumen of the needle. Once covered, back out the fishhook (similar to the retrograde technique), taking care to move the needle along the entry point of the fishhook**.**

**Figure 6.** Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps, the barb. The fishhook and needle are then pulled back and removed as a single unit. ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")



A modification of this technique involves sliding a #11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out through the track of the incision line.

**String-Yank Technique**

The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).



Photo courtesy of Ty Southerland

It has been recognized that tradition of counting *1,2,3, go* (to give a reference point in time to start) prior to performing a yank-pull attempt, causes most patients to assume a flexed posture, which can cause more damage during the course of pulling. Physicians should be familiar with the concepts of this method. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used. Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position, use a simple knot such as a lark's head knot (**Figure 4**). Wrap the free ends around the index finger of the free hand. A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (**Figure 5A**). Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4], for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can be dislodged from its original position and be forcefully pulled back and then embedded into a new location (**Figure 5B**).

**Figure 4**. Applying a lark's head knot to a fishhook. ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")



A. Match the ends of your suture or cord in half.

B. Lay the shank of the fishhook across the suture or cord.

C. Grab the two suture or cord ends and tuck them under the loop.

D. Pull them tightly until tight and snug on the bend of the fishhook.

E. This can be done in reverse

**Figure 5.** String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook. ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")



A. Good firm pulling force
B. Laxity in pulling force

A.
B.

**Barb Crush Technique**

The barb crush technique is considered another modification of the Retrograde Technique, but with a higher success rate. Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (**Figure 7**).

**Figure 7.** Barb crush method. Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes.

("Illustration ©2021 Devon Medical Art, LLC. Used with   permission.")



**Cut-It-Out Technique**

The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.[5] However, this should be a procedure of last resort in the ambulatory care setting, when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present.

To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded (**Figure 8**). This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.

**Figure 8**. Cut-it-out technique. Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment. ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")



**Advance-and-Cut Technique**

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cut technique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off or taped over, prior to attempting removal. Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury. The advance-and-cut technique is likely to be the most universally accepted in the emergency room, ambulatory care, and urgent care settings, as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a wire cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. All wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the emergency room or hospital where a bolt cutter or surgical procedure may be required.

**Figure 9.** Advance and cut method: single-barbed fishhook. (A) Advanced the fishhook through the skin creating an exit wound. (B) Cut off the barb of the fishhook (C) back the remaining fishhook out the entry point. ("Illustration ©2021 Devon Medical Art, LLC. Used with permission.")



**Figure 10**. Advance and cut method: for multiple-barbed fishhook. (A) Advanced the fishhook through the skin creating an exit wound. (B) Cut the eye of the fishhook off and (C) Pull the remaining fishhook forward through the exit wound created by advancing the point through the skin. ("Illustration ©2021 Devon Medical Art, LLC. Used with permission.")



**POST-REMOVAL WOUND CARE**
After removal of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a sterile dressing. Wound care should include routine irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed.

Infections after fishhook removal are uncommon.[1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason

for suspicion of infection and antibiotics are prescribed, consideration of coverage water-borne organisms is reasonable.

Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus-diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required.

**CONCLUSION**

Fishhook injuries can occur at any time, during angling, commercial fishing, or simply cleaning out the garage. To bring about a renewed approach to fishhook injury and advancing medical treatment strategies, it is imperative to track valuable incidence data. There is also a need to establish a basic minimal procedural understanding by all healthcare providers involved in emergency rooms, ambulatory care centers, and urgent care centers for quick assessment and swift removal of fishhooks. This is an area where risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider starting with the simpler removal techniques (ie, retrograde, needle cover) prior to the more robust methods mentioned in this article. Lastly, there is a need to establish a standard fishhook removal system that is as universal as the suture tray, containing a medically approved cutting device, along with hemostat, protective eye wear, and other supportive care supplies. Ensuring there is an established protocol, provider training, and a ready-to-use fishhook removal system on hand (ideally in close proximity to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction.

