UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 1:23-cv-20793-PAS

ANTHONY STANLEY, M.D.

Plaintiff,

vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a
THE JOURNAL OF URGENT CARE MEDICINE

Defendants.

_____/

**AMENDED COMPLAINT**

Plaintiff, Dr. ANTHONY STANLEY, by and through his undersigned attorneys, ChaseLawyers, sues Defendant, THE BRAVEHEART GROUP, LLC ("Braveheart" or "Defendant"), and alleges as follows:

**JURISDICTION, PARTIES, AND VENUE**

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this is an action for Copyright Infringement under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq*.

2.     In addition, this court has jurisdiction over supplemental State law claims under 28 U.S.C. § 1367.

3.     Venue is proper in this district for Defendant BRAVEHEART ("Braveheart" or "Defendant") under 28 U.S.C. § 1400(a) and § 1391(b) because Braveheart and/or its agent(s)

solicit and transact business within this district; a substantial part of the events or omissions giving rise to Plaintiff's claims against Braveheart occurred in this district, including but not limited to Braveheart's violation of Section 501 of the Copyright Act (17 U.S.C. § 501); and/or a substantial part of the property that is the subject of this action is situated in this district.

4.      Plaintiff, Dr. ANTHONY STANLEY ("Dr. Stanley" or "Plaintiff"), is an individual medical doctor, is *sui juris*, and is a resident of Miami-Dade County, Florida.

5.      Upon information and belief, Braveheart is a limited liability company formed under the laws of the State of New Jersey and doing business as the publication known as THE JOURNAL OF URGENT CARE MEDICINE ("JUCM"), which publication is distributed in Miami, Florida.  This Court has personal jurisdiction over Braveheart pursuant to Section 48.193, Fla. Stat. (2018) and Rule 4(k)(1), Fed. R. Civ. P., as Braveheart has engaged in substantial activity in the State of Florida and committed one or more tortious acts within the State of Florida, which acts have caused injury to Plaintiff.  Moreover, Braveheart has purposefully availed itself of the jurisdiction of this Court by transacting business in this district and in the State of Florida, including but not limited to by its actions infringing on Plaintiff's copyright in violation of Section 501 of the Copyright Act (17 U.S.C. § 501).

6.      Upon information and belief, Braveheart is a boutique publisher and publishers' representative firm with seventeen (17) years of experience in publishing and marketing scholarly print medical journals, practical review journals, and online medical highlight products that span a multitude of medical specialties relating to urgent care medicine.

<u>**ACTIONS GIVING RISE TO THIS COMPLAINT**</u>

7.      Dr. Stanley brings this action seeking equitable and monetary relief for Defendant's infringement of the copyright in his original article entitled *Clinical Approach to Fishhook*

*Removal* (the "Copyrighted Work") by (1) making a derivative work thereof ("Derivative Work") without seeking or obtaining a license to do so from Dr. Stanley; (2) materially distorting the content and meaning of the Copyrighted Work in creating its Derivative Work; (3) falsely and without authorization identifying Plaintiff as author of the Derivative Work; and (4) failing to abide by well-settled requirements of Florida law when requested to retract its Derivative Work. A true and correct copy of the Copyrighted Work as authored by Dr. Stanley is attached hereto as Exhibit "A" (at Exhibit page 32 *et seq*.) and is incorporated herein by this reference. A copy of Defendant's unlawfully revised version of Dr. Stanley's Copyrighted Work (the "Derivative Work") is attached hereto as Exhibit "B" (at Exhibit page 46 *et seq*.) and incorporated herein by this reference.

8.      At all times relevant hereto, Plaintiff has been and is the holder of exclusive rights under the Copyright Act of 1976 (17 U.S.C. §§ 101 *et. seq*., and all amendments thereto (the "Copyright Act")) to reproduce, distribute, display, and/or license the reproduction, distribution, and/or display of the Copyrighted Work throughout the United States.  True and correct copies of the copyright registrations for Dr. Stanley's Copyrighted Work from the Registrar of Copyrights, effective October 25, 2021 (Registration No. TXu002286333)[1] and copyright registration for Dr. Stanley's Copyrighted Work from the Registrar of Copyrights, effective October 3, 2022 (Registration No. TXu2339980), are attached hereto as Exhibit "C" (at Exhibit pages 67-72)  and are incorporated herein by this reference.

9.      Dr. Stanley is a well-respected physician who is Board Certified in Internal Medicine and has nearly thirty (30) years of experience.  Concentrating on urgent care medicine,

---

[1] The subsequent filing of Dr. Stanley's Copyrighted Work is currently registered with the United States Copyright Office as of October 3, 2022, including the section entitled "Post-Removal Wound Care", as ownership of certain material was transferred to Dr. Stanley by written agreement under Registration No. TXu2339980.

Dr. Stanley leveraged his experience, his extensive medical training, and his knowledge to author the Copyrighted Work and share with the medical community his expertise regarding removal of foreign bodies and enhance his own professional value and business standing.  The Copyrighted Work reflects Dr. Stanley's approach and guidance in (i) understanding the mechanism of a fishhook injury, (ii) understanding the variety of fishhooks involved, and (iii) the proper techniques for fishhook removal.  In addition to authoring the Copyrighted Work, through his many years of research and clinical experience in the treatment of fishhook injuries, Dr. Stanley has also successfully obtained patents for two (2) of the first medically approved fishhook removal devices – the "Moby Cutter" and the "Moby Clamp".  True and correct copies of United States Patent No. 9,943,971 B2, effective April 17, 2018, and United States Publication No. 2016/0235498 A1, effective April 18, 2016, are attached hereto as Exhibit "D" (at Exhibit pages 73-75) and are incorporated herein by this reference.  The "Moby Cutter", Dr. Stanley's first patented device, is currently registered for commercial use with the Food and Drug Administration ("FDA") as a Class 1 Medical Device.  A true and correct copy of the email correspondence from FDA.gov confirming Dr. Stanley's medical device registration for the year 2022 is attached hereto as Exhibit "E" (at Exhibit page 76) and is incorporated herein by this reference.

10.     Unfortunately, despite Dr. Stanley's successes in bringing advancements to the field of urgent care medicine, the Defendant's actions have undone much of his years of hard work, causing great detriment to Dr. Stanley's livelihood, medical standing, and business career by way of its publishing practices, as further detailed below.

11.     In or about February 2021, in order to share his work with the medical community, Dr. Stanley sought a publisher to distribute his Copyrighted Work.  Having been an avid reader of medical scholarship throughout his career, particularly regarding urgent care medicine, he was

familiar with JUCM (The "Journal of Urgent Care Medicine") and in good faith believed that JUCM could be relied upon as a medical publisher with scrupulous ethics.  One year earlier, in 2020, when Dr. Stanley discovered (on JUCM's website) that JUCM, with its powerful reputation in the medical community, was in search of an article on the topic of fishhook injury, he decided to entrust JUCM with publishing his life's work and burnishing his own professional standing.  A year later Dr. Stanley enthusiastically submitted his Copyrighted Work to JUCM, unaware of the publishing practices that were to follow and the grave and irretrievable cost of those practices to his own professional reputation and ambitions for his business career as an inventor of new medical devices.

12.     On or about February 16, 2021, Dr. Stanley submitted his Copyrighted Work to JUCM through the "Scholastica" web-portal (a hosting software for publishers) ("Scholastica").  A true and correct copy of documents produced during Dr. Stanley's submission process, including correspondence with JUCM within Scholastica and via direct email between Dr. Stanley and JUCM, is attached hereto as Composite Exhibit "F" (at Exhibit page 78 *et seq*., retaining Dr. Stanley's yellow highlights) and is incorporated herein by this reference.[2] After Dr. Stanley submitted his work, he was advised by JUCM's Executive Editor Harris Fleming ("Fleming") that his article would be featured on the cover of the journal's June 2021 hard-copy issue and would also be available online beginning June 1, 2021. *See*, Composite Exhibit "F" (with yellow highlights included).

13.     Between February 16 and May 5, 2021, the Parties maintained a communicative professional relationship; and, in anticipation of the June 1 publishing date, on or about May 5,

---

[2] Prior to his 2021 submission, Dr. Stanley contacted JUCM in or about February 2020 and was advised that he needed to obtain copyright releases for certain photographs to be used prior to his submission of the Copyrighted Work. Despite Dr. Stanley's successful effort to gather the requested releases over approximately a year's time, JUCM unaccountably failed to use most of these photographs in its eventual publication of the Derivative Work.

2021, Dr. Stanley approved the content, layout, and instructional text to his Copyrighted Work in the final form he authorized for publication by JUCM.  *See*, Composite Exhibit "F" (at Exhibit page 82 *et seq*., with yellow highlights included).

14.    Immediately after Dr. Stanley's May 5 approval, however, JUCM inexplicably began engaging in unaccustomed behavior.  Specifically, JUCM began to ignore communications from Dr. Stanley, denying him the right to review, approve, or make final decisions regarding his Copyrighted Work.  After sending multiple communications through Scholastica and placing telephone calls to Fleming in early May, on or about May 17 Dr. Stanley finally received a response from Fleming with the news that JUCM was "unable to share the layout in advance of publication" – even with its author.  *See, specifically*, Exhibit F page 83.  Thus, Dr. Stanley was deprived of access to preview the version of his Copyrighted Work that JUCM would actually publish on June 1.  *See*, Composite Exhibit "F" (at Exhibit page 83 *et seq*., with yellow highlights included).

15.    On or about June 1, JUCM published its Derivative Work as an unapproved version of the Copyrighted Work, without Dr. Stanley's final approval and materially ignoring the "approved" version of the Copyrighted Work he submitted to JUCM on May 5, 2021.

16.    The Derivative Work contained inaccuracies, a false attribution of authorship, numerous typographical errors, and negligent oversights (such as the embarrassing "duplicate printing" of the *Advance and Cut* technique in the online article).  Dr. Stanley and his health-provider colleagues also observed that important parts of his Copyrighted Work were missing or confusingly rearranged so as to risk misleading a busy urgent care provider, and that new parts were added without his knowledge or approval to constitute the Derivative Work (as further explained in paragraphs *18 et seq.* below).  A true and correct copy of the side-by-side comparison

exhibiting the differences between Dr. Stanley's "approved version" of his Copyrighted Work submitted to JUCM on May 5, 2021 and JUCM's Derivative Work is attached hereto as Exhibit "G" (at Exhibit page 102 *et seq*.) and is incorporated herein by this reference.

17.     Most disturbingly, the Derivative Work (as indicated in Table 1 below) *risked conveying misleading medical advice* — which not only caused irretrievable damage to Dr. Stanley's medical reputation, but also, and most importantly, placed in harm's way patients seeking treatment in reliance on JUCM's version, as explained in paragraph 27 below.

18.     Without prior approval from Dr. Stanley, JUCM made, *inter alia*, the following notable additions to the Copyrighted Work:

| Added information in the **Advance and Cut Technique** section |
|---|
| <u>Distorted Derivative Work</u>: "[o]n first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety [sic] the patient, and saves time of procedure." |

Tbl. 1

The above advice (which did not appear at all in the Copyrighted Work) was unilaterally crafted by JUCM, apparently as the result of the pre-May 5 "approval process", when JUCM sent Dr. Stanley a draft of the article and asked him the following question: "would removal of the shank barbs obviate the need to drag them through the wound?". Without notice to Dr. Stanley or his prior approval, however, JUCM then altered Dr. Stanley's work by unilaterally adding Dr. Stanley's response as if it were part of the original article, as follows:

| Dr. Stanley's comment response: *"Harris, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). By cutting the tail end off, then pull thru, you are* | Derivative Work: "[o]n first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating |

| | |
|---|---|
| *just dragging the shank barbs intact thru the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient and saves time of procedure. As seen on X ray some hooks have small barbs and some larger."* | potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety [sic] the patient, and saves time of procedure." |

Tbl. 2

JUCM also published a new section and added information to the section entitled *Advance and Cut Technique* in both the printed and online versions of the Derivative Work.  Upon information and belief, the section was authored by non-medical JUCM staff offering misleading medical advice and instruction by alluding to parts of the fishhook that are not necessary, *i.e.*, the "barbs". The inclusion of these "barbs" can lead to confusion for a medical practitioner whose attention is now drawn to focus on pieces that are insignificant to foreign body removal rather than follow the well-established medical techniques which Dr. Stanley conveys in his Copyrighted Work, *i.e.*, that it is medically unnecessary to cut tiny barbs that are not obstructing the removal process.[3] JUCM's unilateral insertion of this additional section is likely to lead to negligent treatment of a patient, as the tissue injury channel created by the fishhook injury in the patient's skin is larger than the diameter of the fishhook, and focus on the barbs in patient treatment is unnecessary.  As

---

[3] When the fishhook punctures the skin, it triggers a series of tissue trauma events. There is forceful cutting and separation of tissue planes, which creates a "Tissue Injury Channel". The depth of the wound depends on the angle of entry and the Gap Boundary. The cutting diameter created by the combined cutting surface between the Point and Barb is inherently greater than the diameter of the shank of the fishhook trailing. The cutting surface between the point and the barb varies. Some are razor-like and subject to variable pulling forces when being hooked. The shank of the fishhook will pull through easily in either direction unless there are tiny shank barbs (which define a one-way directional removal). The walls of the Tissue Injury Channel are amorphous tissue borders, and as elastic as its associated surrounding structures. If by chance the tiny shaft barbs have entered the Tissue Injury Channel, the procedure directs the provider to cut off the Eye of the fishhook and pull the remaining body through the channel. There is minimal additional tissue damage when pulling the multi-barb through the channel (see medical illustrations in footnote 3). This modification of the Advance and Cut Technique is well established in the medical literature and explained in Dr. Stanley's Copyrighted Work. With a proper understanding of the anatomy of the fishhook, there is no need to suggest or discuss any alteration in the procedure, since this could add confusion. However, the JUCM staff member who wrote the section in question may not  have been a medical doctor, and clearly lacked this type of clinical experience, and therefore wrote an erroneous layman's opinion about an established medical procedure.

demonstrated in the medical illustrations below, the barbs are – or should be – insignificant in patient treatment.[4]

19.     Prior to JUCM's changes in Dr. Stanley's Copyrighted Work, the parties mutually came to numerous decisions regarding the proposed publication, such as: (i) the expected use of photographs submitted by Dr. Stanley on March 23; and (ii) the content layout and instructional text approved by Dr. Stanley on May 5th (which mutual decisions were wholly ignored by JUCM, in favor of making its own unilateral alterations).  *See*, Composite Exhibit "F" (At Exhibit page 78 *et seq*., with yellow highlights included).  Unfortunately, JUCM's blatant disregard of the joint decisions previously made, and its unilateral unauthorized changes, transformed the entire essence of the Copyrighted Work from a scholarly medical treatise to a disorganized – and worse, confusing –technical guide.  *See*, Exhibit "B" (at Exhibit page 46 *et seq*.).



4

20.     Due to 2021's new wave of COVID-19 infections and overtime to treat emergencies, Dr. Stanley was unable to focus on JUCM's alterations in the immediate post-publication period.  On June 23, 2021, however, Dr. Stanley submitted a retraction request by email.   Among other things, he outlined in that email the unauthorized revisions and re-organizations made to his Copyrighted Work by JUCM's staff and advised JUCM that its Derivative Work was unauthorized and **not** his authorship.  Dr. Stanley requested that a retraction be made and that the article be re-published by JUCM in the original form and organization of his Copyrighted Work.  A true and correct copy of Dr. Stanley's email dated June 23, 2021 is attached hereto as Exhibit "H" (at Exhibit page 139) and is incorporated herein by this reference.

21.     Unfortunately, despite JUCM's knowledge of Dr. Stanley's June 23 email – and therefore its knowledge of the (i) misinformation which JUCM had printed, (ii) potential damages associated with providing confusing medical advice to providers engaged in emergency patient care, and (iii) likely and foreseeable damage to Dr. Stanley's medical reputation and known business interests – JUCM unaccountably refused to issue a retraction. Rather than retract the Derivative Work (as requested by Dr. Stanley), JUCM asserted in an email dated June 23, 2021 that the published article was "approved" by Dr. Stanley on May 4  (at which time JUCM submitted an edited version of the article to Dr. Stanley for his review), thereby ignoring the fact that JUCM received an approved version of the article from Dr. Stanley as an attachment to his May 5 email, stating:

> "Hello Harris: I reviewed the article. I made a few rearrangements of photos to make everything flow a little better. I was able to cut the page count from 13 to 12. Content not changed but truncated to conserve space. I included my x ray of the fish hooked finger which has been a inspiration point for me writing this article (PATIENT EVALUATION), hope its [sic] no problem. I like your edits of the article and satisfied with the results."

*See*, Composite Exhibit "F" (*see, specifically*, Exhibit F at page 82, with yellow highlights

included).  Rather than accept Dr. Stanley's changes and his approved version of the article, JUCM ignored Dr. Stanley's request for retraction.  *See*, Composite Exhibit "H" (Exhibit page 139).

22.     Stunned by the disorganization and inaccuracies published online by JUCM, on or about September 22, 2021, multiple members of the South Florida medical community solicited by Dr. Stanley submitted a Petition to JUCM, demanding that JUCM retract its version of the article. The Petition (at Exhibit I, incorporated herein by this reference, at page 142 *et seq*.), signed by Virginia Sardinas, ARPN, Markira Stewart, PA-C, William Kranichfeld, MD, Ernesto Sanz, MD, Betty Ruiz, ARNP, Dia Nguyen, MD, Yenny Ceballos, ARNP, Anisleydi Pardon, ARNP, Michael Sasoni, DO, and Bonnie J, Sullivan, MD[5], stated as follows:

> "We've had the opportunity of reading Dr. Stanley's original article entitled 'Clinical Approach to Fishhook Removal' and the JUCM's printed version entitled 'An Urgent Care Approach of Fishhook Removal' for comparative purposes and have reached the following conclusions.
>
> The current JUMC article gives the reader, a viewpoint that fishhook injured people go to the Urgent Care centers, located in recreation areas, and that they go to the Urgent Cares, during the vacation season. These three unverified clinical assumptions are not factual medical information. There is no National data on the incidence of fishhook injury, no information on seasonal incidence, no information on geographical or regional location centers of concentrated injury. If you read the printed article's citation # 2, you will find no information to support the claims stated in the article regarding the incidence and occurrence of Fishhook injury.
> The original article as written by Dr. Stanley was geared to alert the reader of the mindfulness of needing to track valuable incidence data and bring about a renewed approach to fishhook injury and treatment strategies. In reading the printed JUCM version in comparison to the original version it is evident that Dr. Stanley's information was cut and pasted out of the article, producing multiple typographical errors, and leaving poorly explained, disjointed medical concepts (e.g., "Fish hook Removal System") and, leaving the reader with only technical information of fishhook removal.
>
> The original article furthermore has several pictures of actual patients who have provided their consent to use the images in question to bring home several points of injury awareness and diversity in skill needed to consider removal of this type

---

[5] Notably, multiple signatories to the Petition are critical care providers, experienced in fishhook injury and removal, who are offered course training annually about treatment of fishhook injury, with certification in emergency care by Baptist Hospital of South Florida.

of foreign body. All photos in the original article and related information were unexplainably deleted in the final version. It is, however, noticeable that JUCM has placed their own photos in the published article.

We have analyzed both versions of the article in question and believe that the readers were denied the full scope of Dr. Stanley's insight into this field of medicine, and ultimately denied valuable clinical information intended for the provider who will be faced with the difficult challenge of removing fishhooks from patients. Further, the article has excessive brightly colorized diagrams that are of unacceptable poor visibility, all instructional diagrams listed in the article are located at the top of the pages and do not flow with the written text easily as originally intended. This arrangement requires the readers to constantly look up and look down and could potentially lead to them becoming confused. Providers, who may need to reference this article quickly in current format, (which is full of grammatical errors, disjointed through concepts and difficult to follow text) could become confused.

In conclusion, this current article "An Urgent Care Approach to Fishhook Removal'" is drastically different from its original easy-to-follow format/layout. As a result of these numerous errors and clinical omissions listed above, the use of the article as currently published could adversely affect the care of patients and may result in injuries if not retracted and amended."

As with Dr. Stanley's own request, however, this Petition was met with stonewall silence. Additionally, JUCM was contacted directly by Sheron Clark, a Registered Nurse, on June 5, 2021, advising as follows: "there are multiple errors in the publication…[t]hese errors can adversely affect the care of patients, which may result in more harm than good". A partial copy of the email dated June 5, 2021 from Sheron Clark is attached hereto as Composite "I" (at Exhibit page 147) and incorporated herein by this reference[6]. Thus, as early as June 5, 2021, despite being on notice of the errors and harm that might result from its continued publication of the Derivative Work, JUCM recklessly proceeded to print the Derivative Work in its hard-copy June issue, which was published on or about June 21, 2021 – weeks after receiving Nurse Clark's warning.

---

[6] Upon information and belief, JUCM has received a number of other negative reviews/comments to which access by Dr. Stanley is currently unavailable. We believe that discovery will confirm that Sheron Clark is not the only person to have submitted an individual objection to JUCM about the Distorted Work. Dr. Stanley has never received any notice from JUCM of the individually submitted complaints.

23.     Defendant knew or should have known that JUCM's negligent editing, printing, and subsequent refusal to correct its mistakes would cause substantial damage to Dr. Stanley, financially, professionally, and emotionally.   While it is impossible to know, JUCM's post-publication behavior has been so out of bounds and defiant that Dr. Stanley has speculated that JUCM may have singled him out as an African-American physician-author — perhaps anticipating that it would not be met with this legal challenge due to significant litigation costs.   JUCM also placed an unusual emphasis on the phrase 'urgent care' (understood in the medical community to refer to *commercial* urgent care treatment centers) during its editing process of the Copyrighted Work.   In the most apparent example, JUCM changed the title of the Copyrighted Work from *Clinical Approach to Fishhook Removal* to *An Urgent Care Approach to Fishhook Removal* in a seeming effort to lure readers into associating commercial urgent care facilities (a discreet segment of the medical community) with optimum treatment of a fishhook injury.   Similarly, the article was featured on the publication's June 2021 cover page with the slogan, *'Gone fishin', Then Going to Urgent Care......"*.   When questioned about the purpose of the title change, JUCM advised Dr. Stanley that 96% of doctors who subscribe to its publication do not "like" the word "clinical".[7] Additionally, JUCM added the following sentence to the **Urgent Message** section "while fishhook injuries are common in Urgent Care centers located in recreation areas…" and the following statement on page 3, "[p]atients who contact the Urgent Care center before arrival can be advised to wash the wound with soap and water," which is medically ill-advised because of the risk of infection.   Dr. Stanley never intended for his Copyrighted Work to be transformed from a scholarly

---

[7] Contrary to this claim—JUCM uses the term 'clinical' repeatedly on its website at https://www.jucm.com. A true and correct copy of screenshots (as of November 26, 2022) evidencing multiple examples on JUCM's use of the term 'clinical' is attached hereto as Exhibit "J" (at Exhibit page 148 *et seq*.) and incorporated herein by this reference.

article into an advertisement for commercial urgent care clinics.  Unfortunately, as evidenced by the foregoing changes – it seems that Dr. Stanley's Copyrighted Work was used as a resource and platform for JUCM to advertise and promote its own commercial interests[8] (paid advertising by commercial urgent care facilities) rather than to provide usable critical information to the medical community.

24.     Up to and including the date of this Complaint, JUCM refuses to take action sufficient to correct or even mitigate the damage it has caused to Dr. Stanley and the disservice it has done to practitioners and patients.   All post-publication communications and retraction requests have been met with a disturbing, persistent stubbornness against correcting JUCM's misinformation even though it may harmfully affect patient care.

25.     Due to JUCM's changes in Dr. Stanley's Copyrighted Work, medical practitioners

---

[8] By way of further example, JUCM used Dr. Stanley's Copyrighted Work as a resource for its clinical 'Continuing Medical Education' ("CME") quiz, to which JUCM subscribers could submit responses for up to 3 American Medical Association CME credits by answering the following three multiple choice questions correctly after reading the Distorted Derivative Work:

(1)     Most fishhook injuries are:

     a. Penetrating soft-tissue injuries of the hand, face, head, or upper extremity
     b. Penetrating injuries to deep tissue structures
     c. Lacerations of the face and scalp
     d. Puncture wounds to the sole of the foot

(2)     When one point of a multipoint hook causes an injury, the "free points" should be:

     a. Bent so the sharp end is not exposed to the provider or the patient
     b. Removed from the hook using bolt cutters
     c. Taped or removed with a wire cutter to avoid additional wounds
     d. Simply avoided

(3)     Which of the following fishhook removal techniques is likely to be most widely accepted in urgent care?

     a. Advance-and-cut
     b. Barb crush
     c. Cut-it-out
     d. String-yank

are presented with a confusing presentation of material that is difficult to follow when rendering emergency patient care: (i) the sequencing of photographs/medical artwork in the Derivative Work, with instructions incorrectly presented and misplaced, can lead to a muddled thought process during a high-tension emergency procedure; (ii) the medical artwork presented in fluorescent coloring can cause difficulty in focusing and following instructions while rendering emergency patient care; and (iii) collages created by JUCM and random highlighting throughout the Derivative Work can cause confusion in correctly following Dr. Stanley's substantive guidance.

26.     Unsurprisingly, JUCM's continuing refusal to correct its errors has caused Dr. Stanley (i) substantial known and potential loss of income; (ii) distrust and humiliation amongst his colleagues, employer, and affiliates; (iii) undue hardship to his family; and (iv) emotional distress.   Numerous colleagues of Dr. Stanley have contacted him expressing great concern regarding the Distorted Derivative Work.

27.     For example, in correspondence received by Dr. Stanley on December 2, 2021, a colleague Medical Doctor, Bonnie Jean O'Sullivan, stated:

> I came across your June 1, 2021 article…upon reading the article I noticed multiple typographical errors. I was very disappointed, and had difficulty trying to comprehend the written subject matter, and follow along with the **photos which were not synchronized with the reading**. **(**Emphasis added).

Separately, on November 21, 2021, colleague and Family Nurse Practitioner Raisa K. Barros, wrote:

> I would like to share feedback regarding your article…I found it in the breakroom at our Urgent Care…I was very surprised and disappointed as in my opinion the article was poorly written…has multiple errors and sentences that do not make sense…**pictures are printed in such poor quality, and out of order…made it difficult to follow the recommended procedures**. (Emphasis added).

Yet another colleague, Jennifer Aquino, an Advanced Registered Nurse Practitioner at Mount

Sinai Medical Center, stated in correspondence dated November 23, 2021:

> I came across your June 1, 2021 article…on October 2nd, 2021, I was at work and a patient came in with a fishhook injury to the palm of his hand…I took 5 minutes to review the article and I was shocked of [sic] the typographical errors and disjointed statements…**the pictures were so small and outlined with such bright colors that distracted me from focusing and comprehending what to do…the instructions and the related photos were out of place and made everything difficult to comprehend…** *I was disappointed with your writing and you.* (Emphases added).

True and correct copies of the correspondence from Bonnie Jean O'Sullivan dated December 2, 2021, from Raisa K. Barros on November 21, 2021, and from Jennifer Aquino on November 23, 2021 are attached hereto as Exhibits "K" (at Exhibit page 158), "L" (at Exhibit page 160), and "M" (at Exhibit page 162), respectively, and are incorporated herein by this reference.

28.     Dr. Stanley also relied heavily on JUCM's publication of his Copyrighted Work to market his patented medical devices (*See* Paragraph 9 above) and finalize ongoing negotiations with Dr. William Kranichfeld, an emergency room physician with nearly thirty (30) years of professional experience, to establish an ongoing "procedures" course about outpatient procedures, with the Copyrighted Work serving as the basis for planned teaching materials.  But after the appearance of JUCM's Derivative Work, Dr. Kranichfeld wrote the following to Dr. Stanley on October 10, 2021:

> I offered you an ongoing faculty position and salary of $2,500 per month to lecture on the contents of the article…entitled An Urgent Care Approach to Fish Hook Removed [sic] published in the June issue of the Journal of Urgent Care Medicine…I am sending you this letter to inform you that I can no longer support the use of this article due to its printing of medical misinformation, multiple grammatical errors, poor editing and poorly displayed medical illustrations…[t]he committee found the format used was not professionally suitable for the use of our attendees, and subsequently cannot be referenced in our take home materials nor placed on our website as a creditable source of medical information…[t]he arrangement counted on your listing in the Journal of Urgent Care Medicine, establishing your creditable authorship.

A true and correct copy of the communication from Dr. William Kranichfeld is attached hereto as

Exhibit "N" (at Exhibit page 165) and is incorporated herein by this reference.

29.     Dr. Stanley also relied on the publication of his Copyrighted Work to finalize ongoing negotiations with Baptist Health of South Florida ("BHSF") as a potential customer for Dr. Stanley's aforementioned patented medical devices. (*See* Paragraph 18 and Exhibit "E", at Exhibit page 76). BHSF regularly explores opportunities to introduce new and improved medical devices and techniques to improve its patient care, and it had shown interest in purchasing Dr. Stanley's devices for fishhook removal.  However, negotiations came to a halt as Dr. Stanley needed a credible publication in order to receive an interview for his new project.  The mess that JUCM made of his original Copyrighted Work appears to have put a stop to that process.  A true and correct copy of Dr. Stanley's communications with Baptist Health of South Florida is attached hereto as Composite Exhibit "O" (at Exhibit page 167 *et seq*.) and is incorporated herein by this reference.

30.     Dr. Stanley also relied on JUCM's publication of his Copyrighted Work for plans to inform potential customers desiring to obtain creditable information on his business website, (www.StanleyMedicalDesigns.com) regarding fishhook injury and removal procedures.  Without the responsible distribution of his original Copyrighted Work, Dr. Stanley's website no longer operates as an e-commerce website for the purchase of his patented wire cutter device, nor does it distribute important information to the public regarding safer methods for the fishhook removal procedure.

31.     Due to JUCM's publication of the Derivative Work, Dr. Stanley's ability to gain employment as an "Expert Witness" within the State of Florida — a position for which Dr. Stanley worked for seven (7) years — was met with unexpected difficulty, since credentials as a published medical author would work materially to support his candidacy as a fishhook injury and foreign

body removal expert.  However, after numerous years of attempting to gain a position, Dr. Stanley was finally formally approved to serve as an Expert Reviewer for the Florida Board on April 7, 2023 (a position he declined due to this ongoing litigation).  Furthermore, such a publication would aid Dr. Stanley in being selected for positions as an expert witness on the Seak, Inc. webpage (www.seak.com, an online expert witness directory).  Florida Rule of Civil Procedure 1.390 defines an expert witness as "a person duly and regularly engaged in the practice of a profession who holds a professional degree from a university or college and has had special professional training and experience, or *one possessed of special knowledge or skill about the subject* upon which called to testify".  (Emphasis added).  As such, publication of the Copyrighted Work was integral to meeting Dr. Stanley's application requirements as an Expert Witness.[9]

32.     Finally, JUCM's conduct left Dr. Stanley without any recourse other than to retain the undersigned and to seek judicial intervention.  Cognizant of the significant legal fees associated with litigation, in or about July 2021 Dr. Stanley sought and accepted extra shifts at his workplace to afford the legal costs of litigating against a large, deep-pocket defendant like JUCM.

33.     Thus, as a result of JUCM's conduct, Dr. Stanley has suffered and continues to suffer financial and other damages in an amount to be determined at trial.

34.     At no time did Dr. Stanley expressly or impliedly authorize JUCM to replace his original Copyrighted Work and publish its own Derivative Work.  Instead, JUCM committed the aforesaid acts either grossly negligently or recklessly, without regard to Dr. Stanley's proprietary or other rights.

35.     Dr. Stanley never authorized JUCM to prepare a derivative work based on his

---

[9] Despite the setback caused by JUCM's actions, Dr. Stanley has since been able successfully to overcome this hurdle. He finally received a Medical Doctor Expert Witness Certificate from the Florida Department of Health in January of 2023.

Copyrighted Work, nor to copy, publish, reproduce, distribute, or display the same.

36.     Without Dr. Stanley's permission, JUCM produced, published, and distributed its version, a derivative of Dr. Stanley's Copyrighted Work, to the public. The Copyright Act grants Plaintiff the exclusive right to reproduce, publish, and distribute the Copyrighted Work and any derivatives thereof.  Copyright Act, 17 U.S.C. § 106(2).

37.     JUCM's distortion of Dr. Stanley's Copyrighted Work was willful, in disregard of, and with indifference to, the rights of Dr. Stanley as the copyright owner.

38.     On September 23, 2021, Dr. Stanley's counsel sent a cease and desist letter ("C and D") objecting to Defendant Braveheart's unauthorized reproduction, publication, distribution, public display, and sale of the Derivative Work containing portions of Plaintiff's Copyrighted Work and requesting that a retraction be made pursuant to Fla. Stat. § 770.02.  A true and correct copy of the C and D is attached hereto as Exhibit "P" (at Exhibit page 178 *et seq*.) and incorporated herein by this reference.

39.     To date, Defendant has not retracted the article nor issued an apology pursuant to Fla. Stat. § 770.02.  Instead, JUCM deleted the online digital article, while issuing the following statement on its website (https://www.jucm.com/an-urgent-care-approach-to-fishhook- removal/):

> [i]t has been brought to our attention that the publication titled "An Urgent Care Approach to Fishhook Removal" originally published in [sic] June 2021 digital edition of The Journal of Urgent Care Medicine on June 1, 2021 ("Publication"), contains several changes made during the editing process performed by JUCM which the authors took issue with and subsequently demanded the Publication be retracted. Accordingly, at the request of the authors, Anthony G. Stanley, MD and Jorge Murillo, MD, we have fully retracted the Publication.

A true and correct copy of JUCM's webpage exhibiting the above statement is attached hereto as Exhibit "Q" (at Exhibit page 251 *et seq*.) and incorporated herein by this reference.  But since JUCM is a monthly publication, the retraction should have occurred on or before November 27,

2021 pursuant to Florida law, within the forty-five (45) day notice period.  Although a retraction statement was made for the digital version, no retraction was ever made by JUCM in its printed November 2021 edition.

40.     Next, on or about October 13, 2021, Plaintiff's counsel received the following statement in response to its C and D: "Per our general counsel, we will not be re-publishing the article out of an abundance of caution to avoid the potential confusion to the public. With publication of the full retraction we consider this matter finalized".  A true and correct copy of correspondence dated October 13, 2021 is attached hereto as Exhibit "R" (at Exhibit page 255) and is incorporated herein by this reference.  JUCM's (i) refusal to publish the original Copyrighted Work; and (ii) vague and impliedly accusatory language in its statement (*i.e.* "the authors took issue with and subsequently demanded the Publication be retracted") caused significant injury to Dr. Stanley by implying that there was a problem with "the authors".

41.     The Defendant's acts and inaction are causing, and unless a proper retraction is issued – including an apology, correction, re-publication or full retraction under Florida law – will continue to cause damage and irreparable harm to Dr. Stanley, for which Dr. Stanley has no adequate remedy at law.

42.     All conditions precedent to the bringing of this action have been performed, waived or excused, or otherwise satisfied.

43.     Dr. Stanley has retained the undersigned attorneys to bring this action and is obligated to pay a reasonable fee for their services.

44.     Because the Defendant's actions as described herein were seemingly performed with actual malice, ill will, gross indifference to, or with reckless disregard of, Dr. Stanley's federal and state law rights, and may amount to willful and wanton acts which were deliberate and without

reasonable cause or basis, Dr. Stanley reserves the right to amend this Complaint to seek punitive damages under Fla. Stat. § 768.72.

**FIRST CAUSE OF ACTION**
**Federal Copyright Infringement Against the Defendant**
**(17 U.S.C. § 501)**

45.     Plaintiff repeats and realleges paragraphs 1 through 44 above, as if fully set forth herein; and further alleges as follows.

46.     As set forth above, Plaintiff is the author and holds copyright to the Copyrighted Work.

47.     The Copyrighted Work is an original scholarly article containing copyrightable subject matter for which protection exists under the Copyright Act, 17 U.S.C. § 101, et. seq. Plaintiff is the exclusive owner of rights under copyright in and to the Copyrighted Work. Plaintiff owns a valid copyright registration, with Certificate of Copyright Registration No. TXu002286333 issued by the Registrar of Copyrights on October 25, 2021, and copyright registration for Dr. Stanley's Copyrighted Work from the Registrar of Copyrights, effective October 3, 2022 (Registration No. TXu2339980). *See*, Exhibit "C", which is incorporated herein by this reference, at Exhibit page 67 *et seq*.

48.     The Copyright Act grants Plaintiff the exclusive rights to reproduce, copy, publish and distribute the Copyrighted Work and any "derivative works based upon the copyrighted work." 17 U.S.C. § 106(2).

