UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No.: 1:23-cv-20793-PAS

Anthony Stanley, M.D.,

   Plaintiff,

 vs.

The Braveheart Group, LLC, a New Jersey Limited
Liability Company, d/b/a The Journal of Urgent
Care Medicine,

   Defendant.
_____/

**The Braveheart Group, LLC's Opposition to
Anthony Stanley, M.D.'s Motion False Settlement Document Filing Notification**

On June 20, 2024, plaintiff Anthony Stanley, M.D., filed *pro se* a document titled, "Motion False Settlement Document Filing Notification." (ECF 50.) Stanley falsely claims that he was coerced into settling and that the settlement document he signed is different from what the parties jointly filed with the Court. Defendant The Braveheart Group, LLC opposes Stanley's motion.

**I. Introduction**

Almost a full year after this case was settled and dismissed through court-ordered mediation, Stanley moves to vacate the settlement and dismissal. He posits two arguments; neither have merit.

Stanley first argues that he and his attorney were coerced into settling by a "false narrative" of "witness tampering" by Braveheart's attorney. This argument fails because there was nothing "false" about the narrative. The undisputed email evidence, cited below,

33838134.1

proves that Stanley did not only tamper with witnesses. He conspired with them to fabricate evidence to support his case. Then, when Braveheart served discovery requests for Stanley's pre-suit emails with those witnesses, Stanley repeatedly misrepresented that there were no such emails. Stanley's misrepresentations were exposed when a witness surrendered an email in which Stanley asked her to pretend that she "came across" Stanley's medical article and to write a complaint letter addressed to him criticizing his writing and medical advice. Stanley told this witness that doing so "will support my case." Stanley went so far as to draft every word of the witness's complaint letter and instructed her to send it to him under her signature as if she wrote it, which she did *verbatim*.

Second, Stanley argues that the settlement filed with the Court under seal is a "false" document. Stanley bases this argument on the fact that he apparently signed the original version of the written settlement agreement—as drafted by Braveheart's counsel during mediation—rather than the next version with *his* attorney's minor non-substantive revisions in favor of Stanley. This is much ado about nothing because the material terms of the settlement are the same in both versions of the document, and they are the same material settlement terms that the parties agreed to orally with the mediator before the agreement was memorialized in writing that same day.

Moreover, if Stanley contends that the version of the settlement document that he signed must control, then he is bound by that original version of the agreement because it was drafted by Braveheart, such that Stanley's signature constitutes acceptance of Braveheart's offer. It only benefits Stanley to be bound by the second version because it contains his own attorney's non-substantive revisions that are in *his* favor. Thus, Stanley is bound by the settlement and dismissal, no matter how the Court slices it.

The Court should summarily deny Stanley's motion, maintain the dismissal, and award Braveheart the attorneys' fees that it incurred in responding to Stanley's meritless attempt to reopen a settled case, which was based from the start on fabricated evidence.

## II. Background

### A. The Parties

Plaintiff Anthony Stanley, M.D., is a Miami medical doctor.

Defendant The Braveheart Group, LLC owns and publishes *The Journal of Urgent Care Medicine*, which is sometimes referred to as the "*JUCM*."

### B. Stanley's Fishhook Removal Article

The *JUCM* is a journal that publishes monthly in digital and print format. As its name suggests, the journal offers content relevant to urgent care medicine. Braveheart has published the *JUCM* monthly since at least 2006.

In February 2021, Stanley submitted a manuscript for publication in the *JUCM* addressing the treatment of fishhook injuries by urgent care centers. Stanley's fishhook article published in the June 2021 issue of the *JUCM*.

Stanley alleged that Braveheart changed the article to convey bad medical advice. Braveheart disputed these allegations because the undisputed emails and manuscript drafts exchanged between Stanley and Braveheart prove that Stanley authored or approved *all of the text* in the article. So if Stanley contends his article conveys bad medical advice, then he alone is responsible for it.