**REFERENCES**

1. Doser C, Cooper WL, Edinger WM, et al. Fishhook injuries: a prospective evaluation. *Am J Emerg Med*. 1991;9(5):413-415.
2. Weinick, Robin M., Kirsten Becker, Layla Parast, Brian Dale Stucky, Marc N. Elliott, Megan Mathews, Chris Chan and Virginia Kotzias. Emergency Department Patient Experience of Care Survey: Development and Field Test. Santa Monica, CA: RAND Corporation, 2014. https://www.rand.org/pubs/research_reports/RR761.html.
3. Gammons MG, Jackson E. Fishhook removal. Am Fam Physician. 2001;63(11):2231–6.
4. Newton's Third Law of Motion: Textbook of Physics, AM J Phys. 12,109 (1944)
5. Ahmad SS, Seng CW, Ghani SA, Lee JF.  Cut-it-out technique for ocular fish-hook injury Journal of Emergencies Trauma and Shock, 6(4):293-295, 30 Sep 2013
6. Diekema DS, Quan L. Fishhook removal. In: Henretig FM, King C, eds. Textbook of Pediatric Emergency Procedures. Baltimore: Williams & Wilkins, 1997:1223–7.
7. GOHAR A. SALAM, M.D., D.O., Regional Anesthesia for Office Procedures: North Shore University Hospital at Manhasset, Manhasset, New York: *Am Fam Physician.* 2004 Feb 15;69(4):896-900.

Anthony G. Stanley, MD, Bio: Staff physician Criticare Clinics & Urgent Care Miami, Fl. Staff Emergency Room Physician, Baptist Healthcare of South Florida. Medical Device Inventor (holder of 3

medical device patents).  Dr. Stanley received his medical degree from Rutgers-New Jersey Medical School, Newark New Jersey. He completed Residency in Internal Medicine at University of Miami-Jackson Memorial Medical Center/ Miami VA Medical Center Miami, Florida.

Jorge Murillo, MD, FIDSA, FACP Bio: Associate Professor of Medicine – Herbert Wertheim College of Medicine, Florida International University, Miami, Florida, Consultant in Infectious Diseases and Tropical Medicine, Baptist Health System of South Florida. Dr. Murillo received his medical degree from the Central University of Venezuela. He completed his fellowship in Infectious Diseases at the University of Maryland Hospital, Baltimore, Maryland.

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

                    Plaintiff,


              vs.


THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

                    Defendants.

_____/


EXHIBIT S
TO COMPLAINT FILED
FEBRUARY 28, 2023



Search    | **Subscribe/Get Access**  |  Log In  | f  t  

NEWS      RESEARCH      CLINICAL      PRACTICE MGMT      GET CME      BUYER'S GUIDE      JOBS

AUTHORS      ABOUT US      ARCHIVES

# AN URGENT CARE APPROACH TO FISHHOOK REMOVAL

It has been brought to our attention that the publication titled "An Urgent Care Approach to Fishhook Removal" originally published in June 2021 digital edition of The Journal of Urgent Care Medicine on June 1, 2021 ("Publication"), contains several changes made during the editing process performed by JUCM which the authors took issue with and subsequently demanded the Publication be retracted. Accordingly, at the request of the authors, Anthony G. Stanley, MD and Jorge Murillo, MD, we have fully retracted the Publication.

☐ Uncategorized

## Login

Username

LOGIN

Privacy - Terms

11/26/22, 7:39 PM                    An Urgent Care Approach to Fishhook Removal - Journal of Urgent Care Medicine

Password

PASSWORD

☑ Remember Me

**LOG IN**

**Lost Password**

## Sign Up For The JUCM Newsletter

Urgent care clinical, practice management, and curated news stories - delivered to your inbox - every Tuesday.