49.     Through Defendant's conduct alleged herein, including but not limited to Defendant's reproduction, distribution, public display, and sale of the Derivative Work containing portions of the Copyrighted Work without Plaintiff's permission in a written instrument, Defendant has directly infringed on Dr. Stanley's exclusive rights in the Copyrighted Work in

violation of Section 501 of the Copyright Act, 17 U.S.C. § 501.

50.     Defendant's infringing conduct was and continues to be willful and with actual knowledge of Plaintiff's rights in the Copyrighted Work.

51.     As a direct and proximate result of Defendant's infringing conduct, Plaintiff has been harmed and is entitled to damages in an amount to be proven at trial.

52.     Pursuant to 17 U.S.C. § 504(b), Plaintiff is also entitled to recovery of Defendant's profits attributable to Defendant's infringing conduct alleged herein.

53.     Alternatively, Plaintiff is entitled to recover from Defendant statutory damages pursuant to 17 U.S.C. § 504(c), up to $150,000 for Defendant's willful infringing conduct per copyright infringed, and for such other amount as may be proper pursuant to 17 U.S.C. § 504(c).

54.     Plaintiff is further entitled to its attorney fees and costs pursuant to 17 U.S.C. § 505.

55.     As a direct and proximate result of the Defendant's infringing conduct, Plaintiff has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law.

WHEREFORE, Dr. Stanley respectfully requests that judgment be entered in his favor and against Defendant, containing the following relief:

A.     That Defendant be required to account for and pay over to Dr. Stanley the actual damages suffered by him as a result of the infringement and any profits of the Defendant attributable to the infringement of Plaintiff's copyright or exclusive rights under copyright; and to pay such damages to Dr. Stanley as shall appear just and proper to this Court within the provisions of the Copyright Act, or, in the alternative, at Plaintiff's election, statutory damages for infringement of each separate copyright as set forth in 17 U.S.C. § 504;

B.      For an award of costs under 17 U.S.C. § 505 or as otherwise provided by law;

C.      For an award of attorneys' fees pursuant to 17 U.S.C. § 505;

D.      For an award of pre-judgment interest and post-judgment interest in the maximum amount permitted by law;

E.      For such other and further relief as the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**Defamation Against Defendant**

56.     Plaintiff repeats and realleges paragraphs 1 through 44 above, as if fully set forth herein; and further alleges as follows.

57.     On or about June 1, 2021, Defendant published the Derivative Work, which contained confusingly placed images, inaccuracies, potentially harmful recommendations to health providers and their patients, and a false statement about Plaintiff's authorship.

58.     Defendant JUCM falsely identified Dr. Stanley as an author (along with Dr. Murillo) of content within the Derivative Work that Dr. Stanley never authored or approved.

59.     These false statements were published in print and online to third parties via URL: https://www.jucm.com/documents/jucm-June-2021.pdf/.

60.     These false statements were published recklessly and with actual malice.

61.     A reasonable reader of the Derivative Work containing the unapproved statements could reasonably come to distrust Dr. Stanley and hold him in ill repute, as the Derivative Work contains misleadingly positioned images, inaccuracies and potentially harmful recommendations to readers and their patients.

62.     Defendant's publication of the Derivative Work imputed to Dr. Stanley characteristics incompatible and inconsistent with Dr. Stanley's occupation.

63.     Dr. Stanley has been damaged by these false statements because the statements,

when connected to the Derivative Work published by JUCM, have injured him in his profession and medical-device business.

64.     Defendant's actions were so obviously defamatory and damaging to Dr. Stanley's reputation that they give rise to a presumption of both malice and damages. As a direct and proximate result of Defendant's actions, Dr. Stanley has suffered and continues to suffer reputational harm and harm to his entrepreneurial business efforts, for which he is entitled to an award of damages to the greatest extent permitted under law, including but not limited to punitive damages.

WHEREFORE, Dr. Stanley respectfully requests that judgment be entered in his favor against Defendant, containing the following relief:

A.     An award for monetary damages for reputational harm;

B.     An award of punitive damages;

C.     Pre- and post-judgment interest on all amounts due;

D.     Attorney's fees and costs; and

E.     Such other and further relief as the Court may deem just and proper.

### THIRD CAUSE OF ACTION
### Fraudulent Misrepresentation Against Defendant

65.     Plaintiff repeats and realleges paragraphs 1 through 44 above, as if fully set forth herein; and further alleges as follows.

66.     Defendant JUCM and Dr. Stanley came to numerous decisions regarding publication of what Dr. Stanley expected to be his Copyrighted Work, i.e., the content, layout and instructional text approved by Dr. Stanley on May 5th, 2021. *See*, Exhibit F (Communications from March 2021-May 5, 2021, at Exhibit pages 78-101).

67.     JUCM's statement made to Dr. Stanley by Mr. Fleming via telephone call prior to

his submission that it would publish the Copyrighted Work based upon the decisions jointly made by the parties was false.

68.    JUCM's    instructions    to    authors    states    as    follows    on    its    website https://jucm.scholasticahq.com/for-authors:

> "The Editing and Review Process.
> When your manuscript arrives, we'll send you an acknowledgment and give your article to our Board of Editors. We'll let you know within a few weeks whether [sic] has been accepted. If your submission is accepted for publication, it will be scheduled for an upcoming issue of JUCM and assigned to an editor. After the first round of editing, the article is sent to several physician reviewers and board members for comment. **Any queries or requested changes will be forwarded to you for consideration**. Finally, the article goes to our production department to be prepared for publication." (Emphasis added.)

Thus JUCM, in its own instructions, clearly represented to its authors that its editing is subject to the author's "consideration", a promise on which trustful authors, such as Dr. Stanley, rely prior to submission to assure that their works are published in a form consistent with the author's "consideration" of any suggested edits. A true and correct copy of the webpage detailing JUCM's instructions for authors is attached hereto as Exhibit "S" (Exhibit page 257 *et seq*.) and incorporated herein by this reference.

69.    JUCM's representation that it would publish the Copyrighted Work pursuant to Dr. Stanley's "consideration", as evidenced in Exhibit F (at Exhibit pages 78-101), was material because Dr. Stanley would not have submitted his Copyrighted Work to JUCM without having decision-making and final approval rights. No responsible medical doctor would agree to lose control of his/her Copyrighted Work in the medical field unless he or she could be assured that, when published, it would not cause harm to patients.

70.    When JUCM made the assuring statements to Dr. Stanley, JUMC knew or should have known that the statements were false, because JUCM thenceforth started ignoring

communications from Dr. Stanley, denying him his right to review, approve, "consider" or make decisions regarding the publishing of his Copyrighted Work in final form and only later stating that JUCM was "unable" to provide author-previewing. *See*, Exhibit F at Exhibit page 83.

71.     When JUCM made the false statement, its intent was to induce the Plaintiff's reliance on said false statement.

72.     Dr. Stanley did not otherwise know, nor could he reasonably suspect, that JUCM's representations were false.

73.     Dr. Stanley relied on JUCM's misrepresentations by proceeding with the publishing process and trusting JUCM to publish the Copyrighted Work pursuant to his "consideration" and the parties' joint agreement.

74.     As a result of Dr. Stanley's reliance on JUCM's misrepresentations, Dr. Stanley has been damaged because the statements and his reasonable reliance thereon injured him in his profession and business reputation, as aforesaid.

75.     JUCM's misrepresentations, inducing Dr. Stanley's reliance, were the direct and proximate cause of Dr. Stanley's loss.

WHEREFORE, Dr. Stanley respectfully requests that judgment be entered in his favor and against Defendant Braveheart, containing the following relief:

A.     Judgment for damages entered in his favor and against Defendant Braveheart;

B.     Pre- and post-judgment interest on all amounts due;

C.     Attorneys' fees and costs;

D.     Such other and further relief as the Court may deem just and proper.

**FOURTH CAUSE OF ACTION**
**Tortious Interference Against Defendant**

76.     Plaintiff repeats and realleges paragraphs 1 through 44 above, as if fully set forth

herein; and further alleges as follows.

77.      Prior to publication of the Derivative Work, Dr. Stanley was active in commercial exploitation of his patented medical inventions, activity of which JUCM was aware. He was pursuing these activities with medical supply vendors, hospitals, colleagues, medical clinics, etc. (collectively, "Business Relationships"), which were cultivated over a long period of time and with much effort, patience and expense on the part of Dr. Stanley.

78.      Over the years, Dr. Stanley gained the trust and confidence of his Business Relationships by exhibiting a great level of honesty, professionalism, service, and – most importantly –expert knowledge in his field.  Plaintiff's entire livelihood has been built in large part on the foundation of his substantial Business Relationships.

79.      Defendant tortiously interfered with Dr. Stanley's Business Relationships by publishing a version of the Copyrighted Work containing unapproved statements and layout, statements not actually authored by Dr. Stanley, inaccuracies, and potentially harmful recommendations to health care providers and their patients.

80.      Due to Defendant's willful, wanton, intentional, and malicious conduct, Dr. Stanley has suffered and will continue to suffer significant financial loss and loss of goodwill in his Business Relationships, causing substantial harm to Dr. Stanley.

81.      Plaintiff is therefore entitled to damages, including exemplary damages, as a result of JUCM's conduct, as well as attorneys' fees, costs, and other appropriate and equitable relief.

WHEREFORE, Dr. Stanley respectfully requests that judgment be entered in his favor and against Defendant, containing the following relief:

A.      Judgment for damages entered in his favor and against Defendant;

B.      Pre- and post-judgment interest on all amounts due;

C.      Attorneys' fees and costs;

D.      Such other and further relief as the Court may deem just and proper.

### PRAYER FOR RELIEF

WHEREFORE, Dr. Stanley respectfully requests that this Court enter judgment in his favor and against the Defendant, and further prays as follows:

1.      That Defendant be adjudged to have violated Section 501 of the Copyright Act (17 U.S.C. § 501).

2.      That Defendant be ordered to provide an accounting of Defendant's profits attributable to Defendant's infringing conduct, including Defendant's profits from sales and any other exploitation of the Derivative Work, and any products, works, or other materials that include, copy, are derived from, or otherwise embody the Derivative Work.

3.      That Defendant be ordered to destroy or deliver up for destruction all materials in Defendant's possession, custody, or control used by Defendant in connection with Defendant's infringing conduct, including but not limited to all remaining copies of the Derivative Work and any products and works that embody any reproduction or other copy or colorable imitation of the Copyrighted Work or the Derivative Work, as well as all means for manufacturing them.

4.      That Defendant, at its own expense, be ordered to recall the Derivative Work from distributors, retailers, vendors, or others that have distributed the Derivative Work on Defendant's behalf, and any products, works, or other materials that include, copy, are derived from, or otherwise embody the Derivative Work; and that Defendant be ordered to destroy or deliver up for destruction all materials returned to it.

5.      That Defendant be adjudged to have violated Fla. Stat. §540.08, Fla. Stat. § 501.201 *et seq*., and Fla. Stat. §770.02 and made fraudulent misrepresentations in violation of Florida Law.

6.     That Dr. Stanley be awarded:

    A.     Defendant's profits obtained as a result of Defendant's infringing conduct, including but not limited to all profits from sales and other exploitation of the Derivative Work and any products, works, or other materials that include, copy, are derived from, or otherwise embody the Copyrighted Work or the Derivative Work, or, in the Court's discretion, such amount as the Court and/or jury finds to be just and proper;

    B.     Damages sustained by Dr. Stanley as a result of Defendant's infringing conduct, in an amount to be proven at trial;

    C.     Should Dr. Stanley so elect, statutory damages pursuant to 17 U.S.C. § 504(c) instead of actual damages or profits; and

    D.     Dr. Stanley's reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505.

7.     That Dr. Stanley be awarded interest, including pre-judgment and post-judgment interest, on the foregoing sums against the Defendant.

8.     That Defendant be ordered to print and publish in JUCM the latest Plaintiff-approved version of the Copyrighted Work.

9.     That Defendant be ordered to provide Dr. Stanley a full-page advertising section in JUCM for his medical products the Moby Cutter and the Moby Clamp for a period of twenty-four (24) months.

10.     That the Court award such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  July 14, 2023

Respectfully submitted,

CHASELAWYERS

_____
Barry Chase, Esq.
ChaseLawyers
21 SE 1st Avenue, Suite 700
Miami, Florida 33131
Telephone: (305) 373-7665
Facsimile: (305) 373-7668
Email: barry@chaselawyers.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

This will certify that on July 14, 2023 a copy of the Amended Complaint was served upon the

following parties by CM/ECF to:

Matthew Cavanagh, Esq.          mcavanagh@mcdonaldhopkins.com

Chelsea Furman, Esq.            cfurman@mcdonaldhopkins.com


Dated: July 14, 2023                      Respectfully submitted,


                                          /s/ Barry Chase
                                          Barry Chase, Esq.
                                          ChaseLawyers
                                          Florida Bar No. 0083666
                                           21 SE 1st Avenue, Suite 700
                                          Miami, Florida 33131
                                          Telephone: (305) 373-7665
                                          Facsimile: (305) 373-7668
                                          Email: barry@chaselawyers.com

                                          *Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                            Plaintiff,

                vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE,

                   Defendants.

_____/

EXHIBIT A
TO AMENDED COMPLAINT
FILED JULY 14, 2023

# Clinical Approach to Fishhook Removal

Anthony G. Stanley, MD

**Jorge Murillo, MD**

**Abstract**

Fish hook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care and urgent care facilities. Fish hook injures commonly occur in those who participate in the sport or past time of fishing with a rod and line known as 'Angling'(photo1). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands [1]. What has



been seldomly recognized is the, occurrence of injury to bystanders, accompanying pets and animal wildlife. These types of injury are referred to as collateral damage as noted in the Trauma Gallery (photo 2). Studies show that the Emergency Department is the site for 28% of all acute care visits in the United States [2]. How common is a fish hook injury? This is a commonly asked question, and very little national data exist on this specific type of injuring. Occurrence of injury is an area where more clinical research needs to be performed. Fish hook injuries that are not treated in the field will present to the ER, urgent care or ambulatory care centers. When these injuries present to the health care facilities, "there is often, office pandemonium once the receptionist gives notification of a fish hook injury in the waiting room". Besides the high anxiety felt by the patient, the staff also goes through an equivalent experience. There is disruption in continuity of care of patients already in the treatment area, due to staff frantically making phone calls searching for a fish hook removal device. Currently there are no medical fish hook removal system established. In addition to locating a wire cutting tool for removal, the physician must be well versed in the anatomy of fish hooks and knowledge of the concepts of how to safely remove this type of foreign body. Often because of unavailability of established medical fish hook removal system(s), clinician's lack of removal experience, many of these cases are simply screened by the nurse and doctor then sent to the ER for removal. This leads to loss of revenue by the referring facility, and causes the patient to experience additional pain, suffering and subsequent dissatisfaction rating on satisfaction surveys. Fish hook removal is a procedure comparable in difficulty to laceration repair of the skin with proper equipment. The fish hook removal system can be either disposable or a reusable sterile device similar to, the standard suture tray. This article will review the clinical approach to evaluation and removal of fish hooks. A well-versed doctor should be familiar with the anatomy of the fish hook(figure1), the anatomy of injured area and versed in common techniques used to remove fish hooks in a timely and safe manor with minimal trauma, to minimize the patients suffering [3]. By having

an established medical removal system, safety and patient care experience will be enhanced in several areas monitored by Centers for Medicare and Medicaid (CMS). The confidence of the doctor, availability of the removal system, gives the patient assurance they are in great hands and reduces anxiety with resultant improved patient experience, there is also benefits of seeing reduced registration time to departure time, and increased patient satisfaction scores.

(Photo 2) Trauma Gallery



This article provides a concise guide to performing the six most common techniques of fishhook removal and injury management.  The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be is left up to the discretion of the provider. Tetanus status should be accessed and Td or T Dap administered if needed with age appropriateness as per established guidelines.

## Anatomy of the Fish Hook



Figure 1

There are 3 classic types of fishhooks available (single barbed, multiple barbed and treble) (figure 2). Common fish hook descriptive features are the following. The point is sharp end that penetrates the fish's mouth or skin. The eye connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The gape or gap describes the distance between the shank and the point. When examining, it is important to note if the fishhook is single barbed, multiple barbed or treble. Also note the number

and location of the barbs, these details will help determine the best removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.

Figure 2 (Classic types of fish hooks)



3 classic Types of fishhooks. (A) Single barbed fishhook. (B) Multiple barbed fish hook, and (C) Treble fishhook.

## Patient Evaluation

After obtaining a history of the injury, vital signs, a quick survey of the wound and surrounding structures should be made. A good physical exam is always indicated before removal. Inspect distal and proximal to the injury site.  Access for deep injury involving penetration to tendons, nerves and bone. Radiographs are seldom needed but, may aid in determining the type of fishhook and the depth of penetration. Most fishhook injuries are penetrating soft tissue injuries of the hand, face, head or upper extremity but can involve other body part (photo 3). Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration4. Any eye injury penetrating wounds should be stabilized and transported to the nearest ER for urgent ophthalmology consolation. Remember all wire cutters have a limit of cutting capacity. In cases involving larger fish hooks, the patient may have to be referred to the ER/ Hospital where larger surgical cutting devices are available ie bolt cutter or an extensive surgical procedure may be required.



Photo 3 (X-Ray)

# Principles of Removal

The 6 most common techniques for the removal of fishhooks are: Retrograde, String-Yank, Needle Cover, Barb Crush, Cut It Out and lastly, Advance and Cut. Each method and some modifications to these techniques are described in detail in this article. The method selected to remove an embedded fishhook is usually based on the judgment of the physician, the anatomic location of the injury and the type and anatomy of fishhook. Before you get started make sure that you have of a fish hook removal system. This at minimal will require a wire cutter, hemostat or needle driver, gloves, wound cleanser, protective eyewear (goggles or face shield) and local anesthetic.

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times multiple techniques must be attempted before the fishhook is successfully removed.

In the clinical setting local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, Hexachlorophene solution or if not available use soap and water before attempting removal of the fishhook. Local anesthesia typically Lidocaine 1% (Xylocaine) without epinephrine, A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook, should have the free barbs taped or cut to avoid receiving additional embedded puncture wounds during the removal procedure. All items attached to the hook (i.e., fish line, bait and the body of the lure itself) should be removed. The physician and bystanders should take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the String-Yank method and Advance and Cut method.

# 1 Retrograde Technique

 Retrograde technique is considered the simplest of the removal techniques and has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb, from the resting tissue site. The hook can then be backed out of the skin along the path of entry (Figure



3). If there is any resistance or snagging sensation of the barb during the procedure consider an alternative removal method. Figure 3 [Retrograde Technique Diagrams]

Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry.

## 2 *String-Yank Technique*

The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. This technique generally works best when removing fishhooks of small and medium size hooks. This technique should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and parts of the body that are not fixed (lips, nose, eye lids, ears) (Photo 4). It has been recognized that traditional counting 1,2,3, go (to give a reference point in time to start) prior to performing a yank-pull attempt, causes most patients to assume a flexed posture, which can cause more damage during the course of pulling. Physicians should be familiar with the concepts of this method. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material: heavy suture cord, or 20 to 30 lbs. test fishing line, can be used. Wrap and position the string material around the midpoint of the bend in the fishhook, to keep the string in a fixed position, use a simple knot such as a *Larks Head* knot (figure 5). Wrap the free ends around the index finger of the free hand.

Photo 4



 A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (figure 6A). Fishhooks extracted with this technique will come out with significant velocity, so the physician and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons 3rd Law of Motion 5. For every action there is an equal and opposite reaction. This is true when pulling, there is an equal and opposite force. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and be embedded into a new location (See Figure 6-B).

Figure 5    (Larks Head Knot Diagrams)



A. Match the ends of your suture or cord in half.

B. Lay the shank of the fishhook across the suture or cord.

C. Grab the two suture or cord ends and tuck them under the loop.

D. Pull them tightly until tight and snug on the bend of the fishhook.

E. This can be done in reverse

Figure 6    (String Yank Diagrams)

String-yank method. (A) Tie a string using a Larks Head Knot around the midpoint of the bend in the fishhook (figure 6). (B) Depress the shank of the fishhook against the skin. (C) Press firmly and quickly yank/ pull on the string while maintaining continued pressure to the shank of the hook.



A. Good firm pulling force
B. Laxity in pulling force

## 3 Needle Cover Technique

The needle cover technique requires great dexterity on the part of the physician and a little luck. It works well for the removal of large hooks with single barb, and when the point of the fishhook is superficially embedded in the skin (surface). After standard wound prep and local anesthesia, a 16-18-gauge needle is advanced along the wound entrance of the fishhook (figure 7). The direction of insertion should be parallel to the shank. The bevel should point toward the inside of the curve of the fishhook, enabling the needle opening to cover over (capping off) the barb. It is important to have the bevel pointed in the correct direction as shown so that the leading edge of the needle matches the angle of the fishhook barb. Advance the fishhook to disengage the barb, then pull and wiggle it so that the point enters the lumen of the needle. Once covered back out the fishhook (similar to the retrograde technique), taking care to move the needle along the entry point of the fishhook.

Figure 7 (Needle Cover Diagrams)



Needle cover method. (A) Advance a 16-18-gauge - needle along the fishhook until the needle opening covers or caps, the barb. (B) The fishhook and needle are then pulled back and removed as a single unit.

A modification of this technique involves sliding a # 11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out thru the track of the incision line.

# 4 Barb Crush Technique

The Barb Crush technique is considered another modification of the Retrograde Technique It has a higher success rate.  Often there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fish hook (shank). Using a pair of pliers or sturdy Hemostat you can repeatedly crimp down, and crush the fishhook barb flat using the powerful jaws of your device. Carefully smooth all rough edges, and pull gently backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (Figure 8).

Figure 8     (Barb Crush Diagrams)  Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes.



# 5 Cut It Out Technique

The cut it out technique useful in penetrating fish hook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fish hook injuries penetrating the sclera or cornea 6. However, this should be a procedure of last resort in the ambulatory care setting, when there is no wire cutting device available and there is an urgent need to remove the fish hook (figure 9). This technique is best conducted in an area of superficial penetration, no major surrounding neuro vascular structures or tendons present. To perform you simply take a hemostat and pull up gently on the shaft of the hook, in a vertical direction (see figure9). Next take a scalpel, preferable a standard #11 blade type and gently cut along the shaft of the distal end of the fish hook toward the proximal end with the barb. The hook can be then extracted and discarded. This technique consequently causes lots of tissue damage and the resultant scar will likely have a jagged wound edge appearance.

Figure 9      (Cut it out Diagrams)

Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment.



# 6 Advance and Cut Technique

One advantage of this traditional method of fishhook removal is that it has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The **Advance and cut technique** is most effective when the point of the fishhook is located near the surface of the skin[7]. It involves two methods of removal: one for single-barded fishhooks (Figure 10) and one for multiple-barbed fishhooks (Figure 11) where the non-embedded hooks are cut off prior to attempting removal. Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries[8]. Using a Hemostat or needle driver. Using a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note, is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit.  Once the distal shaft of the fish hook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fish hook fragments fly off with massive force and cause bodily injury. The Advance and Cut Technique is most universally accepted in the Urgent Care, ambulatory care and ER settings. This procedure is the most familiar to providers and least anxiety producing for the general public. If by chance the fish hook has several barbs on the shaft the distal end (eye) should be cut off with a cutter and the proximal end with the hook is pulled forward through the exit wound (figure 11). A surgical fishhook removal device, based on this technique is available (SMD, INC, Miami Beach, Florida)[9]. Remember all wire cutters, have a limit of diameter cutting capacity and in cases involving larger fish hooks, they may have to be referred to the ER or Hospital where a bolt cutter or surgical procedure may be required.

Figure 10        (Single Barb Advance and Cut Diagrams)



Advance and cut method: single-barbed fishhook. (A) Advanced the fishhook through the skin creating an exit wound. (B) Cut off the barb of the fishhook (C) back the remaining fishhook out the entry point.

Figure 11        (Multiple Barbs: Advance and Cut)



Advance and cut method: for multiple-barbed fishhook. (A) Advanced the fishhook through the skin creating an exit wound. (B) Cut the eye of the fishhook off and (C) Pull the remaining fishhook forward through the exit wound created by advancing the point through the skin.

## Post-Removal Wound Care

After removal of the fish hook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies present in the wound should be removed. After the procedure is completed, the wound should be covered with antibiotic ointment (Mupirocin) and a sterile dressing. Wound care should include routine irrigation, cleansing (betadine), application of antibiotic ointment and dressing change on a daily basis or every other day. Observations

should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water 2 to 3 times a day until healing is observed.

Infections after fishhook removal are uncommon therefore, routine use of antibiotics for uncomplicated superficial skin injuries are not indicated 1. If there is deep tissue injury in anatomical areas with higher risk for infection such as earlobes, fingertips or tendons, antibiotics should be prescribed empirically.

Infections are commonly caused by *Staphylococcus aureus* (*S. aureus*) and *Streptococcus pyogenes*, which are normal flora of the skin.  Once skin injury occurs, these bacteria can be introduced to the wound and can cause an infection.

If the patient has risk factors for **methicillin-resistant Staphylococcus aureus** (**MRSA**) infection such as history of skin abscess, furuncles, MRSA colonization, frequent exposure to antimicrobial agents, inability to maintain personal hygiene, sharing personal items (i.e. razors, towels, sports equipment, etc.), skin injury, living in crowded housing conditions or in a community where > 15% of S. aureus isolates are MRSA, then drugs like Clindamycin (300 – 450 mg PO every 6-8 hours) or the combination of Amoxicillin (875 mg PO every 12 hours) and Trimethoprim-Sulfamethoxazole (1 DS tab PO every 12 hours) or Doxycycline (100 mg PO every 12 hours) is recommended 10.

If risk factors for MRSA are not present, treatment should cover **Methicillin-susceptible Staphylococcus aureus** (MSSA) and Group A *Streptococcus*. A first-generation cephalosporin like Cefadroxil (500 -1000 mg PO every 12 hours) is recommended, for better compliance other cephalosporins like Cephalexin (first generation) or cefuroxime (second generation) can also be used. In cases of anaphylactic reaction to penicillin, Clindamycin should be the drug of choice 11.

In cases of fishhook exposure and contamination of freshwater or seawater with infectious agents like *Aeromonas, Edwardsiella, Erysipelothrix and Vibrio vulnificus* should be covered empirically. In this situation, the recommendation is Cefadroxil or Clindamycin plus a quinolone such as Levofloxacin (750 mg PO every day) in case of freshwater exposure. If the exposure is to seawater, then Doxycycline should be added for coverage against *Vibrio* species.

Duration of therapy should be 3 to 5 days. Patients who are prescribed antibiotics should be scheduled for follow up 2 to 3 days after the initial visit for evaluation of possible infection. Patients should also be evaluated for tetanus prophylaxis. Tetanus-Diphtheria or Tetanus-Diphtheria-Pertussis (Td or Tdap) vaccine should be administered if there is a history of less than 3 doses or unknown doses of tetanus toxoid administration. If last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required.

**Conclusions**

Fish Hook injuries can occur at any time, during angling, commercial fishing or simply cleaning out the garage. In this era of heightened quality of care as measured by emphasis placed on shorter arrival to discharge times, patient satisfaction and patient outcome, there is a need to establish a basic minimal procedural understanding by all healthcare providers involved in ambulatory care, urgent care and emergency rooms for quick assessment and swift removal of fish hooks. This an area where risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider starting with the simpler removal techniques (Retrograde, Needle Cover) prior to the more robust methods mentioned in this article. There is a need to establish a standard fish hook removal system that is as universal as the suture tray. Containing a medically approved cutting device, along with hemostat, protective eye wear, and other supportive care supplies. By being prepared for this inevitable occurrence the patient can be seen in a timely manner, experience minimal suffering and anxiety. Health care Institutions now realizing reimbursements are tied to the quality of care that is given 2, should make it easier to appreciate this specialized procedure by having an established protocol, provider training and fish hook removal systems located in every ambulatory health care facility supply room in close proximity to the laceration repair kit.

### The Authors

Anthony G. Stanley, MD, Bio: Staff physician Criticare Clinics & Urgent Care Miami, Fl. Staff Emergency Room Physician, Baptist Healthcare of South Florida. Medical Device Inventor (holder of 3 medical device patents).  Dr. Stanley received his medical degree from Rutgers-New Jersey Medical School, Newark New Jersey. He completed Residency in Internal Medicine at University of Miami-Jackson Memorial Medical Center/ Miami VA Medical Center Miami, Florida.

Jorge Murillo, MD, FIDSA, FACP Bio: Associate Professor of Medicine – Herbert Wertheim College of Medicine, Florida International University, Miami, Florida, Consultant in Infectious Diseases and Tropical Medicine, Baptist Health System of South Florida. Dr. Murillo received his medical degree from the Central University of Venezuela. He completed his fellowship in Infectious Diseases at the University of Maryland Hospital, Baltimore, Maryland.

## REFERENCES / Citations

1. Doser C, Cooper WL, Edinger WM, et al. Fishhook injuries: a prospective evaluation. **Am J Emerg Med**. 1991;9(5):413-415.
2. 2.Weinick, Robin M., Kirsten Becker, Layla Parast, Brian Dale Stucky, Marc N. Elliott, Megan Mathews, Chris Chan and Virginia Kotzias. Emergency Department Patient Experience of Care Survey: Development and Field Test. Santa Monica, CA: **RAND Corporation,** 2014. https://www.rand.org/pubs/research_reports/RR761.html.
3. Zuber TJ. Skin biopsy, excision, and repair techniques. The illustrated manuals and videotapes of soft tissue surgery techniques. Kansas City: American Academy of Family Physicians, 1998.

4. Gammons MG, Jackson E. Fishhook removal. Am Fam Physician. 2001;63(11):2231–6.

5. Newton's Third Law of Motion: Textbook of Physics, AM J Phys. 12,109 (1944)

6. Ahmad SS, Seng CW, Ghani SA, Lee JF.  Cut-it-out technique for ocular fish-hook injury Journal of Emergencies Trauma and Shock, 6(4):293-295, 30 Sep 2013

7. Diekema DS, Quan L. Fishhook removal. In: Henretig FM, King C, eds. Textbook of Pediatric Emergency Procedures. Baltimore: Williams & Wilkins, 1997:1223–7.

8. GOHAR A. SALAM, M.D., D.O., Regional Anesthesia for Office Procedures: North Shore University Hospital at Manhasset, Manhasset, New York: *Am Fam Physician.* 2004 Feb 15;69(4):896-900.

9. Stanley Medical Designs, Incorporated, Miami Beach, Florida. Website: StanleyMedicalDesigns.com   e mail: info@stanleymedicaldesigns.com

10. Clinical Infectious Diseases. 2011 Feb 1;52(3): **e18**-55

11. Practice Guidelines for the Diagnosis and Management of Skin and Soft Tissue Infections: 2014 Update by the Infectious Diseases Society of America, Stevens, DL, Bisno, AL, Chambers, HF et al. *Clinical Infectious Diseases*, Volume 59, Issue 2, 15 July 2014, Pages e10–e52

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                Plaintiff,

       vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and

       Defendants.

_____/

EXHIBIT B
TO AMENDED COMPLAINT
FILED JULY 14, 2023

# JUCM ®

JUNE 2021
VOLUME 15, NUMBER 9

## THE JOURNAL OF URGENT CARE MEDICINE®





www.jucm.com    The Official Publication of the UCA and CUCM

CLINICAL cme

## Gone Fishin',
## Then Going to Urgent Care

**ALSO IN THIS ISSUE**

cme

21  **Case Report**
Don't Let Anchoring Bias Sink Your
Patient's Chance for Survival

25  **Original Research**
Keep Them Waiting, and You'll Keep
Them Away—Why You Must Break
Through Bottlenecks

34  **Clinical**
Follow the Evidence to Keep
Concussion Patients Safe

38  **Pediatric Urgent Care**
'Usually Benign' Shouldn't Keep You
from Digging for the Right Diagnosis

cme

**Practice Management**
Could Keeping Your
Team Apart Help Keep
Your Business Together?

# JUCM®

The Official Publication of the UCA and CUCM

June 2021 | VOLUME 15, NUMBER 9



**CLINICAL**

## 13 An Urgent Care Approach to Fishhook Removal

*Gone fishin'* usually signals a blissful experience in nature—until fishhook meets human flesh, at least. When patients present with a sharp, barbed metal object embedded in one body part or another, you'll need a sound understanding of the type of hook you're dealing with, the corresponding proper technique for removal, and what the next steps should be.

*Anthony G. Stanley, MD and Jorge Murrilo, MD*

---

**CASE REPORT**

## 21 A 'Red Herring' Chief Complaint

 The patient's accounting of what brought them to your urgent care center is the foundation of the history. However, falling victim to anchoring bias could have devastating consequences.

*Ryan Hagan, PA-C and*
*Christina Gardner, DHSc, MBA, PA-C*

**ORIGINAL RESEARCH**

## 25 More Timely Care: Effect of Online Queuing vs Change in Hours of Operation on Hourly Arrival Volumes. A Practice Management Reflection

 Bottlenecks can be the bane of the urgent care operator's existence. What's the best solution (or better yet, preventive measure), though?

*Aimy Patel, MD; Jennifer Johnson, MD;*
*Brian R. Lee, PhD, MPH;*
*Amanda Montalbano, MD, MPH*

---

**PRACTICE MANAGEMENT** 

## 31 What Does a Hybrid Workforce Look Like for Urgent Care?

 COVID-19 threw a wrench into our collective understanding of how a "normal" workplace functions. What happens now that restrictions are easing?

*Alan A. Ayers, MBA, MAcc*

**CLINICAL**

## 34 Managing Concussion in Acute Care

 Knowing the best approach to managing patients who may have sustained a concussion starts with recognizing the signs and grasping the relative merits of the rest vs return-to-activity approaches.

*Jordan Wackett, MD, MPH, Joshua Kornegay, MD, and Craig Rudy, MD*

**PEDIATRIC URGENT CARE**

## 38 Febrile Seizure: An Urgent Care Overview

 Identifying the type of seizure and causes of fever are the essential first steps.

*Tiffany Addington, MD*

---

**NEXT MONTH IN *JUCM***

The sight of blood is always unsettling to the patient and their loved ones. While it's likely to be less disconcerting to healthcare professionals, bleeding without an obvious cause is concerning even when the presentation is something as common as epistaxis. Vital signs, location of the bleeding, and patient history are essential to understanding the etiology. Familiarity and comfort with certain procedures are necessary for a positive outcome. Reading the cover article in the July/August issue of *JUCM* will help you feel confident that you'll be prepared.

................................................

**DEPARTMENTS**

1  Letter from the Editor-in-Chief
9  From the UCA CEO
10  Continuing Medical Education
43  Insights in Images
50  Abstracts in Urgent Care
53  Revenue Cycle Management Q&A
57  Developing Data

**CLASSIFIEDS**

55  Career Opportunities

**TO SUBMIT AN ARTICLE:**
*JUCM* utilizes the content management platform Scholastica for article submissions and peer review. Please visit our website for instructions at http://www.jucm.com/submit-an-article

**Clinical**

CME: This peer-reviewed article is offered for AMA PRA Category 1 Credit.™
See CME Quiz Questions on page 11.



# An Urgent Care Approach to Fishhook Removal

**Urgent message:** While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal.

ANTHONY G. STANLEY, MD and JORGE MURRILO, MD

**Citation:** Stanley AG, Murrilo J. An urgent care approach to fishhook removal. *J Urgent Care Med.* 2021; 15(9):13-18.

## Introduction

Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as *collateral damage*.

U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are treated in the field without attention from a healthcare provider. However, the presumption is that patients who seek medical care do so in the emergency room, an urgent care center, or in an ambulatory care center. (The emergency department is the site for 28% of all acute care visits in the United States.[2]) From this author's experience, pandemonium commences as soon as front desk personnel in the urgent care center announce there's a fishhook injury in the waiting room.

Fishhook removal is a procedure comparable in



difficulty to laceration repair of the skin with proper equipment. The fishhook removal system can be either disposable or a reusable sterile device similar to the standard suture tray. Here, we review the clinical approach to evaluation and removal of fishhooks, focusing on the six most common techniques of fishhook removal and injury management. To do so, it is essential to understand the anatomy of the fishhook,

**Author affiliations: Anthony G. Stanley, MD,** Criticare Clinics & Urgent Care, Miami, FL; Baptist Healthcare of South Florida; Stanley Medical Designs. Dr. Stanley holds patents for three medical devices, but has no relevant outside financial relationships with any commercial interests. **Jorge Murrilo, MD, FIDSA, FACP,** Herbert Wertheim College of Medicine, Florida International University; Baptist Health System of South Florida. Dr. Murrilo has no relevant financial relationships with any commercial interests.