The only "changes" that Braveheart made to the article—after Stanley approved in writing the near-final version—were standard editorial changes that did not alter the substance of what the article conveyed. That editorial work included removing unnecessary

photos of fishhook injuries to fit the journal's page limitations, laying out the text and figures to fit the journal, and selecting pullout quotes using Stanley's own words from within the article. None of this editorial work changed the substance of the medical advice conveyed by the article, and all words that appeared in the article were authored or approved by Stanley.

### C. Stanley sues Braveheart and discovery commences.

On February 28, 2023, Stanley sued Braveheart. (ECF 1.)[1] He alleges copyright infringement and several torts. (ECF 40.)

Stanley's complaint describes and relies upon complaint letters from others in the medical community that allegedly wrote to Stanley to complain about the poor quality of his article. (*See, e.g.*, Am. Compl. ¶¶ 22, 26-29, ECF 40.) Stanley also attached the complaint letters as Exhibits K-N to his amended complaint. The letters did not indicate that Stanley had asked the authors to write the complaints or critique his article. Instead, the letters were written from the perspective of persons who had casually "come across" the article, "learned of" it, or "found it in the break room at our Urgent Care," for example. (*See* Am. Compl., Ex. K, M, and L, respectively.) Stanley's complaint also cited and attached a "Petition for Article Retraction" signed by one or more authors of the complaint letters and others. (*See id.* ¶ 22 & Ex. I.) The petition echoed the criticisms from the complaint letters.

Suspicious that so many busy physicians and nurses would spend the time to write and send complaint letters about the article, Braveheart served document requests to obtain all communications between Stanley and any third-parties (including the authors of the

---

[1] Stanley originally named three other companies as defendants in addition to Braveheart, but dropped them by filing an amended complaint naming only Braveheart.

complaint letters) regarding the article. (Cavanagh Decl. ¶ 6; Ex. C-1.)[2] Stanley responded that he had no such communications, other than the complaint letters themselves and the petition itself. (*Id.* ¶ 7; Ex. C-2.)

On June 28, 20203, Braveheart's counsel sent a discovery deficiency email to Stanley's counsel that, among other things, questioned how it was possible that there were no communications between Stanley and the third-parties that signed the petition, who were many of the same people that sent the complaint letters. (*Id.* ¶ 8; Ex. C-3.)

On July 7, 2023, Stanley's counsel responded that he had "personally pressed Dr. Stanley," and Stanley confirmed there were no written communications between Stanley and the signatories to the petition (including those signatories that also had submitted complaint letters) and that all such communications were "oral." (*Id.* ¶ 9; Ex. C-4.) Stanley's counsel invited Braveheart to press Dr. Stanley on this point at deposition or trial. (*Id.*)

Unconvinced, Braveheart issued subpoenas to authors of the complaint letters for communications with Stanley about the article. (Cavanagh Decl. ¶ 10; Ex. C-5.) Relevant to the issues raised by Stanley's motion, Braveheart issued one of the subpoenas to Bonnie O'Sullivan, M.D. O'Sullivan had written a complaint letter to Stanley in which she claimed to have "come across" the article and claimed the article had mistakes and was "poorly written." O'Sullivan also had signed the petition for retraction. (*Id.* ¶ 11; Ex. C-6.)

### D. Braveheart discovers that Stanley fabricated evidence and then concealed evidence of his wrongdoing.

On August 24, 2023, the day before Court-ordered mediation was to occur, O'Sullivan produced three pages of documents in response to Braveheart's subpoena. (Cavanagh Decl.

---

[2] Cavanagh's declaration is attached hereto, as are the C-# exhibits to his declaration.

5

33838134.1

¶ 12; Ex. C-7.) O'Sullivan produced a damning December 2, 2021 email sent from Stanley's personal email account (tuff57@msn.com) to O'Sullivan. (*Id.*) In that email, Stanley explains what he thinks is wrong with the article as published and why *JUMC* is responsible, and he provides the full text of a "complaint letter" that he asks O'Sullivan to send under her signature to Stanley's work email at anthonys@baptisthealth.net. (*Id.*) Below is the email sent by Stanley to O'Sullivan, including the full text of the complaint letter that he asked O'Sullivan to send.