Enter Your Name

Enter Your Email Address

**SIGN UP**



Privacy · Terms

## ABOUT US

The Journal of Urgent Care Medicine® (JUCM) is the official journal of the Urgent Care Association (UCA). Each issue contains a mix of peer-reviewed clinical and practice management articles that address the distinct clinical and

practice management needs of those who are working in today's busy urgent care centers. JUCM's reach of over 42,000 includes qualified clinicians, business and administrative professionals working in urgent care facilities nationwide

## QUICK LINKS

About Us

Advertise

Subscribe

Submit An Article

Careers

Contact Us

## JUCM IS THE OFFICIAL JOURNAL OF

©2022 - The Journal of Urgent Care Medicine - All Rights Reserved

Privacy - Terms

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

      Plaintiff,


    vs.


THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

      Defendants.

_____/


      EXHIBIT T
     TO COMPLAINT FILED
     FEBRUARY 28, 2023

From: <swilliams@jucm.com>
Date: Wed, Oct 13, 2021 at 11:07 AM
Subject: RE: Retraction of Article
To: Alex Loveyko <alex@chaselawyers.com>


Alex,


Thank you for your note.  Per our general counsel, attached please find the redline and clean versions of the retraction we will be publishing online shortly and in our next print edition.  Further, per our general counsel, we will not be re-publishing the article out of an abundance of caution to avoid the potential confusion to the public.  With publication of the full retraction, we consider this matter finalized.


Best,


Stuart

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. _____**

ANTHONY STANLEY, M.D.

                    Plaintiff,


          vs.


THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE, and

EXPERITY INC., an Illinois Corporation, d/b/a
EXPERITY HEALTH, and

URGENT CARE ASSOCIATION, INC., an Illinois
Corporation, d/b/a
URGENT CARE ASSOCIATION, and

URGENT CARE COLLEGE OF PHYSICIANS, INC.,
an Illinois Corporation, d/b/a
COLLEGE OF URGENT CARE MEDICINE.

                    Defendants.

_____/


EXHIBIT U
TO COMPLAINT FILED
FEBRUARY 28, 2023

**MENU**

# For Authors    Submit Manuscript (https://app.scholasticahq.com/submissions/jucm/new)

**JUCM Instructions for Authors**

***JUCM, The Journal of Urgent Care Medicine***, welcomes original articles that provide practical clinical and practice management information for our readers—the nation's urgent care physicians, physician assistants, and nurse practitioners. **JUCM** articles should offer practical advice and solutions to clinical and practice management issues commonly encountered in day-to-day practice.

Our aim is to combine scientific precision and evidence-based content with a concise, lively style that's easy to read. Keep these guidelines in mind as you're preparing your manuscript, and remember that we have highly skilled, experienced editors who are prepared to give you as much help as you need.

**Originality and Copyright**

Articles that appear in **JUCM** must be original to their authors. The text must not have been published previously, in any format—in print or on the Internet. Cutting and pasting sentences, paragraphs, or sections of a work that has been published previously into your article is unacceptable because it could violate another publisher's copyright.

**Audience**

The information you provide should be of practical use to our readers, who have come to practice in an urgent care setting from a variety of clinical backgrounds. Your article should take their perspective into account by considering several key issues, such as

• What immediate management is indicated?

• What laboratory tests or diagnostics are required?

• What are the next steps—with whom should the patient follow up?

• Who should be admitted or referred to the emergency department?

Imagine yourself in the reader's shoes and ensure that your article includes the answers to questions you'd be asking.

**The Editing and Review Process**

When your manuscript arrives, we'll send you an acknowledgment and give your article to our Board of Editors. We'll let you know within a few weeks whether has been accepted. If your submission is

accepted for publication, it will be scheduled for an upcoming issue of **JUCM** and assigned to an editor.

After the first round of editing, the article is sent to several physician reviewers and board members for comment. Any queries or requested changes will be forwarded to you for consideration. Finally, the article goes to our production department to be prepared for publication.

## References

We ask our authors to cite a reference in only two instances:

1. When citing the results of a single study
2. When making statements that readers are likely to question, find unusual, or want to follow up on

You need not reference information that most readers would accept as true or statements that numerous studies over time have borne out. We try to limit reference lists and suggested reading lists to 15 items per article.