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



Figure 1. Classic types of fishhooks: A, single barbed fishhook; B, multiple barbed fishhook; C, treble fishhook.

A.      B.      C.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*



Figure 2. Anatomy of the fishhook.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

*"Tetanus-diphtheria or tetanus-diphtheria-pertussis vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required."*

the injured area, and common techniques used to remove fishhooks in a timely and safe manner with minimal trauma.

### Anatomy of the Fishhook—and Why It Matters
The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the discretion of the provider. Tetanus status should be ascertained.

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (**Figure 1**). There are common features among them, however (**Figure 2**). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point.

When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-

barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.

### Patient Evaluation
After obtaining a history of the injury and vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration.

Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head, or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED.

Bear in mind that the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required).

### Principles of Removal
The six most common techniques for the removal of fishhooks are:
1. Retrograde
2. String-yank
3. Needle cover
4. Barb crush
5. Cut-it-out
6. Advance-and-cut

The method selected is based on the judgment of

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



**Figure 3. Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry.**

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*



**Figure 4. Applying a lark's head knot to a fishhook.**

A. Match the ends of your suture or cord and fold in half.
B. Lay the shank of the fishhook across the suture or cord.
C. Pull the two suture or cord ends under the loop.
D. Pull the suture or cord through, until a tight and snug knot is positioned on the bend of the fish hook.
E. This can be done in reverse

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimum, this will require:

1. Wire cutter
2. Hemostat or needle driver
3. Gloves
4. Wound cleanser
5. Protective eyewear (goggles or face shield)
6. Local anesthetic

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times, multiple techniques must be attempted before the fishhook is successfully removed.

In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia is typically lidocaine 1% (Xylocaine) without epinephrine. A nerve block or regional block may also be required depending on the injury site.

Hooks with more than one point like the treble fishhook should have the free barbs taped or cut to avoid additional embedded puncture wounds during the removal procedure. All items attached to the hook (eg, fish line, bait, and the body of the lure itself) should be removed. The provider and bystanders take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.

### Retrograde Technique
Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb from the resting tissue site. The hook can then be backed out of the skin along the path of entry (**Figure 3**). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.

### String-Yank Technique
The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting 1,2,3, go (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position; use a simple knot such as a lark's head knot (**Figure 4**). Wrap the free ends around the index finger of the free hand.

A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft.

The involved skin area should be well stabilized

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



**Figure 5. String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook.**

A. Good firm pulling force
B. Laxity in pulling force

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*



**Figure 6. Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps, the barb. The fishhook and needle are then pulled back and removed as a single unit.**

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (**Figure 5A**).

Fishhooks extracted with this technique will come out with significant velocity, so the provider and by-standers should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and become embedded into a new location (**Figure 5B**).

### Needle Cover Technique

The needle cover technique requires great dexterity on the part of the provider (and a little luck). It works well for the removal of large hooks with a single barb, and when the point of the fishhook is superficially embedded in the skin (surface).

After standard wound prep and local anesthesia, a 16- to 18-gauge needle is advanced along the wound entrance of the fishhook (**Figure 6**). The direction of insertion should be parallel to the shank. The bevel should point toward the inside of the curve of the fishhook, enabling the needle opening to cover over (capping off) the barb. It is important to have the bevel

pointed in the correct direction as shown so that the leading edge of the needle matches the angle of the fishhook barb. Advance the fishhook to disengage the barb, then pull and wiggle it so that the point enters the lumen of the needle. Once covered, back out the fishhook (similar to the retrograde technique), taking care to move the needle along the entry point of the fishhook.

A modification of this technique involves sliding a #11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out through the track of the incision line.

### Barb Crush Technique

The barb crush technique is considered another modification of the retrograde technique, but with a higher success rate.

Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (**Figure 7**).

### Cut-It-Out Technique

The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.[5] However, this should be a procedure of last resort in the ambulatory care setting,

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



**Figure 7. Barb crush method.** Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*



**Figure 8. Cut-it-out technique.** Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present.

To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See **Figure 8**). This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.

### Advance-and-Cut Technique

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cut technique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin; alternatively, a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting

tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

On first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient, and saves time of procedure.

### Postremoval Wound Care

After removal of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a sterile dressing. Wound care should include rou-

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



**Figure 9. Advance-and-cut technique with a single barb fishhook.** Advance the fishhook through the skin, creating an exit wound. Cut off the barb of the fishhook and back the remaining fishhook out the entry point.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*



**Figure 10. Advance-and-cut technique with a multiple barb fishhook.** Advance the fishhook through the skin creating an exit wound. Cut the eye of the fishhook off and pull the remaining fishhook forward through the exit wound created by advancing the point through the skin.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

*"Risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method."*

tine irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed. Infections after fishhook removal are uncommon.[1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason for suspicion of infection and antibiotics are prescribed, consideration of coverage for water-borne organisms is reasonable.

Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus-diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required.

## Conclusion

Fishhook injuries can occur at any time—during angling, commercial fishing, or simply cleaning out the garage. There is a need to establish a basic minimal procedural understanding by all healthcare providers involved in ambulatory care, urgent care, and emergency rooms for quick assessment and swift removal of fishhooks. This is an area where risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider starting with the simpler removal techniques (ie, retrograde, needle cover) prior to the more robust methods mentioned in this article.

Further, there is a need to establish a standard fishhook removal system that is as universal as the suture tray, containing a medically approved cutting device, along with hemostat, protective eye wear, and other supportive care supplies.

Ensuring there is an established protocol, provider training, and a ready-to-use fishhook removal system on hand (ideally in close proximity to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction. ■

**References**
1. Doser C, Cooper WL, Edinger WM, et al. Fishhook injuries: a prospective evaluation. *Am J Emerg Med.* 1991;9(5):413-415.
2. Weinick, RM, Becker K, Parast L, et al. Emergency department patient experience of care survey: development and field test. Santa Monica, CA: RAND Corporation, 2014. Available at: https://www.rand.org/pubs/research_reports/RR761.html. Accessed May 12, 2021.
3. Gammons MG, Jackson E. Fishhook removal. *Am Fam Physician.* 2001;63(11):2231–2236.
4. Newton's Third Law of Motion: Textbook of Physics.
5. Ahmad SS, Seng CW, Ghani SA, Lee JF. Cut-it-out technique for ocular fish-hook injury. *J Emerg Trauma Shock.* 2013;6(4):293-295.
6. Diekema DS, Quan L. Fishhook removal. In: Henretig FM, King C, eds. *Textbook of Pediatric Emergency Procedures.* Baltimore, MD: Williams & Wilkins; 1997:1223–1227.
7. Salam GA. Regional anesthesia for office procedures: North Shore University Hospital at Manhasset, Manhasset, New York: *Am Fam Physician.* 2004;69(4):896-900.

# JUCM
### THE JOURNAL OF URGENT CARE MEDICINE®

NEWS   RESEARCH   CLINICAL   PRACTICE MGMT   GET CME   BUYER'S GUIDE   JOBS   AUTHORS   ABOUT US   ARCHIVES

Search 🔍 | Subscribe/Get Access | Log Out | f 🐦 ▶

# CLINICAL FEATURE ARTICLES



### An Urgent Care Approach To Fishhook Removal

Urgent message: While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal. Anthony G. Stanley, MD and Jorge Murillo, MD Citation: Stanley AG, Murillo J. An urgent care approach to fishhook removal. J Urgent Care Med. 2021;15(9):13-18. INTRODUCTION Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and ...

Read More



### Outpatient Management Of COVID-19 In The Urgent Care Clinic: Administering Monoclonal Antibodies

Urgent message: The approved use of monoclonal antibodies to treat patients who have COVID-19 may signal a shift from inpatient to outpatient care of infected individuals who do not require hospitalization. Urgent care facilities may be ideally suited to serve as treatment centers and to become destinations of choice for such patients. Lindsey Fish, MD Now that COVID-19 has been with us for over a year, we are in a much different position regarding the treatment of this illness. While many of the initial therapeutics were focused on inpatient, specifically ...

Read More



### Pretravel Consultations In The Urgent Care Setting

Urgent message: A pretravel consultation assesses the patient's fitness for travel in the context of anticipated risks associated with their journey. This individualized counseling takes into account not just age or destination, but also general health and other factors such as past travel experience. Given the proliferation of single-specialty travel medicine clinics, with appropriate training and preparation, these assessments can easily be



How will you meet patients' needs in the **New Era** of Urgent Care?

adapt

EXPERITY
Get the Guide ›

Welcome Anthonys



**THE JOURNAL OF URGENT CARE MEDICINE®**

| Search |

Subscribe/Get Access | Log Out | f  t  ▶

NEWS    RESEARCH    CLINICAL    PRACTICE MGMT    GET CME    BUYER'S GUIDE    JOBS

AUTHORS    ABOUT US    ARCHIVES

# AN URGENT CARE APPROACH TO FISHHOOK REMOVAL

**Urgent message:** While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal.

**Anthony G. Stanley, MD** and Jorge Murillo, MD    *Murillo*

*Citation:* Stanley AG, Murillo J. An urgent care approach to fishhook removal. *J Urgent Care Med*. 2021;15(9):13-18.    *Murillo*

## INTRODUCTION

Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line known (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as *collateral damage*.

U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are treated in the field without attention from a healthcare provider. However, the presumption is that patients who seek medical care do so in the emergency room, an urgent care center, or in an ambulatory care center. (The emergency department is the site for 28% of all acute care visits in the United States.[2]) From this author's experience, pandemonium commences as soon as front desk personnel in the urgent care center announce there's a fishhook injury in the waiting room.

Fishhook removal is a procedure comparable in difficulty to laceration repair of the skin with proper equipment. The fishhook removal system can be either disposable or a reusable sterile device similar to the standard suture tray. Here, we review the clinical approach to evaluation and removal of fishhooks, focusing on the six most common techniques of fishhook removal and injury management. To do so, it is essential to understand the anatomy of the fishhook, the

**Welcome Anthonys**

View Archived        Privacy - Terms

injured area, and common techniques used to remove fishhooks in a timely and safe manner with minimal trauma.

# ANATOMY OF THE FISHHOOK—AND WHY IT MATTERS

The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the *discretion* of the provider. Tetanus status should be accessed and Td or Tdap administered if needed with age appropriateness as per established guidelines.

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (**Figure 1**). There are common features among them, however (**Figure 2**). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point. When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.



**Figure 1. Classic types of fishhooks: A, single barbed fishhook; B, multiple barbed fishhook; C, treble fishhook.**

A.       B.       C.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*



**Figure 2. Anatomy of the fishhook.**

Eye
Shank
Shank barbs
(not present on all hooks)
Gap — Point
Barb
Bend

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

# PATIENT EVALUATION

After obtaining a history of the injury, vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury

Dashboard

Subscriptions

Payments

Logout

Sign Up For The JUCM Newsletter
Urgent care clinical, practice management, and curated news stories - delivered to your inbox - every Tuesday.

Enter Your Name

Enter Your Email Address

**SIGN UP**

Privacy • Terms

involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration.

Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED. Bear in mind that the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required).

## PRINCIPLES OF REMOVAL

The six most common techniques for the removal of fishhooks are:

1. Retrograde
2. String-yank
3. Needle cover
4. Barb crush
5. Cut-it-out
6. Advance-and-cut

The method selected is based on the judgment of the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimal, this will require:

1. Wire cutter
2. Hemostat or needle driver
3. Gloves
4. Wound cleanser
5. Protective eyewear (goggles or face shield)
6. Local anesthetic

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times multiple techniques must be attempted before the fishhook is successfully removed.

In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia typically lidocaine 1% (Xylocaine) without epinephrine. A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook should have the free barbs taped or cut to avoid additional embedded puncture wounds during the removal procedure. All items attached to the hook (eg, fish line, bait, and the body of the lure itself) should be removed. The provider and bystanders should take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.

## Retrograde Technique

Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of the hook. This maneuver pushes the hook deeper into the tissue bed and

dislodges the barb, from the resting tissue site. The hook can then be backed out of the skin along the path of entry (**Figure 3**). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.



**Figure 3**. Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

## String-Yank Technique

The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting *1,2,3, go* (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position, use a simple knot such as a lark's head knot (**Figure 4**). Wrap the free ends around the index finger of the free hand. A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (**Figure 5A**). Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and be embedded into a new location (**Figure 5B**).



A. Match the ends of your suture or cord in half.

B. Lay the shank of the fishhook across the suture or cord.

C. Grab the two suture or cord ends and tuck them under the loop.

D. Pull them tightly until tight and snug on the bend of the fishhook.

E. This can be done in reverse

Figure 4. Applying a lark's head knot to a fishhook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



A. Good firm pulling force
B. Laxity in pulling force

A.
B.

Figure 5. String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



Figure 6. Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps the barb. The fishhook and needle are then pulled back and removed as a single unit. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

A modification of this technique involves sliding a #11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out thru the track of the incision line.

# Barb Crush Technique

The barb crush technique is considered another modification of the Retrograde Technique, but with a higher success rate. Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (**Figure 7**).



**Figure 7**. Barb crush method. Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

# Cut-It-Out Technique

The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.[5] However, this should be a procedure of last resort in the ambulatory care setting, when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present. To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See **Figure 8**)This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.



**Figure 8.** Cut-it-out technique. Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

## Advance-and-Cut Technique

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cuttechnique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

On first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture

wound. This results in less risk of injury to the provider, less anxiety to the patient, and saves time of procedure.

# Advance-and-Cut Technique

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cuttechnique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

On first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient, and saves time of procedure.



**Figure 9.** Advance-and-cut technique with a single barb fishhook. Advance the fishhook through the skin, creating an exit wound. Cut off the barb of the fishhook and back the remaining fishhook out the entry point. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



**Figure 10.** Advance-and-cut technique with a multiple barb fishhook. Advance the fishhook through the skin creating an exit wound. Cut the eye of the fishhook off and pull the remaining fishhook forward through the exit wound created by advancing the point through the skin. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

## POSTREMOVAL WOUND CARE

After removal of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a sterile dressing. Wound care should include routine irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed.

Infections after fishhook removal are uncommon.[1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason for suspicion of infection and antibiotics are prescribed, consideration of coverage water-borne organisms is reasonable.

Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus-diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required.

## CONCLUSION

Fishhook injuries can occur at any time—during angling, commercial fishing, or simply cleaning out the garage. There is a need to establish a basic minimum procedural understanding by all healthcare providers involved in ambulatory care, urgent care, and emergency rooms for quick assessment and swift removal of fishhooks. This is an area where risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider starting with the simpler removal techniques (ie, retrograde, needle cover) prior to the more robust methods mentioned in this article. Further, there is a need to establish a standard fishhook removal system that is as universal as the suture tray, containing a medically approved cutting device, along with hemostat, protective eye wear, and other supportive care supplies. Ensuring there is an established protocol, provider training, and a ready-to-use fishhook removal system on hand (ideally in close proximity

to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction.

**REFERENCES**

1. Doser C, Cooper WL, Edinger WM, et al. Fishhook injuries: a prospective evaluation. *Am J Emerg Med.* 1991;9(5):413-415.
2. Weinick, RM, Becker K, Parast L, et al. Emergency department patient experience of care survey: development and field test. Santa Monica, CA: RAND Corporation, 2014. Available at: https://www.rand.org/pubs/research_reports/RR761.html. Accessed May 12, 2021.
3. Gammons MG, Jackson E. Fishhook removal. *Am Fam Physician.* 2001;63(11):2231-2236.
4. Newton's Third Law of Motion: Textbook of Physics.
5. Ahmad SS, Seng CW, Ghani SA, Lee JF. Cut-it-out technique for ocular fish-hook injury. *J Emerg Trauma Shock.* 2013;6(4):293-295.
6. Diekema DS, Quan L. Fishhook removal. In: Henretig FM, King C, eds. *Textbook of Pediatric Emergency Procedures.* Baltimore, MD: Williams & Wilkins; 1997:1223–1227.
7. Salam GA. Regional anesthesia for office procedures: North Shore University Hospital at Manhasset, Manhasset, New York: *Am Fam Physician.* 2004;;69(4):896-900.

**Author affiliations: Anthony G. Stanley, MD,** Criticare Clinics & Urgent Care, Miami, FL; Baptist Healthcare of South Florida; Stanley Medical Designs. Dr. Stanley holds patents for three medical devices, but has no relevant outside financial relationships with any commercial interests. **Jorge Murrilo, MD, FIDSA, FACP,** Herbert Wertheim College of Medicine, Florida International University; Baptist Health System of South Florida. Dr. Murillo has no relevant financial relationships with any commercial interests.

Tagged on:   Clinical      Clinical Article      Fishhook      Foreign Body Removal

🖿 Clinical, Clinical Articles



**ABOUT US**

The Journal of Urgent Care Medicine® (JUCM) is the official journal of the Urgent Care Association (UCA). Each issue contains a mix of peer-reviewed clinical and practice management articles that address the distinct clinical and practice management needs of those who are working in today's busy urgent care centers. JUCM's reach of over 42,000 includes qualified

**QUICK LINKS**

About Us

Advertise

Subscribe

Submit An Article

Careers

Contact Us

clinicians, business and
administrative
professionals working in
urgent care facilities
nationwide

©2021 - The Journal of Urgent Care Medicine - All Rights Reserved

Privacy - Terms

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                    Plaintiff,

         vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and

        Defendants.

_____/

EXHIBIT C
TO AMENDED COMPLAINT
FILED JULY 14, 2023

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Shira Perlmutter*

United States Register of Copyrights and Director



**Registration Number**

# TXu 2-286-333

**Effective Date of Registration:**
October 25, 2021

**Registration Decision Date:**
November 09, 2021

---

## Title
        **Title of Work:**  Clinical Approach to Fishhook Removal

## Completion/Publication
    **Year of Completion:**  2021

## Author
-           **Author:**  Anthony George Stanley
    **Author Created:**  text, Revisions to Article
        **Citizen of:**  United States
    **Domiciled in:**  United States
     **Year Born:**  1957

## Copyright Claimant
    **Copyright Claimant:**  Anthony Stanley
7900 Harbor Island Drive, Unit #1514, North Bay Village, FL, 33141, United States

## Limitation of copyright claim
**Material excluded from this claim:**  text, Section titled "Post-Removal Wound Care"
**Previous registration and year:**  TX0008995658, 2021

    **New material included in claim:**  text, Revisions and Edits

## Rights and Permissions
        **Name:**  Anthony Stanley
        **Email:**  stanmeddesigns@gmail.com
    **Address:**  7900 Harbor Island Drive, Unit #1514
North Bay Village, FL 33141 United States

Page 1 of 2

## Certification

|  |  |
|---|---|
| **Name:** | Alexander Loveyko |
| **Date:** | October 25, 2021 |

**Registration #:**   TXu002286333
**Service Request #:**   1-10926769541



Anthony Stanley
7900 Harbor Island Drive, Unit #1514
North Bay Village, FL 33141 United States

# Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.



*Shira Perlmutter*

United States Register of Copyrights and Director

**Registration Number**

## TXu 2-339-980

**Effective Date of Registration:**
October 03, 2022
**Registration Decision Date:**
October 25, 2022

---

## Title

**Title of Work:**   Clinical Approach to Fishhook Removal

## Completion/Publication

**Year of Completion:**   2021

## Author

- **Author:**   Anthony G. Stanley
  **Author Created:**   text
  **Citizen of:**   United States
  **Domiciled in:**   United States

- **Author:**   Jorge Murillo
  **Author Created:**   text
  **Work made for hire:**   Yes
  **Citizen of:**   United States

## Copyright Claimant

**Copyright Claimant:**   Anthony G. Stanley
7900 Harbor Island Drive, Unit 1514, North Bay Village,, FL, 33141, United States
**Transfer statement:**   By written agreement

## Limitation of  copyright claim

**Material excluded from this claim:**   photograph(s), artwork

**New material included in claim:**   text

## Rights and Permissions

Page 1 of 2

|          |                                             |
|----------|---------------------------------------------|
| **Name:**    | Anthony G. Stanley                      |
| **Email:**   | stanmeddesigns@gmail.com                |
| **Address:** | 7900 Harbor Island Drive                |
|          | Unit 1514                                   |
|          | North Bay Village, FL 33141 United States   |

## Certification

|          |                    |
|----------|--------------------|
| **Name:** | Anastasia Latman  |
| **Date**: | October 03, 2022  |

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

Plaintiff,

vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and

Defendants.

_____/

EXHIBIT D
TO AMENDED COMPLAINT
FILED JULY 14, 2023



US009943971B2

<table>
<tr><td>(12)</td><td colspan="2"><b>United States Patent</b></td></tr>
<tr><td></td><td colspan="2">Stanley</td></tr>
</table>

(12) **United States Patent**
Stanley

(10) Patent No.: **US 9,943,971 B2**
(45) Date of Patent: **Apr. 17, 2018**

(54) **CUTTING TOOL**

(71) Applicant: **Anthony G. Stanley**, North Bay Village, FL (US)

(72) Inventor: **Anthony G. Stanley**, North Bay Village, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 185 days.

(21) Appl. No.: **14/825,306**

(22) Filed: **Aug. 13, 2015**

(65) **Prior Publication Data**

US 2016/0059427 A1    Mar. 3, 2016

**Related U.S. Application Data**

(60) Provisional application No. 62/044,555, filed on Sep. 2, 2014.

(51) **Int. Cl.**
| | |
|---|---|
| *B26B 11/00* | (2006.01) |
| *B26B 29/00* | (2006.01) |
| *B26B 27/00* | (2006.01) |
| *B26B 17/00* | (2006.01) |
| *A61B 17/50* | (2006.01) |
| *A61B 17/88* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *B26B 17/00* (2013.01); *A61B 17/50* (2013.01); *A61B 17/8863* (2013.01)

(58) **Field of Classification Search**
CPC ........ A61B 17/50; A61B 17/8863; B26B 7/00
USPC ......................................... 30/124
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,012,648 | A | * | 8/1935 | Wheeler .................. A01G 3/02 30/134 |
| 2,281,189 | A | * | 4/1942 | Wright .................. A01G 3/053 30/132 |
| 3,842,500 | A | * | 10/1974 | Cassel .................... B26B 17/00 30/124 |
| 4,464,837 | A | * | 8/1984 | Arnstutz ........... A01G 3/0475 30/134 |
| D313,334 | S | * | 1/1991 | Novak ............................. D8/5 |
| 5,033,195 | A | | 7/1991 | Appelkvist et al. |
| 5,301,431 | A | * | 4/1994 | Cera ................. A61B 17/8863 30/186 |
| 5,365,625 | A | | 11/1994 | Han |
| 5,383,274 | A | | 1/1995 | Miller |
| 5,619,892 | A | * | 4/1997 | Eggert ..................... B25B 7/00 24/11 R |

(Continued)

OTHER PUBLICATIONS

Stanley, Dr. Anthony G.; International Patent Application No. PCT/US15/44976; International Search Report; dated Nov. 23, 2015; 2 pages.

(Continued)

*Primary Examiner* — Ghassem Alie
*Assistant Examiner* — Bharat C Patel
(74) *Attorney, Agent, or Firm* — Dority & Manning, PA

(57) **ABSTRACT**

A cutting tool is described. The cutting tool can provide increased safety in residential, commercial, and/or medical applications. The cutting tool includes a container that can catch and/or hold material that is cut by use of the tool. This can prevent the cut material from flying indiscriminately away from the cutting tool at high velocity and can also prevent the cut material from falling to the floor/ground after cutting. The cutting tool can be sterilized for medical use, such as fish hook or jewelry removal.

**25 Claims, 16 Drawing Sheets**



US 20160235498A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: **US 2016/0235498 A1**

Stanley et al. (43) **Pub. Date:** **Aug. 18, 2016**

(54) **MEASURING DEVICES FOR MEDICAL TOOLS**

(71) Applicants: **Anthony G. Stanley**, North Bay Village, FL (US); **Donald L. Huzzie, Sr.**, Miami Gardens, FL (US)

(72) Inventors: **Anthony G. Stanley**, North Bay Village, FL (US); **Donald L. Huzzie, Sr.**, Miami Gardens, FL (US)

(21) Appl. No.: **15/045,612**

(22) Filed: **Feb. 17, 2016**

**Related U.S. Application Data**

(60) Provisional application No. 62/117,731, filed on Feb. 18, 2015.

**Publication Classification**

(51) **Int. Cl.**
  *A61B 90/00* (2006.01)
  *A61B 17/285* (2006.01)
  *A61B 17/28* (2006.01)

(52) **U.S. Cl.**
  CPC ............. *A61B 90/06* (2016.02); *A61B 17/2812* (2013.01); *A61B 17/285* (2013.01); *A61B 17/282* (2013.01); *A61B 2090/061* (2016.02)

(57) **ABSTRACT**

Measuring devices that can be incorporated with gripping tools are described. The measuring devices can be integral to a gripping tool or can be removably attachable to a gripping tool. The measuring devices can be incorporated in conjunction with a gripping tool for use in a medical application such as a clamp, a hemostat, a forceps, or the like. Devices can be utilized to determine a straight length and/or to determine the spread of the jaws a gripping tool associated with the device.



# UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF FLORIDA

## MIAMI DIVISION

### CASE NO. 1:23-cv-20793-PAS

ANTHONY STANLEY, M.D.

                Plaintiff,

        vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and

       Defendants.

_____/

EXHIBIT E
TO AMENDED COMPLAINT
FILED JULY 14, 2023

 Gmail

Anthony Stanley MD <stanmeddesigns@gmail.com>

**Successful 2022 Medical Device Establishment Registration**
1 message



**CDRH Registration and Listing** <reglist@cdrh.fda.gov>
To: "stanmeddesigns@gmail.com" <stanmeddesigns@gmail.com>

Wed, Feb 23, 2022 at 9:41 PM

Header

Dear Anthony Stanley:

This e-mail provides confirmation that the annual registration for the following medical device establishment has been successfully completed for 2022:

Registration Number:
Owner Operator Number: 10084436
STANLEY MEDICAL DESIGNS, INCORPORATED
7900 Harbor Island Drive
Suite 1514
North Bay Village, FL 33141
UNITED STATES

If you do not see a registration number assigned to the establishment and your establishment previously had one, please send an email to reglist@cdrh.fda.gov and include the registration number you believe is assigned to your establishment. We will review and determine if a duplicate registration has been created for your establishment.

Your registration is valid until December 31, 2022. Registration for 2023 will be conducted between October 1 and December 31, 2022.

Please note that registering your device facility and listing your devices does not, in any way, constitute FDA approval of your facility or your devices.

Should you have any questions, please send an e-mail to the CDRH Registration and Listing Helpdesk at reglist@cdrh.fda.gov.

CDRH Registration and Listing Helpdesk
Imports & Registration and Listing Team
Division 2 Establishment Support
Office of Regulatory Programs
Office of Product Evaluation and Quality
Center for Devices and Radiological Health
U.S. Food and Drug Administration

Tel: 301-796-7400, Option 1
Email: reglist@cdrh.fda.gov
Signature Block Logo

---

2 attachments

  Header.jpg
46K

U.S. FOOD & DRUG ADMINISTRATION SignatureBlockLogo.png
7K

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 1:23-cv-20793-PAS

ANTHONY STANLEY, M.D.

                    Plaintiff,

          vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and

.

                Defendants.

_____/

EXHIBIT F
TO AMENDED COMPLAINT
FILED JULY 14, 2023

# Clinical Approach to Fishhook Removal

Submitted on Feb 16, 2021 - Manuscript ID: 1320812

Start a discussion

- Anthony G. Stanley
  Jun 4, 2021 - 11:11 am EDT
  Article Credits
  4
  Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on some of the online d...
- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT
  Receipt of your submission to JUCM
  8
  Ok great Harris. Looking forward to reading it along with family and friends. Yes please send a f...
- Anthony G. Stanley
  Apr 29, 2021 - 11:41 am EDT
  Article discussion and photos
  4
  Hello Harris: Just checking to see how the project is coming along. Let if you need my assistance...

Discussion with *Journal of Urgent Care Medicine*

## Article discussion and photos

- Anthony G. Stanley
  Apr 16, 2021 - 7:32 pm EDT
  Hello Harris: I would like to contact you on Monday to discuss some aspects of the article and set up. I will try to contact you Monday 4/19/21 after 10:30am, if it is good timing for you.
  Dr. Stanley

- Anthony G. Stanley
  Apr 19, 2021 - 10:44 am EDT
  hello
  Attachments
    - work copy an urgent care approach to fishhook remova
- Anthony G. Stanley

Help

Apr 20, 2021 - 7:26 am EDT

Hello Harris:

I contacted all the photo copyright owners and cc you last evening. Attached is a composite contact list.

keep me posted.

Dr. Stanley

Attachments

  ○ 2021_copy_right_granted_list_a_autorecovered_.docx

- Anthony G. Stanley

  Apr 29, 2021 - 11:41 am EDT

  Hello Harris:

  Just checking to see how the project is coming along. Let if you need my assistance.

  Take

  Dr. Stanley

## Post a response

**bold**_italic_bulletsnumberslink

Add an attachment

| Choose File | No file chosen        Add file

## Allowed file types

**You may upload the following types of files:**

\*.aac, \*.avi, \*.csv, \*.doc, \*.docx, \*.flac, \*.gif, \*.html , \*.jpeg, \*.jpg, \*.key, \*.m4a, \*.md, \*.mov, \*.mp3, \*.mp4, \*.mpeg, \*.mpg, \*.odt, \*.pdf, \*.png, \*.pps, \*.ppt, \*.tex, \*.tif, \*.tiff, \*.txt, \*.xls, \*.xml, \*.zip

If you have a file that is unsupported please archive it within a **\*.ZIP** file before uploading.

| Post Message |

X

# Clinical Approach to Fishhook Removal

Submitted on Feb 16, 2021 - Manuscript ID: 1320812

Start a discussion

- Anthony G. Stanley
  Jun 4, 2021 - 11:11 am EDT
  Article Credits
  4
  Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on some of the online d...
- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT
  Receipt of your submission to JUCM
  8
  Ok great Harris. Looking forward to reading it along with family and friends. Yes please send a f...
- Anthony G. Stanley
  Apr 29, 2021 - 11:41 am EDT
  Article discussion and photos
  4
  Hello Harris: Just checking to see how the project is coming along. Let if you need my assistance...

Discussion with *Journal of Urgent Care Medicine*

## Receipt of your submission to JUCM

- Harris Fleming
  Feb 17, 2021 - 8:02 am EST
  Dear Dr. Stanley,

  Thank you for submitting your manuscript to *JUCM, The Journal of Urgent Care Medicine*. We appreciate your taking the time and the initiative to contribute to the growing body of urgent care literature.

  Your article will be shared with a member of our clinical editorial team, after which I will update you on its status. You can expect to hear from me in 2 to 4 weeks. Typically, manuscripts that are accepted by our journal wil' ↲3 to 6 months after submission, depending on seasonality, the peer and other factors.

Help

If you have any questions at any time, please email me at hfleming@jucm.com.

Thanks again.

Harris

**Harris Fleming**
**Executive Editor**
**JUCM, _The Journal of Urgent Care Medicine_**

- Anthony G. Stanley
  Mar 2, 2021 - 8:54 am EST
  Hello Harris: Just checking in. This is my first journal article. Let me know if you need any information from me, medical illustrations, photos etc...

  Have a great day!
  Dr. Stanley

- Harris Fleming
  Apr 30, 2021 - 12:01 pm EDT
  Dr. Stanley,
  Right now your manuscript is being read by a couple members of our peer review panel. It's the final step before preparing the article for publication. I will let you know whether or not they have any queries. I've asked them to get back to me no later than today.

  Thank you for checking in.

  Harris

- Anthony G. Stanley
  May 5, 2021 - 6:31 pm EDT
  Hello Harris: I reviewed the article . I made a few rearrangements of photos to make everything flow a little better. I was able to cut the page count from 13 to 12. Content not changed but truncated to conserve space.
  I included my x ray of the fish hooked finger which has been a inspiration point for me writing this article (PATIENT EVALUATION), hope its no problem. I like your edits of the article and satisfied with the results.

Dr. Stanley

Attachments
- ○ jucm_0621_clinical_fishhook_post_peer_review_2.docx
- ○ jucm_article_disclosure_form_ags.pdf

- Anthony G. Stanley
  May 10, 2021 - 7:57 am EDT
  Good Morning Harris;
  Here are two photos of me to choose from  and Disclosure from Dr. Murrillo.
  Have a great week.
  Dr. Stanley

  Attachments
  - ○ dr.stanley.jpg
  - ○ dr._stanley.jpg
  - ○ jucm_disclosure_form3_28_21jm.pdf

- Anthony G. Stanley
  May 17, 2021 - 1:31 pm EDT
  Hello Harris:

  Just checking if you know if the article is slated for June or July issue?
  Also please send a copy of the final layout plans ( copy and photos) of the article.

  Thanks
  Dr. Stanley

- Harris Fleming
  May 17, 2021 - 2:39 pm EDT
  Hi, Dr. Stanley.

  Your article will be featured on the cover of the June issue, which goes to press
  this week. I will be happy to send you a few copies after we've received the excess
  back from the printer, which will probably be in the second week of June.
  Unfortunately, we're unable to share the layout in advance of publication. It will
  be available online starting on June 1.

  Harris

- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT

  Ok great Harris. Looking forward to reading it along with family and
  friends. Yes please send a few copies when you can!

  Have a great week

## Post a response

bolditalicbulletsnumberslink

Add an attachment

[Choose File] No file chosen          Add file

## Allowed file types

**You may upload the following types of files:**

\*.aac, \*.avi, \*.csv, \*.doc, \*.docx, \*.flac, \*.gif, \*.html , \*.jpeg, \*.jpg, \*.key, \*.m4a, \*.md, \*.mov, \*.mp3, \*.mp4, \*.mpeg, \*.mpg, \*.odt, \*.pdf, \*.png, \*.pps, \*.ppt, \*.tex, \*.tif, \*.tiff, \*.txt, \*.xls, \*.xml, \*.zip

If you have a file that is unsupported please archive it within a **\*.ZIP** file before uploading.

[Post Message]
X

# Clinical Approach to Fishhook Removal

Submitted on Feb 16, 2021 - Manuscript ID: 1320812

Start a discussion

- Anthony G. Stanley
  Jun 4, 2021 - 11:11 am EDT
  Article Credits
  4
  Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on some of the online d...
- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT
  Receipt of your submission to JUCM
  8
  Ok great Harris. Looking forward to reading it along with family and friends. Yes please send a f...
- Anthony G. Stanley
  Apr 29, 2021 - 11:41 am EDT
  Article discussion and photos
  4
  Hello Harris: Just checking to see how the project is coming along. Let if you need my assistance...

Discussion with *Journal of Urgent Care Medicine*

## Article Credits

- Anthony G. Stanley
  Jun 1, 2021 - 12:46 pm EDT
  Hello Fleming:

  I wanted see if my photo can be added to the On-line version and add me to the Authors Bios  Section.

  Thanks
  Dr. Stanley
  Attachments
    - dr_ stanley.jpg
    - post_review.docx
- Harris Fleming

Help

Jun 1, 2021 - 11:40 pm EDT
Dr. Stanley,
Yes, your photo and your information will be added when the standalone PDF
version of your article is uploaded to the website. There is a lag between
publication of the issue and its articles and their addition to the archives, which
coincides with updating the author bios.
Thank you for asking (and, again, for your excellent contribution).
Harris

- Anthony G. Stanley
  Jun 2, 2021 - 10:53 am EDT

  Hi Harris:

  Thanks for the info. Oh by the way , I wanted to know if in the future ,
  can you send me any statistical data in regards to the article readership .
  How many clicks and that sort of info if it is available?
  Just want to gauge where it is on the popularity list over time!

  Thanks again.

- Anthony G. Stanley
  Jun 4, 2021 - 11:11 am EDT
  Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on
  some of the online documents?

  If possible;

  Jorge Murillo

  Dr. Stanley

## Post a response

bolditalicbulletsnumberslink

Add an attachment
Choose File | No file chosen        Add file

## Allowed file types

**You may upload the following types of files:**

*.aac, *.avi, *.csv, *.doc, *.docx, *.flac, *.gif, *.html , *.jpeg, *.jpg, *.key, *.m4a, *.md, *.mov, *.mp3, *.mp4, *.mpeg, *.mpg, *.odt, *.pdf, *.png, *.pps, *.ppt, *.tex, *.tif, *.tiff, *.txt, *.xls, *.xml, *.zip

If you have a file that is unsupported please archive it within a **\*.ZIP** file before uploading.

Post Message

X

 Gmail

Anthony Stanley MD <stanmeddesigns@gmail.com>

**Sample Photo release form**
6 messages

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                Thu, Feb 6, 2020 at 8:52 PM
To: editor@jucm.com

Hello My name is Anthony Stanley, MD:

I am currently working on a **clinical review article** to JUCM with in the near future. Currently I am obtaining permission for a photo and graphics, I would like to use from the internet. Do you have a sample **photo release form**, that I can reference and covers the scope of your concerns at the Journal of Urgent Care Medicine.