 Bonnie Jean O'Sullivan <bjosullivan7@gmail.com>

**JUCM MD Complaint**
1 message

Anthony Stanley <tuff57@msn.com>  Thu, Dec 2, 2021 at 6:34 PM
To: Bonnie Jean O'Sullivan <bjosullivan7@gmail.com>

Hello BJ:

Thanks for your help. The JUMC staff cut and pasted various sections **out of** my paper with out permission, and made the whole document disjointed reading. They also did not print any of the pictures properly. The picture they printed are too small and too much color in the borders. There is a lot of unauthorized editing with my copyrighted work. It would help also if they were synchronized with the topics. Below is the complaint letter. It encompasses the key issues with the printed article that will support my case. Fee free to edit as you like. Send the completed letter to my e mail:

anthonys@baptisthealth.net

---

Hello Dr. Stanley:

I came across your June 1, 2021 article (**An Urgent Care Approach to Fishhook Removal**) online, early October, on the Journal of Urgent Care Medicine website. It seemed like a timely article that would summarize all the current ways to remove a fishhook. I wanted to use it for our Urgent Care Journal Club meeting, upon reading the article I noticed multiple typographical errors. I was very disappointed, and had difficulty trying to comprehend the written subject matter, and follow along with the photos which are not synchronized with the reading. You also alluded to the fact that there needs to be more research in fishhook injury and related demographics. However, the discussion seemed disconnected somehow. Lastly, you talked about a new concept, a fishhook removal system but the discussion was limited. Over all, it was poorly written by you as a physician and author. The JUCM should share the blame for not proof reading. It's a great topic but needs to be presented to the medical community properly. I am a monthly reader of the JUMC and surprised of this body of work they released to the medical community! I have read several medical journals with mistakes in the past and like them, in this case, it should be corrected and reprinted. I would love to have presented this article "**An Urgent Care Approach to Fishhook Removal**" to Journal Club at our urgent care.

I was hesitant to contact you, but just felt you should know.

Sincerely

XXXXXXXXXXXXXX , MD

(Ex. C-7.) On the following page is the actual complaint letter signed by O'Sullivan and sent to Dr. Stanley. O'Sullivan sent her letter on the very same day that Stanley sent his email request that she do so. As the Court will see, O'Sullivan's letter is a verbatim match of what Stanley drafted for her to send.

7

> December 2, 2021
>
> Hello Dr. Stanley:
>
> I came across your June 1, 2021 article (**An Urgent Care Approach to Fishhook Removal**) online, early October, on the Journal of Urgent Care Medicine website. It seemed like a timely article that would summarize all the current ways to remove a fishhook. I wanted to use it for our Urgent Care Journal Club meeting, upon reading the article I noticed multiple typographical errors. I was very disappointed, and had difficulty trying to comprehend the written subject matter, and follow along with the photos which are not synchronized with the reading. You also alluded to the fact that there needs to be more research in fishhook injury and related demographics. However, the discussion seemed disconnected somehow.  Lastly, you talked about a new concept, a fishhook removal system but the discussion was limited. Over all, it was poorly written by you as a physician and author. The JUCM should share the blame for not proof reading. It's a great topic but needs to be presented to the medical community properly. I am a monthly reader of the JUMC and surprised of this body of work they released to the medical community! I have read several medical journals with mistakes in the past and like them, in this case, it should be corrected and reprinted. I would love to have presented this article "**An Urgent Care Approach to Fishhook Removal**" to Journal Club at our urgent care.
>
> I was hesitant to contact you, but just felt you should know.
>
> Sincerely,
>
> *[signature]*
>
> Bonnie Jean O'Sullivan, MD

(Ex. C-6.)