## Also keep the following guidelines in mind:

• References and suggested readings should be recent; unless a publication is a seminal work, limit citations to material published in the past 5 years.

• References should be limited to review articles, clinical trials, and other scholarly material. **JUCM** rarely cites nonclinical sources. (Statistics attributed to government agencies would be one exception.)

• References should be formatted in AMA style (AMA Manual of Style, 10th edition).

• Primary, rather than secondary, sources should be cited. (For example, a research article listed in MEDLINE is a primary source; an article in UpToDate is a secondary source.)

• Articles need not have a suggested reading list, although if your reference list contains fewer than 10 citations, you may want to include a suggested reading list of a few items that readers may find valuable.

## Tables, Figures, Sidebars, and Pictures

Please send tables, graphs, sidebars (boxes), and digital images whenever possible. Our readers appreciate well-chosen graphics, tables, and similar elements that add practical value to an article. Number all tables, graphs, sidebars, and images in chronological order (e.g., Figure 1, Figure 2, Table 1, Table 2, Sidebar 1, Sidebar 2), and indicate where in the text each item should appear when your article is printed. Here is an example:

. . . primarily located in the transverse and sigmoidal regions (Figure 1).

Digital images should be a minimum of 300 dpi. Please do not embed figures in your manuscript file. Instead, please submit each figure as a separate image file (i.e., a JPG, TIFF, or PNG file). Each file should be named in a way that indicates your surname, your manuscript topic, and the figure number (e.g., Jones_ShoulderPain_Figure3.jpg) For all images, please supply figure legends (captions) in your manuscript.

We prefer that you submit graphics that are original to you, such as x-rays taken as part of your practice. For all images of patients, please do the following:

• Crop out anything that could reveal the identity of the patient.

• Have the patient sign a document granting you permission to publish the image without identifying the patient. Please keep this document on file.

One good source of potentially copyright-free images that you may wish to search on the Internet is Wikimedia Commons:

[link]http://commons.wikimedia.org/wiki/Main_Page (http://commons.wikimedia.org/wiki/Main_Page)

If you wish to use tables or images that have previously appeared elsewhere—in print or on the Internet—you must let the editor know, providing all publication details and links. We can write the previous publisher for permission to reuse the material in **JUCM**. There is no guarantee, however, that the permission will be granted. If permission is not granted, we cannot legally reprint the material.

Tables must be created within Microsoft Word, using the "Insert Table" function, so that they can be edited. Do not submit (1) photographs of tables or (2) tables created within Microsoft Excel or other software.

## Urgent Message

Before the introduction section of your article, please provide a short "urgent message" (2 or 3 sentences) that embodies the main teaching points of your article in relation to urgent care. Whole sentences copied and pasted directly from later in the article are fine.

## Manuscript Length

Limit the manuscript to 2600–3200 words, plus references, tables, figures, and other accessories. Articles that are longer will probably need to be cut during editing.

## Manuscript Submission

Articles should be submitted via e-mail, as Microsoft Word files (with multicolumn tables created within Word), and should be addressed to Editor@jucm.com (mailto:editor@jucm .com). The title page of the manuscript should include the title of the article, the names of all the authors in the order they are to appear, and the name, address, and contact information (mailing address, phone, fax, and email) for the corresponding author.

If you need to send photos, images, scans, or hard copies of tables that may be difficult to create electronically, please label your materials clearly (regarding which article they are meant to accompany), and mail them to this address:

Harris Fleming, Managing Editor

JUCM

11 E Sundial Circle

PO Box 5156

Carefree, AZ 85377

All original art materials will be returned to the authors.

**Time Frame**

Articles typically are scheduled to appear in **JUCM** within 6 months of acceptance. The editing and review process occurs approximately 3 months before publication.

**Publication Copies**

You will receive a copy of the **JUCM** issue in which your article appears. If you'd like more than one copy of that issue, please ask; extras are often available. **JUCM** retains the copyright to articles, but we freely allow authors to photocopy or otherwise reuse their material for educational purposes.

---



Powered by Scholastica (https://scholasticahq.com), the modern academic journal management system