Thank you
Anthony G. Stanley, MD

**Harris Fleming** <hfleming@jucm.com>                Thu, Feb 6, 2020 at 9:57 PM
To: Anthony Stanley MD <stanmeddesigns@gmail.com>

Dr. Stanley,

Thank you for your email, and for your interest in submitting an article to *JUCM*. We appreciate your initiative very much.

We do not have a standard form for requesting permission to use images that have appeared in other publications or online. Rather, each copyright holder maintains their own permissions process. When you're ready to submit your manuscript, simply included images that would suit your needs. We will seek permission to use them once your article is accepted, or find suitable alternatives through services we work with regularly.

May I ask the topic your clinical review article will address, so we can ensure we don't already have one on a similar subject in the mix?

Harris

**Harris Fleming**

**Executive Editor**

*JUCM, The Journal of Urgent Care Medicine*

hfleming@jucm.com

[Quoted text hidden]

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                Mon, Feb 10, 2020 at 11:06 AM
To: Harris Fleming <hfleming@jucm.com>

Mr. Harris: Thanks for your response. The title of my paper is **Clinical Approach to Fishhook Removal**. It is shaping to be a very comprehensive summary.

I have a few general question regarding the submission and acceptance JUCM policy. This is my first article and just want to get a better understanding of the process.  If the article is accepted what are the advantages of being published  in the JUCM: circulation wise, etc...? Am I allowed to submit the article to another medical journal or are there any limitations I should be aware of?

Thanks
Dr. Stanley

[Quoted text hidden]

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                           Mon, Feb 15, 2021 at 6:45 PM
To: Harris Fleming <hfleming@jucm.com>

Hello Mr. Fleming:

Its Dr. Stanley. We talked last year in February (2020); about an article I was writing. Hope all is well. I have been busy with work/ pandemic, gathering permission for photos, and restructuring my article. The article is going to be a **comprehensive review of fish hook removal**, with all the latest concepts put together in one place. I have lots of diagrams to demonstrate the various techniques. Lots of photos provided by a collaboration with **fishermen, wildlife societies and a medical art illustrator**. I have worked many years perfecting various procedures and want to present an article that Doctors, ARNP, and PA's, can have on their desktop or i-pad for quick reference.

I will be sending the article your way on Wednesday via the SCHOLASTICA portal.

Once received please send me an email so I will know it arrived, and will go from there.


Anthony G. Stanley, MD

(305) 439-7274

[Quoted text hidden]

---

**Harris Fleming** <hfleming@jucm.com>                                       Tue, Feb 16, 2021 at 9:21 AM
To: Anthony Stanley MD <stanmeddesigns@gmail.com>

Thank you, Dr. Stanley. I will be on the lookout for and confirm receipt of your submission. When it does arrive, it will be assigned to one of our clinical editors for review. I will update you on its status after we've had a chance to discuss it, which should be within 2 weeks after receipt.


Harris

[Quoted text hidden]

 This email has been checked for viruses by Avast antivirus software.
www.avast.com

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                           Tue, Feb 16, 2021 at 9:23 AM
To: Harris Fleming <hfleming@jucm.com>

Sounds good, thank you!

[Quoted text hidden]

 Gmail                                    **Anthony Stanley MD <stanmeddesigns@gmail.com>**

## New Clinical Review Article
1 message

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                          Mon, Feb 15, 2021 at 7:01 PM
To: editor@jucm.com

Hello Dr. Russell:

My name is Anthony G. Stanley, MD. from sunny Miami Beach, Florida.  I am currently working on a **clinical review article** to submit to the Journal of Urgent Care Medicine. The article is going to be a comprehensive review of **fish hook removal**, with all the latest concepts put together in one place. As more people start to get back to fishing, subsequently more injuries will be presenting to the health care facilities. What I wanted to create, is a procedural review and guideline article. I have lots of updated diagrams to demonstrate the various techniques. Lots of photos provided by a collaboration with **fishermen, wildlife societies and a medical art illustrator**. I have worked many years perfecting various procedures and want to present an article that Doctors, ARNP, and PA's, can have on their desktop or i-pad for quick reference.

I will be sending the article your way on Wednesday via the SCHOLASTICA portal.

Once received please send me an email so I will know it arrived.


Anthony G. Stanley, MD

(305) 439-7274

 **Gmail**

Anthony Stanley MD <stanmeddesigns@gmail.com>

## New Clinical Review Article
3 messages

**Anthony Stanley MD** <stanmeddesigns@gmail.com>
To: leeresnick@sbcglobal.net

Mon, Feb 15, 2021 at 6:57 PM

Hello Mr. Fleming:

Its Dr. Stanley. We talked last year in February (2020); about an article I was writing. Hope all is well. I have been busy with work/ pandemic, gathering permission for photos, and restructuring my article. The article is going to be a **comprehensive review of fish hook removal**, with all the latest concepts put together in one place. I have lots of diagrams to demonstrate the various techniques. Lots of photos provided by a collaboration with **fishermen, wildlife societies and a medical art illustrator**. I have worked many years perfecting various procedures and want to present an article that Doctors, ARNP, and PA's, can have on their desktop or i-pad for quick reference.

I will be sending the article your way on Wednesday via the SCHOLASTICA portal.

Once received please send me an email so I will know it arrived, and will go from there.


Anthony G. Stanley, MD

(305) 439-7274

---

**Lee Resnick** <leeresnick@sbcglobal.net>
To: Anthony Stanley MD <stanmeddesigns@gmail.com>, Harris Fleming <hfleming@jucm.com>

Mon, Feb 15, 2021 at 10:43 PM

Dr Stanley,

I am forwarding your email to Harris Fleming for review and response. I didn't see him copied on your email below.  I am no longer editor of JUCM, but Harris can get you connected

**Lee A. Resnick, MD**
[Quoted text hidden]

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>
To: Lee Resnick <leeresnick@sbcglobal.net>
Cc: Harris Fleming <hfleming@jucm.com>

Tue, Feb 16, 2021 at 6:50 AM

Great, thanks!
[Quoted text hidden]

 Gmail

Anthony Stanley MD <stanmeddesigns@gmail.com>

## Update on you JUCM submission

9 messages

---

**Harris Fleming** <hfleming@jucm.com>
To: Anthony Stanley MD <stanmeddesigns@gmail.com>

Mon, Mar 8, 2021 at 10:54 PM

Dr. Stanley,

Thank you for your patience as your submission has worked its way through our editorial team. In short, I'm happy to let you know that your article has been accepted pending your response to a few suggested edits from our clinical editors. I will be sending you an annotated version of the article explaining what those are within the next few days.

Harris

**Harris Fleming**

**Executive Editor**

*JUCM, The Journal of Urgent Care Medicine*

**Phone: 201-248-2834**

**Email: hfleming@jucm.com**

 This email has been checked for viruses by Avast antivirus software.
www.avast.com

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>
To: Harris Fleming <hfleming@jucm.com>

Tue, Mar 9, 2021 at 12:26 PM

Hello Harris; That is great news! Looking forward to reviewing the edits.
Thanks
Dr. Stanley
[Quoted text hidden]

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>
To: Harris Fleming <hfleming@jucm.com>

Thu, Mar 25, 2021 at 8:03 AM

Good morning Harris:

Any updates from the editorial team?

Thanks

Dr. Stanley
[Quoted text hidden]

---

**Harris Fleming** <hfleming@jucm.com>                                   Thu, Mar 25, 2021 at 11:14 AM
To: Anthony Stanley MD <stanmeddesigns@gmail.com>

Hi, Dr. Stanley.

Thanks again for your patience. We had a couple of disruptions in the review chain, but I do have an annotated document with recommended edits to your article. It's attached here.

You don't need to go to the trouble of accepting the edits that are tracked; I just wanted you to be aware of them. If you disagree with anything, please note that in a comment for our consideration. One question you'll see several times is where the images were sourced from. They're a great help and it would be nice to include as many as possible, assuming we can get permission from the copyright holders. If any of them are your own, please note that so we can add the appropriate attribution.

I'm also attaching a disclosure form for our CME accreditor. (As you may know, readers can get CME credit for answering questions on select articles in each issue.) Please complete it and return it to me, and ask Dr. Murrilo to do the same.

Our plan is to publish this as the lead clinical article in the June or July issue due to the timeliness of the topic.

Thank you so much for offering us the opportunity to share this with our readers.

Harris

---

**From:** Anthony Stanley MD <stanmeddesigns@gmail.com>
**Sent:** Thursday, March 25, 2021 8:03 AM
**To:** Harris Fleming <hfleming@jucm.com>
**Subject:** Re: Update on you JUCM submission

Good morning Harris:

Any updates from the editorial team?

Thanks

Dr. Stanley

On Tue, Mar 9, 2021 at 12:26 PM Anthony Stanley MD <stanmeddesigns@gmail.com> wrote:

Hello Harris; That is great news! Looking forward to reviewing the edits.

Thanks

Dr. Stanley

On Mon, Mar 8, 2021 at 10:54 PM Harris Fleming <hfleming@jucm.com> wrote:

Dr. Stanley,

Thank you for your patience as your submission has worked its way through our editorial team. In short, I'm happy to let you know that your article has been accepted pending your response to a few suggested edits from our clinical editors. I will be sending you an annotated version of the article explaining what those are within the next few days.

Harris

**Harris Fleming**

**Executive Editor**

***JUCM, The Journal of Urgent Care Medicine***

**Phone: 201-248-2834**

**Email: hfleming@jucm.com**

This email has been checked for viruses by Avast antivirus software.
www.avast.com

**2 attachments**

**Clinical - Fishhook Removal JUCM notes.docx**
1575K

**JUCM Disclosure Form.pdf**
224K

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                    Tue, Mar 30, 2021 at 8:08 AM
To: Harris Fleming <hfleming@jucm.com>

Good morning Harris: Attached is my disclosure form. Will send Dr, Murillo's letter shortly. **I am also composing a list of photo contributors with contact information.**

[Quoted text hidden]

 **JUCM Disclosure Form AGS.pdf**
507K

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                         Fri, Apr 16, 2021 at 4:34 PM
To: Harris Fleming <hfleming@jucm.com>

Hello Harris: is it possible to talk on the phone, This coming Monday around 10:30 am. I have put together a list of photo contributors and contact information. I have a few questions to ask before sending on Monday. Let me know what time works for you on Monday 4/18/2021
Thanks
Dr. Stanley

[Quoted text hidden]

---

**Harris Fleming** <hfleming@jucm.com>                                    Fri, Apr 16, 2021 at 5:23 PM
To: Anthony Stanley MD <stanmeddesigns@gmail.com>

Dr. Stanley,


Yes, we can speak on Monday. Would that be 10:30 am Eastern time? Whichever, please feel free to call me at 201-248-2834. Or, let me if you'd prefer that I give you a call.


Thank you!

[Quoted text hidden]

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                         Mon, Apr 19, 2021 at 8:08 AM
To: Harris Fleming <hfleming@jucm.com>

Good morning Harris:

I will be totally free at that time. But it may be better for you to call , your agenda maybe not as flexible as mine. I am preparing for a discussion on a few aspects of the article and compiling the source list.
My phone  (305) 439-7274

Talk to you soon
Dr. Stanley
[Quoted text hidden]

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                        Mon, Apr 19, 2021 at 10:24 AM
To: Harris Fleming <hfleming@jucm.com>

Hello Harris; I am sending you an updated work copy of the current edits to go over in  today's discussion
Dr. Stanley .
[Quoted text hidden]

 **Work Copy_An Urgent Care Approach to Fishhook Removal.docx**
1642K

 **Gmail**

**Anthony Stanley MD <stanmeddesigns@gmail.com>**

## Peer review of your JUCM submission
1 message

**Harris Fleming** <hfleming@jucm.com>                                    Tue, May 4, 2021 at 6:19 PM
To: Anthony Stanley MD <stanmeddesigns@gmail.com>

Greetings, Dr. Stanley.

Your article came through the peer review process with flying colors (an average of 4 out of 5 stars). There was just one substantive query, noted as a comment in the attached. Could you please take a look at that and let me know what you think?

Also, I wanted to thank you for facilitating permission for us to use the photos and illustrations. We may not be able to use every one, but this gives our art director a great selection.

I do have one final request: Could you and Dr. Murrilo please complete and return the attached disclosure form? Readers will be able to get CME credit for reading your article, and will need to supply these to our CME accreditor. If you could each include a photo (a standard headshot would be fine) of yourself, that would also be helpful.

Thanks very much for all your help.

Harris

**Harris Fleming**

**Executive Editor**

*JUCM, The Journal of Urgent Care Medicine*

**Phone: 201-248-2834**

**Email: hfleming@jucm.com**

 This email has been checked for viruses by Avast antivirus software.
www.avast.com

**2 attachments**

**JUCM 0621 Clinical - Fishhook Post Peer Review.docx**
1416K

**JUCM Disclosure Form.pdf**
224K

 Gmail

Anthony Stanley MD <stanmeddesigns@gmail.com>

**Article Concerns**
7 messages

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                                    Fri, Jun 11, 2021 at 7:16 AM
To: swilliams@jucm.com
Bcc: Lee Resnick <leeresnick@sbcglobal.net>, Harris Fleming <hfleming@jucm.com>, editor@jucm.com

Dear Mr. Williams (**Journal of Urgent Care Medicine / Braveheart Group, LLC**):

This is Dr. Stanley. It's in regards to the article **An Urgent Care Approach to Fishhook Removal**. I read the article online and have **some broad concerns** and **questions**. Can you call me on Monday June 14, 2021 9am to 10 am.

Thank you

Anthony G. Stanley,MD

305-439-7274

---

**Harris Fleming** <hfleming@jucm.com>                                    Fri, Jun 11, 2021 at 7:29 AM
To: Anthony Stanley MD <stanmeddesigns@gmail.com>
Cc: swilliams@jucm.com

Good morning, Dr. Stanley.

I'm sorry to hear you have concerns about your article. It would be most helpful, however, if you detail them in an email so we can look into them.

Thank you.

Harris

[Quoted text hidden]

 This email has been checked for viruses by Avast antivirus software.
www.avast.com

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                                    Fri, Jun 11, 2021 at 8:07 AM
To: Harris Fleming <hfleming@jucm.com>

Hello Harris:
We will discuss the details during our telephone call conversation on Monday.

Dr. Stanley
[Quoted text hidden]

---

**Harris Fleming** <hfleming@jucm.com>                                    Mon, Jun 14, 2021 at 8:16 AM
To: Anthony Stanley MD <stanmeddesigns@gmail.com>

Dr. Stanley,

As I explained in my previous email, the best and promptest course to understanding and looking into your concerns will be through a detailed email. We are engaged in preparing our July issue for publication all week and I'm afraid I will not have any availability for a conference call.

I appreciate your understanding and hope you will let me know your concerns in writing so we can look into them once the July issue is off to the printer.

Harris

---

**From:** Anthony Stanley MD <stanmeddesigns@gmail.com>
**Sent:** Friday, June 11, 2021 8:08 AM

**To:** Harris Fleming <hfleming@jucm.com>
**Subject:** Re: Article Concerns

Hello Harris,

We will discuss the details during our telephone call conversation on Monday.

Dr. Stanley

On Fri, Jun 11, 2021 at 7:29 AM Harris Fleming <hfleming@jucm.com> wrote:

Good morning, Dr. Stanley.

I'm sorry to hear you have concerns about your article. It would be most helpful, however, if you detail them in an email so we can look into them.

Thank you.

Harris

**From:** Anthony Stanley MD <stanmeddesigns@gmail.com>
**Sent:** Friday, June 11, 2021 7:16 AM
**To:** swilliams@jucm.com
**Subject:** Article Concerns

Dear Mr. Williams (**Journal of Urgent Care Medicine / Braveheart Group, LLC**):

This is Dr. Stanley. It's in regards to the article **An Urgent Care Approach to Fishhook Removal**. I read the article online and have **some broad concerns** and **questions**. Can you call me on Monday June 14, 2021 9am to 10 am.

Thank you

Anthony G. Stanley,MD

305-439-7274

This email has been checked for viruses by Avast antivirus software.
www.avast.com

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                                  Mon, Jun 14, 2021 at 1:37 PM
To: Harris Fleming <hfleming@jucm.com>
Cc: swilliams@jucm.com, Lee Resnick <leeresnick@sbcglobal.net>, editor@jucm.com

Mr. Harris Fleming  (**Journal of Urgent Care Medicine / Braveheart Group, LLC**):

This serves as an acknowledgement of your email. However, it is regrettable that you are unavailable to participate in a telephone discussion.

This is my **second notification** to you, regarding the multiple errors published in the article, **An Urgent Care Approach to Fishhook Removal ( on-line and print)**. As you recall, as **the expert**, I was denied access to proof the final article prior to the JUCM's printing. For this reason, it is imperative that we formulate a corrective plan of action. These errors if allowed to remain as published **pose severe risk and negative outcomes** in the delivery of patient care. I do speak from experience as a medical professional.

I am anticipating a telephone conversation, at your earliest convenience in order to avoid the possibility of litigation to resolve this matter.

Again, **my availability by telephone** will be **Wednesday, June 16th,2021. 9am to 10am**

Anticipating your earliest response.

Sincerely

Anthony Stanley, MD
(305) 439-7274
[Quoted text hidden]

---

**Harris Fleming** <hfleming@jucm.com>                                    Mon, Jun 14, 2021 at 3:43 PM
To: Anthony Stanley MD <stanmeddesigns@gmail.com>
Cc: swilliams@jucm.com

Dr. Stanley,

We are aware that you have concerns, as noted in my previous responses to your emails. Stu Williams and I have cleared our schedules for a conference call this Wednesday at 9:30 am, as you requested. You probably already received an invitation via email.

It would still be helpful to know the nature of your concerns in advance of our call so we can make good use of our time. Please follow up with an email detailing them so we can get straight to it on Wednesday.

Also, FYI, Dr. Resnick is no longer engaged in the operations of the journal. Please refrain from including him on the distribution of future emails.

[Quoted text hidden]

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>
To: Harris Fleming <hfleming@jucm.com>

Good morning Mr. Harris:

After your e-mail response **early yesterday**, I called an attorney and they advised me to stop communication and  just let them handle the matter. I realized your time is valuable, I spent the l hour shifts, sleeping poorly and concentrating  poorly, trying to find all the mistakes the JUCM printed and how to correct them. No need for you or Mr. Williams or **Journal of Urgent Care M** The damage to my reputation has been done and **in the records of history forever**. Now it is a matter of how to protect the public from misinformation and confusion in that article " **A** We will let members of the legal system ( do the JUCM homework and) read the original paper and final print to figure out  why things went astray. **Be aware that** there is no need for you to call me tomorrow June 16th.

Have a good day!
Dr. Stanley

[Quoted text hidden]

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                Plaintiff,

        vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and


        Defendants.

_____/



EXHIBIT G
TO AMENDED COMPLAINT
FILED JULY 14, 2023

| Approved Article: | Online Article: |
|---|---|
| INTRODUCTION<br><br>Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line known (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as *collateral damage.*.<br><br><br><br>Photo courtesy of Thundermist Lure Company. | INTRODUCTION<br><br>Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line known (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands. 1 What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as collateral damage.<br><br>==[PHOTOGRAPH REMOVED]== |

| Approved Article: | Online Article: |
|---|---|
| ANATOMY OF THE FISHHOOK—AND WHY IT MATTERS<br><br>The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the | ANATOMY OF THE FISHHOOK-AND WHY IT MATTERS<br><br>The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the |

discretion of the provider. Tetanus status should be accessed and Td or Tdap administered if needed with age appropriateness as per established guidelines.

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (Figure 1). There are common features among them, however (Figure 2). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point. When examining the patient, it is important to note



whether the fishhook is single-barbed or multiple-barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.

Figure 1. Classic types of fishhooks: A, single barbed fishhook; B, multiple barbed fishhook; C, treble fishhook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

discretion of the provider. Tetanus status should be accessed and Td or Tdap administered if needed with age appropriateness as per established guidelines.

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (Figure 1). There are common features among them, however (Figure 2). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point. When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.



[ARTWORK DISTORTED AND CONFUSINGLY MISPLACED]

104



Figure 2. Anatomy of the fishhook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

| Approved Article: | Online Article: |
|---|---|
| **PATIENT EVALUATION**<br>After obtaining a history of the injury, vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration.<br>Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED. Bear in mind that the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required). | **PATIENT EVALUATION**<br>After obtaining a history of the injury, vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration.<br>Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED. Bear in mind that the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required). |



Photo courtesy of A G Stanley, MD.

<mark>[PHOTOGRAPH REMOVED]</mark>

| Approved Article: | Online Article: |
|---|---|
| PRINCIPLES OF REMOVAL | PRINCIPLES OF REMOVAL |
| The six most common techniques for the removal of fishhooks are: | The six most common techniques for the removal of fishhooks are: |
| 1. Retrograde<br>2. String-yank<br>3. Needle<br>4. Barb crush<br>5. Cut-it-Out<br>6. Advance-and-cut | 1. Retrograde<br>2. String-yank<br>3. Needle cover<br>4. Barb crush<br>5. Cut-it-out<br>6. Advance-and-cut |
| The method selected is based on the judgment of the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimal, this will require: | The method selected is based on the judgment of the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimal, this will require: |
| 1. Wire cutter<br>2. Hemostat or needle driver<br>3. Gloves<br>4. Wound cleanser<br>5. Protective eyewear (goggles or face shield)<br>6. Local anesthetic | 1. Wire cutter<br>2. Hemostat or needle driver<br>3.  Gloves<br>4. Wound cleanser<br>5. Protective eyewear (goggles or face shield)<br>6. Local anesthetic |

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times multiple techniques must be attempted before the fishhook is successfully removed.

In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia typically lidocaine 1% (Xylocaine) without epinephrine. A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook should have the free barbs taped or cut to avoid additional embedded puncture wounds during the removal procedure. All items attached to the hook (eg, fish line, bait, and the body of the lure itself) should be removed. The provider and bystanders should take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.

Trauma Gallery



Photo courtesy of Steve Wecks.

---

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times multiple techniques must be attempted before the fishhook is successfully removed.

In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia typically lidocaine 1% (Xylocaine) without epinephrine. A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook should have the free barbs taped or cut to avoid additional embedded puncture wounds during the removal procedure. All items attached to the hook (eg, fish line, bait, and the body of the lure itself) should be removed. The provider and bystanders should take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.

[PHOTOGRAPH REMOVED]

| | |
|---|---|
| <br>Photo courtesy of Chris Barry. | <mark>[PHOTOGRAPH REMOVED]</mark> |
| <br>Photo courtesy of *Fishing World Magazine*. | <mark>[PHOTOGRAPH REMOVED]</mark> |
| Photo(s) courtesy of Karen Rudkin-Moody and<br>Ryan Moody. | <mark>[PHOTOGRAPH REMOVED]</mark> |

| Approved Article: | Online Article: |
|---|---|
| Retrograde Technique | Retrograde Technique |
| Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of | Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of |

the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb, from the resting tissue site. The hook can then be backed out of the skin along the path of entry (Figure 3). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.



Figure 3.

Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



Photo courtesy of Ty Southerland.

the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb, from the resting tissue site. The hook can then be backed out of the skin along the path of entry (Figure 3). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.



Figure 3. Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

==[PHOTOGRAPH REMOVED]==

| Approved Article: | Online Article: |
|---|---|
| String-Yank Technique | String-Yank Technique |
| The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires | The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. |

anesthesia. This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting *1,2,3, go* (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position, use a simple knot such as a lark's head knot (Figure 4). Wrap the free ends around the index finger of the free hand.

---

This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting 1,2,3, go (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position, use a simple knot such as a lark's head knot (Figure 4). Wrap the free ends around the index finger of the free hand.

A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (Figure 5A). Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear

A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of



A. Match the ends of your suture or cord in half.

B. Lay the shank of the fishhook across the suture or cord.

C. Grab the two suture or cord ends and tuck them under the loop.

D. Pull them tightly until tight and snug on the bend of the fishhook.

E. This can be done in reverse

the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (Figure 5A). Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and be embedded into a new location (Figure 5B).

(goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and be embedded into a new location (Figure 5B).

Figure 4. Applying a lark's head knot to a fishhook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

Figure 5. String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)





[FIGURE 6 ARTWORK PLACED IN INCORRECT SECTION (Needle Cover Technique)]

| | [ARTWORK DESCRIPTION POSITION CHANGED] |
|---|---|

| Approved Article: | Online Article: [PAGE MISSING] |
|---|---|
| Needle Cover Technique<br><br>The needle cover technique requires great dexterity on the part of the provider (and a little luck). It works well for the removal of large hooks with a single barb, and when the point of the fishhook is superficially embedded in the skin (surface).<br><br>After standard wound prep and local anesthesia, a 16-18-gauge needle is advanced along the wound entrance of the fishhook (Figure 6). The direction of insertion should be parallel to the shank. The bevel should point toward the inside of the curve of the fishhook, enabling the needle opening to cover over (capping off) the barb. It is important to have the bevel pointed in the correct direction as shown so that the leading edge of the needle matches the angle of the fishhook barb. Advance the fishhook to disengage the barb, then pull and wiggle it so that the point enters the lumen of the needle. Once covered, back out the fishhook (similar to the retrograde technique), taking care to move the needle along the entry point of the fishhook.<br><br>Figure 6. Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps, the barb. The fishhook and needle are then pulled back and removed as a single unit. (Illustration copyright Devon Medical Art, LLC. Used with permission.) | |



A modification of this technique involves sliding a #11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out thru the track of the incision line.

| Approved Article: | Online Article: |
|---|---|
| Barb Crush Technique | Barb Crush Technique |
| The barb crush technique is considered another modification of the Retrograde Technique, but with a higher success rate. | The barb crush technique is considered another modification of the Retrograde Technique, but with a higher success rate. |
| Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (Figure 7). Figure 7. Barb crush method. Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes. (Illustration copyright | Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (Figure 7).  |

Devon Medical Art, LLC. Used with permission.)



Figure 7. Barb crush method. Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes. (Illustration copyright Devon Medical Art. LLC. Used with permission.)

<mark>[ARTWORK DESCRIPTION POSITION CHANGED]</mark>

| Approved Article: | Online Article: |
|---|---|
| Cut-It-Out Technique | Cut-It-Out Technique |
| The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.5 However, this should be a procedure of last resort in the ambulatory care setting, when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present. | The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea. [5] However, this should be a procedure of last resort in the ambulatory care setting, when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present. |
| To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See Figure 8)This technique consequently causes lots of tissue damage, and the | To perform, take a hemostat and pull up gently on the shaft of the hook in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See Figure 8)This technique consequently causes lots of tissue damage, and the |

resultant scar will likely have a jagged wound edge appearance.

Figure 8. Cut-it-out technique. Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



resultant scar will likely have a jagged wound edge appearance.



Figure 8. Cut-it-out technique. Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

[ARTWORK DESCRIPTION POSITION CHANGED]

| Approved Article: | Online Article: |
|---|---|
| **Advance-and-Cut Technique** | **Advance-and-Cut Technique** |
| This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cut technique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barded fishhooks (Figure 9) and one for multiple-barbed fishhooks (Figure 10) where the non-embedded hooks are cut off prior to attempting removal. | This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however. additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cut technique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barded fishhooks (Figure 9) and one for multiple-barbed fishhooks (Figure 10) where the non-embedded hooks are cut off prior to attempting removal. |
| Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and | Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.7 Using a hemostat or needle driver, with a strong grip and |

twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

Figure 9. Advance-and-cut technique with a single barb fishhook. Advance the fishhook through the skin, creating an exit wound. Cut off the barb of the fishhook and back the remaining fishhook out the entry point. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

---

twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

[NEWLY ADDED SECTION]

On first glance. it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been



Figure 10. Advance-and-cut technique with a multiple barb fishhook. Advance the fishhook through the skin creating an exit wound. Cut the eye of the fishhook off and pull the remaining fishhook forward through the exit wound created by advancing the point through the skin. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient, and saves time of procedure.



[ARTWORK DESCRIPTION POSITION CHANGED]

[PRINTED TWICE]

| Approved Article: | Printed Article: |
|---|---|
| Urgent message: While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause  pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal. | Urgent message: While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal. |

| Approved Article: | Printed Article: |
|---|---|
| Anthony G. Stanley, MD and Jorge Murrilo, MD | Anthony G. Stanley, MD and Jorge Murrilo, MD |

| Approved Article: | Printed Article: |
|---|---|
| INTRODUCTION<br>Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line known (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as *collateral damage.*.<br><br><br><br>Photo courtesy of Thundermist Lure Company.<br><br>U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are | Introduction<br>Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line ['KNOWN' REMOVED] (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1]  What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as collateral damage.<br>[PHOTOGRAPH REMOVED]<br><br><br><br><br><br><br><br>U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are |

treated in the field without attention from a healthcare provider. However, the presumption is that patients who seek medical care do so in the emergency room, an urgent care center, or in an ambulatory care center. (The emergency department is the site for 28% of all acute care visits in the United States.[2]) From this author's experience, pandemonium commences as soon as front desk personnel in the urgent care center announce there's a fishhook injury in the waiting room.

Fishhook removal is a procedure comparable in difficulty to laceration repair of the skin with proper equipment. The fishhook removal system can be either disposable or a reusable sterile device similar to the standard suture tray. Here, we review the clinical approach to evaluation and removal of fishhooks, focusing on the six most common techniques of fishhook removal and injury management. To do so, it is essential to understand the anatomy of the fishhook, the injured area, and common techniques used to remove fishhooks in a timely and safe manner with minimal trauma.



[UNAPPROVED PHOTOGRAPH PLACED]



|  | [ARTWORK DISTORTED/PLACED IN INCORRECT LOCATION] <br><br> *"Tetanus-diphtheria or tetanus-diphtheria-pertussis vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dosE of tetanus toxoid was received within the last 10 years, then no further vaccination is required. "* <br><br> [RANDOM QUOTE PLACEMENT] |
|---|---|
| **Approved Article:** <br><br> ANATOMY OF THE FISHHOOK—AND WHY IT MATTERS <br><br> The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the discretion of the provider. Tetanus status should be accessed and Td or Tdap administered if needed with age appropriateness as per established guidelines. | **Printed Article:** <br><br> Anatomy of the Fishhook – and Why It Matters <br><br> Anatomy of the Fishhook-and Why It Matters The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the discretion of the provider. Tetanus status should be ascertained. [SENTENCE CHANGED] |

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (Figure 1). There are common features among them, however (Figure 2). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point. When examining the patient, it is important to note



whether the fishhook is single-barbed or multiple-barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.

Figure 1. Classic types of fishhooks: A, single barbed fishhook; B, multiple barbed fishhook; C, treble fishhook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (Figure 1). There are common features among them, however (Figure 2). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point. When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.



[ARTWORK DISTORTED/PLACED IN INCORRECT LOCATION]



Figure 2. Anatomy of the fishhook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

| Approved Article: | Printed Article: |
|---|---|
| **PATIENT EVALUATION**<br><br>After obtaining a history of the injury, vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration.<br><br>Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED. Bear in mind that the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required). | **Patient Evaluation**<br><br>After obtaining a history of the injury ==and== ==[WORD ADDED]== vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration.<br><br>Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED. Bear in mind that the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required). |



Photo courtesy of A G Stanley, MD.

[PHOTOGRAPH REMOVED]

| Approved Article: | Printed Article: |
|---|---|
| PRINCIPLES OF REMOVAL | Principles of Removal |
| The six most common techniques for the removal of fishhooks are: | The six most common techniques for the removal of fishhooks are: |
| 1. Retrograde<br>2. String-yank<br>3. Needle<br>4. Barb crush<br>5. Cut-it-Out<br>6. Advance-and-cut | 1. Retrograde<br>2. String-yank<br>3. Needle cover<br>4. Barb crush<br>5. Cut-it-out<br>6. Advance-and-cut |
| The method selected is based on the judgment of the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimal, this will require: | The method selected is based on the judgment of  <br>Figure 3. Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry. <br>[ARTWORK DISTORTED/PLACED IN INCORRECT LOCATION] <br><br>the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimal, this will require: |
| 1. Wire cutter<br>2. Hemostat or needle driver<br>3. Gloves<br>4. Wound cleanser<br>5. Protective eyewear (goggles or face shield)<br>6. Local anesthetic | |

| | |
|---|---|
| The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times multiple techniques must be attempted before the fishhook is successfully removed. | 1. Wire cutter<br>2. Hemostat or needle driver<br>3. Gloves<br>4. Wound cleanser<br>5. Protective eyewear (goggles or face shield)<br>6. Local anesthetic |
| In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia typically lidocaine 1% (Xylocaine) without epinephrine. A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook should have the free barbs taped or cut to avoid additional embedded puncture wounds during the removal procedure. All items attached to the hook (eg, fish line, bait, and the body of the lure itself) should be removed. The provider and bystanders should take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.<br><br>Trauma Gallery<br><br><br>Photo courtesy of Steve Wecks. | The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times, [COMMA PLACED] multiple techniques must be attempted before the fishhook is successfully removed.<br><br>In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia typically lidocaine 1% (Xylocaine) without epinephrine. A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook should have the free barbs taped or cut to avoid additional embedded puncture wounds during the removal procedure. All items attached to the hook (eg, fish line, bait, and the body of the lure itself) should be removed. The provider and bystanders should take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.<br><br>[PHOTOGRAPH(S) REMOVED] |



Photo courtesy of Chris Barry.



Photo courtesy of *Fishing World Magazine*.



Photo(s) courtesy of Karen Rudkin-Moody and
Ryan Moody.

| Approved Article: | Printed Article: |
|---|---|
| Retrograde Technique | Retrograde Technique |
| Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of | Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of |

the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb, from the resting tissue site. The hook can then be backed out of the skin along the path of entry (Figure 3). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.



Figure 3.

Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



Photo courtesy of Ty Southerland.

---

the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb ==[COMMA REMOVED]== from the resting tissue site. The hook can then be backed out of the skin along the path of entry (Figure 3). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.

==[FIGURE 3 ARTWORK REMOVED]==
==[PHOTOGRAPH REMOVED]==



==[FIGURE 4 ARTWORK PLACED IN INCORRECT LOCATION]==

---

| Approved Article: | Printed Article: |
|---|---|
| String-Yank Technique | String-Yank Technique |
| The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires | The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. |

anesthesia. This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting *1,2,3, go* (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position, use a simple knot such as a lark's head knot (Figure 4). Wrap the free ends around the index finger of the free hand.

This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting 1,2,3, go (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position, use a simple knot such as a lark's head knot (Figure 4). Wrap the free ends around the index finger of the free hand.

A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (Figure 5A). Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear

A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of



E. This can be done in reverse

A. Match the ends of your suture or cord in half.

B. Lay the shank of the fishhook across the suture or cord.

C. Grab the two suture or cord ends and tuck them under the loop.

D. Pull them tightly until tight and snug on the bend of the fishhook.

the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (Figure 5A). Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and be embedded into a new location (Figure 5B).

(goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and be embedded into a new location (Figure 5B).



Figure 5. String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook.

[ARTWORK DISTORTED/PLACED IN INCORRECT LOCATION]

[FIGURE 4 AND 5 ARTWORK REMOVED FROM SECTION]

Figure 4. Applying a lark's head knot to a fishhook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

Figure 5. String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



| Approved Article: | Printed Article: |
|---|---|
| **Needle Cover Technique** | **Needle Cover Technique** |
| The needle cover technique requires great dexterity on the part of the provider (and a little luck). It works well for the removal of large hooks with a single barb, and when the point of the fishhook is superficially embedded in the skin (surface). | The needle cover  technique requires great dexterity on the part of the provider (and a little luck). It works well for the removal of large hooks with a single barb, and when the point of the fishhook is superficially embedded in the skin (surface). |
| After standard wound prep and local anesthesia, a 16-18-gauge needle is advanced along the wound entrance of the fishhook (Figure 6). The direction of insertion should be parallel to the shank. The bevel should point toward the inside of the curve of the fishhook, enabling the needle opening to cover over | After standard wound prep and local anesthesia, a 16-18-gauge needle is advanced along the wound entrance of the fishhook (Figure 6). The direction of insertion should be parallel to the shank. The bevel |

(capping off) the barb. It is important to have the bevel pointed in the correct direction as shown so that the leading edge of the needle matches the angle of the fishhook barb. Advance the fishhook to disengage the barb, then pull and wiggle it so that the point enters the lumen of the needle. Once covered, back out the fishhook (similar to the retrograde technique), taking care to move the needle along the entry point of the fishhook.

Figure 6. Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps, the barb. The fishhook and needle are then pulled back and removed as a single unit. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



A modification of this technique involves sliding a #11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out thru the track of the incision line.