Stanley's email to O'Sullivan proved that he was dishonest when he represented repeatedly that he had no written communications with the signatories of the petition and the authors of the complaint letters.  It also proved that Stanley had fabricated evidence by drafting the complaint letter for this witness and instructing her to send the letter under her signature as if she had authored it. Indeed, because Stanley's email to O'Sullivan educated her about what was wrong with the article, it's obvious that O'Sullivan did not casually "come across" the article and spot problems with the article herself—as her letter falsely represents. It was Stanley that brought the article to her attention (looking for a friend's

8

help), told her the article had problems, and instructed her to send the complaint letter that he drafted because it "will support my case."

O'Sullivan's letter contains other falsehoods. For example, it suggests that O'Sullivan did not want to offend Stanley and thus was "hesitant to contact you, but just felt you should know." (*See* Ex. C-6.) In reality, Stanley requested that O'Sullivan send the complaint letter to him, such that O'Sullivan could not possibly have been "hesitant" to send it or concerned about upsetting Stanley with the letter.

O'Sullivan also produced a post-litigation text message from Stanley warning her that the *JUCM* had "sent a subpoena to everybody who complained about the article and tried to help me!" and to "Give me a call." (Ex. C-7.)

Braveheart raised this damning evidence with Stanley's counsel and the mediator immediately on August 24, 2023, because he knew it would be relevant to the next day's mediation. (Cavanagh Decl. ¶ 13; Ex. C-8, C-9.)

Braveheart stated that, if the case did not settle at mediation, it would move the Court for a forensic exam of Stanley's hard drives, email accounts, and cell phones to obtain all other emails and text messages with witnesses concerning the articles. (*Id.*)

While Braveheart was disappointed that Stanley would fabricate evidence, the discovery vindicated Braveheart's position. The discovery proved that there was nothing wrong with the fishhook article published in the *JUCM* because the industry "complaints" on which Stanley based his case were all fictitious and orchestrated by Stanley himself.

E.   **Mediation and settlement.**

The August 25, 2023 mediation occurred virtually by Zoom by agreement of the parties. (Cavanagh Decl. ¶ 14.) The Mediator was Jeffrey Grubman, Esq., of JAMS. As Mr.

Grubman's JAMS biography proves, he is an experienced and respected mediator, who has mediated over 2,000 cases. (*See* www.jamsadr.com/grubman/). The parties all consented to Mr. Grubman as the mediator. While Stanley complains that the Braveheart representative that signed the settlement, Matthew Logan, was not present at mediation, that is not true. Mr. Logan, who is Braveheart's general counsel, was present by Zoom at mediation the entire time.[3] (Cavanagh Decl. ¶ 14.)

While Braveheart obviously wanted to recover from Stanley the substantial attorneys' fees that it spent defending against his meritless and fabricated case, in the spirit of mediation and aiming to end litigation spending immediately, Braveheart offered a "walkaway" settlement with Stanley. Braveheart proposed that the case be dismissed with prejudice, no money change hands, and the parties grant each other mutual releases. As communicated through the mediator, Stanley agreed to Braveheart's walkaway proposal with the additional term that Stanley be allowed to submit an updated version of the fishhook removal article for *JUCM* to consider for publication. (Cavanagh Decl. ¶ 15.)

Braveheart agreed to Stanley's resubmission proposal, with the understanding that Braveheart would only "consider" publishing it, not be obligated to publish the resubmission, and maintain "sole discretion whether to publish it." Stanley agreed. At that point, a binding settlement between the parties had occurred. (Cavanagh Decl. ¶ 16.)

---

[3] While this Court's Local Rule 16.2(g) protects mediation as confidential, it incorporates by reference Florida Statutes § 44.405. That statute permits disclosure of mediation communications under at least two grounds present here: (a) when offered to refute an attempt to void a settlement reached during mediation, or (b) when offered to disprove allegations of professional misconduct. (Fla. St. § 44.405(4)(a)(5), (6).) Thus, Braveheart's disclosure of statements and conduct that occurred at mediation are permitted to refute Stanley's allegations that the settlement is void and that the attorneys engaged in misconduct.

With time remaining in the mediation session, Braveheart's counsel drafted a written agreement memorializing the settlement. He emailed the agreement to Stanley's counsel at 11:38 a.m. on August 25, and he copied the mediator. (Cavanagh Decl. ¶ 17; Ex. C-10.)