[ARTWORK DISTORTED/PLACED IN INCORRECT LOCATION]

should point toward the inside of the curve of the fishhook, enabling the needle opening to cover over (capping off) the barb. Advance the fishhook to disengage the barb, then pull and wiggle it so that the point enters the lumen of the needle. Once covered, back out the fishhook (similar to the retrograde technique), taking care to move the needle along the entry point of the fishhook.

[FIGURE 6 ARTWORK REMOVED FROM SECTION]

A modification of this technique involves sliding a #11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out through the track of the incision line.

| Approved Article: | Printed Article: |
|---|---|
| Barb Crush Technique | Barb Crush Technique |

The barb crush technique is considered another modification of the Retrograde Technique, but with a higher success rate.

Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (Figure 7).

Figure 7. Barb crush method. Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



---

The barb crush technique is considered another modification of the Retrograde Technique, but with a higher success rate.

Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (Figure 7).

[FIGURE 7 ARTWORK REMOVED FROM SECTION]

---

Approved Article:

Cut-It-Out Technique

The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.5 However, this should be a procedure of last resort in the

---

Printed Article:

Cut-It-Out Technique

The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea. [5] However,

ambulatory care setting, when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present.

To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See Figure 8)This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.

Figure 8. Cut-it-out technique. Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



---

this should be a procedure of last resort in the ambulatory care setting,



[ARTWORK DISTORTED/PLACED IN INCORRECT LOCATION]

when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present.

To perform, take a hemostat and pull up gently on the shaft of the hook in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See Figure 8)This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.

[FIGURE 8 ARTWORK REMOVED FROM SECTION]

---

| Approved Article: | Printed Article: |
|---|---|
| Advance-and-Cut Technique | Advance-and-Cut Technique |
| This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is | This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however. additional trauma to the surrounding tissue is |

caused by creating an exit wound (a slight disadvantage). The advance-and-cut technique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (Figure 9) and one for multiple-barbed fishhooks (Figure 10) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients

---

caused by creating an exit wound (a slight disadvantage). The advance-and-cut technique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (Figure 9) and one for multiple-barbed fishhooks (Figure 10) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin; [SEMI-COLON ADDED] alternatively, [COMMA ADDED] a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting



[ARTWORK DISTORTED/PLACED IN INCORRECT LOCATION]

tool. allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent

may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

Figure 9. Advance-and-cut technique with a single barb fishhook. Advance the fishhook through the skin, creating an exit wound. Cut off the barb of the fishhook and back the remaining fishhook out the entry point. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



Figure 10. Advance-and-cut technique with a multiple barb fishhook. Advance the fishhook through the skin creating an exit wound. Cut the eye of the fishhook off and pull the remaining fishhook forward through the exit wound created by advancing the point through the skin. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

[FIGURE 9 AND 10 ARTWORK REMOVED FROM SECTION]

[NEWLY ADDED SECTION]

On first glance. it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient, and saves time of procedure.



| Approved Article: | Printed Article: |
|---|---|
| POSTREMOVAL WOUND CARE | Postremoval Wound Care |
| After removal of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a sterile dressing. Wound care should include routine irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed. | After removal of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a sterile dressing. Wound care should include routine  ==[ARTWORK DISTORTED/PLACED IN INCORRECT LOCATION]== |
| Infections after fishhook removal are uncommon.[1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason for suspicion of infection and antibiotics are prescribed, consideration of coverage water-borne organisms is reasonable. | ==*"Risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method."*== ==[RANDOM QUOTE PLACEMENT]== |
| Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus- | |

| | |
|---|---|
| diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required. | irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed.<br><br>Infections after fishhook removal are uncommon. [1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason for suspicion of infection and antibiotics are prescribed, consideration of coverage water-borne organisms is reasonable.<br><br>Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus-diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required. |

| Approved Article: | Printed Article: |
|---|---|
| CONCLUSION | Conclusion |
| Fishhook injuries can occur at any time—during angling, commercial fishing, or simply cleaning out the garage. There is a need to establish a basic minimal procedural understanding by all healthcare providers involved in ambulatory care, urgent care, and emergency rooms for quick assessment and swift removal of fishhooks. This is an area where risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of | Fishhook injuries can occur at any time-during angling, commercial fishing, or simply cleaning out the garage. There is a need to establish a basic minimal procedural understanding by all healthcare providers involved in ambulatory care, urgent care, and emergency rooms for quick assessment and swift removal of fishhooks. This is an area where risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of |

| | |
|---|---|
| the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider starting with the simpler removal techniques (ie, retrograde, needle cover) prior to the more robust methods mentioned in this article. Further, there is a need to establish a standard fishhook removal system that is as universal as the suture tray, containing a medically approved cutting device, along with hemostat, protective eye wear, and other supportive care supplies. Ensuring there is an established protocol, provider training, and a ready-to-use fishhook removal system on hand (ideally in close proximity to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction. | the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider starting with the simpler removal techniques (ie, retrograde, needle cover) prior to the more robust methods mentioned in this article. Further, there is a need to establish a standard fishhook removal system that is as universal as the suture tray, containing a medically approved cutting device, along with hemostat, protective eye wear, and other supportive care supplies. Ensuring there is an established protocol, provider training, and a ready-to-use fishhook removal system on hand (ideally in close proximity to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction. |

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                            Plaintiff,


                vs.


THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and



                Defendants.

_____/



EXHIBIT H
TO AMENDED COMPLAINT
FILED JULY 14, 2023

 **Anthony Stanley MD <stanmeddesigns@gmail.com>**

---

## Article Retraction Request

3 messages

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                    Wed, Jun 23, 2021 at 9:07 AM
To: editor@jucm.com
Cc: swilliams@jucm.com, Harris Fleming <hfleming@jucm.com>

6/23/2021

Dear **Journal of Urgent Care Medicine / Braveheart Group, LLC/ Experity Health**:

You recently printed an unauthorized article on June 1, 2021 in the JUCM, entitled **An Urgent Care Approach to Fishhook Removal** under my name which is not my writings. It is superimposed with editorial comments placed by the JUCM and medical advice injected, not authorized by me. I came to your company with integrity, honesty and fairness. However, I was not treated with the same. I want to know why did you do such a thing? The peer reviews your website advertise, worked as a peer take over and operated under inadequate supervision of the editing and rewriting process. The paper is filled with grammatical errors and omitted steps in medical procedural concepts due to unskillful cutting and pasting. I worked and researched the article contents for **7 years** and it's now in ruins as well as my medical reputation. An opportunity to proof the final article was intentionally taken away from me. Why did you do such a thing? Do you take over from **every author**, **every month** and **deny all authors final proofing** or did you just, **decided to choose** me? Were your actions, **Racially Motivated** or what was your reason? Was your hastiness due to the old acronym Publish or Perish (ideological thinking). **How can you sleep at night knowing what you have done?**

Key sections of my work were wrongfully discarded.  There are sections in the paper that your non doctoral staff contributed, giving **medical advice and misinformation** which may have damaging effects if readers act on **wrongful medical advice in performance of patient care.** Read what your agents wrote into the article and compare it to the original submission in the **Scholastica portal**. I am asking that the article be retracted and my original writings be printed unchanged. I was asked to write your organization and **"simply ask, the Journal of urgent Care Medicine to retract the article and remove it from any form of technological circulation".**   I hold all parties mentioned (and copied in this email) accountable and ask for an internal audit of your activity and participation in this event. I look forward to your response. I am very, very disappointed in the JUCM and what has taken place.  I hope we can work together to rectify the issues, prevent harm to the readers acting on misinformation and come to a reasonable solution. Your website talks about integrity, honesty and fairness but as you can see by the treatment shown to me, those claims are not true. All of the **doctors on your JUCM staff have a medical license, and** all took a "**Hippocratic Oath", I am sure they realized the importance of retracting the article in all forms and setting the record straight, to protect the public. At the advice of an attorney, I am sending you this letter to "simply ask".**

**Sincerely**

---

**swilliams@jucm.com** <swilliams@jucm.com>                    Wed, Jun 23, 2021 at 11:27 AM
To: Anthony Stanley MD <stanmeddesigns@gmail.com>

Dr. Stanley,

I'm sorry to hear that you weren't happy with our publishing your article.

On May 4th, you were sent a version of the manuscript of your article that included edits necessitated after our internal medical review comments, and external peer reviewer comments. You may have forgotten that on May 5th, you sent an email to Executive Editor Harris Fleming acknowledging the receipt of the revised manuscript, and replied "I like your edits and am satisfied with your results".  Upon receipt of  your approval, this exact version of the manuscript was sent to our designer for layout.

I don't understand what the problem is, now that the article has been published.  You approved the content, in writing.  As our medical staff and peer reviewers have agreed, it is a valuable contribution to the medical literature on an important topic in urgent care medicine.

I see no reason to retract this article.

Best wishes,

Stuart



**Stuart Williams**

Publisher

p: 201-529-4004

[Quoted text hidden]

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>
Draft To: swilliams@jucm.com

Wed, Jun 23, 2021 at 12:38 PM

Hello Mr. Williams: This is the first time you have formally entered the picture. Welcome! Please try to keep the facts correct. The version (work copy #2 that was corrected by me and ) I sent to Mr. Harris on May 5th is not the version you printed June 1, 2021 online. There is an old Jamacian saying
" out of evil, cometh good". I am sure we both will have a clearer understanding with time. The problem still stands as stated in the previous emails. **By your statements today**, It appears you printed an unauthorized version. Recheck your emails time and date. It seems that all emails go to you or Mr. Harris, do you guys own the JUCM?

Dr. Stanley

[Quoted text hidden]

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                     Plaintiff,


          vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and



          Defendants.

_____/


EXHIBIT I
TO AMENDED COMPLAINT
FILED JULY 14, 2023

**Petition for Article Retraction**

To: Braveheart Group LLC d/b/a "The Journal of Urgent Care Medicine"

185 State Route 17, Suite 4

Mahwah, NJ 07430

Dear Journal of Urgent Care Medicine (JUCM):

We the undersigned are licensed medical providers (MD, DO, ARNP, PA-C, RN) working in the Urgent Care setting. We the undersigned are familiar with caring for fishhook injured patients, with Dr. Stanley and his work in fishhook removal education over the past several years.

Upon reading the article in your JUCM magazine on-line and printed dated June 1, 2021, entitled "An Urgent Care Approach to Fishhook Removal" we have been unfortunately surprised by the medical misinformation multiple grammatical errors that the JUCM publication presented to the medical community. We've had the opportunity of reading Dr. Stanley's original article entitled "Clinical Approach to Fishhook Removal" and the JUCM's printed version entitle "An Urgent Care Approach of Fishhook Removal" for comparative purposes and have reached the following conclusions.

The current JUMC article gives the reader, a viewpoint that fishhook injured people go to the Urgent Care centers, located in recreation areas, and that they go to the Urgent Cares, during the vacation season. These three unverified clinical assumptions are not factual medical information. There is no National data on the incidence of fishhook injury, no information on seasonal incidence, no information on geographical or regional location centers of concentrated injury. If you read the printed article's citation # 2, you will find no information to support the claims stated in the article regarding the incidence and occurrence of Fishhook injury.

The original article as written by Dr. Stanley was geared to alert the reader of the mindfulness of needing to track valuable incidence data and bring about a renewed approach to fishhook injury and treatment strategies. In reading the printed JUCM version in comparison to the original version it is evident that Dr. Stanley's information was cut and pasted out of the article, producing multiple typographical errors, and leaving poorly explained, disjointed medical concepts (e.g., "Fish hook Removal System") and, leaving the reader with only technical information of fishhook removal.

The original article furthermore has several pictures of actual patients who have provided their consent to use the images in question to bring home several points of injury awareness and diversity in skill needed to consider removal of this type of foreign body. All photos in the original article and related information were unexplainably deleted in the final version. It is, however, noticeable that JUCM has placed their own photos in the published article.

We have analyzed both versions of the article in question and believe that the readers were denied the full scope of Dr. Stanley's insight into this field of medicine, and ultimately denied valuable clinical information intended for the provider who will be faced with the difficult challenge of removing fishhooks from patients. Further, the article has

excessive brightly colorized diagrams that are of unacceptable poor visibility, all instructional diagrams listed in the article are located at the top of the pages and do not flow with the written text easily as originally intended. This arrangement requires the readers to constantly look up and look down and could potentially lead to them becoming confused. Providers, who may need to reference this article quickly in current format, (which is full of grammatical errors, disjointed through concepts and difficult to follow text) could become confused.

In conclusion, this current article "An Urgent Care Approach to Fishhook Removal'" is drastically different from its original easy-to-follow format/ layout. As a result of these numerous errors and clinical omissions listed above, the use of the article as currently published could adversely affect the care of patients and may result in injuries if not retracted and amended.

For the aforementioned reasons:

- We the undersigned medical practitioners, support a complete retraction of the article "An Urgent Care Approach to Fishhook Removal" (attached to herein in Exhibit A) in all media forms to mitigate or reduce risk to patients, ensure patient safety and satisfactory outcome.

- We the undersigned medical practitioners, support that an updated version of the article (attached to herein as Exhibit B) be published in the same edition or issue of the newspaper or periodical in which said article appeared and in as conspicuous place and type as said original article (both online and printed versions) in the Journal of Urgent Care Medicine.

By: _____

Virginia Sardinas, ARPN

Date: ____9/8/2021_____

By: _____

Markira Stewart, PA-C

Date: ____09-08-2021_____

By: _____

William Kranichfeld, MD

Medical Director Criticare Clinics Urgent Care

Date: _____ 9 / 17 / 21 _____

By: _____

Ernesto Sanz, MD

Medical Director Criticare Clinics Urgent Care

Date: _____ 9 | 17 | 21 _____

By: _____

Betty Ruiz, ARNP

Date: 09 | 17 | 21 _____

By: _____

Dia Nguyen, MD

Date: _____ 9 | 8 | 21 _____

By: _____

Yenny Ceballos, ARNP

Date: _____ 9 / 8 / 21 _____

By: _____

Anisleydi Pardon, ARNP

Date: _____ 9 | 18 | 2021 _____

By: _____

Name/Title: _Michael Sason, DO_

Date: _09-08-21_

By: _____

Name/Title: _Bonnie J. O'Sullivan MD_

Date: _9/13/21_

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

**From:** JUCM <forms@jucm.com>
**Sent:** Saturday, June 5, 2021 11:52 PM
**To:** swilliams@jucm.com
**Subject:** Journal of Urgent Care Medicine Contact Request

| Name | Sheron Clarke |
|---|---|
| Email | sheronclarke2742@aol.com |
| Message | I am writing to you as nurse to say that there are multiple errors in your publication of Fishhook Removal. These errors can adversely affect the care of patients, which may result in more harm than good. For this reason ,I think a correction is imperative in order to mitigate or reduce risk to patients,and ensure patient safety and satisfactory outcomes. |

https://jucm.com)

 This email has been checked for viruses by Avast antivirus software.
www.avast.com

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                Plaintiff,

       vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and

       Defendants.

_____/

EXHIBIT J
TO AMENDED COMPLAINT
FILED JULY 14, 2023

Journal Of Urgent Care Medicine - Journal of Urgent Care Medicine



Search

**Subscribe/Get Access** | <span style="color:red">Log In</span> | f 🐦 ▶

NEWS    RESEARCH    CLINICAL    PRACTICE MGMT    GET CME    BUYER'S GUIDE    JOBS

AUTHORS    ABOUT US    ARCHIVES

**CLINICAL ARTICLES**

When A Fever Is Not A URI: If It's Not In The Differential, It Won't Be In The Diagnosis



## When a Fever is Not a URI: If It's Not in the Differential, It Won't Be in the Diagnosis

**WEB EXCLUSIVE**
What Qualifies Someone To Take X-Rays In The Urgent Care Center? It All Depends On Where You're Located

**CASE REPORTS**
An Unusual Case Of Third And Fourth Metacarpophalangeal Joint Dislocations Following A Fall

**HEALTH LAW**
Who Can Take X-Rays In An Urgent

**IMAGES CHALLENGE**
A 10-Year-Old Boy

### Login

Username

LOGIN

Password

PASSWORD

Privacy • Terms

☑ Remember Me

LOG IN

Lost Password

# URGENT CARE NEWS

## Update: Amoxicillin and Clavulanate Products Will Continue to Be in Short Supply

JUCM News reported nearly a month ago on a scarcity of oral presentations of amoxicillin ...

## The Early Winter Forecast: Chilly with a Chance of COVID

As temperatures fall in much of the United States new hospitalizations for COVID-19 are expected ...

## Free *JUCM* Webinar: STI's Are Heating Up. Find Out What Role Urgent Care (and You) Can Play

As cases of COVID-19 (and restrictions like social distancing) took hold in the United States, ...

## Showing That You 'Understand' Individual Patients Could Go a Long Way Toward Ensuring Their Satisfaction

Everybody wants to be recognized and understood—whatever that means in a given scenario. When that ...

## Nurse Practitioners Are Inching Closer to Independence from Physician Oversight

The contributions of nurse practitioners and physician assistants (known collectively as advanced practice providers, or ...

# WEB EXCLUSIVE ARTICLES

## Code Case Files: An Established Adult Male Patient with 2 Days of COVID-Like Symptoms

Bradley L. Laymon, PA-C, CPC, CEMC PRESENTATION A 47-year-old established male patient presented after 2 ...

## What Qualifies Someone to Take X-Rays in the Urgent Care Center? It All Depends on Where You're Located

## Repairing Parallel Lacerations in the Urgent Care Center

## Mysterious Skin Lesions in a Horse Trainer

## Getting the Most Out of Your Urgent Care Google Ads Budget in 2022

## Sign Up For The JUCM Newsletter

Urgent care clinical, practice management, and curated news stories - delivered to your inbox - every Tuesday.

Enter Your Name

Enter Your Email Address

**SIGN UP**

# CLINICAL ARTICLES

## When a Fever is Not a URI: If It's Not the Differential, It

# PRACTICE MANAGEMENT ARTICLES


Privacy • Terms

11/26/22, 7:24 PM                          Journal Of Urgent Care Medicine - Journal of Urgent Care Medicine

**Won't Be in the Diagnosis**

Urgent message: Fever in patients presenting to UC is often attributable to viral infections, urinary tract infections, otitis media, cellulitis, ...

**Is It Appendicitis? The Role of Clinical Scoring Systems, Labs, and Diagnostic Imaging**

Urgent message: Ultrasound can provide essential data in the urgent care evaluation of suspicion of acute appendicitis. Facilitating a rapid ...

**A Legal Quandary: A Diagnosis of Cellulitis...That Isn't**

Michael Weinstock, MD; Gabby Gostigian, MD; and Matthew Delaney, MD Urgent message: Failure to consider subtleties and the context in ...

**Where Should I Refer My Spinal Patient? Outcomes with Orthopedic and Neurosurgeons for Common Neck and Back Procedures**

Urgent message: Neck and back pain are common issues preceding surgical intervention. Given differences in care plans, outcomes, cost, and ...

**DOT Physicals and Urine Drug Testing Represent a Growth Opportunity for Urgent Care Centers**

Urgent message: Demand for DOT-related services for truck drivers is soaring. Urgent care centers can augment traditional insurance-paid visits with ...

**Find Prime Locations for Rapid Urgent Care Growth**

Urgent message: Using a data-driven approach to predict performance, taking advantage of openings in traditional retail spaces, or utilizing resources ...

**As COVID Turns Endemic, Investors Remain Bullish on Urgent Care Growth**

Urgent message: De novo growth of urgent care continued through the pandemic. As COVID turns endemic, investors remain bullish on ...

**Why Private Equity and Other 'Smart Money' Is Bullish on Brick-and-Mortar Urgent Care**

Urgent message: Despite the current seasonal, postpandemic lull in volume, sophisticated investors are focused on the long-term growth prospects of ...

# INSIGHTS IN IMAGES CHALLENGES

Privacy • Terms

Privacy • Terms

## JUCM CAREER CENTER

**Physician House Calls Program New York City, Long Island, Northern Westchester, Staten Island, Bronx, and Brooklyn**
Brooklyn, NY - Northwell Health

**Internal Medicine: Pediatrics - Elizabethtown, KY - Paducah, KY - Recruiting Incentives up to $200,000**
Elizabethtown, KY - Baptist Health Medical Group

**Excellent PT or FT opportunity for Family Practice Physicians**
Hampstead, MD - LifeBridge Health

**STAFF PHYSICIAN - GENERAL PEDIATRICS**
Hershey, PA - Penn State Health Children's Hospital

**Family Medicine or Internal Medicine Recruiting Incentives up to $200,000**
Paducah, KY - Baptist Health Medical Group

**Family Medicine - Kentucky and Southern Indiana - Find optimal work-life balance and a lucrative recruitment package in the Beautiful Bluegrass Region - Recruiting Incentives up to $200,000**
KY - Baptist Health Medical Group

**Urgent Care Veterinarian**
Northampton, MA - Integrity Veterinary Center

**Urgent Care - Nurse Practitioner**
TEMPLE, TX - Baylor Scott & White Health

**Employed Family Medicine Employment Opportunities in Virginia + STUDENT LOAN INCENTIVES**
Roanoke, VA - Carilion Clinic

**Family Medicine Physicians**
St. Johnsbury, VT - Northeastern Vermont Regional Hospital

Privacy - Terms

# DOWNLOAD PAST ISSUES

*November 2022* : *Broadening the Differential for Fever – Etiologies Beyond Infection*

 October 2022

 September 2022

 July-August 2022

June 2022

VIEW ISSUES ARCHIVE

## CASE REPORTS

**An Unusual Case of Third and Fourth Metacarpophalangeal Joint Dislocations Following a Fall**

Urgent message: Metacarpophalangeal dislocations involving digits other than the thumb or index finger may be somewhat ...

**Bullous Pemphigoid Reaction After Second Dose of COVID-19 Vaccine**

**A Rare Case of Sequential Simultaneous Bilateral Mandibular Fractures**

**Brain Abscess in an Immunocompetent Patient:**

## HEALTH LAW

**Who Can Take X-Rays in an Urgent Care Center?**

Urgent message: Given that x-ray is a differentiating feature of "urgent care" and the current challenges ...

**What Qualifies Someone to Take X-Rays in the Urgent Care Center? It All Depends on Where You're Located**

**Avoiding Defamation Lawsuits in Urgent Care**

**Can PAs and NPs Unionize in Urgent Care Settings?**

Privacy • Terms

Complex Pathology and Communication

What's the Best Policy for Unlocking an Urgent Care's Doors when a Provider isn't Present?

How Useful Is Ultrasound in Diagnosing Ovarian Torsion?

## CLINICAL CHALLENGES

### An 83-Year-Old Female with CHF, A-Fib, and New-Onset Confusion and Syncope

An 83-year-old female with past medical history of congestive heart failure and atrial fibrillation presents to urgent care with confusion ...

### A 9-Year-Old Girl with a New Rash on Her Face

### A 40-Year-Old with Back Pain After a Fall

### A 45-Year-Old Male with Palpitations

### A 43-Year-Old with a New Rash on the Trunk

## OCCUPATIONAL MEDICINE

### Update: The COVID-19 Vaccine Mandate for Many Businesses Is Off—Again

Just when you thought you had clarity on the Occupational Safety and Health Administration's mandate to vaccinate workers at businesses ...

### That Vaccine Mandate for Private Businesses That Was Called Off? It's on Again—and the Clock Is Ticking

### Your Occ Med Clients Need Your Support with the New COVID-19 ETS—Immediately

### More People Are Trudging Off to Work on Site. Do You Know Who's at Greatest Risk for COVID-19?

### As Travel Opens Up, Opportunities to Offer COVID-19 Tests Could Be Lucrative

## REVENUE CYCLE MANAGEMENT

### Where Do You Start When Starting Your Urgent Care?

Heather Real There are many reasons to start your own urgent care, whether it be feeding your entrepreneurial spirit, investing ...

### New ICD-10-CM Codes in Effect as of October 1

### Primed for Growth: Why It's Time to

## DEVELOPING DATA

### Urgent Care Is Correcting Course on Antibiotic Prescribing

Just 4 years ago, a Research Letter published by JAMA Internal Medicine painted an unflattering picture of the antibiotic prescribing ...

### The Data Are Clear: Urgent Care Visits Almost Always Suffice for Low-Acuity Cervical Trauma

Privacy • Terms

**Consider Adding Primary Care Services to Your Urgent Care Center**

**A Tale of Two Viruses: Rapid Flu and COVID-19 Tests in the Urgent Care Setting**

**A Half Century of Urgent Care: What Today's Startups Need to Know**

**Urgent Care—It's a Millennial's Market**

**Decreasing Denials and Rejections Through Your Urgent Care Operating Model**

**Spoiler Alert: 2020 Saw a New Trent in Urgent Care Data Claims**

## ABSTRACTS IN URGENT CARE

**Abstracts in Urgent Care November 2022**

Fever: To Treat or Not to Treat? Distinguishing Viral from Bacterial ConjunctivitisScapular Fractures and Blunt Chest Trauma in ChildrenSterile vs Nonsterile …

**Abstracts in Urgent Care – October 2022**

**Abstracts in Urgent Care – September 2022**

**Abstracts in Urgent Care – July/August 2022**

**Abstracts in Urgent Care – June 2022**

## LETTER FROM THE EDITOR-IN-CHIEF

**The Value of Repeat Vital Signs**

Joshua Russell, MD, MSc, FCUCM, FACEP I'm just going say it: we should repeat vital signs more often in urgent …

**The Value of Vitals – Part I**

**Antibiotic Prescribing in "Gotham City"**

**Playing in the Band**

**Addressing Without Managing: Defusing the Ticking Time Bombs in Urgent Care**

## ABOUT US

The Journal of Urgent Care Medicine® (JUCM) is the official journal of the Urgent Care Association (UCA). Each issue contains a mix of peer-reviewed clinical and practice management articles that

## QUICK LINKS

About Us

Advertise

Subscribe

Submit An Article

Careers

C

Privacy • Terms

address the distinct clinical and

practice management needs of those who are working in today's busy urgent care centers. JUCM's reach of over 42,000 includes qualified clinicians, business and administrative professionals working in urgent care facilities nationwide

**JUCM IS THE OFFICIAL JOURNAL OF**

©2022 - The Journal of Urgent Care Medicine - All Rights Reserved



**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                      Plaintiff,

              vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and

                 Defendants.

_____/

EXHIBIT K
TO AMENDED COMPLAINT
FILED JULY 14, 2023

December 2, 2021

Hello Dr. Stanley:

I came across your June 1, 2021 article (**An Urgent Care Approach to Fishhook Removal**) online, early October, on the Journal of Urgent Care Medicine website. It seemed like a timely article that would summarize all the current ways to remove a fishhook. I wanted to use it for our Urgent Care Journal Club meeting, upon reading the article I noticed multiple typographical errors. I was very disappointed, and had difficulty trying to comprehend the written subject matter, and follow along with the photos which are not synchronized with the reading. You also alluded to the fact that there needs to be more research in fishhook injury and related demographics. However, the discussion seemed disconnected somehow.  Lastly, you talked about a new concept, a fishhook removal system but the discussion was limited. Over all, it was poorly written by you as a physician and author. The JUCM should share the blame for not proof reading. It's a great topic but needs to be presented to the medical community properly. I am a monthly reader of the JUMC and surprised of this body of work they released to the medical community! I have read several medical journals with mistakes in the past and like them, in this case, it should be corrected and reprinted. I would love to have presented this article "**An Urgent Care Approach to Fishhook Removal**" to Journal Club at our urgent care.

I was hesitant to contact you, but just felt you should know.

Sincerely,

Bonnie Jean O'Sullivan, MD

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                Plaintiff,


      vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and



      Defendants.

_____/


EXHIBIT L
TO AMENDED COMPLAINT
FILED JULY 14, 2023

160

**From:** Raisa K. Barros <RaisaB@baptisthealth.net>
**Sent:** Wednesday, November 24, 2021 10:28
**To:** tuff57@msn.com
**Subject:** Journal Complaint

Dr. Stanley,
I would like to share some feedback regarding your article "An Urgent Care Approach to Fish Hook Removal" in the Journal of Urgent Care Medicine printed June 1, 2021.  I found it in the break room at our Urgent Care and I was very interested in the subject as this is a very common patient visit in my patient demographic area. I have to mentioned that I was very surprised and disappointed as in my opinion the article was poorly written. The article, has multiple errors and the sentences do not make sense in a lot of the sections. The pictures are printed in such poor quality, and out of order. I made it dif icult to follow the recommended procedures. You are supposed to be an expert in the subject, I am surprised you did not proof read your work before submitting it to a Premier Medical Journal like the Journal of Urgent Care Medicine.  I am also sending a copy of this letter to the Journal for not checking what they printed. I hope you consider my feedback for any future work you publish.
Respectfully,

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                 Plaintiff,

         vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and

         Defendants.

_____/

EXHIBIT M
TO AMENDED COMPLAINT
FILED JULY 14, 2023

162

**From:** Aquino, Jennifer <Jennifer.Aquino@mountsinai.org>
**Sent:** Tuesday, November 23, 2021 11:05 AM
**To:** Anthony G. Stanley <AnthonyS@baptisthealth.net>
**Subject:** [External] FW: Complaint letter

Dear Dr. Anthony Stanley:

My name is Jennifer Aquino, ARNP.  I am writing to inform you, I came across your June 1, 2021 article on fish hook removal in the Journal of Urgent Care Medicine (JUCM) entitled "An Urgent Care Approach to Fish Hook Removal". I saved the article for that possible situation of getting a patient in the urgent care with a fish hook injury. I have rarely seen the injury but felt assured that the JUCM would have the best information. On October 2nd, 2021, I was at work and a patient came in with a fish hook injury to the palm of his hand. Before going into the room I took 5 minutes to review the article and its suggested approaches. Upon finally reading the article I was shocked of the typographical errors and disjointed statements located in the article.

The pictures were so small and outlined with such bright colors that distracted me from focusing and comprehending what to do. Also, the instructions and the related photos were out of place and made everything difficult to comprehend. I am sorry to say I was disappointed with your writing and you

should take a course in journalism. I am surprised the JUCM published this article. I had to send the patient to the emergency room for fish hook removal and I looked very bad for not being able to perform the procedure. The patient also wrote a discouraging letter to my supervisor about me as a practitioner. It took some time to locate you, but.

Thought you should share in my sorrow!

Cordially

Jennifer Aquino, ARNP

This message originates from Baptist Health South Florida (BHSF). It contains information that may be confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for anyone else to disclose, copy, distribute or use the contents of this message. This message may not be copied or distributed without this disclaimer. All personal messages express views solely of the sender, which are not to be attributed to BHSF. If you received this message in error, please notify us immediately at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

       Plaintiff,


    vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and



     Defendants.

_____/

EXHIBIT N
TO AMENDED COMPLAINT
FILED JULY 14, 2023



**CritiCare Clinics, Inc.**

October 10, 2021

Dear Dr. Stanley:

As you know each year in October, my company is the host of an annual Out-Patient Procedures Course to in-service our medical staff of over 150 Physicians, ARNP's, PA's, in addition we reach out to community physicians in need of medical procedure education.  On May 3rd, 2021, you and I discussed your participation in a paid faculty position as an authority in the field based on your upcoming article in the JUCM. As you know we are considering, making this program a monthly course. In a private meeting I offered you an ongoing faculty position and salary of $2,500 per month to lecture on <u>the contents of the article at our various venues,</u> and a monthly royalty fee of $500.00 monthly for the term of one year, to use the contents of your copyrighted article and medical illustrations as we saw fit, and for future ads.  The educational committee this year learned of your article entitled **An Urgent Care Approach to Fish Hook Removal** published in the June issue of the **Journal of Urgent Care Medicine** and submitted it for review to be implemented in our educational platform. I am sending you this letter to inform you that I can no longer support the use of this article due to its printing of medical misinformation, multiple grammatical errors, poor editing and poorly displayed medical illustrations.

The committee found the format used was not professionally suitable for the use of our attendees, and subsequently cannot be referenced in our take home materials nor placed on our purposed website as a creditable source of medical information. I sorry to inform you of this decision by the committee. I will not be able to honor any financial considerations previously discussed, nor afford you a place on the lecture podium this year. Time is of the essence for preparing our course curriculum and this position will be offered to another candidate. The arrangement counted on your listing in the Journal of Urgent Care Medicine, establishing your creditable authorship. As you know all lectures on our program <u>must have published creditable articles on their topic.</u> Your current JUCM article on-line and in print does not meet our requirements to be a part of the lecture staff. The participants of our program appreciate the authenticity of the material being presented to them to use safely and reliably in their patient care practice.  If you are able to present the committee with a creditable article printed in an acceptable medical journal I will reconsider this offer at a later date.

Cordially,

Dr. William Kranichfeld

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

      Plaintiff,


   vs.


THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and



   Defendants.

_____/




EXHIBIT O
TO AMENDED COMPLAINT
FILED JULY 14, 2023

From: **Barry Katzen** <BARRYK@baptisthealth.net>
Date: Wed, Apr 6, 2022 at 12:04 PM
Subject: RE: FW: [External]
To: Anthony Stanley MD <stanmeddesigns@gmail.com>
Cc: Nila D. Bhakuni <NilaB@baptisthealth.net>

Dr. Stanley,


We have reviewed this opportunity in detail and tried to share with you the information collected during the process.  Unfortunately, Innovations will not be able to move forward on this device, but wish you success moving forward and hope the analytics done by us might be helpful to you moving forward.  Keep working on new ideas!


Barry

Barry T. Katzen, MD, FACC, FACR, FSIR

Founder and Chief Medical Executive | Miami Cardiac & Vascular Institute

Chief Medical Innovation Officer | Baptist Health South Florida

**Assistant: Lisa Gordon 786-662-7754**

1500 San Remo Avenue, Suite 125| Coral Gables, Florida 33146

Direct: 786-662-7787 | Mobile: 305-773-4060

BarryK@baptisthealth.net | BaptistHealth.net



Professor and Chairman

Department of Interventional Radiology

Herbert Wertheim College of Medicine

Florida International University





**From:** Nila D. Bhakuni <NilaB@baptisthealth.net>
**Sent:** Wednesday, April 6, 2022 11:02 AM
**To:** Anthony Stanley MD <stanmeddesigns@gmail.com>
**Cc:** Barry Katzen <BARRYK@baptisthealth.net>
**Subject:** RE: FW: [External]

Hello Dr. Stanley,

Thanks for your note.  Let me touch base with Dr. Katzen and we will get back with you.

Best,

Nila

**From:** Anthony Stanley MD <stanmeddesigns@gmail.com>
**Sent:** Thursday, March 31, 2022 10:08 AM
**To:** Nila D. Bhakuni <NilaB@baptisthealth.net>
**Subject:** Re: FW: [External]

Hello Nila: Thank you for the information. Would Innovations be interested in partnering in hemostat development?

Thanks

Dr. Stanley

On Wed, Mar 30, 2022 at 11:06 AM Nila D. Bhakuni <NilaB@baptisthealth.net> wrote:

> Dr. Stanley,
>
> As promised, please find the market landscape for your Hybrid Hemostat Invention.  In addition, I asked the group to see if they could quantify the issue of fishhook injuries, and I think they did a pretty decent job.
>
> Take a look and let me know if you have any questions.

Best,

Nila

---

**From:** Maureen Wilson <mwilson@firstlinkanalytics.com>
**Sent:** Wednesday, March 30, 2022 10:52 AM
**To:** Nila D. Bhakuni <NilaB@baptisthealth.net>
**Cc:** Brittany Shaffer <bshaffer@firstlinkanalytics.com>
**Subject:** Re: [External]

Hi Nila,

Attached is the Hybrid Hemostat Market Landscape, a supplemental 2-pager, and information we found regarding fishhook injuries. The key findings for the Hybrid Hemostat Market Landscape include:

- There appear to be a total of **10 solutions** that offer similar features to the proposed invention.
- **Integra LifeSciences Corporation's (MicroFrance) solution appears to be the only one that has the unique feature of a medical tool combined with a measuring device. However, it is designed to be used only in the field of otology, which limits its application.**
- Since proper and timely insurance reimbursement may be contingent upon accurate reporting of medical procedure details, such as the dimensions of embedded objects, wounds, and the like, the proposed invention can assist in this regard due to its unique measuring feature.
- There are two relevant markets for the proposed invention, the global market for handheld surgical instruments and the global hemostats market.

Additionally, in regards to fishhook injuries, we found that:

- There is little data on the prevalence of fishhook injuries in the United States. The best estimate is **500,000 to 1 million injuries related to fishhooks each year.**
  - Uncounted are the numerous hooks removed by the injured anglers themselves or by their fishing buddies. Removal advice is not hard to find.
- Some hospitals state that they treat **90 to 100 patients with embedded fishhooks each year.**
- There are approximately **60 million anglers in the U.S.** of which 46 million are estimated to fish in a given year.
- **Florida is the number one ranked state for fishing** and the number one ranked state for non-resident fishing destinations.