At 1:05 p.m., Stanley's counsel emailed back what he described as a "gentle" redline of the agreement. (Cavanagh Decl. ¶ 18; Ex. C-11.) Because none of the redlines changed the substance of what was agreed to in mediation or of the original document drafted by Braveheart, Braveheart responded by email 12 minutes later (at 1:17 p.m.) agreeing to the changes. (*Id.* ¶ 19; Ex. C-12.) Braveheart also attached a final version of the settlement document in PDF for signature. (*Id.*) That email stated:

> Barry,
>
> We accepted all your changes. Attached is the final version for signature. I'm having Matt Logan sign now.
>
> --Matt

(*Id.*)

At 1:24 p.m., Braveheart's counsel emailed his client's signature on the final version of the settlement document, i.e., with Stanley's 1:05 p.m. changes incorporated. (Cavanagh Decl. ¶ 20; Ex. C-13.)

At 2:52 p.m., Stanley's counsel emailed a photo of Stanley's signature on page four of the settlement agreement. (Cavanagh Decl. ¶ 21; Ex. C-14.). Based on what Stanley now contends and what is shown by that photo, it appears that Stanley signed the original version of the settlement agreement drafted by Braveheart—*i.e.*, the version emailed by Braveheart's counsel at 11:38 a.m.—rather than the version with Stanley's "gentle" redlines (as emailed by his attorney at 1:05 p.m.). (*Compare* Ex. C-14 (Stanley's signature) *with* Ex. C-10 (original

11

version drafted by Braveheart) *and* Ex. C-13 (final version with gentle revisions by Stanley's lawyer).) The Court can confirm this fact by comparing ECF 50-2 pages 1-4 (the version signed by Stanley) to the Word attachment to Braveheart's 11:38 a.m. email (filed herewith) (Ex. C-10).

The content of those documents are the same, and both documents have the same document ID number in the bottom left hand corner: 32435104.1. (*See* Ex. C-10; ECF 50-2.) The document ID number is placed on all Word documents created by Braveheart's counsel using his law firm's *iManage* document management system. (Cavanagh Decl. ¶ 17.) As will be explained more below, the fact that Stanley signed the earlier version of the settlement document is immaterial and does not effect the enforceability of settlement in any way.

### F.    The parties jointly notify the Court of settlement and stipulate to dismissal.

On August 29, 2023, the parties filed a stipulation of dismissal in which they "stipulate[d] that they have settled their dispute at court-ordered mediation," and they stipulated to a "dismissal of this entire action with prejudice." (ECF 43.)  This stipulation was agreed to and signed by Stanley's attorney, who was still attorney of record for Stanley at that time. (*See id.*)

About a week later, the parties filed a joint motion requesting that the Court retain jurisdiction over enforcement of the settlement, in the event of a dispute, for two years; allow them to file the settlement under seal; and, again, the parties stipulated again that they had "settled their dispute at confidential mediation." (ECF 45.)

In response to the parties' joint filings, the Court dismissed the case with prejudice on September 19, 2023, and retained jurisdiction for two years "solely for the purpose of enforcing the Settlement Agreement." (ECF 49.)

12

Viewing Stanley's motion in a light most favorable to him, he now seeks to void the settlement, vacate dismissal, and restart the case. The Court should deny his motion summarily and without an evidentiary hearing.

## **Law and Argument**

### I. **Legal standard**

Florida state law governs settlements of lawsuits in Florida federal courts. *Berman v. Kafka*, 518 Fed. Appx. 783, 785 (11th Cir. 2013) ("The contract law of the forum state governs the construction and enforcement of settlement agreements.").