Please let us know if you have any questions on any of this information!

Thank you,

Maureen

On Feb 23, 2022, at 8:37 AM, Nila D. Bhakuni <NilaB@baptisthealth.net> wrote:

Hi,

Can you do a market assessment for this product?

And is there any way you can determine how many people get hooked with fishhooks in the US, rest of the world?

Thanks,

Nila

---

**From:** Nila D. Bhakuni
**Sent:** Tuesday, January 25, 2022 9:55 AM
**To:** Carla Garic <Carla.Garic@baptisthealth.net>
**Cc:** Stephanie Parra <Stephanie.Parra@baptisthealth.net>; Daeanne Alvarez Cruz <Daeanne.AlvarezCruz@baptisthealth.net>
**Subject:** FW: [External]

A new project – new hybrid hemostat

Anthony Stanley has submitted other project ideas to us so there are related projects.

Project Manager is Stephanie Parra

Person internally right now is Barry Katzen.

Stephanie, please ask Barry if he can give you a subject matter expert for this case to review this material.

Nila

**From:** Anthony Stanley MD <stanmeddesigns@gmail.com>
**Sent:** Monday, January 24, 2022 3:18 PM
**To:** Nila D. Bhakuni <NilaB@baptisthealth.net>
**Cc:** Bill M. Duquette <BillD@baptisthealth.net>; Barry Katzen <BARRYK@baptisthealth.net>; Stephanie Parra <Stephanie.Parra@baptisthealth.net>; Lisa Gordon <lisag@baptisthealth.net>; Caroline Mauriello <CarolineM@baptisthealth.net>; Daeanne Alvarez Cruz <Daeanne.AlvarezCruz@baptisthealth.net>; Carla Garic

<carla.garic@wellspring.com>
**Subject:** Re: [External]

1/24/2022
Dear Innovations:

 This is Dr. Stanley with another medical device that I am desiring to bring to fulfillment.  My **second invention** is a **new hybrid hemostat** approved by the US Patent office for measuring while in surgical procedures.  During surgical procedures, the need often arises to measure distances of a relatively small size such as puncture depths, foreign object sizes, wound sizes, abscess sizes, and the like. Such dimensions are often necessary to gauge the level and type of care required for a patient. Moreover, this need is also becoming necessary for administrative purposes. For instance, proper and timely insurance remuneration can depend upon the accurate reporting of the details of a medical procedure including the dimensions of embedded objects, wounds, etc. This device can perform multiple surgical functions and uniquely give the provider the option to measure simultaneously.

 I am in the development phase of the project and this may be an opportunity for **Baptist Health South Florida** to partner with me in bringing this new medical device to its full potential. As you are aware I recently presented my first medical invention to the**Innovations division, a special wire cutter which was able to catch cut fragments and prevent them, from flying across the surgical table**, called a" **Moby Cutter"** of which I was informed was too close to the"purchasing phase", **and not a potential co-development opportunity**.

I am enclosing a copy of the **second invention Patent** for your review. I would like an opportunity to come in and meet with the Innovations staff to present my second medical device plans. **I have been associated with Baptist Health South Florida since 1997. My**

**specialty outside of Emergency Medicine Services for Baptist Health South Florida, is developing ways to make medical procedures safer with improved efficiency. I have now been awarded 3 approved US medical device patents and 4 pending**. I think it is a great opportunity for all of us to get together to advance the field of medical device development, work on mutual interest to **improve patient care**, **and satisfaction** with improved medical device usage. I have attached a copy of the**approved US patent** for the device.

Thank you for your consideration and look forward to your review and response.

Anthony G. Stanley, MD

On Tue, Jan 18, 2022 at 5:51 PM Nila D. Bhakuni <NilaB@baptisthealth.net> wrote:

> Dr. Stanley,
>
> Please note that since this is a purchasing issue, and not a potential co-development opportunity, it is no longer in the hands of Innovations, and will be passed to those who will be able to adequately evaluate your new designs.
>
> Best,
>
> Nila
>
> ---
>
> **From:** Stephanie Parra <Stephanie.Parra@baptisthealth.net>
> **Sent:** Tuesday, January 18, 2022 5:36 PM
> **To:** stanmeddesigns@gmail.com
> **Cc:** Nila D. Bhakuni <NilaB@baptisthealth.net>; Lisa Gordon <lisag@baptisthealth.net>
> **Subject:** RE: [External]
>
> Good afternoon Dr. Stanley,

I hope this email finds you well.

We received your voicemail earlier today and have elevated your request to our Miami Cardiac & Vascular Institute team. Lisa Gordon will be reaching out to you soon to discuss the next steps and getting a meeting scheduled.

Thank you.

Best regards,

**Stephanie Parra**

Innovation Project Manager

Baptist Health Innovations

**Baptist Health South Florida**

6855 S. Red Rd. l Coral Gables, FL 33143

Direct: (786) 662-7859

Stephanie.Parra@baptisthealth.netlBaptist Health Innovations



**From:** Anthony Stanley MD <stanmeddesigns@gmail.com>

**Sent:** Monday, December 27, 2021 7:37 AM
**To:** Nila D. Bhakuni <NilaB@baptisthealth.net>
**Cc:** Bill M. Duquette <BillD@baptisthealth.net>; Stephanie Parra
<Stephanie.Parra@baptisthealth.net>; Carla Garic
<carla.garic@wellspring.com>; Barry Katzen
<BARRYK@baptisthealth.net>
**Subject:** Re: [External]

12/26/2021

Dear Baptist Health of South Florida Innovations:

I am contacting your department to introduce a new cutting device that I have invented. The device was actually presented in its prototype stage at the Baptist Doral Plaza to a group of BOS representatives, it was tested for functionality and well received. That meeting was held on June 5th, 2018. The device is now fully developed and has a **United States Patent** (see attached). The first shipment is now in Ohio being packaged and will be **FDA Registered and Device Listed as** required as a **Class 1 Medical Device** in late January, 2022, before shipping to Miami, Florida.  It is my desire and intent to have **Baptist Health of South Florida**, to have the first opportunity to purchase and partner with my group.  I think this is a unique opportunity to have **your own in-house staff member** that is an **inventor**, **first responder in your urgent care system** and **born and raised** in the **South Florida Community**. I think that concept will go over well with the local community. The device is designed to replace many of the surgical wire cutters currently used due to its improved safety designs and features. The cutter can be used in **Orthopedic Surgery, Cardiac Surgery, Podiatry Surgery, Emergency Room and in the Urgent Care Centers**. It is one of the best surgical wire cutters on the market. The device last week was approved for patenting in Europe, so you know it must work well. The device is called a "Moby Cutter" and is 7 years now in the making.

Over the past 7 years with my background in healthcare and mechanical engineering science, I conducted research on the functionality of multiple commercial and surgical wire cutters while designing the current one whose pictures were previously sent to the Innovations Department. In conjunction with the design, I wrote an article **(An Urgent Care Approach to Fishhook Removal)** on June 1, 2021 in the **Journal of Urgent Care Medicine**. The article was written by myself and co-authored by one of the Baptist Health of South Florida's Premier Infectious Disease physicians', Dr. **Jorge Murillo**, however the **timely article** was **misprinted** (see below acknowledgement by the JUCM) and a reprint is not available at this time to assist your committee to understand the need for the wire cutter and its purchase.



It has been brought to our attention that the publication titled "An Urgent Care Approach to Fishhook Removal" originally published in June 2021 digital edition of The Journal of Urgent Care Medicine on June 1, 2021 ("Publication"), contains several changes made during the editing process performed by JUCM which the authors took issue with and subsequently demanded the Publication be retracted. Accordingly, at the request of the authors, Anthony G. Stanley, MD and Jorge Murillo, MD, we have fully retracted the Publication.

An Urgent Care Approach to Fishhook Removal - Journal of Urgent Care Medicine (jucm.com)

However, I have developed a **powerpoint presentation** to help compensate for the loss of the article and ask your committee to allow me to come in for a formal presentation and hands on demonstration with your purchasing department and appropriate clinical representatives. As your surgeon reviewer said in your last email to me, it was hard for him to understand the application by looking at pictures, ... *"and if it works properly, it may add safety in the OR".*  I believe a formal presentation to the key committee members will quickly show the potential of the device and the timely ness of its arrival to Baptist Health OF South Florida. Some of you may know or have heard of me, I have been working with Baptist Health of South Florida since completing Internal Medicine Residency at Jackson Memorial Hospital in 1997. I have worked at Homestead Hospital for many years and currently registered Baptist Medical Staff working in the BOS Urgent Care

Hospital for many years and currently registered Baptist Medical Staff working in the DCC Urgent Care
facilities.

I appreciate your review of my introduction and look forward to setting up a formal meeting to have a chance
to properly introduce my surgical device with multiple applications.

Sincerely,


Anthony G. Stanley, MD


On Fri, Dec 17, 2021 at 8:23 AM Nila D. Bhakuni <NilaB@baptisthealth.net> wrote:

> Dr. Stanley,
>
>
> Your information was shown to a surgeon in our system, and this was
> the reply.
>
>
> *"I think the concept is a good one, I'm not sure I understand how it actually works by looking at the design
> or pictures of the device.  Certainly we have all seen flying pieces of wire after clipping them, and if it
> works properly it may aid safety in the OR."*
>
>
> Best,
>
>
> Nila

---

**From:** Anthony Stanley MD <stanmeddesigns@gmail.com>
**Sent:** Thursday, December 16, 2021 1:48 PM
**To:** Nila D. Bhakuni <NilaB@baptisthealth.net>
**Cc:** Bill M. Duquette <BillD@baptisthealth.net>
**Subject:** [External]


*External Email: Exercise Caution!*

Hello Nila:

 I have not heard from anyone regarding my medical device review since your communication on October
13, 2021.

 I am just contacting you to follow up on the next steps.


Thanks

Anthony G. Stannley, MD

This message originates from Baptist Health South Florida (BHSF). It contains information that may be
confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for
anyone else to disclose, copy, distribute or use the contents of this message. This message may not be
copied or distributed without this disclaimer. All personal messages express views solely of the sender,
which are not to be attributed to BHSF. If you received this message in error, please notify us immediately
at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

This message originates from Baptist Health South Florida (BHSF). It contains information that may be
confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for
anyone else to disclose, copy, distribute or use the contents of this message. This message may not be
copied or distributed without this disclaimer. All personal messages express views solely of the sender, which

are not to be attributed to BHSF. If you received this message in error, please notify us immediately at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

This message originates from Baptist Health South Florida (BHSF). It contains information that may be confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for anyone else to disclose, copy, distribute or use the contents of this message. This message may not be copied or distributed without this disclaimer. All personal messages express views solely of the sender, which are not to be attributed to BHSF. If you received this message in error, please notify us immediately at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

This message originates from Baptist Health South Florida (BHSF). It contains information that may be confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for anyone else to disclose, copy, distribute or use the contents of this message. This message may not be copied or distributed without this disclaimer. All personal messages express views solely of the sender, which are not to be attributed to BHSF. If you received this message in error, please notify us immediately at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

This message originates from Baptist Health South Florida (BHSF). It contains information that may be confidential or privileged and is intended only for the individuals or entity named above. It is prohibited for anyone else to disclose, copy, distribute or use the contents of this message. This message may not be copied or distributed without this disclaimer. All personal messages express views solely of the sender, which are not to be attributed to BHSF. If you received this message in error, please notify us immediately at postmaster@baptisthealth.net. BHSF scanned this email for malicious content

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                Plaintiff,

      vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and

      Defendants.

_____/

EXHIBIT P
TO AMENDED COMPLAINT
FILED JULY 14, 2023



Barry Oliver Chase
Senior Partner
Barry@ChaseLawyers.com
Florida, New York, District of
Columbia, US Supreme Court

Gregory Bloom
Partner
Greg@ChaseLawyers.com
Florida

Alexander Loveyko
Associate Attorney
Alex@ChaseLawyers.com
New York

Anastasia Latman
Associate Attorney
Anastasia@ChaseLawyers.com
New York

Website: www.ChaseLawyers.com

IP, Entertainment, Arts, Sports and Media Law

| 21 SE 1st Ave. Suite 700 | 1345 6th Avenue, 2nd floor, |
| Miami, FL 33131 USA | New York, NY 10105 |
| Office (305) 373-7665 | Office (212)-601-2762 |
| Fax (305) 373-7668 | Fax (305) 373-7668 |

September 23, 2021

**To: Braveheart Group LLC d/b/a "The Journal of Urgent Care Medicine"**

**185 State Route 17, Suite 4**

**Mahwah, NJ 07430**

**Via email to swilliams@jucm.com, editor@jucm.com**

Dear Mr. Williams,

Reaching out on behalf of our client, Dr. Anthony Stanley ("Client" or "Copyright Owner"), in regard to the article published by your company, The Journal of Urgent Care Medicine ("Publisher") on June 1, 2021, titled "An Urgent Care Approach to Fishhook Removal" with a URL located at https://www.jucm.com/documents/jucm-June-2021.pdf/ ("Publication"), as well as printed in the June 2021 print edition of the Publisher.

We have been informed by our Client, and have concluded from independently researching the matter at hand, that there were several substantial infringements of our client's rights, both as it regards federal copyright legislation, as well as local legislation on defamation by Publisher as follows:

    I.       **Violation of our Client's rights under the Copyright Act.**

In your email dated June 23, 2021, addressed to our Client you are referring to an approval allegedly received from our Client on May 5th, 2021 in regard to the version of the Original Article that was to be published in the Publication ("Approval Correspondence"). See Exhibit A for the copy of that correspondence and a copy of the June 23 correspondence.

Please also see Exhibit B, comparing the version approved by our Client in Approval Correspondence and the version of the Original Article actually published in the Publication (online version), and identifying the parts of Publication inserted or removed without Dr. Stanley's approval, as well as the legend of existing typos, misrepresentations, improper attributions of rights ownership and basic spelling mistakes currently present in the Publication.

Description of differences:

    1.   Section "Urgent Message" added w/o our Client's approval.

2. Photo by "Thundermist Lure Company" removed w/o our Client's approval.
3. The following sentences added w/o our Client's approval:

"U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are treated in the field without attention from a healthcare provider. However, the presumption is that patients who seek medical care do so in the emergency room, an urgent care center, or in an ambulatory care center."

"From this author's experience, pandemonium commences as soon as front desk personnel in the urgent care center announce there's a fishhook injury in the waiting room."

4. Photo by Dr. Stanley was removed w/o our Client's approval, and, moreover, in contradiction with a direct request by Dr. Stanley in an email dated 06/05/2021.
5. Five (5) Photos removed from the "Trauma Gallery" section of the Original Article w/o our Client's approval.
6. Photo by "Ty Southerland" removed w/o our Client's approval.
7. An answer to the question posed by Publisher to Dr. Stanley under a premise of peer review during the approval process was reworded, supplemented with Publisher's own comments and published w/o our Client's approval.

Additionally, the following violations were performed by Publisher in its printed version of the Publication (please see Exhibit C detailing the placement of the violations attached to herein):

1. Unauthorized use of a photo belonging to by Dr. Stanley in violation of his rights.
2. Misplaced photos (Figure 5, Figure 6, Figure 7, Figure 9, Figure 10) confusing the reader and leading to potential injuries to the reading public.

As is evident from both Exhibit B, Exhibit C, the legend of existing mistakes and misrepresentations (in Exhibit B) and the breakdown provided above, the version originally approved for publication by Dr. Stanley on May 5th, as referred to above, and in your correspondence dated June 23, 2021, is substantially different from the version actually published in the Publication (including the print version) violating a number of rights of our Client under the Copyright Act (please see below).

Please be aware, that our Client has performed a filing for Copyright Registration in regard to the original version of the Publication ("Original Article"), Copyright Claim # 1-10640834731 on 07/08/2021 – within three (3) months of the work's publication as per 17 U.S.C. 412 - providing himself with access to both actual and statutory damages associated with the infringement of the scope of his rights under the Copyright Act.

Publisher's failure to obtain our Client's authorization to publish the Publication violated Dr. Stanley's rights to distribute the Original Article, to publicly display the Original Article, and to prepare derivative works on the basis of the Original Article, with the Publisher going beyond the scope of any implied license by implementing edits and amendments that were both contrary to the spirit of the Original Article, as well as potentially harmful to both our Client's reputation and health of the public.

2

Namely, in present instance, registration of Dr. Stanley's rights to the Original Article and subsequent violation of his rights under the Copyright Act by the Publisher, results in potential liability for copyright infringement for the Publisher, the scope of statutory damages for which can be as high as **$150,000 (One Hundred and Fifty Thousand US Dollars)** per work infringed, as per 17 U.S.C. 504, as well as attorney's fees.

Copyright Owner treats copyright infringement as a very serious matter and fully enforces its rights against infringers. Under the circumstances, Copyright Owner is prepared to try to resolve this matter amicably provided that you cooperate fully with Copyright Owner and establish to its satisfaction that this was a one-time error of judgment and not a systematic effort to profit from Copyright Owner's intellectual property.

## II.   Claim of Defamation under Florida Law

Under Florida law, the elements of a defamation claim are:

- the defendant published a false statement;
- about the plaintiff;
- to a third party; and
- the falsity of the statement caused injury to the plaintiff.

Border Collie Rescue v. Ryan, 418 F.Supp.2d 1330, 1348 (M.D.Fla. 2006). A plaintiff must also prove that the defendant's fault in publishing the statement amounted to at least negligence.

In present instance, all elements are clearly evident from the facts of the case:

1) Publisher published the Publication that contains multiple inconsistencies, medical inaccuracies and potentially harmful recommendations to the readers of the Publication;
2) Publisher identified Dr. Stanley as the author of the Publication, leading to reputational damages to Dr. Stanley, as well as potentially negligent infliction of harm to the public at large;
3) Publisher distributed the Publication to third parties via providing access to the Publication at the https://www.jucm.com/documents/jucm-June-2021.pdf/ URL as well as in the printed version of the Publication;
4) Publisher have caused and continues to cause substantial reputational damages to our Client by refusing to retract or edit the Publication, in violation of our Client's rights.

Please see Exhibit D for a Petition for Article Retraction ("Retraction Statement") authored by William Kranichfeld, MD, Ernesto Sanz, MD, Betty Ruiz, ARNP, Dia Nguyen, MD, Yenny Ceballos, ARNP, Anisleydi Pardon, ARNP, Michael Sasoni, MD and Bonnie J. O'Sullivan, MD that identifies the following issues existing with the publication:

1) Factual and grammatical errors
2) Factual misrepresentations and omissions
3) Unauthorized and incorrect medical advice provided by Publisher under Dr. Stanley's name

Our Client fully intends to proceed with asserting his claims of defamation, if the Publisher fails to comply with our

respectful demands contained below, due to the contents of Publication being harmful not only as it pertains his personal reputation, but also potentially, subject to a tort of negligence, due to the Publication reflecting a breach on behalf of the Publisher, as a medical issue, of its duty to provide correct and truthful information to the medical professionals that can use this information to serve the public, as confirmed by a number of medical professionals that have authored the Petition Statement.

Failure of Publisher to comply with our respectful demands contained in the later section will result in our Client asserting the claim of defamation under Florida law, subject to compensatory, punitive and other available damages under the appropriate legislation.

**III.      Provisions of Florida's Retraction Statute**

Under the Florida retraction statute, Fla. Stat. § 770.02, once the publisher receives the retraction request, the publisher must **publish the correction, apology, or retraction within**:

- ten days of notice, for a daily or weekly publication;
- twenty days of notice, for a semimonthly publication;
- forty-five days of notice, for a monthly publication; or
- the next issue, for a work published "less frequently than monthly," as long as the plaintiff serves the notice no later than 45 days prior to such publication.

The publisher must make a **full and fair correction, apology, or retraction** by placing it in the same editions or corresponding issues of the newspaper or periodical in which said article appeared and in as conspicuous place and type as said original article.

Failure of the Publisher to retract an offensive publication may result in the plaintiff potentially claiming not only actual damages resulting from the defamation inflicted by the improper publication, but also reputational or punitive damages.

**IV.      Our Respectful Demands**

Our Client fully intends to assert his rights under both federal Copyright legislation, as well as local civil regulations pertaining to defamation, and negligence on behalf of the Publisher in publishing an unauthorized version of the Original Article at the https://www.jucm.com/documents/jucm-June-2021.pdf/ URL, unless:

1. Publisher immediately ceases and desists from all further attempts to reproduce, publish, provide, distribute, transmit, display, publicly perform, or otherwise make any use of the Publication as it is currently published at the https://www.jucm.com/documents/jucm-June-2021.pdf/ URL.

2. Publisher immediately ceases and desists from all further attempts to reproduce, publish, provide, distribute, transmit, display, publicly perform, or otherwise make any use of the Publication as it is currently published in its printed June 2021 version.

4

3.   Publisher interprets this Demand Letter as the "retraction request" within the meaning of Fla. Stat. § 770.02.

4.   In accordance with Fla. Stat. § 770.02, as well as the Publisher's own Retraction Rules which can be found at https://www.jucm.com/author-instructions/, under "Retractions", Publisher makes a **full and fair apology, or retraction** by placing it in the same edition or issue of the newspaper or periodical in which said article appeared and in as conspicuous place and type as said original article (both online and printed versions).

5.   Publisher makes a correction, by publishing an updated version of the Original Article attached to herein as Exhibit E, by placing it in the same edition or issue of the newspaper or periodical in which said article appeared and in as conspicuous place and type as said original article (both online and printed versions), as the current Publication contains flawed or erroneous data such that its findings and conclusions cannot be relied upon.

**The above does not constitute a full recitation of our Client's rights or claims and nothing set forth herein constitutes a waiver of any of our Client's rights, remedies and positions, all of which are expressly reserved.**

Please contact the undersigned no later than **five (5) days** from the date of this letter to confirm that the parties are in mutual understanding that the absence of action on behalf of the Publisher will result in us advising our Client to consider legal action to enforce his rights and to collect the damages for defamation as well as ..  action for copyright infringement under the Copyright Act, subject to the claims for actual, statutory damages and attorney's fees.

**Name:** Alexander Loveyko, Esq.

**Address:** 21 SE 1st Ave, Suite 700,

Miami, FL, USA 33131

**Telephone:** 305-373-7665

**Email:** alex@chaselawyers.com

Very truly yours,

*Loveyko Alexander*

Attorney of Record for Client

**Exhibit A – "Correspondence Printouts"**

*Emails From Scholastica Web Portal*

*Total (4)*

# Clinical Approach to Fishhook Removal

Submitted on Feb 16, 2021 - Manuscript ID: 1320812

Start a discussion

- Anthony G. Stanley
  Jun 4, 2021 - 11:11 am EDT
  Article Credits
  4
  Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on some of the online d...
- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT
  Receipt of your submission to JUCM
  8
  Ok great Harris. Looking forward to reading it along with family and friends. Yes please send a f...
- Anthony G. Stanley
  Apr 29, 2021 - 11:41 am EDT
  Article discussion and photos
  4
  Hello Harris: Just checking to see how the project is coming along. Let if you need my assistance...

Discussion with *Journal of Urgent Care Medicine*

## Article discussion and photos

- Anthony G. Stanley
  Apr 16, 2021 - 7:32 pm EDT
  Hello Harris: I would like to contact you on Monday to discuss some aspects of the article and set up. I will try to contact you Monday 4/19/21 after 10:30am, if it is good timing for you.
  Dr. Stanley

- Anthony G. Stanley
  Apr 19, 2021 - 10:44 am EDT
  hello
  Attachments
  o work copy an urgent care approach to fishhook remova
- Anthony G. Stanley

Help

Apr 20, 2021 - 7:26 am EDT
Hello Harris:
I contacted all the photo copyright owners and cc you last evening. Attached is a composite contact list.

keep me posted.
Dr. Stanley
Attachments
- ○ 2021_copy_right_granted_list_a_autorecovered_.docx
- Anthony G. Stanley
Apr 29, 2021 - 11:41 am EDT
Hello Harris:
Just checking to see how the project is coming along. Let if you need my assistance.
Take
Dr. Stanley

## Post a response

bolditalicbulletsnumberslink

Add an attachment
[ Choose File ] No file chosen        Add file

## Allowed file types

**You may upload the following types of files:**

*.aac, *.avi, *.csv, *.doc, *.docx, *.flac, *.gif, *.html , *.jpeg, *.jpg, *.key, *.m4a, *.md, *.mov, *.mp3, *.mp4, *.mpeg, *.mpg, *.odt, *.pdf, *.png, *.pps, *.ppt, *.tex, *.tif, *.tiff, *.txt, *.xls, *.xml, *.zip

If you have a file that is unsupported please archive it within a **.ZIP** file before uploading.

[ Post Message ]
X

186

*Email From Scholastic Web Portal*     *Total (8)*

# Clinical Approach to Fishhook Removal

Submitted on Feb 16, 2021 - Manuscript ID: 1320812

Start a discussion

- Anthony G. Stanley
  Jun 4, 2021 - 11:11 am EDT
  Article Credits
  4
  Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on some of the online d...
- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT
  Receipt of your submission to JUCM
  8
  Ok great Harris. Looking forward to reading it along with family and friends. Yes please send a f...
- Anthony G. Stanley
  Apr 29, 2021 - 11:41 am EDT
  Article discussion and photos
  4
  Hello Harris: Just checking to see how the project is coming along. Let if you need my assistance...

Discussion with *Journal of Urgent Care Medicine*

## Receipt of your submission to JUCM

- Harris Fleming
  Feb 17, 2021 - 8:02 am EST
  Dear Dr. Stanley,

  Thank you for submitting your manuscript to *JUCM, The Journal of Urgent Care Medicine*. We appreciate your taking the time and the initiative to contribute to the growing body of urgent care literature.

  Your article will be shared with a member of our clinical editorial team, after which I will update you on its status. You can expect to hear from me in 2 to 4 weeks. Typically, manuscripts that are accepted by our journal wil'         3 to 6 months after submission, depending on seasonality, the peer       , and other factors.

Help

If you have any questions at any time, please email me at hfleming@jucm.com.

Thanks again.

Harris

**Harris Fleming**
**Executive Editor**
***JUCM, The Journal of Urgent Care Medicine***


- Anthony G. Stanley
  Mar 2, 2021 - 8:54 am EST
  Hello Harris: Just checking in. This is my first journal article. Let me know if you need any information from me, medical illustrations, photos etc...

  Have a great day!
  Dr. Stanley

- Harris Fleming
  Apr 30, 2021 - 12:01 pm EDT
  Dr. Stanley,
  Right now your manuscript is being read by a couple members of our peer review panel. It's the final step before preparing the article for publication. I will let you know whether or not they have any queries. I've asked them to get back to me no later than today.

  Thank you for checking in.

  Harris

- Anthony G. Stanley
  May 5, 2021 - 6:31 pm EDT
  Hello Harris: I reviewed the article . I made a few rearrangements of photos to make everything flow a little better. I was able to cut the page count from 13 to 12. Content not changed but truncated to conserve space.
  I included my x ray of the fish hooked finger which has been a inspiration point for me writing this article (PATIENT EVALUATION), hope its no problem. I like your edits of the article and satisfied with the results.

Dr. Stanley

Attachments
- o jucm_0621_clinical_fishhook_post_peer_review_2.docx
- o jucm_article_disclosure_form_ags.pdf

- Anthony G. Stanley
  May 10, 2021 - 7:57 am EDT
  Good Morning Harris;
  Here are two photos of me to choose from  and Disclosure from Dr. Murrilo.
  Have a great week.
  Dr. Stanley

  Attachments
  - o dr.stanley.jpg
  - o dr._stanley.jpg
  - o jucm_disclosure_form3_28_21jm.pdf

- Anthony G. Stanley
  May 17, 2021 - 1:31 pm EDT
  Hello Harris:

  Just checking if you know if the article is slated for June or July issue?
  Also please send a copy of the final layout plans ( copy and photos) of the article.

  Thanks
  Dr. Stanley

- Harris Fleming
  May 17, 2021 - 2:39 pm EDT
  Hi, Dr. Stanley.

  Your article will be featured on the cover of the June issue, which goes to press
  this week. I will be happy to send you a few copies after we've received the excess
  back from the printer, which will probably be in the second week of June.
  Unfortunately, we're unable to share the layout in advance of publication. It will
  be available online starting on June 1.

  Harris

- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT

  Ok great Harris. Looking forward to reading it along with family and
  friends. Yes please send a few copies when you can!

  Have a great week

## Post a response

<u>bold</u><u>italic</u><u>bullets</u><u>numbers</u><u>link</u>

Add an attachment

| Choose File | No file chosen |        Add file

## Allowed file types

**You may upload the following types of files:**

*.aac, *.avi, *.csv, *.doc, *.docx, *.flac, *.gif, *.html , *.jpeg, *.jpg, *.key, *.m4a, *.md, *.mov, *.mp3, *.mp4, *.mpeg, *.mpg, *.odt, *.pdf, *.png, *.pps, *.ppt, *.tex, *.tif, *.tiff, *.txt, *.xls, *.xml, *.zip

If you have a file that is unsupported please archive it within a **\*.ZIP** file before uploading.

Post Message
X

*E-mail From Scholactica Web Portal*

*Total (4)* 

# Clinical Approach to Fishhook Removal

Submitted on Feb 16, 2021 - Manuscript ID: 1320812

Start a discussion

- Anthony G. Stanley
  Jun 4, 2021 - 11:11 am EDT
  Article Credits
  4
  Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on some of the online d...
- Anthony G. Stanley
  May 17, 2021 - 2:43 pm EDT
  Receipt of your submission to JUCM
  8
  Ok great Harris. Looking forward to reading it along with family and friends. Yes please send a f...
- Anthony G. Stanley
  Apr 29, 2021 - 11:41 am EDT
  Article discussion and photos
  4
  Hello Harris: Just checking to see how the project is coming along. Let if you need my assistance...

Discussion with *Journal of Urgent Care Medicine*

## Article Credits

- Anthony G. Stanley
  Jun 1, 2021 - 12:46 pm EDT
  Hello Fleming:

  I wanted see if my photo can be added to the On-line version and add me to the Authors Bios  Section.

  Thanks
  Dr. Stanley
  Attachments
    ○ dr._stanley.jpg
    ○ post_review.docx
- Harris Fleming

Jun 1, 2021 - 11:40 pm EDT
Dr. Stanley,
Yes, your photo and your information will be added when the standalone PDF
version of your article is uploaded to the website. There is a lag between
publication of the issue and its articles and their addition to the archives, which
coincides with updating the author bios.
Thank you for asking (and, again, for your excellent contribution).
Harris

- Anthony G. Stanley
  Jun 2, 2021 - 10:53 am EDT

  Hi Harris:

  Thanks for the info. Oh by the way , I wanted to know if in the future ,
  can you send me any statistical data in regards to the article readership .
  How many clicks and that sort of info if it is available?
  Just want to gauge where it is on the popularity list over time!

  Thanks again.

- Anthony G. Stanley
  Jun 4, 2021 - 11:11 am EDT
  Hello Harris ; Dr. Murillo's name is spelled wrong can we make correction on
  some of the online documents?

  If possible;

  Jorge Murillo

  Dr. Stanley

## Post a response

bolditalicbulletsnumberslink

Add an attachment
Choose File | No file chosen          Add file

## Allowed file types

**You may upload the following types of files:**

*.aac, *.avi, *.csv, *.doc, *.docx, *.flac, *.gif, *.html , *.jpeg, *.jpg, *.key, *.m4a, *.md, *.mov, *.mp3, *.mp4, *.mpeg, *.mpg, *.odt, *.pdf, *.png, *.pps, *.ppt, *.tex, *.tif, *.tiff, *.txt, *.xls, *.xml, *.zip

If you have a file that is unsupported please archive it within a **.ZIP** file before uploading.

Post Message

X



Anthony Stanley MD <stanmeddesigns@gmail.com>

---

## Article Retraction Request

3 messages

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                    Wed, Jun 23, 2021 at 9:07 AM
To: editor@jucm.com
Cc: swilliams@jucm.com, Harris Fleming <hfleming@jucm.com>

6/23/2021

Dear **Journal of Urgent Care Medicine / Braveheart Group, LLC/ Experity Health**:

 You recently printed an unauthorized article on June 1, 2021 in the JUCM, entitled **An Urgent Care Approach to Fishhook Removal** under my name which is not my writings. It is superimposed with editorial comments placed by the JUCM and medical advice injected, not authorized by me. I came to your company with integrity, honesty and fairness. However, I was not treated with the same. I want to know why did you do such a thing? The peer reviews your website advertise, worked as a peer take over and operated under inadequate supervision of the editing and rewriting process. The paper is filled with grammatical errors and omitted steps in medical procedural concepts due to unskillful cutting and pasting. I worked and researched the article contents for **7 years** and it's now in ruins as well as my medical reputation. An opportunity to proof the final article was intentionally taken away from me. Why did you do such a thing? Do you take over from **every author**, **every month** and **deny all authors final proofing** or did you just, **decided to choose** me? Were your actions, **Racially Motivated** or what was your reason? Was your hastiness due to the old acronym Publish or Perish (ideological thinking). **How can you sleep at night knowing what you have done?**

Key sections of my work were wrongfully discarded.  There are sections in the paper that your non doctoral staff contributed, giving **medical advice and misinformation** which may have damaging effects if readers act on **wrongful medical advice in performance of patient care.** Read what your agents wrote into the article and compare it to the original submission in the **Scholastica portal**. I am asking that the article be retracted and my original writings be printed unchanged. I was asked to write your organization and **"simply ask, the Journal of urgent Care Medicine to retract the article and remove it from any form of technological circulation".**   I hold all parties mentioned (and copied in this email) accountable and ask for an internal audit of your activity and participation in this event. I look forward to your response. I am very, very disappointed in the JUCM and what has taken place.  I hope we can work together to rectify the issues, prevent harm to the readers acting on misinformation and come to a reasonable solution. Your website talks about integrity, honesty and fairness but as you can see by the treatment shown to me, those claims are not true. All of the **doctors on your JUCM staff have a medical license, and** all took a "**Hippocratic Oath", I am sure they realized the importance of retracting the article in all forms and setting the record straight, to protect the public. At the advice of an attorney, I am sending you this letter to "simply ask".**

  **Sincerely**

---

**swilliams@jucm.com** <swilliams@jucm.com>                    Wed, Jun 23, 2021 at 11:27 AM
To: Anthony Stanley MD <stanmeddesigns@gmail.com>

Dr. Stanley,

I'm sorry to hear that you weren't happy with our publishing your article.

On May 4th, you were sent a version of the manuscript of your article that included edits necessitated after our internal medical review comments, and external peer reviewer comments. You may have forgotten that on May 5th, you sent an email to Executive Editor Harris Fleming acknowledging the receipt of the revised manuscript, and replied "I like your edits and am satisfied with your results".  Upon receipt of  your approval, this exact version of the manuscript was sent to our designer for layout.

I don't understand what the problem is, now that the article has been published.  You approved the content, in writing.  As our medical staff and peer reviewers have agreed, it is a valuable contribution to the medical literature on an important topic in urgent care medicine.

I see no reason to retract this article.

Best wishes,

Stuart



**Stuart Williams**

Publisher

p: 201-529-4004

[Quoted text hidden]

---

**Anthony Stanley MD** <stanmeddesigns@gmail.com>                          Wed, Jun 23, 2021 at 12:38 PM
Draft To: swilliams@jucm.com

Hello Mr. Williams: This is the first time you have formally entered the picture. Welcome! Please try to keep the facts correct. The version (work copy #2 that was corrected by me and ) I sent to Mr. Harris on May 5th is not the version you printed June 1, 2021 online. There is an old Jamacian saying
" out of evil, cometh good". I am sure we both will have a clearer understanding with time. The problem still stands as stated in the previous emails. **By your statements today**, It appears you printed an unauthorized version. Recheck your emails time and date. It seems that all emails go to you or Mr. Harris, do you guys own the JUCM?