"In Florida, courts favor settlement agreements and will enforce them when it is possible to do so." *Id.*

### II. **Stanley's duress argument is meritless.**

Stanley claims that he should not be bound by settlement because he was "under duress on the morning of August 24 [sic], 2023." (at p. 2.) Vacating a settlement based on a claim of duress is a heavy burden. Stanley must prove that (i) his agreement was "involuntary," (ii) he had "no other alternative," and (iii) the circumstances were the "result of coercive acts of the opposite party." *Berman*, 518 Fed. Appx. at 785; *see also Rodriguez v. Hiday & Ricke, P.A.*, No. 14-cv-61509, 2015 WL 1470513, at *3-4 (S.D. Fla. Mar. 31, 2015).

Stanley cannot show that the opposing party, Braveheart, committed coercive acts to create circumstances of duress. Stanley's only allegation of coercion is his claim that Braveheart's attorney created a "false narrative" of "witness tampering" and that Stanley's attorney "fell for and believed the False Narrative given to him." (ECF 50-1 at 1-4). These are not coercive acts by Braveheart because alleging wrongdoing by Stanley could not possibly have deprived Stanley of his free will, especially when he had the benefit of counsel

13

representing him to evaluate Braveheart's allegations against him. *See AIDS Healthcare Foundation, Inc. v. Carrel*, No. 1:15-cv-21546-KMW, 2020 WL 13566042, at *4 (S.D. Fla. July 7, 2020), *recommendation adopted* at 2020 WL 13566040 (rejecting duress argument and upholding settlement reached at mediation where defendant was represented by counsel and defendant failed to show opposing party's conduct "destroy[ed] the free agency and will power" of defendant); *see also Edwards v. Kia Motors of Am., Inc.*, 486 F.3d 1229, 1236 (11th Cir. 2007) ("assertions of duress are substantially undermined by the fact that [appellants were] represented by counsel") (quoting *Hyman v. Ford Motor Co.*, 142 F. Supp. 2d 735, 745-46 (D.S.C. 2001)).

Moreover, Braveheart's allegation of "witness tampering" against Stanley was not a "false narrative." On the contrary, the undisputed email evidence proves that Stanley not only engaged in witness tampering. He also conspired with witnesses to fabricate evidence, and then hid the email evidence by misrepresenting to his attorney and Braveheart that he had no email communications with the authors of the complaint letters and signatories to the petition. (*See supra* pp. 5-9.) O'Sullivan's subpoena response, described above, proves that Stanley did all of those wrongful and sanctionable acts. (*Id.*)

Also, if Stanley believed he did nothing wrong, then he had the "other alternative" of rejecting Braveheart's settlement proposal and proceeding with litigation. Thus, he cannot show he had "no other alternative" as required to vacate a settlement. Settler's remorse is insufficient grounds for vacating a settlement. *See Young v. F.D.I.C.*, 103 F.3d 1180, 1195 (4th Cir. 1997) ("having second thoughts about the results of a settlement agreement does not justify setting aside an otherwise valid agreement").

14

**III.     Stanley's "fraudulent filing" allegation is meritless.**

Stanley also contends that the settlement agreement filed with the Court under seal is a "fraudulent filing" and suggests that it is not the settlement to which he agreed. (ECF 50-1 at 1.) This argument is meritless because, no matter how you slice it, Stanley agreed to the material terms of a binding settlement.

Under Florida law, a signed and written settlement agreement is not required. *See Berman v. Kafka*, 518 Fed. Appx. 783, 785-86 (11th Cir. 2013). Thus, when the parties agreed to the material terms of the settlement at mediation, Stanley was bound, regardless of whether he signed a written agreement. That meeting of the minds occurred during the August 25, 2023 mediation. During that session, Braveheart offered a "walkaway" settlement whereby the parties would stipulate to a with-prejudice dismissal of the action without payment of money by any party and mutual releases. (*See supra* at p. 10.) Stanley agreed to those terms if Braveheart would agree to consider publishing a revised version of the fishhook article, and Braveheart accepted. That consummated a binding settlement. So if Stanley contends that the written agreement is void, he is still bound by the oral agreement.