Dr. Stanley

[Quoted text hidden]

**Exhibit B – "Online Publication Violations and Legend"**

**Journal of Urgent Care Medicine (JUCM) Error Sheet Legend (Comparison of Approved Article and Published Article)**

1. Mr. Harris Fleming (editor), stated to me, the JUCM readers did not want to see the word **Clinical**, it does not sit well with them, they like something with Urgent Care in it so he removed and changed, my title "Clinical Approach to Fishhook Removal" to **An Urgent Care Approach to Fishhook Removal.** Contrary to his statements he uses the word **Clinical Feature Articles** on their JUCM website.
2. Un authorized photo attached to my article. All of my comparable photos, were omitted. Please refer to original article to appreciate all the changes.
3. My article used for advertisement solicitation and attraction or readers.
4. JUCM propaganda injected into my article without permission to steer (brain wash) readers to their Urgent Care mindset- not authorized
5. There is no national data (CDC tracking) on incidence of injuries going to Urgent Care Centers in the US with fishhook injury. This is **medical misinformation**
6. Grammatical error
7. There is no **U.S. data** on incidence on fishhook injury, the **CDC** does not track that information at this time. This is one of the points, pointed out in the original paper but unknowingly taken out during the rapid takeover of the paper (cut and paste process) by the JUCM. They over looked that point completely.
8. Word tense error
9. Poor wording (bad writing habits)
10. The subject **Fishhook Removal System**, which is a totally new concept to medicine, has no lead-in introduction. The lead in statements were cut out during the rapid cut and past proceeding by the JUMC. Since the JUCM, did not write the paper, the cut and paste confederates did not appreciate the concept.
11. Grammatical error
12. Interjection by the JUCM- not authorized
13. Misspelled word
14. Typo
15. Interjection by the JUMC after cut and pasting
16. Placing unauthorized framing and coloring on © copyrighted art without permission
17. Changing colors on the **fish hook diagram** from black to red on © copyrighted art without permission
18. Reproducing art with poor quality coloring
19. Improper © copyright art work salutation
20. Personal Phrase interjection not authorized
21. Wasted space- The JUMC lied and informed me, they had spacing limitations but avoided formatting in space saving set ups.
22. JUCM propaganda injected into my article without permission to steer (brain wash) readers to their Urgent Care mindset- not authorized
23. Typo
24. Improper © copyright art work salutation
25. Typo
26. Improper © copyright art work salutation

27. Improper © copyright art work salutation
28. Found only on the on-line version. The entire chapter on **Needle Cover Technique** is missing
29. Improper © copyright art work salutation
30. Improper © copyright art work salutation
31. Typo
32. Improper © copyright art work salutation
33. Personal Phrase interjection not authorized
34. This entire paragraph starting with "**On first glance**……etc.", was written by Mr. Harris Fleming whom in **not a medical doctor** and clearly **giving medical advice** in my article. No permission given.
35. Major error due to not proof reading the on-line version has the **Advance and Cut** section printed twice.
36. POSTREOVAL WOUND CARE, post-removal is spelled wrong

*This is my last response to Jucm.*
*Response Sent to Jucm 6/5/21 approx 6pm*
*there is also an email sent.*

**JUCM 0621 Clinical – Fishhook Removal CME**

**An Urgent Care Approach to Fishhook Removal**

*Jucm Comments*

**Urgent message:** While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal.

**Anthony G. Stanley, MD** and **Jorge Murrilo, MD**

**INTRODUCTION**

Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line known (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as *collateral damage.*.



*Removed by Jucm*

Photo courtesy of Thundermist Lure Company.

*Jucm Comments*

U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are treated in the field without attention from a healthcare provider. However, the presumption is that patients who seek medical care do so in the emergency room, an urgent care center, or in an ambulatory care center. (The emergency department is the site for 28% of all acute care visits in the United States.[2]) From this author's experience, pandemonium commences as soon as front desk personnel in the urgent care center announce there's a fishhook injury in the waiting room.

Fishhook removal is a procedure comparable in difficulty to laceration repair of the skin with proper equipment. The fishhook removal system can be either disposable or a reusable sterile device similar to the standard suture tray. Here, we review the clinical approach to evaluation and removal of fishhooks, focusing on the six most common techniques of fishhook removal and injury management. To do so, it is essential to understand the anatomy of the fishhook, the injured area, and common techniques used to remove fishhooks in a timely and safe manner with minimal trauma.

*Jucm*

## ANATOMY OF THE FISHHOOK—AND WHY IT MATTERS

The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the discretion of the provider. Tetanus status should be accessed and Td or Tdap administered if needed with age appropriateness as per established guidelines.

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (**Figure 1**). There are common features among them, however (**Figure 2**). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point. When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.



**Figure 1. Classic types of fishhooks: A, single barbed fishhook; B, multiple barbed fishhook; C, treble fishhook.** (Illustration copyright Devon Medical Art, LLC. Used with permission.)



**Figure 2. Anatomy of the fishhook.** (Illustration copyright Devon Medical Art, LLC. Used with permission.)

**PATIENT EVALUATION**

After obtaining a history of the injury, vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration. Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED. ==Bear in mind that== the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required).

==Photo courtesy of A G Stanley, MD.==

*Removed*

*I specifically wrote a note on the 6/15/21 email to leave in my XRay, it was also Removed*

**PRINCIPLES OF REMOVAL**

The six most common techniques for the removal of fishhooks are:

1. Retrograde
2. String-yank
3. Needle cover
4. Barb crush
5. Cut-it-Out
6. Advance-and-cut

The method selected is based on the judgment of the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimal, this will require:

1. Wire cutter
2. Hemostat or needle driver
3. Gloves
4. Wound cleanser
5. Protective eyewear (goggles or face shield)
6. Local anesthetic

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times multiple techniques must be attempted before the fishhook is successfully removed.

In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia typically lidocaine 1% (Xylocaine) without epinephrine. A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook should have the free barbs taped or cut to avoid additional embedded puncture wounds during the removal procedure. All items attached to the hook (eg, fish line, bait, and the body of the lure itself) should be removed. The provider and bystanders should take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.

**Trauma Gallery**



Photo courtesy of Steve Wecks.



Photo courtesy of Chris Barry.



Photo courtesy of *Fishing World Magazine*.
R



Photo(s) courtesy of Karen Rudkin-Moody and Ryan Moody.

*Section Removed after 6/5/21*

## Retrograde Technique

Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb, from the resting tissue site. The hook can then be backed out of the skin along the path of entry (**Figure 3**). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.



**Figure 3.** Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



Photo courtesy of Ty Southerland.

*Removed by JVCM*

## String-Yank Technique

The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. This technique works best when removing small and *medium-size hooks. It should not be attempted* on deeply embedded fishhooks, for fear of

damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting *1,2,3, go* (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position, use a simple knot such as a lark's head knot (**Figure 4**). Wrap the free ends around the index finger of the free hand.

A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (**Figure 5A**). Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and be embedded into a new location (**Figure 5B**).

**Figure 4**. Applying a lark's head knot to a fishhook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



A. Match the ends of your suture or cord in half.

B. Lay the shank of the fishhook across the suture or cord.

C. Grab the two suture or cord ends and tuck them under the loop.

D. Pull them tightly until tight and snug on the bend of the fishhook.

E. This can be done in reverse

**Figure 5.** String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



### Needle Cover Technique

The needle cover technique requires great dexterity on the part of the provider (and a little luck). It works well for the removal of large hooks with a single barb, and when the point of the fishhook is superficially embedded in the skin (surface).

After standard wound prep and local anesthesia, a 16-18-gauge needle is advanced along the wound entrance of the fishhook (**Figure 6**). The direction of insertion should be parallel to the shank. The bevel should point toward the inside of the curve of the fishhook, enabling the needle opening to cover over (capping off) the barb. It is important to have the bevel pointed in the correct direction as shown so that the leading edge of the needle matches the angle of the fishhook barb. Advance the fishhook to disengage the barb, then pull and wiggle it so that the point enters the lumen of the needle. Once covered, back out the fishhook (similar to the retrograde technique), taking care to move the needle along the entry point of the fishhook.

**Figure 6.** Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps, the barb. The fishhook and needle are then pulled back and removed as a single unit. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



A modification of this technique involves sliding a #11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out thru the track of the incision line.

**Barb Crush Technique**

The barb crush technique is considered another modification of the Retrograde Technique, but with a higher success rate.

Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (**Figure 7**).

**Figure 7.** Barb crush method. Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



**Cut-It-Out Technique**

The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.[5] However, this should be a procedure of last resort in the ambulatory care setting, when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present.

To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See **Figure 8**)This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.

**Figure 8**. Cut-it-out technique. Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



**Advance-and-Cut Technique**

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cut technique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective

eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

*"On first glance ..."*

*Here on the Printed version 7/1/2021*

**Figure 9.** Advance-and-cut technique with a single barb fishhook. Advance the fishhook through the skin, creating an exit wound. Cut off the barb of the fishhook and back the remaining fishhook out the entry point. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



**Figure 10**. Advance-and-cut technique with a multiple barb fishhook. Advance the fishhook through the skin creating an exit wound. Cut the eye of the fishhook off and pull the remaining fishhook forward through the exit wound created by advancing the point through the skin. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

*Alex, JUGM Ased me a question then re-wrote ¿ Adeleed Their comments*



**Commented [HF1]:** Peer review question: "Would removal of the shank barbs obviate the need to drag them through the wound?"

**Commented [AS2R1]:** Harris, It is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). By cutting the tail end off, then pull thru, you are just dragging the shank barbs intact thru the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient and saves time of procedure.  As seen on the X ray some hooks have small barbs and some larger.

**Commented [AS3R1]:**

**Commented [AS4R1]:**

**POSTREMOVAL WOUND CARE**

After removal of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a sterile dressing. Wound care should include routine irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed.

Infections after fishhook removal are uncommon.[1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason for suspicion of infection and antibiotics are prescribed, consideration of coverage water-borne organisms is reasonable.

Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus-diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required.

**CONCLUSION**

Fishhook injuries can occur at any time—during angling, commercial fishing, or simply cleaning out the garage. There is a need to establish a basic minimal procedural understanding by all healthcare providers involved in ambulatory care, urgent care, and emergency rooms for quick assessment and swift removal of fishhooks. This is an area where risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider starting with the simpler removal techniques (ie, retrograde, needle cover) prior to the more robust methods mentioned in this article. Further, there is a need to establish a standard fishhook removal system that is as universal as the suture tray, containing a medically approved cutting device, along with hemostat, protective eye wear, and other supportive care supplies. Ensuring there is an established protocol, provider training, and a ready-to-use fishhook removal system on hand (ideally in close proximity to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction.

**REFERENCES**

1. Doser C, Cooper WL, Edinger WM, et al. Fishhook injuries: a prospective evaluation. *Am J Emerg Med.* 1991;9(5):413-415.
2. Weinick, Robin M., Kirsten Becker, Layla Parast, Brian Dale Stucky, Marc N. Elliott, Megan Mathews, Chris Chan and Virginia Kotzias. Emergency Department Patient Experience of Care Survey: Development and Field Test. Santa Monica, CA: RAND Corporation, 2014. https://www.rand.org/pubs/research_reports/RR761.html.
3. Gammons MG, Jackson E. Fishhook removal. Am Fam Physician. 2001;63(11):2231–6.
4. Newton's Third Law of Motion: Textbook of Physics, AM J Phys. 12,109 (1944)

5.  Ahmad SS, Seng CW, Ghani SA, Lee JF.  Cut-it-out technique for ocular fish-hook injury
    Journal of Emergencies Trauma and Shock, 6(4):293-295, 30 Sep 2013
6.  Diekema DS, Quan L. Fishhook removal. In: Henretig FM, King C, eds. Textbook of Pediatric
    Emergency Procedures. Baltimore: Williams & Wilkins, 1997:1223–7.
7.  GOHAR A. SALAM, M.D., D.O., Regional Anesthesia for Office Procedures: North Shore
    University Hospital at Manhasset, Manhasset, New York: *Am Fam
    Physician*. 2004 Feb 15;69(4):896-900.

Anthony G. Stanley, MD, Bio: Staff physician Criticare Clinics & Urgent Care Miami, Fl. Staff
Emergency Room Physician, Baptist Healthcare of South Florida. Medical Device Inventor (holder of 3
medical device patents).  Dr. Stanley received his medical degree from Rutgers-New Jersey Medical
School, Newark New Jersey. He completed Residency in Internal Medicine at University of Miami-
Jackson Memorial Medical Center/ Miami VA Medical Center Miami, Florida.

Jorge Murrilo, MD, FIDSA, FACP Bio: Associate Professor of Medicine – Herbert Wertheim
College of Medicine, Florida International University, Miami, Florida, Consultant in Infectious
Diseases and Tropical Medicine, Baptist Health System of South Florida. Dr. Murillo received his
medical degree from the Central University of Venezuela. He completed his fellowship in
Infectious Diseases at the University of Maryland Hospital, Baltimore, Maryland.

[handwritten: Editor Edition]
[handwritten: explained to me, 96-98% Readership]
[handwritten: Urgent Care Docs]
[handwritten: #2 Unauthorized Photo attached to my article]
[handwritten: Paid Advertisement #3]

# JUCM
### THE JOURNAL OF URGENT CARE MEDICINE

## CLINICAL FEATURE ARTICLES

### An Urgent Care Approach To Fishhook Removal

Urgent message: While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal. Anthony G. Stanley, MD and Jorge Murrilo, MD Citation: Stanley AG, Murrilo J. An urgent care approach to fishhook removal. J Urgent Care Med. 2021;15(9):13-18. INTRODUCTION Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and ...

### Outpatient Management Of COVID-19 In The Urgent Care Clinic: Administering Monoclonal Antibodies

Urgent message: The approved use of monoclonal antibodies to treat patients who have COVID-19 may signal a shift from inpatient to outpatient care of infected individuals who do not require hospitalization. Urgent care facilities may be ideally suited to serve as treatment centers and to become destinations of choice for such patients. Lindsey Fish, MD Now that COVID-19 has been with us for over a year, we are in a much different position regarding the treatment of this illness. While many of the initial therapeutics were focused on inpatient, specifically ...

Read More

### Pretravel Consultations In The Urgent Care Setting

Urgent message: A pretravel consultation assesses the patient's fitness for travel in the context of anticipated risks associated with their journey. This individualized counseling takes into account not just age or destination, but also general health and other factors such as past travel experience. Given the proliferation of single-specialty travel medicine clinics, with appropriate training and preparation, these assessments can easily be

Read More

How will you meet patients' needs in the New Era of Urgent Care?

aaapx



EXPERITY
Get the Guide >

Welcome Anthonys

**JUCM**
THE JOURNAL OF URGENT CARE MEDICINE

*[handwritten: Online-Printed Version 6/1/2021]*

Search    Subscribe/Get Access   Log Out   f  t  ▶

# AN URGENT CARE APPROACH TO FISHHOOK REMOVAL

*[handwritten: #4 Jucm Propaganda Interjected by Jucm]*

*[handwritten: #5 There is No National (CDC) Data to confirm this claim Jucm ... misinformation to the public]*

**Urgent message:** While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal.

**Anthony G. Stanley, MD** and **Jorge Murillo, MD**   *[handwritten: Murillo]*

*Citation:* Stanley AG, Murillo J. An urgent care approach to fishhook removal. *J Urgent Care Med.* 2021;15(9):13-18.   *[handwritten: Murillo]*

# INTRODUCTION

*[handwritten: Jucm Puncutation #6 Error]*

Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line known (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as *collateral damage*.   *[handwritten: Jucm word tense #8]*   *[handwritten: Jucm #9 Poor Wording]*

U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are treated in the field without attention from a healthcare provider. However, the presumption is that patients who seek medical care do so in the emergency room, an urgent care center, or in an ambulatory care center. (The emergency department is the site for 28% of all acute care visits in the United States.[2]) From this author's experience, pandemonium commences as soon as front desk personnel in the urgent care center announce there's a fishhook injury in the waiting room.

*[handwritten: #10 Subject has no lead in (removed by peer review cut & paste) Jucm]*

Fishhook removal is a procedure comparable in difficulty to laceration repair of the skin with proper equipment. The fishhook removal system can be either disposable or a reusable sterile device similar to the standard suture tray. Here, we review the clinical approach to evaluation and removal of fishhooks, focusing on the six most common techniques of fishhook removal and injury management. To do so, it is essential to understand the anatomy of the fishhook, the

*[handwritten: Page 2]*   *[handwritten: #11 [word tense Jucm]*

**Welcome Anthonys**

View Archived  | Privacy - Terms

injured area, and common techniques used to remove fishhooks in a timely and safe manner with minimal trauma.

# ANATOMY OF THE FISHHOOK—AND WHY IT MATTERS

Dashboard

Subscriptions

Payments

Logout

The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the *discretion* of the provider. Tetanus status should be accessed and Td or Tdap administered if needed with age appropriateness as per established guidelines.

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (**Figure 1**). There are common features among them, however (**Figure 2**). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point. When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.

Figure 1. Classic types of fishhooks: A, single barbed fishhook; B, multiple barbed fishhook; C, treble fishhook.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

Figure 2. Anatomy of the fishhook.

Eye
Shank
Shank barbs
[not present on all hooks]
Gap
Point
Barb
Bend

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

Sign Up For The JUCM Newsletter

Urgent care clinical, practice management, and curated news stories - delivered to your inbox - every Tuesday.

Enter Your Name

Enter Your Email Address

SIGN UP

Privacy - Terms

# PATIENT EVALUATION

After obtaining a history of the injury, vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury

involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration.

Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED. Bear in mind that the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required).

*#29 Jucm Personal Phrase Interjection*

# PRINCIPLES OF REMOVAL

The six most common techniques for the removal of fishhooks are:

*Wasted Space*

1. Retrograde
2. String-yank
3. Needle cover
4. Barb crush
5. Cut-it-out
6. Advance-and-cut

*This Lay out Saves Space*

*#21 Wasted Space*

The method selected is based on the judgment of the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimal, this will require:

*Wasted Space*

1. Wire cutter
2. Hemostat or needle driver
3. Gloves
4. Wound cleanser
5. Protective eyewear (goggles or face shield)
6. Local anesthetic

*This Lay out Saves Space*

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods?). Often times multiple techniques must be attempted before the fishhook is successfully removed.

In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia typically lidocaine 1% (Xylocaine) without epinephrine. A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook should have the free barbs taped or cut (oavoid additional embedded puncture wounds during the removal procedure. All items attached to the hook (eg, fish line, bait, and the body of the lure itself) should be removed. The provider and bystanders should take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.

*#22 Jucm Interjection of Personal Comments*

*#25 Jucm Typo*

# Retrograde Technique

Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of the hook. This maneuver pushes the hook deeper into the tissue bed and

*Page 4*

dislodges the barb, from the resting tissue site. The hook can then be backed out of the skin along the path of entry (**Figure 3**). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.



Figure 3. Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

#24 Juem improper copyright Salutation

## String-Yank Technique

The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting *1,2,3, go* (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

#25 Juem Typo

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position, use a simple knot such as a lark's head knot (**Figure 4**). Wrap the free ends around the index finger of the free hand. A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the skank while continuing to exert downward pressure on the eye of the fishhook (**Figure 5A**). Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and be embedded into a new location (**Figure 5B**).

Privacy – Terms



A. Match the ends of your suture or cord in half.

B. Lay the shank of the fishhook across the suture or cord.

C. Grab the two suture or cord ends and tuck them under the loop.

D. Pull them tightly until tight and snug on the bend of the fishhook.

E. This can be done in reverse

Figure 4. Applying a lark's head knot to a fishhook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



A. Good firm pulling force
B. Laxity in pulling force

A.
B.

Figure 5. String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

Figure 6. Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps, the barb. The fishhook and needle are then pulled back and removed as a single unit. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

*Handwritten annotations:*
#26 JUCM
Improper © Salutation

#27

#28
Missing the entire Section on Needle Cover Technique
Procedure Instructions not Printed
Information Goes above fig 6.

JUCM Skin Color Printed Darker Then original

JUCM

#29 Improper Salutation See copyright

Page 6

216

A modification of this technique involves sliding a #11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out thru the track of the incision line.

# Barb Crush Technique

The barb crush technique is considered another modification of the Retrograde Technique, but with a higher success rate. Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (**Figure 7**).



**Figure 7**. Barb crush method. Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

# Cut-It-Out Technique

#30
Inappropriate @ Salutatar
Jucm

The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.[5] However, this should be a procedure of last resort in the ambulatory care setting, when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present. To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See **Figure 8**)This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.

#31
Jucm
Typo

Page 3

Privacy - Terms



**Figure 8.** Cut-it-out technique. Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

## Advance-and-Cut Technique

#32
Improper Salutation

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cuttechnique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barded fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

#33
JUCM
Personal Re-Phrasing

On first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture

#34
All Personal Comments Interjected into the article by Mr. Harris JUCM Un-necessary Jargon

Page 8
Misinformation to public

wound. This results in less risk of injury to the provider, less anxiety to the patient, and saves time of procedure.

## Advance-and-Cut Technique

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cuttechnique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barded fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

On first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient, and saves time of procedure.



**Figure 9.** Advance-and-cut technique with a single barb fishhook. Advance the fishhook through the skin, creating an exit wound. Cut off the barb of the fishhook and back the remaining fishhook out the entry point. (Illustration copyright Devon Medical Art, LLC. Used with permission.)



**Figure 10.** Advance-and-cut technique with a multiple barb fishhook. Advance the fishhook through the skin creating an exit wound. Cut the eye of the fishhook off and pull the remaining fishhook forward through the exit wound created by advancing the point through the skin. (Illustration copyright Devon Medical Art, LLC. Used with permission.)

# POSTREMOVAL WOUND CARE

After removal of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a sterile dressing. Wound care should include routine irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed.

Infections after fishhook removal are uncommon.[1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason for suspicion of infection and antibiotics are prescribed, consideration of coverage water-borne organisms is reasonable.

Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus-diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required.

# CONCLUSION

Fishhook injuries can occur at any time—during angling, commercial fishing, or simply cleaning out the garage. There is a need to establish a basic minimal procedural understanding by all healthcare providers involved in ambulatory care, urgent care, and emergency rooms for quick assessment and swift removal of fishhooks. This is an area where risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider starting with the simpler removal techniques (ie, retrograde, needle cover) prior to the more robust methods mentioned in this article. Further, there is a need to establish a standard fishhook removal system that is as universal as the suture tray, containing a medically approved cutting device, along with hemostat, protective eye wear, and other supportive care supplies. Ensuring there is an established protocol, provider training, and a ready-to-use fishhook removal system on hand (ideally in close proximity

to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction.

## REFERENCES

1. Doser C, Cooper WL, Edinger WM, et al. Fishhook injuries: a prospective evaluation. *Am J Emerg Med.* 1991;9(5):413-415.
2. Weinick, RM, Becker K, Parast L, et al. Emergency department patient experience of care survey: development and field test. Santa Monica, CA: RAND Corporation, 2014. Available at: https://www.rand.org/pubs/research_reports/RR761.html. Accessed May 12, 2021.
3. Gammons MG, Jackson E. Fishhook removal. *Am Fam Physician.* 2001;63(11):2231-2236.
4. Newton's Third Law of Motion: Textbook of Physics.
5. Ahmad SS, Seng CW, Ghani SA, Lee JF. Cut-it-out technique for ocular fish-hook injury. *J Emerg Trauma Shock.* 2013;6(4):293-295.
6. Diekema DS, Quan L. Fishhook removal. In: Henretig FM, King C, eds. *Textbook of Pediatric Emergency Procedures.* Baltimore, MD: Williams & Wilkins; 1997:1223–1227.
7. Salam GA. Regional anesthesia for office procedures: North Shore University Hospital at Manhasset, Manhasset, New York: *Am Fam Physician.* 2004;;69(4):896-900.

**Author affiliations:** Anthony G. Stanley, MD, Criticare Clinics & Urgent Care, Miami, FL; Baptist Healthcare of South Florida; Stanley Medical Designs. Dr. Stanley holds patents for three medical devices, but has no relevant outside financial relationships with any commercial interests. Jorge Murillo, MD, FIDSA, FACP, Herbert Wertheim College of Medicine, Florida International University; Baptist Health System of South Florida. Dr. Murillo has no relevant financial relationships with any commercial interests.

*This section Cut Short by JUCM*

*Mar. 11o*

Tagged on:    Clinical      Clinical Article      Fishhook      Foreign Body Removal

📁 Clinical, Clinical Articles

## ABOUT US

The Journal of Urgent Care Medicine® (JUCM) is the official journal of the Urgent Care Association (UCA). Each issue contains a mix of peer-reviewed clinical and practice management articles that address the distinct clinical and
practice management needs of those who are working in today's busy urgent care centers. JUCM's reach of over 42,000 includes qualified

## QUICK LINKS

About Us

Advertise

Subscribe

Submit An Article

Careers

Contact Us

**JUCM IS THE OFFICIAL JOURNAL OF**

UCA URGENT CARE ASSOCIATION

COLLEGE OF URGENT CARE MEDICINE

Privacy - Terms


*Page 11*

clinicians, business and
administrative
professionals working in
urgent care facilities
nationwide

©2021 - The Journal of Urgent Care Medicine - All Rights Reserved

6/5/21 Question From MR Harris Fleming

Advance the fishhook
off and pull the remaining
oint through the skin.

**Commented [HF1]:** Peer review question: "Would removal of the shank barbs obviate the need to drag them through the wound?"

**Commented [AS2R1]:** Harris, It is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). By cutting the tail end off, then pull thru, you are just dragging the shank barbs intact thru the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient and saves time of procedure. As seen on the X ray some hooks have small barbs and some larger.

**Commented [AS3R1]:**

**Commented [AS4R1]:**

Privacy - Terms

**Exhibit C – "Violations in the Printed Version"**

# JUCM ®

## THE JOURNAL OF URGENT CARE MEDICINE ®

JUNE 2021
VOLUME 15, NUMBER 9

*Journalistic Confusion!*

www.jucm.com     The Official Publication of the UCA and CUCM

**CLINICAL** cme

## Gone Fishin,' Then Going to Urgent Care

*Article used to make money selling advertisement ←*

*Unauthorized Photo →*

### ALSO IN THIS ISSUE

**21** cme  **Case Report**
Don't Let Anchoring Bias Sink Your Patient's Chance for Survival

**25**  **Original Research**
Keep Them Waiting, and You'll Keep Them Away—Why You Must Break Through Bottlenecks

**34**  **Clinical**
Follow the Evidence to Keep Concussion Patients Safe

**38**  **Pediatric Urgent Care**
'Usually Benign' Shouldn't Keep You from Digging for the Right Diagnosis

cme  **Practice Management**
Could Keeping Your Team Apart Help Keep Your Business Together?

# JUCM®

The Official Publication of the UCA and CUCM

June 2021 | VOLUME 15, NUMBER 9



**CLINICAL**

## 13 An Urgent Care Approach to Fishhook Removal

*Gone fishin'* usually signals a blissful experience in nature—until fishhook meets human flesh, at least. When patients present with a sharp, barbed metal object embedded in one body part or another, you'll need a sound understanding of the type of hook you're dealing with, the corresponding proper technique for removal, and what the next steps should be.

*Anthony G. Stanley, MD and Jorge Murrilo, MD*

---

**CASE REPORT**

## 21 A 'Red Herring' Chief Complaint



The patient's account of what brought them to urgent care center is the f... dation of the history. However, falling ... tim to anchoring bias could have dev... tating consequences.

*Ryan Hagan, PA-C and
Christina Gardner, DHSc, MBA, PA-C*

**ORIGINAL RESEARCH**

## 25 More Timely Care: Effect of Online Queuing vs Change in Hours of Operation on Hourly Arrival Volumes. A Practice Management Reflection



Bottlenecks can be the bane of the urgent care operator's existence. What's the best solution (or better yet, preventive measure), though?

*Aimy Patel, MD; Jennifer Johnson, MD;
Brian R. Lee, PhD, MPH;
Amanda Montalbano, MD, MPH*

---

**...AGEMENT**



...Hybrid
...k Like for

... w a wrench into ... ...llective understanding of ... now a "normal" workplace func-tions. What happens now that restrictions are easing?

*Alan A. Ayers, MBA, MAcc*

**CLINICAL**

## 34 Managing Concussion in Acute Care



Knowing the best approach to managing patients who may have sustained a concussion starts with recognizing the signs and grasping the relative merits of the rest vs return-to-activity approaches.

*Jordan Wackett, MD, MPH, Joshua
Kornegay, MD, and Craig Rudy, MD*

**PEDIATRIC URGENT CARE**

## 38 Febrile Seizure: An Urgent Care Overview



Identifying the type of seizure and causes of fever are the essential first steps.

*Tiffany Addington, MD*

---

**NEXT MONTH IN *JUCM***

The sight of blood is always unsettling to the patient and their loved ones. While it's likely to be less disconcerting to healthcare professionals, bleeding without an obvious cause is concerning even when the presentation is something as common as epistaxis. Vital signs, location of the bleeding, and patient history are essential to understanding the etiology. Familiarity and comfort with certain procedures are necessary for a positive outcome. Reading the cover article in the July/August issue of *JUCM* will help you feel confident that you'll be prepared.

**DEPARTMENTS**

1 Letter from the Editor-in-Chief
9 From the UCA CEO
10 Continuing Medical Education
43 Insights in Images
50 Abstracts in Urgent Care
53 Revenue Cycle Management Q&A
57 Developing Data

**CLASSIFIEDS**

55 Career Opportunities

**TO SUBMIT AN ARTICLE:**
*JUCM* utilizes the content management platform Scholastica for article submissions and peer review. Please visit our website for instructions at http://www.jucm.com/submit-an-article

---

**Clinical**

**CME:** This peer-reviewed article is offered for AMA PRA Category 1 Credit.™
See **CME Quiz Questions** on page 11.



# An Urgent Care Approach to Fishhook Removal

**Urgent message:** While fishhook injuries are common in urgent care centers located in or near recreation areas, especially during vacation season, their untimely presentation can cause pandemonium in the office. Management requires a thorough understanding of the mechanism of injury, the type of hook involved, and proper technique for removal.

ANTHONY G. STANLEY, MD and JORGE MURRILO, MD

**Citation:** Stanley AG, Murrilo J. An urgent care approach to fishhook removal. *J Urgent Care Med.* 2021; 15(9):13-18.

## Introduction

Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line (or "angling"). There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as *collateral damage.*

U.S. data on actual incidence of fishhook injuries are scarce, as many such injuries are treated in the field without attention from a healthcare provider. However, the presumption is that patients who seek medical care do so in the emergency room, an urgent care center, or in an ambulatory care center. (The emergency department is the site for 28% of all acute care visits in the United States.[2]) From this author's experience, pandemonium commences as soon as front desk personnel in the urgent care center announce there's a fishhook injury in the waiting room.

Fishhook removal is a procedure comparable in



difficulty to laceration repair of the skin with proper equipment. The fishhook removal system can be either disposable or a reusable sterile device similar to the standard suture tray. Here, we review the clinical approach to evaluation and removal of fishhooks, focusing on the six most common techniques of fishhook removal and injury management. To do so, it is essential to understand the anatomy of the fishhook,

**Author affiliations: Anthony G. Stanley, MD,** Criticare Clinics & Urgent Care, Miami, FL; Baptist Healthcare of South Florida; Stanley Medical Designs. Dr. Stanley holds patents for three medical devices, but has no relevant outside financial relationships with any commercial interests. **Jorge Murrilo, MD, FIDSA, FACP,** Herbert Wertheim College of Medicine, Florida International University; Baptist Health System of South Florida. Dr. Murrilo has no relevant financial relationships with any commercial interests.

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



Figure 1. Classic types of fishhooks: A, single barbed fishhook; B, multiple barbed fishhook; C, treble fishhook.

(Illustration copyright Devon Medical Art, LLC. Used with permission.)



Figure 2. Anatomy of the fishhook.

(Illustration copyright Devon Medical Art, LLC. Used with permission.)

*"Tetanus-diphtheria or tetanus-diphtheria-pertussis vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required."*

the injured area, and common techniques used to remove fishhooks in a timely and safe manner with minimal trauma.

### Anatomy of the Fishhook—and Why It Matters
The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the discretion of the provider. Tetanus status should be ascertained.

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble (**Figure 1**). There are common features among them, however (**Figure 2**). In each, the "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin. The gape or gap describes the distance between the shank and the point.

When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-

barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.

### Patient Evaluation
After obtaining a history of the injury and vital signs, a quick survey of the wound and surrounding structures should be made. Inspect distal and proximal to the injury site. Assess for deep injury involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration.

Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head, or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest ED.

Bear in mind that the cutting capacity of wire cutters is limited. In cases involving larger fishhooks, the patient may have to be referred to the ED where larger surgical cutting devices are available (ie, bolt cutter or an extensive surgical procedure may be required).

### Principles of Removal
The six most common techniques for the removal of fishhooks are:
1. Retrograde
2. String-yank
3. Needle cover
4. Barb crush
5. Cut-it-out
6. Advance-and-cut

The method selected is based on the judgment of

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



**Figure 3. Retrograde technique.** Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*



**Figure 4.** Applying a lark's head knot to a fishhook.

A. Match the ends of your suture or cord and fold in half.
B. Lay the shank of the fishhook across the suture or cord.
C. Pull the two suture or cord ends under the loop.
D. Pull the suture or cord through, until a tight and sung knot is positioned on the bend of the fish hook.
E. This can be done in reverse.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

*"Diagram Hook Positioned"*

the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before you get started make sure that you have of a fishhook removal system. At minimum, this will require:

1. Wire cutter
2. Hemostat or needle driver
3. Gloves
4. Wound cleanser
5. Protective eyewear (goggles or face shield)
6. Local anesthetic

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank methods). Often times, multiple techniques must be attempted before the fishhook is successfully removed.

In the clinical setting, local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, hexachlorophene solution before attempting removal of the fishhook. Patients who contact the urgent care center before arrival can be advised to wash the wound with soap and water. Local anesthesia is typically lidocaine 1% (Xylocaine) without ep[...] or regional block may also be [...] the injury site.

Hooks wi[...] like the treble fish-hook should [...] ed or cut to avoid additional e[...] nds during the removal proce[...] to the hook (eg, fish line, bai[...] e itself) should be removed. Th[...] s should take care not to be str[...] removal. Anyone assisting wit[...] ave clean hands and gloves. P[...]ective eyewear should be worn with all procedures, especially when performing the string-yank method and advance-and-cut method.

*(handwritten: "Fixed" / "Added Unauthorized Comments")*

**Retrograde Technique**
Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It

works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb from the resting tissue site. The hook can then be backed out of the skin along the path of entry (**Figure 3**). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.

**String-Yank Technique**
The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).

The tradition of counting 1,2,3, go (to give a reference point in time to start) prior to performing a yank-pull attempt is not advised as it may prompt patients to assume a flexed posture, which can cause more damage during the course of pulling. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used.

Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position; use a simple knot such as a lark's head knot (**Figure 4**). Wrap the free ends around the index finger of the free hand.

A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft.

The involved skin area should be well stabilized

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



Figure 5. String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook.

A. Good firm pulling force
B. Laxity in pulling force

(Illustration copyright Devon Medical Art, LLC. Used with permission.)



Figure 6. Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps, the barb. The fishhook and needle are then pulled back and removed as a single unit.

(Illustration copyright Devon Medical Art, LLC. Used with permission.)

against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (**Figure 5A**).

Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4]; for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can come out of its original position and be forcefully pulled back and become embedded into a new location (**Figure 5B**).

### Needle Cover Technique
The needle cover technique requires great dexterity on the part of the provider (and a little luck). It works well for the removal of large hooks with a single barb, and when the point of the fishhook is superficially embedded in the skin (surface).

After standard wound prep and local anesthesia, a 16- to 18-gauge needle is advanced along the wound entrance of the fishhook (**Figure 6**). The direction of insertion should be parallel to the shank. The bevel should point toward the inside of the curve of the fishhook, enabling the needle opening to cover over (capping off) the barb. It is important to have the bevel

pointed in the correct direction _____ the leading edge of the ne_____ the fishhook barb. Advance _____ barb, then pull and wiggle _____ the lumen of the needle. O_____ fishhook (similar to the retro_____ care to move the needle along _____ fishhook.

A modification of this techniqu_____ #11 scalpel blade along the wound _____ fishhook. The fishhook may the_____ through the track of the incision line_____

### Barb Crush Technique
The barb crush technique is considered a_____ ification of the retrograde technique, but wi_____ success rate.

Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (**Figure 7**).

### Cut-It-Out Technique
The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.[5] However, this should be a procedure of last resort in the ambulatory care setting,

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL

*[handwritten note: This Photo goes on page 16]*



Figure 7. Barb crush method. Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes.

(Illustration copyright Devon Medical Art, LLC. Used with permission.)



Figure 8. Cut-it-out technique. Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment.

(Illustration copyright Devon Medical Art, LLC. Used with permission.)

when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present.

To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded. (See **Figure 8**). This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.

**Advance-and-Cut Technique**

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cut technique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off prior to attempting removal.

Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin; alternatively, a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the exit point of the hook to allow easier exit. Once the shaft of the fishhook completely clears the skin, cut it with a medical wire cutter or another

tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury.

The advance-and-cut technique is likely to be the most universally accepted in the urgent care, ambulatory care, and ED settings as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. Bear in mind that all wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the ED or hospital where a bolt cutter or surgical procedure may be required.