Turning to the signed agreements, no matter how you view them, Stanley is still bound. Again, Stanley evidently signed the original version of the settlement drafted by Braveheart, instead of the version that had his lawyer's "gentle" redline revisions. Because Braveheart drafted that agreement, it was an offer, and Stanley accepted that offer by signing that original version. Thus, if Stanley contends the earlier version of the agreement that he signed controls, then so be it—that's the version that Braveheart drafted.

It only helps Stanley to add the revisions that his lawyer added in the revised version, and to which Braveheart agreed. Indeed, when Stanley's lawyer emailed the revised version

15

at 1:05 p.m., and Braveheart's attorney wrote back "We accepted all your changes," a binding settlement occurred, regardless of whether the parties signed the document. Moreover, the redline revisions by Stanley's attorney were minimal and non-substantive. He merely added the title "Dr." to Stanley's name, made some grammatical fixes, and added minor clarifying language to Paragraph 3. Below is a screenshot showing the minor change to Paragraph 3 in Stanley's 1:05 p.m. revised version:

> 3. **Resubmission**. Stanley may submit to Braveheart an updated version of the fishhook removal article that originally appeared in the June 2021 issue of the JUCM. Braveheart will, in good faith, consider that updated article for publication pursuant to Braveheart's/JUCM's then-standard procedures and timelines, but Braveheart has no obligation to publish the updated article, and retains sole discretion to decide whether to publish it. If Braveheart decides to publish the updated article, Braveheart will provide Stanley the opportunity to review the final version of the article before it is published.

Thus, no matter how the Court interprets Stanley signing Braveheart's original draft, he is bound to the material terms of the settlement, including the "walk away" with-prejudice dismissal and mutual releases. He's either bound to the oral terms (which are the same as the material terms in both written agreements); he's bound by Braveheart's original 11:38 a.m. draft that Stanley apparently signed; or he's bound by the revised version that his lawyer sent at 1:05 p.m., which Braveheart accepted in an 1:17 p.m. email.

Thus, the Court should deny Stanley's motion summarily and without the need for an evidentiary hearing. *See de Ordonez v. Mint Center LLC*, No. 23-cv-21530, 2024 WL 2882640 (S.D. Fla. May 24, 2024) ("courts may summarily enforce the terms of a settlement without an evidentiary hearing" when there's no dispute of material fact).

**IV.     The Court should award Braveheart its attorneys' fees**

Because Stanley's motion is legally and factually baseless, the Court should use its inherent power to award Braveheart its attorneys' fees incurred in responding to Stanley's frivolous motion. *See Barash v. Kates*, 585 F. Supp. 2d 1368, 1371 (S.D. Fla. 2008) ("It is well established that courts may award attorney's fees and costs as a sanction pursuant to the court's inherent authority for bad faith litigation."). This remedy is especially appropriate because Braveheart agreed to a walkaway settlement at mediation—and released its right to seek attorneys' fees against Stanley for his sanctionable conduct—because it wanted to stop incurring legal fees immediately and be done once and for all with the lawsuit. By trying to resurrect the lawsuit that Stanley voluntarily settled, he has forced Braveheart to incur attorneys' fees drafting this opposition. Thus, Stanley has unilaterally deprived Braveheart of the benefit of the bargain that it had obtained by settling (*i.e.*, avoiding incurring further legal fees).

## Conclusion

For these reasons, the Court should deny Stanley's motion and award attorneys' fees to Braveheart.

Respectfully submitted,

Dated: July 12, 2024

By: */s/ Chelsea L. Furman*
CHELSEA L. FURMAN
Florida Bar No. 118674
MCDONALD HOPKINS, LLC
501 South Flagler Drive, Suite 200
West Palm Beach, Florida 33401
Telephone: 561-472-2121
Facsimile: 561-472-2122
Primary Email:
cfurman@mcdonaldhopkins.com
Secondary Email:
tploskunak@mcdonaldhopkins.com

and

Matthew J. Cavanagh (OH 0079522)
 *Admitted Pro Hac Vice*
mcavanagh@mcdonaldhopkins.com
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
t 216.348.5400 │ f 216.348.5474

*Attorneys for Braveheart Group, LLC*

18

33838134.1