On first glance, it may appear that removing the shank barbs could obviate the need to drag them through the wound. However, it is difficult to stabilize the hook with a hemostat and try to remove the small multiple shank barbs (creating potentially multiple small flying objects as you try to snip them off). Cutting the tail end off, then pulling through, amounts to dragging the shank barbs intact through the tissue plane that has already been cut from the initial puncture wound. This results in less risk of injury to the provider, less anxiety to the patient, and saves time of procedure.

**Wound Care**

*[handwritten note on sticky: Medical Advice Not authorized]*

of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a dressing. Wound care should include rou-

AN URGENT CARE APPROACH TO FISHHOOK REMOVAL



**Figure 9.** Advance-and-cut technique with a single barb fishhook. Advance the fishhook through the skin, creating an exit wound. Cut off the barb of the fishhook and back the remaining fishhook out the entry point.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*



**Figure 10.** Advance-and-cut technique with a multiple barb fishhook. Advance the fishhook through the skin creating an exit wound. Cut the eye of the fishhook off and pull the remaining fishhook forward through the exit wound created by advancing the point through the skin.

*(Illustration copyright Devon Medical Art, LLC. Used with permission.)*

*"Risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method."*

tine irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed. Infections after fishhook removal are uncommon.[1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason for suspicion of infection and antibiotics are prescribed, consideration of coverage for water-borne organisms is reasonable.

Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus-diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required.

**Conclusion**

Fishhook injuries can occur at any time—during angling, commercial fishing, or simply cleaning out the garage. There is a need to establish a basic minimal procedure for use by all healthcare providers in the office, emergency care, urgent care, and emergency department and swift removal of fishhooks. Furthermore risk recognition has to be appreciated to prevent injuries to patients and providers and be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider the simpler removal techniques (i.e. retrograde) prior to the more robust methods when applicable.

Further, the use of a standard fishhook removal kit (consisting of the suture tray, containing a wire cutting device, along with hemostats, pick-ups, and other supportive care such as lidocaine).

Ensuring there is an established protocol, provider training, and a ready-to-use fishhook removal system on hand (ideally in close proximity to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction. ∎

**References**
1. Doser C, Cooper WL, Edinger WM, et al. Fishhook injuries: a prospective evaluation. *Am J Emerg Med.* 1991;9(5):413-415.
2. Weinick, RM, Becker K, Parast L, et al. Emergency department patient experience of care survey: development and field test. Santa Monica, CA: RAND Corporation, 2014. Available at: https://www.rand.org/pubs/research_reports/RR761.html. Accessed May 12, 2021.
3. Gammons MG, Jackson E. Fishhook removal. *Am Fam Physician.* 2001;63(11):2231–2236.
4. Newton's Third Law of Motion: Textbook of Physics.
5. Ahmad SS, Seng CW, Ghani SA, Lee JF. Cut-it-out technique for ocular fish-hook injury. *J Emerg Trauma Shock.* 2013;6(4):293-295.
6. Diekema DS, Quan L. Fishhook removal. In: Henretig FM, King C, eds. *Textbook of Pediatric Emergency Procedures.* Baltimore, MD: Williams & Wilkins; 1997:1223–1227.
7. Salam GA. Regional anesthesia for office procedures: North Shore University Hospital at Manhasset, Manhasset, New York: *Am Fam Physician.* 2004;69(4):896-900.

231

**Exhibit D – "Retraction Petition"**

**Petition for Article Retraction**

To: Braveheart Group LLC d/b/a "The Journal of Urgent Care Medicine"
185 State Route 17, Suite 4
Mahwah, NJ 07430

Dear Journal of Urgent Care Medicine (JUCM):

We the undersigned are licensed medical providers (MD, DO, ARNP, PA-C, RN) working in the Urgent Care setting. We the undersigned are familiar with caring for fishhook injured patients, with Dr. Stanley and his work in fishhook removal education over the past several years.

Upon reading the article in your JUCM magazine on-line and printed dated June 1, 2021, entitled "An Urgent Care Approach to Fishhook Removal" we have been unfortunately surprised by the medical misinformation multiple grammatical errors that the JUCM publication presented to the medical community. We've had the opportunity of reading Dr. Stanley's original article entitled "Clinical Approach to Fishhook Removal" and the JUCM's printed version entitle "An Urgent Care Approach of Fishhook Removal" for comparative purposes and have reached the following conclusions.

The current JUMC article gives the reader, a viewpoint that fishhook injured people go to the Urgent Care centers, located in recreation areas, and that they go to the Urgent Cares, during the vacation season. These three unverified clinical assumptions are not factual medical information. There is no National data on the incidence of fishhook injury, no information on seasonal incidence, no information on geographical or regional location centers of concentrated injury. If you read the printed article's citation # 2, you will find no information to support the claims stated in the article regarding the incidence and occurrence of Fishhook injury.

The original article as written by Dr. Stanley was geared to alert the reader of the mindfulness of needing to track valuable incidence data and bring about a renewed approach to fishhook injury and treatment strategies. In reading the printed JUCM version in comparison to the original version it is evident that Dr. Stanley's information was cut and pasted out of the article, producing multiple typographical errors, and leaving poorly explained, disjointed medical concepts (e.g., "Fish hook Removal System") and, leaving the reader with only technical information of fishhook removal.

The original article furthermore has several pictures of actual patients who have provided their consent to use the images in question to bring home several points of injury awareness and diversity in skill needed to consider removal of this type of foreign body. All photos in the original article and related information were unexplainably deleted in the final version. It is, however, noticeable that JUCM has placed their own photos in the published article.

We have analyzed both versions of the article in question and believe that the readers were denied the full scope of Dr. Stanley's insight into this field of medicine, and ultimately denied valuable clinical information intended for the provider who will be faced with the difficult challenge of removing fishhooks from patients. Further, the article has

excessive brightly colorized diagrams that are of unacceptable poor visibility, all instructional diagrams listed in the article are located at the top of the pages and do not flow with the written text easily as originally intended. This arrangement requires the readers to constantly look up and look down and could potentially lead to them becoming confused. Providers, who may need to reference this article quickly in current format, (which is full of grammatical errors, disjointed through concepts and difficult to follow text) could become confused.

In conclusion, this current article "An Urgent Care Approach to Fishhook Removal"' is drastically different from its original easy-to-follow format/ layout. As a result of these numerous errors and clinical omissions listed above, the use of the article as currently published could adversely affect the care of patients and may result in injuries if not retracted and amended.

For the aforementioned reasons:

- We the undersigned medical practitioners, support a complete retraction of the article "An Urgent Care Approach to Fishhook Removal" (attached to herein in Exhibit A) in all media forms to mitigate or reduce risk to patients, ensure patient safety and satisfactory outcome.

- We the undersigned medical practitioners, support that an updated version of the article (attached to herein as Exhibit B) be published in the same edition or issue of the newspaper or periodical in which said article appeared and in as conspicuous place and type as said original article (both online and printed versions) in the Journal of Urgent Care Medicine.

By: _____

Virginia Sardinas, ARPN

Date: _____9/8/2021_____

By: _____

Markira Stewart, PA-C

Date: _____09-08-2021_____

By: _____

William Kranichfeld, MD

Medical Director Criticare Clinics Urgent Care

Date: _____9/17/21_____

By: _____

Ernesto Sanz, MD

Medical Director Criticare Clinics Urgent Care

Date: _____9/17/21_____

By: _____

Betty Ruiz, ARNP

Date: ___09/17/21___

By: _____

Dia Nguyen, MD

Date: _____9/8/21_____

By: _____

Yenny Ceballos, ARNP

Date: ___9/8/21___

By: _____

Anisleydi Pardon, ARNP

Date: ___9/18/2021___

235

By: _____

Name/Title: _Michael Sason, DO_

Date: _09-08-21_

By: _____

Name/Title: _Bonnie J. O'Sullivan MD_

Date: _9/13/21_

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

By: _____

Name/Title: _____

Date: _____

**Exhibit E – "Updated Article"**

©2021 Anthony G. Stanley, MD

## Clinical Approach to Fishhook Removal

**Anthony G. Stanley, MD** and **Jorge Murillo, MD**

## Key Concepts

**Fish hook removal system**

**Risk Recognition**

**Patient satisfaction & experience**

**Shorter registration to discharge times**

*Urgent Message* **Fishhook injuries occur year-round under various circumstances, as simple as cleaning out the trunk of your car or garage. Upon arrival at the health care facility,** *"there is often, office pandemonium once the receptionist gives notification of a fish hook injury in the waiting room"*

## Navigate this Article

- Abstract / Introduction
-     Relevance in today's health care system
- Anatomy of the Fish Hook
- Patient Evaluation
- Principles of Removal
-     Fishhook Removal System
-   Techniques
-     1 Retrograde Technique
-     2 Needle Cover Technique
-     3 String-Yank Technique
-     4 Barb Crush Technique
-     5 Cut it out Technique
-     6 Advance and Cut Technique
-   Post-Removal Wound Care
- Conclusion
- References

**Lead internet photo(s)**



Photo courtesy of Thundermist Lure



Photo courtesy of Richard Gene

**INTRODUCTION**

Fishhook injuries are a common, underestimated occurrence presenting to emergency rooms, ambulatory care, and urgent care facilities, especially among those who participate in the sport of fishing with a rod and line known as "angling". There are also multiple injuries in the commercial fishing industry. The vast majority of fishhook injuries occur to the head and hands.[1] What has been seldomly recognized is the occurrence of injury to bystanders, as well as to accompanying pets and wildlife. These types of injury are referred to as *"collateral damage"* as noted in our *Trauma Gallery.*

National data reveal, the emergency department is the site for 28% of all acute care visits in the United States.[2] How common is a fish hook injury? This is a commonly asked question, and very little national data exist on this specific type of injuring. The incident of this type of injury is an area where more clinical research is needed. Fishhook injuries that are not treated in the field will present to the ER, ambulatory care or urgent care centers. When these injuries present to the health care facilities, "there is often, office pandemonium once the receptionist gives notification of a fishhook injury in the waiting room". Besides the high anxiety felt by the patient, the staff also goes through an equivalent experience. There is disruption in continuity in the care of patients already in the treatment area, due to staff frantically making phone calls searching for a fishhook removal device. Many of the commonly used wire cutters, are only sanctioned for home repairs and electrical work use. Currently there is no medical fishhook removal system established. In addition to locating a wire cutting tool for removal, the provider must be familiar with the anatomy of the fishhook, the anatomy of injured area and well versed in common techniques used to remove fishhooks in a timely and safe manor with minimal trauma. The confidence of the provider, availability of the removal system, gives the patient assurance they are in great hands and reduces anxiety.  Often because of unavailability of established medical fish hook removal system(s), clinician's lack of removal experience, many of these cases are simply screened by the nurse and provider then sent to the ER for removal. Fishhook removal is a procedure comparable in difficulty to laceration repair of the skin with proper equipment. The fishhook removal system can be either disposable or a reusable sterile medical device similar to, the standard suture tray.

This article will review the clinical approach to evaluation and removal of fishhooks, focusing on the six most common techniques of fishhook removal, injury management and the mindfulness of establishing a formal fishhook removal system. The choice of the method for fishhook removal depends on the type of fishhook embedded, the location of the injury, and the depth of tissue penetration. Occasionally, more than one removal technique may be required for removal of the fishhook. Wound care following successful removal involves extraction of foreign bodies from the wound and the application of a simple dressing. Prophylactic antibiotics are generally not indicated, and should be left up to the discretion of the provider. Tetanus status should be assessed and Td or Tdap administered if needed with age appropriateness as per established guidelines.

**Trauma Gallery**



Photo courtesy of Steve Wecks



Photo courtesy of Chris Barry



Photo courtesy of *Fishing World Magazine*



Photo(s) courtesy of Karen Rudkin-Moody and Ryan Moody





Photo courtesy of Thundermist Lure Company

**ANATOMY OF THE FISHHOOK**

There are three classic types of fishhooks: single-barbed, multiple-barbed, and treble as seen in (**Figure 1**). Common features of fishhooks seen in (**Figure 2**). The "eye" connects the hook to the fishing line. The shank is the portion of the hook that connects the point and the eye. The "point" is the sharp end that penetrates the fish's mouth or skin.  The gape or gap describes the

240

distance between the shank and the point. When examining the patient, it is important to note whether the fishhook is single-barbed or multiple-barbed, as well as the number and location of the barbs; these details will help determine the optimal removal technique. Often, patients will know the type of hook they were using and, in many cases, they bring in a sample or photo of the embedded hook for viewing.



Figure 1. Classic types of fishhooks: A. single barbed fishhook; B. multiple barbed fishhook; C. Treble fish hook. ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")



Figure 2. Anatomy of the fishhook. ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")

## PATIENT EVALUATION

After obtaining a history of the injury, vital signs, examine the wound and surrounding structures. Inspect distal and proximal to the injury site. Assess for deep injury involving penetration to tendons, nerves, and bone. Radiographs are seldom needed, but may aid in determining the type of fishhook and the depth of penetration. Most fishhook injuries are penetrating soft-tissue injuries of the hand, face, head or upper extremity but can involve other body parts. Injuries usually do not involve deeper tissue structures because of the linear forces applied along the fishing line to the curved shape fishhook that brings the point parallel to the skin and keep it from deep penetration.[3] Any eye injury penetrating wounds should be stabilized and transported to the nearest emergency room. Keep in mind, all wire cutters have a limitation in cutting capacity. In cases involving larger fishhooks, the patient may have to be referred to the ER where larger surgical cutting devices are available (e.g., bolt cutter or an extensive surgical procedure may be required).

©2021 A G Stanley, MD

.

**PRINCIPLES OF REMOVAL**

The six most common techniques for the removal of fishhooks are:

| | |
|---|---|
| 1. Retrograde | 4. Barb crush |
| 2. Needle cover | 5. Cut-it-Out |
| 3. String-yank | 6. Advance-and-cut |

The method selected is based on the judgment of the provider, the anatomic location of the injury, and the type and anatomy of fishhook. Before getting started make sure you have a fish hook removal system, this will require:

| | |
|---|---|
| 1. Wire cutter | 4. Wound cleanser |
| 2. Hemostat or needle driver | 5. Protective eyewear (goggles or face shield) |
| 3. Gloves | 6. Local anesthetic |

The approach of removal is multifactorial. In the field with limited resources, the more robust methods are generally attempted commonly (string-yank method). Often times multiple techniques must be attempted before the fishhook is successfully removed. In the clinical setting local wound care should be performed first. This typically involves cleaning the site with combination of povidone-iodine, Hexachlorophene solution or if not available use soap and water before attempting removal of the fishhook. Local anesthesia typically Lidocaine 1% (Xylocaine) without epinephrine, A nerve block or regional block may also be required depending on the injury site. Hooks with more than one point like the treble fishhook, should have the free barbs taped or cut to avoid receiving additional embedded puncture wounds during the removal procedure. All items attached to the hook (i.e., fish line, bait and the body of the lure itself) should be removed. The physician and bystanders should take care not to be struck by the hook during removal. Anyone assisting with the procedure should have clean hands and gloves. Protective eyewear should be worn with all procedures, especially when performing the String-Yank method and Advance and Cut method.

**Retrograde Technique**

Retrograde technique is considered the simplest of the removal techniques but has the lowest success rate. It works well for barbless and superficially embedded hooks. Downward pressure is applied to the shank of the hook. This maneuver pushes the hook deeper into the tissue bed and dislodges the barb, from the resting tissue site. The hook can then be backed out of the skin along the path of entry (**Figure 3**). If there is any resistance or snagging sensation of the barb during the procedure, consider an alternate method.



**Figure 3.** Retrograde technique. Apply downward pressure to the shank of the fishhook while it's being pushed back out along the point of entry. ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")

### Needle Cover Technique

The needle cover technique requires great dexterity on the part of the provider (and a little luck). It works well for the removal of large hooks with a single barb, and when the point of the fishhook is superficially embedded in the skin (surface).

After standard wound prep and local anesthesia, a 16-18-gauge needle is advanced along the wound entrance of the fishhook (**Figure 6**). The direction of insertion should be parallel to the shank. The bevel should point toward the inside of the curve of the fishhook, enabling the needle opening to cover over (capping off) the barb. It is important to have the bevel pointed in the correct direction as shown so that the leading edge of the needle matches the angle of the fishhook barb. Advance the fishhook to disengage the barb, then pull and wiggle it so that the point enters the lumen of the needle. Once covered, back out the fishhook (similar to the retrograde technique), taking care to move the needle along the entry point of the fishhook**.**

**Figure 6.** Needle cover method. Advance a 16- to 18-gauge needle along the fishhook until the needle opening covers or caps, the barb. The fishhook and needle are then pulled back and removed as a single unit. ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")



A modification of this technique involves sliding a #11 scalpel blade along the wound to the point of the fishhook. The fishhook may then be backed out through the track of the incision line.

**String-Yank Technique**

The string-yank technique is a modification of the retrograde technique. It is commonly performed in the field and many fishermen believe it's less traumatic because it creates no new wounds and rarely requires anesthesia. This technique works best when removing small and medium-size hooks. It should not be attempted on deeply embedded fishhooks, for fear of damaging deep nerve and vascular structures, and when the fishhook is embedded in parts of the body that are not fixed (lips, nose, eye lids, ears).



Photo courtesy of Ty Southerland

It has been recongnized that tradition of counting *1,2,3, go* (to give a reference point in time to start) prior to performing a yank-pull attempt, causes most patients to assume a flexed posture, which can cause more damage during the course of pulling. Physicians should be familiar with the concepts of this method. It can become a risky endeavor with improper technique, and may result in permanent tissue and structural damage. A heavy string material (eg, heavy suture cord, or a 20- to 30-pound test fishing line) can be used. Wrap and position the string material around the midpoint of the bend in the fishhook to keep the string in a fixed position, use a simple knot such as a lark's head knot (**Figure 4**). Wrap the free ends around the index finger of the free hand. A better grip on the string can be achieved by wrapping the ends around the gloved hand, grouped tongue depressors, or hemostat shaft. The involved skin area should be well stabilized against a flat surface as the shank of the fishhook is depressed against the skin. Continue to depress the eye and/or distal portion of the shank of the hook, taking care to keep the shank parallel to the underlying skin. A firm, quick jerk (with sustained forceful motion) is then applied parallel to the shank while continuing to exert downward pressure on the eye of the fishhook (**Figure 5A**). Fishhooks extracted with this technique will come out with significant velocity, so the provider and bystanders should remain out of the line of flight and wear protective eye wear (goggles or face shield). Caution should be taken when performing the yank procedure. Keep in mind Newtons third Law of Motion[4], for every action there is an equal and opposite reaction. This is true when pulling. If there is laxity in the parallel pulling force, the hook can be dislodged from its original position and be forcefully pulled back and then embedded into a new location (**Figure 5B**).

**Figure 4**. Applying a lark's head knot to a fishhook. (“Illustration ©2020 Devon Medical Art, LLC. Used with permission.”)



**Figure 5.** String-yank method. A: Tie a string using a lark's head knot around the midpoint of the bend in the fishhook. B: Depress the shank of the fishhook against the skin. Press firmly and quickly yank/pull on the string while maintaining continued pressure to the shank of the hook. (“Illustration ©2020 Devon Medical Art, LLC. Used with permission.”)



**Barb Crush Technique**

The barb crush technique is considered another modification of the Retrograde Technique, but with a higher success rate. Often, there is no wire cutter available. In most cases the available wire cutter may not cut the diameter of the fishhook (shank). Using a pair of pliers or sturdy hemostat you can repeatedly crimp down and crush the fishhook barb flat. Carefully smooth all rough edges, and pull gently, backing the hook out the way it entered the skin. The hook can then be backed out of the skin along the entry path (**Figure 7**).

**Figure 7.** Barb crush method. Repeatedly crimp down hard crushing the barb on the hook until flattened. Next back the hook out the entrance holes.
("Illustration ©2021 Devon Medical Art, LLC. Used with   permission.")



**Cut-It-Out Technique**

The cut-it-out technique is useful in penetrating fishhook injury of the fingers. It requires dissection along the shaft of the hook. This procedure is also used frequently by eye surgeons in fishhook injuries penetrating the sclera or cornea.[5] However, this should be a procedure of last resort in the ambulatory care setting, when there is no wire-cutting device available and there is an urgent need to remove the fishhook. This technique is best conducted in an area of superficial penetration, with no major surrounding neurovascular structures or tendons present.

To perform, take a hemostat and pull up gently on the shaft of the hook, in a vertical direction. Next, take a scalpel (preferable a standard #11 blade type) and gently cut along the shaft of the distal end of the fishhook toward the proximal end with the barb. The hook can be then extracted and discarded (**Figure 8**). This technique consequently causes lots of tissue damage, and the resultant scar will likely have a jagged wound edge appearance.

**Figure 8**. Cut-it-out technique. Using a #11 blade pull up and cut along the shaft of the hook in a vertical direction until free of entrapment. ("Illustration ©2020 Devon Medical Art, LLC. Used with permission.")



**Advance-and-Cut Technique**

This traditional method of fishhook removal has the best success rate, even when removing larger fishhooks; however, additional trauma to the surrounding tissue is caused by creating an exit wound (a slight disadvantage). The advance-and-cut technique is most effective when the point of the fishhook is located near the surface of the skin.[6] It involves two methods of removal: one for single-barbed fishhooks (**Figure 9**) and one for multiple-barbed fishhooks (**Figure 10**) where the non-embedded hooks are cut off or taped over, prior to attempting removal. Infiltration with a local anesthetic is performed over the area where the fishhook has penetrated the skin, alternatively a digital or regional block may be appropriate for various body site injuries.[7] Using a hemostat or needle driver, with a strong grip and twisting motion of the wrist, drive the point of the fishhook (including the entire barb) upward through the skin, creating an exit wound. A modification of note is to open the skin with a #11 scalpel blade, slightly above the tenting point of the hook to allow easier exit. Once the distal shaft of the fishhook completely clears the skin surface, cut it with a medical wire cutter or another cutting tool, allowing the rest of the fishhook to be backed out with little resistance. Protective eyewear should be worn by provider and bystanders. Fishhook fragments fly off with massive force and can cause bodily injury. The advance-and-cut technique is likely to be the most universally accepted in the emergency room, ambulatory care, and urgent care settings, as it is probably the most familiar to providers and least anxiety-producing for the patient. If by chance the fishhook has several barbs on the shaft, the distal end (eye) should be cut off with a wire cutter and the proximal end with the hook pulled forward through the exit wound. Devices specifically designed for this purpose are available. All wire cutters have a limit of diameter cutting capacity and in cases involving larger fishhooks, patients may have to be referred to the emergency room or hospital where a bolt cutter or surgical procedure may be required.

**Figure 9.** Advance and cut method: single-barbed fishhook. (A) Advanced the fishhook through the skin creating an exit wound. (B) Cut off the barb of the fishhook (C) back the remaining fishhook out the entry point. ("Illustration ©2021 Devon Medical Art, LLC. Used with permission.")



**Figure 10**. Advance and cut method: for multiple-barbed fishhook. (A) Advanced the fishhook through the skin creating an exit wound. (B) Cut the eye of the fishhook off and (C) Pull the remaining fishhook forward through the exit wound created by advancing the point through the skin. ("Illustration ©2021 Devon Medical Art, LLC. Used with permission.")



## POST-REMOVAL WOUND CARE

After removal of the fishhook, the wound should be irrigated thoroughly with normal saline. All debris and foreign bodies should be removed. Finally, the wound should be covered with antibiotic ointment (mupirocin) and a sterile dressing. Wound care should include routine irrigation, cleansing (betadine), application of antibiotic ointment, and dressing change on a daily basis or every other day. Observations should be made for signs of infection such as edema, erythema, purulent drainage, etc. Healthy patients with uncomplicated skin injuries should be advised to soak the wound in warm water two to three times a day until healing is observed.

Infections after fishhook removal are uncommon.[1] Therefore, routine use of antibiotics for uncomplicated superficial skin injuries is not indicated. For the rare cases in which there is reason

for suspicion of infection and antibiotics are prescribed, consideration of coverage water-borne organisms is reasonable.

Patients should also be evaluated for tetanus prophylaxis. Tetanus-diphtheria or tetanus-diphtheria-pertussis (Td or Tdap) vaccine should be administered if there is a history of less than three doses or unknown doses of tetanus toxoid administration. If the last dose of tetanus toxoid was received within the last 10 years, then no further vaccination is required.

**CONCLUSION**

Fishhook injuries can occur at any time, during angling, commercial fishing, or simply cleaning out the garage. To bring about a renewed approach to fishhook injury and advancing medical treatment strategies, it is imperative to track valuable incidence data. There is also a need to establish a basic minimal procedural understanding by all healthcare providers involved in emergency rooms, ambulatory care centers, and urgent care centers for quick assessment and swift removal of fishhooks. This is an area where risk recognition has to be appreciated to prevent injuries to patients and providers. The best approach is to be knowledgeable of the anatomy of the injured area and be prepared mentally to make adjustments in your procedural method. Always consider starting with the simpler removal techniques (ie, retrograde, needle cover) prior to the more robust methods mentioned in this article. Lastly, there is a need to establish a standard fishhook removal system that is as universal as the suture tray, containing a medically approved cutting device, along with hemostat, protective eye wear, and other supportive care supplies. Ensuring there is an established protocol, provider training, and a ready-to-use fishhook removal system on hand (ideally in close proximity to a laceration repair kit) will increase the likelihood of both a positive clinical outcome and high patient satisfaction.

**REFERENCES**

1. Doser C, Cooper WL, Edinger WM, et al. Fishhook injuries: a prospective evaluation. *Am J Emerg Med*. 1991;9(5):413-415.
2. Weinick, Robin M., Kirsten Becker, Layla Parast, Brian Dale Stucky, Marc N. Elliott, Megan Mathews, Chris Chan and Virginia Kotzias. Emergency Department Patient Experience of Care Survey: Development and Field Test. Santa Monica, CA: RAND Corporation, 2014. https://www.rand.org/pubs/research_reports/RR761.html.
3. Gammons MG, Jackson E. Fishhook removal. Am Fam Physician. 2001;63(11):2231–6.
4. Newton's Third Law of Motion: Textbook of Physics, AM J Phys. 12,109 (1944)
5. Ahmad SS, Seng CW, Ghani SA, Lee JF.  Cut-it-out technique for ocular fish-hook injury Journal of Emergencies Trauma and Shock, 6(4):293-295, 30 Sep 2013
6. Diekema DS, Quan L. Fishhook removal. In: Henretig FM, King C, eds. Textbook of Pediatric Emergency Procedures. Baltimore: Williams & Wilkins, 1997:1223–7.
7. GOHAR A. SALAM, M.D., D.O., Regional Anesthesia for Office Procedures: North Shore University Hospital at Manhasset, Manhasset, New York: *Am Fam Physician.* 2004 Feb 15;69(4):896-900.

Anthony G. Stanley, MD, Bio: Staff physician Criticare Clinics & Urgent Care Miami, Fl. Staff Emergency Room Physician, Baptist Healthcare of South Florida. Medical Device Inventor (holder of 3

medical device patents).  Dr. Stanley received his medical degree from Rutgers-New Jersey Medical School, Newark New Jersey. He completed Residency in Internal Medicine at University of Miami-Jackson Memorial Medical Center/ Miami VA Medical Center Miami, Florida.

Jorge Murillo, MD, FIDSA, FACP Bio: Associate Professor of Medicine – Herbert Wertheim College of Medicine, Florida International University, Miami, Florida, Consultant in Infectious Diseases and Tropical Medicine, Baptist Health System of South Florida. Dr. Murillo received his medical degree from the Central University of Venezuela. He completed his fellowship in Infectious Diseases at the University of Maryland Hospital, Baltimore, Maryland.

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                     Plaintiff,


          vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and



          Defendants.

_____/



EXHIBIT Q
TO AMENDED COMPLAINT
FILED JULY 14, 2023

251

11/26/22, 7:39 PM                        An Urgent Care Approach to Fishhook Removal - Journal of Urgent Care Medicine



Search    | **Subscribe/Get Access** | Log In | f  t  YouTube

NEWS      RESEARCH     CLINICAL     PRACTICE MGMT     GET CME     BUYER'S GUIDE     JOBS

AUTHORS     ABOUT US     ARCHIVES

# AN URGENT CARE APPROACH TO FISHHOOK REMOVAL

It has been brought to our attention that the publication titled "An Urgent Care Approach to Fishhook Removal" originally published in June 2021 digital edition of The Journal of Urgent Care Medicine on June 1, 2021 ("Publication"), contains several changes made during the editing process performed by JUCM which the authors took issue with and subsequently demanded the Publication be retracted. Accordingly, at the request of the authors, Anthony G. Stanley, MD and Jorge Murillo, MD, we have fully retracted the Publication.

📁 Uncategorized

## Login

Username

LOGIN


Privacy · Terms

Password

PASSWORD

☑ Remember Me

**LOG IN**

**Lost Password**

## Sign Up For The JUCM Newsletter

Urgent care clinical, practice management, and curated news stories - delivered to your inbox - every Tuesday.

Enter Your Name

Enter Your Email Address

**SIGN UP**



Privacy - Terms

## ABOUT US

The Journal of Urgent Care Medicine® (JUCM) is the official journal of the Urgent Care Association (UCA). Each issue contains a mix of peer-reviewed clinical and practice management articles that address the distinct clinical and

practice management needs of those who are working in today's busy urgent care centers. JUCM's reach of over 42,000 includes qualified clinicians, business and administrative professionals working in urgent care facilities nationwide

## QUICK LINKS

About Us

Advertise

Subscribe

Submit An Article

Careers

Contact Us

## JUCM IS THE OFFICIAL JOURNAL OF

©2022 - The Journal of Urgent Care Medicine - All Rights Reserved

Privacy - Terms

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                        Plaintiff,

              vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and

              Defendants.

_____/

EXHIBIT R
TO AMENDED COMPLAINT
FILED JULY 14, 2023

From: <swilliams@jucm.com>
Date: Wed, Oct 13, 2021 at 11:07 AM
Subject: RE: Retraction of Article
To: Alex Loveyko <alex@chaselawyers.com>


Alex,


Thank you for your note.  Per our general counsel, attached please find the redline and clean versions of the retraction we will be publishing online shortly and in our next print edition.  Further, per our general counsel, we will not be re-publishing the article out of an abundance of caution to avoid the potential confusion to the public.  With publication of the full retraction, we consider this matter finalized.


Best,


Stuart

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:23-cv-20793-PAS**

ANTHONY STANLEY, M.D.

                     Plaintiff,

           vs.

THE BRAVEHEART GROUP, LLC, a New Jersey
Limited Liability Company, d/b/a

THE JOURNAL OF URGENT CARE MEDICINE, and

           Defendants.

_____/

EXHIBIT S
TO AMENDED COMPLAINT
FILED JULY 14, 2023

MENU

# For Authors    Submit Manuscript (https://app.scholasticahq.com/submissions/jucm/new)

**JUCM Instructions for Authors**

***JUCM, The Journal of Urgent Care Medicine***, welcomes original articles that provide practical clinical and practice management information for our readers—the nation's urgent care physicians, physician assistants, and nurse practitioners. **JUCM** articles should offer practical advice and solutions to clinical and practice management issues commonly encountered in day-to-day practice.

Our aim is to combine scientific precision and evidence-based content with a concise, lively style that's easy to read. Keep these guidelines in mind as you're preparing your manuscript, and remember that we have highly skilled, experienced editors who are prepared to give you as much help as you need.

**Originality and Copyright**

Articles that appear in **JUCM** must be original to their authors. The text must not have been published previously, in any format—in print or on the Internet. Cutting and pasting sentences, paragraphs, or sections of a work that has been published previously into your article is unacceptable because it could violate another publisher's copyright.

**Audience**

The information you provide should be of practical use to our readers, who have come to practice in an urgent care setting from a variety of clinical backgrounds. Your article should take their perspective into account by considering several key issues, such as

• What immediate management is indicated?

• What laboratory tests or diagnostics are required?

• What are the next steps—with whom should the patient follow up?

• Who should be admitted or referred to the emergency department?

Imagine yourself in the reader's shoes and ensure that your article includes the answers to questions you'd be asking.

**The Editing and Review Process**

When your manuscript arrives, we'll send you an acknowledgment and give your article to our Board of Editors. We'll let you know within a few weeks whether has been accepted. If your submission is

accepted for publication, it will be scheduled for an upcoming issue of **JUCM** and assigned to an editor.

After the first round of editing, the article is sent to several physician reviewers and board members for comment. Any queries or requested changes will be forwarded to you for consideration. Finally, the article goes to our production department to be prepared for publication.

**References**

We ask our authors to cite a reference in only two instances:

1. When citing the results of a single study
2. When making statements that readers are likely to question, find unusual, or want to follow up on

You need not reference information that most readers would accept as true or statements that numerous studies over time have borne out. We try to limit reference lists and suggested reading lists to 15 items per article.

**Also keep the following guidelines in mind:**

• References and suggested readings should be recent; unless a publication is a seminal work, limit citations to material published in the past 5 years.

• References should be limited to review articles, clinical trials, and other scholarly material. **JUCM** rarely cites nonclinical sources. (Statistics attributed to government agencies would be one exception.)

• References should be formatted in AMA style (AMA Manual of Style, 10th edition).

• Primary, rather than secondary, sources should be cited. (For example, a research article listed in MEDLINE is a primary source; an article in UpToDate is a secondary source.)

• Articles need not have a suggested reading list, although if your reference list contains fewer than 10 citations, you may want to include a suggested reading list of a few items that readers may find valuable.

**Tables, Figures, Sidebars, and Pictures**

Please send tables, graphs, sidebars (boxes), and digital images whenever possible. Our readers appreciate well-chosen graphics, tables, and similar elements that add practical value to an article. Number all tables, graphs, sidebars, and images in chronological order (e.g., Figure 1, Figure 2, Table 1, Table 2, Sidebar 1, Sidebar 2), and indicate where in the text each item should appear when your article is printed. Here is an example:

. . . primarily located in the transverse and sigmoidal regions (Figure 1).

Digital images should be a minimum of 300 dpi. Please do not embed figures in your manuscript file. Instead, please submit each figure as a separate image file (i.e., a JPG, TIFF, or PNG file). Each file should be named in a way that indicates your surname, your manuscript topic, and the figure number (e.g., Jones_ShoulderPain_Figure3.jpg) For all images, please supply figure legends (captions) in your manuscript.

We prefer that you submit graphics that are original to you, such as x-rays taken as part of your practice. For all images of patients, please do the following:

• Crop out anything that could reveal the identity of the patient.

• Have the patient sign a document granting you permission to publish the image without identifying the patient. Please keep this document on file.

One good source of potentially copyright-free images that you may wish to search on the Internet is Wikimedia Commons:

[link]http://commons.wikimedia.org/wiki/Main_Page (http://commons.wikimedia.org/wiki/Main_Page)

If you wish to use tables or images that have previously appeared elsewhere—in print or on the Internet—you must let the editor know, providing all publication details and links. We can write the previous publisher for permission to reuse the material in **JUCM**. There is no guarantee, however, that the permission will be granted. If permission is not granted, we cannot legally reprint the material.

Tables must be created within Microsoft Word, using the "Insert Table" function, so that they can be edited. Do not submit (1) photographs of tables or (2) tables created within Microsoft Excel or other software.

**Urgent Message**

Before the introduction section of your article, please provide a short "urgent message" (2 or 3 sentences) that embodies the main teaching points of your article in relation to urgent care. Whole sentences copied and pasted directly from later in the article are fine.

**Manuscript Length**

Limit the manuscript to 2600–3200 words, plus references, tables, figures, and other accessories. Articles that are longer will probably need to be cut during editing.

**Manuscript Submission**

Articles should be submitted via e-mail, as Microsoft Word files (with multicolumn tables created within Word), and should be addressed to Editor@jucm.com (mailto:editor@jucm .com). The title page of the manuscript should include the title of the article, the names of all the authors in the order they are to appear, and the name, address, and contact information (mailing address, phone, fax, and email) for the corresponding author.

If you need to send photos, images, scans, or hard copies of tables that may be difficult to create electronically, please label your materials clearly (regarding which article they are meant to accompany), and mail them to this address:

Harris Fleming, Managing Editor

JUCM

11 E Sundial Circle

PO Box 5156

Carefree, AZ 85377

All original art materials will be returned to the authors.

**Time Frame**

Articles typically are scheduled to appear in **JUCM** within 6 months of acceptance. The editing and review process occurs approximately 3 months before publication.

**Publication Copies**

You will receive a copy of the **JUCM** issue in which your article appears. If you'd like more than one copy of that issue, please ask; extras are often available. **JUCM** retains the copyright to articles, but we freely allow authors to photocopy or otherwise reuse their material for educational purposes.

---



Powered by Scholastica (https://scholasticahq.com), the modern academic journal management system